**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHAEL ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 1:25-CV-01604 |
| | ) | |
| v. | ) | JUDGE MANISH SURESH SHAH |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| *and* COLLEEN LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

At the behest of Regional Sales Director Colleen Lewis ("Lewis"), Abbott Laboratories Inc. ("Abbott") hired Plaintiff Rachael Rose ("Rose") as an Endovascular Account Manager who sold Abbott Vascular products and devices in the Cleveland, Ohio area. Over more than four years, Abbott and Lewis provided Rose with extensive training, mentorship, and resources, including clear policies on expense reporting and the mandatory use of Abbott's corporate credit card for business-related expenses. Rose admittedly violated those clear policies, as well as Abbott's Code of Business Conduct (which requires, among other things, integrity and honest dealings) by repeatedly submitting fraudulent requests for expense reimbursement and then lying to Abbott investigators about what she had done. After her termination, Rose sent a text message to Lewis apologizing for "the damage caused by her lapse in judgment" and admitting, "this was my doing and my mistake and I'm sorry that you were put in the middle."

Specifically, in August 2023, Abbott's Vascular Division realigned its business, assigning Rose a new interim manager (not Lewis). Shortly thereafter, that manager identified questionable expense submissions by Rose, including parking charges for facilities that did not impose fees. An

Abbott Employee Relations ("ER") investigation revealed that Rose violated Abbott policy and the Code of Business Conduct when she repeatedly failed to use Abbott's corporate credit card, falsified her requests for expense reimbursement by characterizing as "parking" expenses that were not incurred for parking, and improperly requested reimbursement for personal (non-business) expenses. Rose's explanations of her conduct were inconsistent and demonstrably false. Her stated excuse—that she forgot her wallet and relied on Apple Pay rather than her corporate card—was disproven; of $1,117.83 claimed, only $440.23 matched Apple Pay records. She also initially claimed the parking valet services she used accepted only cash, but the investigation confirmed they accepted credit cards, and the amounts Rose submitted as parking far exceeded what the garages charged or were at facilities that did not charge for parking at all. When confronted, Rose shifted her story, claiming the reimbursements were for coffee purchased for healthcare providers that she inexplicably and deliberately misclassified as parking despite knowing the strict reporting requirements for reimbursement of healthcare provider food and beverages. Based on ER's thorough investigation, because Abbott concluded that Rose violated its policies and Code of Conduct by knowingly submitting false expense reports and lying during the investigation, Abbott terminated her employment.

Despite these facts and her admissions in her deposition that she submitted false expense reports, Rose now alleges that the termination of her employment was gender/sex discrimination. She also claims Lewis subjected her to a sex-based hostile work environment even though Rose: (a) called Lewis "the best manager ever" before her termination; (b) never complained about any such conduct during her employment; and (c) the only harassment she did report—the unwanted advances of a customer—were immediately addressed by Abbott and Lewis, and never occurred again.

Regarding her discrimination claim, Rose cannot meet her *prima facie* burden because she cannot show she was meeting Abbott's legitimate expectations or that any similarly situated male

2

employees was treated better than she was. She also cannot establish that the reasons for her termination, i.e., her repeated and serious violations of Abbott's Code of Conduct, are a pretext for sex/gender discrimination. Likewise, Rose cannot establish that she was subjected to sex-based harassment that was so severe or pervasive to alter the conditions of employment and create a hostile working environment. Finally, Rose's aiding and abetting claim falls short because she cannot create a triable fact issue on her discrimination or harassment claims. In short, Rose creates no triable fact issue on her claims and they should be dismissed as a matter of law.

**ARGUMENT**

**I.      Summary Judgment Standard.**

Federal Rule of Civil Procedure ("Rule") 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court must view the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Anderson*, 477 U.S. at 249–50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corporation*, 475 U.S. 574, 587 (1986).

Here, there are no genuine issues of material fact and the record taken as whole cannot lead a rational trier of fact to find for Rose. Therefore, Defendants' motion for summary judgment should be granted and all of Rose's claims should be dismissed as a matter of law.

3

**II.     Rose's Claim That Abbott Terminated Her Based on Her Sex and Gender Fails as a Matter of Law.**

Rose's discriminatory termination claim fails as a matter of law. She offers no direct evidence to establish her sex and gender discrimination claim based on her termination. Because Rose has no direct evidence of sex discrimination, she must proceed under the *McDonnell Douglas* indirect method framework and meet her *prima facie* burden of showing: (1) she is a member of a protected class; (2) she was meeting Abbott's legitimate expectations; (3) she was subjected to an adverse employment action; and (4) she was treated less favorably than similarly situated employees who were outside of her protected class. *McGowan v. Deere & Company*, 581 F.3d 575, 579 (7th Cir. 2009).

If Rose establishes a *prima facie* case, "the burden shifts to [Abbott] to provide a legitimate justification, before finally shifting back to [Rose] to establish that such justification was pretextual." *Wince v. CBRE, Inc.*, 66 F. 4th 1033, 1040 (7th Cir. 2023). Here, Rose cannot meet her *prima facie* burden or show that Abbott's reasons for her termination were a pretext for discrimination. Her claim also fails under the *Ortiz* framework, as no reasonable factfinder could conclude that her sex caused Abbott to terminate her employment. *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Therefore, Rose's Title VII and ORC sex and gender discrimination claims based on her termination[1] fail under both the *McDonnell Douglas* framework and the *Ortiz* reasonable factfinder method.

**A.     Rose Offers No Evidence That She Was Meeting Abbott's Legitimate Expectations.**

It is undisputed that Rose's Employee Agreement required her to conduct herself in accordance with Abbott policies and to comply with Abbott's Code of Conduct. (SOF ¶ 5).

---

[1] For the same reasons and authorities discussed above, Rose's termination-based discrimination claim under Title VII and the ORC will be analyzed together. *See Hampel*, 89 Ohio St. 3d at 175, 729 N.C. 2d at 731 (citing *Plumbers & Steamfitters Joint Apprenticeship Committee*, 66 Ohio St. 2d 192 at 196, 421 N.E. 2d at 131); *Nobel*, 391 F. 3d at 720.

According to the Code of Conduct, Rose was required to act with honesty and integrity. (SOF ¶ 6).

Further, Rose understood that she was required to comply with specific requirements of Abbott's Office of Ethics and Compliance ("OEC") regarding seeking reimbursement for meals and other items purchased for Abbott's customers who are healthcare professionals. (SOF ¶ 11). She knew accurate records of such meals and items purchased for Abbott's customers were required to adhere to the Sunshine Act, which governs the sales practices of medical device providers like Abbott. (SOF ¶¶ 12-13). It is undisputed that Abbott's "Travel, Entertainment, and Other Employee Business Expenses" policy provides guidelines for reporting business expenses (such as parking, meals, beverages, and entertainment) that Rose could access in Abbott's online portal. (SOF ¶ 14). Rose admits she knew to use the code "food with HCP" to accurately categorize meals with healthcare professionals and that there was a different code for transportation expenses. (SOF ¶ 20).

Despite being trained on these policies, Rose admittedly coded items in her expense reimbursement requests as parking expenses that were <u>not</u> parking expenses, such as coffee allegedly purchased for healthcare providers. (SOF ¶¶ 59-62). It is also undisputed that Rose sought reimbursement for parking expenses <u>she did not incur</u> and for personal expenses <u>for which she was not entitled to seek reimbursement</u>, such as a cell phone charger, a sweatshirt, beverages for her personal consumption, and towing charges. (SOF ¶ 62). These are textbook examples of dishonesty and lack of integrity in violation of Abbott's Code of Business Conduct. (SOF ¶ 62).

In addition, Rose was given an Abbott credit card to use for all business-related travel and entertainment expenses. (SOF ¶ 15). It is undisputed that Rose did not use that card, instead paying for alleged business expenses out of pocket using her own Apple Pay account, in violation of Abbott policy regarding incurring business expenses. (SOF ¶¶ 55-62).

5

Finally, Rose provided shifting explanations when confronted with these undisputed facts during the ER investigation. (SOF ¶¶ 57-68). This again demonstrated a lack of honesty and integrity in violation of the Code of Business Conduct. (SOF ¶ 62).

Given these undisputed facts, Rose cannot seriously allege or prove that she was meeting Abbott's legitimate job expectations.

**B.      Rose Offers No Evidence That Abbott Treated Similarly Situated Employees More Favorably.**

Rose also cannot meet her *prima facie* burden because she points to no similarly situated male employees who were treated better than she was. Rose alleges her co-worker, Ron Petitte ("Petitte"), labeled miscellaneous expenses as parking, but admits she never saw Petitte's expense reports and has no idea whether he engaged in similar behavior. (SOF ¶ 69). In addition, Petitte denies engaging in this behavior and Rose offers no evidence that Petitte, like Rose, was untruthful during an investigation (the second reason for Rose's termination). (SOF ¶ 69). Petitte is not a proper comparator because there is no evidence that he falsely labeled miscellaneous expenses as parking or that he, like Rose, lied during an investigation. (SOF ¶¶ 68-69).

In short, Abbott did not treat similarly situated male employees better than Rose. *See Johnson v. Advocate Health & Hospitals Corporation*, 892 F.3d 887, at 895 (7th Cir. 2018) (similarly situated inquiry looks at whether the employees "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (citation omitted).

**C.      Rose Offers No Evidence That Abbott's Reasons for Her Termination Were a Pretext for Sex or Gender Discrimination.**

Rose also cannot show that Abbott's reasons for her termination are a pretext for sex discrimination. Abbott terminated Rose's employment solely for violating Abbott's Code of Conduct by knowingly submitting false expense reports and for not being forthright during its investigation into Rose's expenses. As discussed above, Rose admits she knowingly submitted

6

false expense reports. (SOF ¶¶ 57-68). Further, Rose first told Abbott investigators that her parking charges were legitimate, then, when confronted with the fact that she submitted such reimbursement requests for hospitals that did not charge for parking, Rose changed her story, claiming those were actually expenses for purchasing coffee for healthcare providers. (SOF ¶¶ 57-65). In doing so, Rose was dishonest during the investigation. (SOF ¶¶ 57-65). During her deposition, Rose admitted she engaged in this conduct. (SOF ¶¶ 61-63). In fact, after termination, Rose sent a text message to Lewis apologizing for "the damage caused by her lapse in judgment" and admitting, "this was my doing and my mistake and I'm sorry that you were put in the middle. (SOF ¶ 66). Simply put, Rose admitted that she engaged in dishonest conduct and she cannot produce any evidence that Abbott's reasons for termination are false, let alone a pretext for sex discrimination. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 691 (7th Cir. 2008).

Rose has failed to set forth any evidence from which a reasonable jury could conclude that her sex or gender caused Abbott to terminate her employment. Accordingly, Rose's termination-based claim for sex discrimination fails as a matter of law.

### III. Rose's Sex and Gender Hostile Work Environment Claim Against Abbott Fails as a Matter of Law.

Despite having called Lewis "the best manager ever" before her termination (SOF ¶ 34), Rose now alleges that Lewis created a sex/gender based hostile work environment by directly engaging in purported sexual harassment and allegedly allowing a customer to sexually harass her. Rose's allegations are not supported by the undisputed record and are contradicted by her own admissions.

To prevail on her sex and gender hostile work environment claim against Abbott under Title VII and the Ohio Revised Code (ORC),[2] Rose must prove four elements: "(1) she was subject

---

[2] Rose's sex and gender hostile work environment claims under Title VII and Section 4112.02(A) of the ORC will be analyzed together because the statutes apply the same burden-shifting framework and have the same evidentiary standards. *Nobel v. Brinker International, Inc.*, 391 F. 3d. 715, 720 (6th Cir. 2004); *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 175, 729 N.C. 2d 726, 731 (Ohio 2000) (citing *Plumbers & Steamfitters Joint*

to unwelcome sexual harassment; (2) the harassment was based on sex; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). As explained below, Rose's sex and gender hostile work environment claim fails because she cannot establish multiple elements of her required burden

### A. Rose Has Not Shown That Any Alleged Harassment Was Based on Sex.

Same-sex harassment claims like the one Rose alleges here are "cognizable under Title VII provided that 'the conduct at issue was not merely tinged with offensive sexual connotations but actually constituted discrimina[tion] ... because of ... sex.'" *Lord v. High Voltage Software, Inc.,* 839 F.3d 556, 561 (7th Cir. 2016) (jokes and repeated slaps on butt in same sex context were insufficient to establish that plaintiff was "targeted because of his sex"), citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S. Ct. 998, 140 L.Ed.2d 201 (1998). In *Oncale*, the U.S. Supreme Court identified three scenarios of conduct that might support an inference of discrimination on the basis of sex in the context of a same-sex harassment claim: (1) where there is evidence that the harasser is homosexual, (2) where the harasser uses "such sex-specific and derogatory terms" to make it clear she is "motivated by a general hostility to the presence of [members of the same sex] in the workplace," and (3) where direct comparator evidence of how the alleged harasser treated members of both sexes in a mixed-sex workplace suggests discrimination. *Id*. at 80-81. The conduct that Rose alleges here does not fall into any of these categories.

First, Rose offers no evidence that Lewis is homosexual. In fact, Lewis is heterosexual. (SOF ¶ 32). This bars Plaintiff from establishing the first type of same-sex harassment claim. *Lord*, 839 F.3d at 562 (plaintiff failed to establish harassment *because of* his sex where nothing in the

---

*Apprenticeship Committee v. Ohio Civil Rights Commission*, 66 Ohio St. 2d 192, 196, 421 N.E. 2d 128, 131 (Ohio 1981)).

record suggested that his same-sex alleged harasser was homosexual and the behavior complained of was not so explicit or patently indicative of sexual arousal that a trier of fact could reasonably draw that conclusion).

Second, Rose does not attribute to Lewis any alleged conduct or comments that could arguably be "motivated by a general hostility to the presence of [members of the same sex] in the workplace." This bars Plaintiff from establishing the second type of same-sex harassment claim. *Johnson v. Hondo, Inc*, 125 F.3d 408, 412 (7th Cir. 1997) (sexually explicit expressions are not *because of* sex where conduct of harasser was motivated by animosity toward the plaintiff or juvenile behavior, and not sexual attraction or general hostility towards members of the same sex).

Third, while Rose alleges that Lewis required her to have weekly dinners with customers, a requirement that Rose believed was "hostile," she admits Lewis told *both female and male* employees to arrange and engage in such dinners. (SOF ¶¶ 24-25). Rose further acknowledges that she—not Lewis—chose the time, location, and attendees for these dinners. (SOF ¶¶ 26-27). Even if this conduct could be characterized as harassment (it cannot), by Rose's own admissions, Lewis allegedly treated both sexes the same in this regard.

Likewise, with respect to the stories Lewis allegedly shared—about going to a customer's home and drinking wine with him, a former employee who had sex with a stripper, and Lewis having sex with her fiancé in a closet—Rose alleges Lewis told these stories in the presence of both men and women. (SOF ¶¶ 28-32). This bars Plaintiff from establishing the third type of same-sex harassment claim. *Armintrout v. Bloomingdale's Pizza, Inc.*, No. 04 C 313, 2007 WL 837279, at *7 (N.D. Ill. March 13, 2007) ("the Seventh Circuit has held that 'inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex, is outside [Title VII's] ambit."), citing *Holman v. State of Indiana*, 211 F.3d 399, 403 (7th Cir. 2000) (dismissing claims of husband and wife who alleged that their supervisor sexually harassed both of them by requesting sexual favors because such behavior did not involve discrimination based on gender); *see also Wyninger v. New*

9

*Venture Gear, Inc.*, 361 F.3d 965, 975-76 (7th Cir. 2004) (dismissing hostile work environment claim where the evidence showed that the putative harassers were 'crude individuals who treated everyone poorly'").

Finally, as to the physical conduct Rose alleges, none of it supports an inference of discrimination on the basis of sex. Rose alleges that Lewis grabbed the breasts of a female co-worker on one occasion and commented, "these things are great" at a team meeting in the presence of both men and women, and that the coworker "laughed" at the incident. (SOF ¶ 29). With respect to Rose's allegation that Lewis "smacked" her on the butt at a restaurant, Rose admits it happened only once, she cannot remember any details about the purported incident, but concedes she was not extremely upset by Lewis's actions. (SOF ¶ 30). Rose also alleges that Lewis was physical with males in the workplace and that she (Lewis) kissed a male customer on the cheek. (SOF ¶ 28). The fact that the conduct could have sexual connotations is insufficient to support an inference that the conduct was based on sex. *See Oncale*, 523 U.S. at 80 ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations"); *see also Shearrow v. Easton Enterprises*, LLC, No. 11 C 50050, 2013 WL 12446231, at *9 (N.D. Ill. July 19, 2013) ("[e]ven physical acts of harassment between [same-sex persons] in the workplace with sexual connotations that constitute assault or battery under state law are not necessarily 'because of sex'" where such acts were motivated by physical domination, personal animosity, or juvenile behavior), citing *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 665-67 (7th Cir. 2005) (affirming summary judgment for employer because harasser's alleged acts (such as forcing plaintiff's face down his crotch while clothed, grabbing plaintiff's hand and moving it to his clothed crotch, pulling a handful of hair from plaintiff's chest, and biting plaintiff on the neck hard enough to raise welts) were designed to demonstrate physical domination over plaintiff and not *because of* sex).

In short, Rose has presented no evidence that Lewis's alleged harassing conduct was based on sex and her hostile work environment claim should be dismissed.

**B.      Rose Does Not Allege Any Harassment That Was So Severe or Pervasive as to Create a Hostile Work Environment as a Matter of Law.**

Rose's hostile work environment claim also fails as a matter of law because she cannot establish that any alleged harassment was "so severe or pervasive as to create an abusive work environment." *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2003). To resolve this fact-intensive inquiry, a court must consider "all the circumstances" including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). In conducting this inquiry, the court must bear in mind that Title VII does not impose a "general civility code" and that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Saxton v. Wolf*, 508 F. Supp. 3d 299, 310 (N.D. Ill. 2020), citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). In same-sex hostile work environment cases, this "inquiry requires careful consideration of the social context in which particular behavior occurs and experienced by its target." *Oncale*, 523 U.S. at 81. Moreover, "[c]ommon sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive. *Oncale*, 523 U.S. at 82; *see Lord*, 839 F.3d at 562 (noting that sexual horseplay is different from sex discrimination, and Title VII covers only discriminatory conduct).

Here, it is undisputed that <u>Rose never reported Lewis's alleged conduct to Abbott before her termination from employment</u>, despite her awareness of Abbott's robust policy for reporting alleged discrimination or harassment. (SOF ¶ 31). Moreover, Lewis's alleged conduct about which

Rose only now complains was not severe and occurred, at most, sporadically. With regard to the alleged stories Rose contends Lewis shared, Rose does not contend that they were particularly graphic in nature and admits Lewis did not "constantly" or "regularly" tell such stories and that they were shared in front of other coworkers. (SOF ¶ 32). Rose also admits the alleged incident where she claims to have seen Lewis grab another co-worker's breasts in February 2020 happened only once and the coworker laughed at the conduct. (SOF ¶ 29). Likewise, Rose claims the alleged incident where Lewis supposedly smacked Rose's butt at a restaurant occurred only once, cannot remember any details about it, and admittedly was not extremely upset by it. (SOF ¶ 30). Further, Rose, who lived and worked in Ohio, and Lewis, who lived and mostly worked in Pennsylvania, did not interact in person often and, when they did interact, it was mostly via text messages. (SOF ¶¶ 22-33). Rose estimates that she only saw Lewis four or five times per year. (SOF ¶ 23). Simply put, this alleged conduct does not rise to the requisite level to support a hostile work environment claim. *Shafer*, 417 F.3d at 666-67 (where most of plaintiff's employment was untroubled, four alleged batteries by a harasser did not establish a pervasive deterioration in conditions of employment on account of sex).

Further, although the dinners with customers about which Rose now complains allegedly occurred weekly, other than Rose labeling these dinners as "hostile," there is no evidence that the dinners themselves were harassing as a matter of law. Rose admits she had total discretion on which customers she invited to dinner, where the dinners took place, the day of the week and the time such dinners took place, and that she could invite her manager or other co-workers to such dinners if she so chose. (SOF ¶¶ 26-27). Moreover, although Rose says she did not like having dinner with doctors, she admits one-on-one dinners occurred only "occasionally." (SOF ¶ 26). Thus, this did not constitute actionable harassment as a matter of law. *Saxton v. American Telephone & Telegraph Company*, 10 F.3d 526, 534 (7th Cir. 1993) (affirming summary judgment

12

in case where plaintiff failed to show that "relatively isolated" instances of non-severe misconduct interfered with her work or otherwise created an abusive work environment).

As to the one instance where Rose reported that a customer bit her ear at a restaurant, this alleged conduct happened only once, Lewis took swift action and informed Rose she did not have to work with the customer going forward, and Rose admits she had limited contact with the customer afterward and that no other inappropriate conduct occurred. (SOF ¶¶ 38-42). Again, this did not constitute actionable harassment as a matter of law. *Saxton*, 10 F.3d at 535-36 (although employer's remedial efforts did not meet plaintiff's expectations, the court found that employer's actions of beginning investigation the day after plaintiff made complaint and transferring employee to another department "was a sufficient safeguard against any recurrence of the harassment").

At bottom, Rose has presented no evidence which a reasonable person in Rose's position would find the conduct she has alleged severely hostile or abusive. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-64 (7th Cir. 2002) (affirming summary judgment although plaintiff subjectively viewed her work environment as hostile, upon finding an objective person would not view plaintiff's work environment as hostile or abusive).

Further, the frequency and severity of the alleged harassing conduct did not unreasonably interfere with Rose's work performance, as Rose consistently met quotas, performed well at selling Abbott's products, and received positive performance reviews. (SOF ¶ 35). Rose's and Lewis's relationship was cordial – not hostile – and, in fact, after termination, Rose sent Lewis a text message thanking Lewis for all she learned and telling Lewis that she loved her. (SOF ¶ 66). Rose's employment with Abbott simply was not hostile or abusive and this, too, entitles Defendants to summary judgment on this claim.

To survive summary judgment, Rose must put forth evidence to establish the elements of her hostile work environment case. Here, Rose has simply failed to do and such claim should be summarily dismissed.

### III. Rose's Aiding and Abetting Discrimination Claim Against Lewis Under the Ohio Revised Code Fails as a Matter of Law.

Rose's aiding and abetting discrimination claim against Lewis fails for the simple reason that she cannot establish any underlying unlawful discriminatory conduct, as set forth above. *See, e.g.*, *Toth v. Cardinal Health 414 LLC*, No. 1:17-CV-00370, 2020 WL 1275095, at *10 (S.D. Ohio Mar. 17, 2020) ("As Plaintiff's disability discrimination and age discrimination claims fail, his claims of aiding and abetting disability discrimination and age discrimination under Ohio law necessarily fail."); *Demassimo v. Sagamore Hills Twp.*, No. 5:16CV1820, 2017 WL 6344653, at *6 (N.D. Ohio Dec. 11, 2017) ("The aiding and abetting claim fails, because Plaintiff has not established an underlying violation."); *Woolf v. City of Streetsboro*, No. 5:09 CV 1570, 2010 WL 4105550, at *15 (N.D. Ohio Oct. 18, 2010) ("As plaintiff has not established the elements of her sexual discrimination and sexual harassment claims, her claim for aiding and abetting sexual harassment under Ohio law also fails.").

For the reasons discussed in Sections II and III above, neither Abbott nor Lewis created a sex-based hostile work environment, nor was Rose's employment terminated based on sex. Because Rose has not proved that Lewis or Abbott violated Section 4112.02(A) of the ORC, Rose cannot show that Lewis aided and abetted another's discriminatory act declared unlawful under the ORC. Therefore, Lewis is entitled to summary judgment on Rose's claim under Section 4112.02(J) of the ORC as a matter of law.

### CONCLUSION

For these reasons, Defendants respectfully request that the Court enter summary judgment in their favor on all of Rose's claims.

DATED:  December 19, 2025

Respectfully submitted by,

ABBOTT LABORATORIES INC. AND
COLLEEN LEWIS


By: /s/ *Uma Chandrasekaran*
One of Defendant's Attorneys

Uma Chandrasekaran
Illinois Bar No. 6281690
uchandrasekaran@seyfarth.com

Victoria S. Tolbert
Admitted *Pro Hac Vice*
vtolbert@seyfarth.com

SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 19, 2025, she caused the foregoing Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment to be filed with the Clerk of the United States District Court for the Northern District of Illinois through the Court's CM/ECF system, which will provide notice to and serve a copy upon all other counsel of record.

/s/ *Uma Chandrasekaran*
Uma Chandrasekaran

16