**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHAEL ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 1:25-CV-01604 |
| | ) | |
| v. | ) | JUDGE MANISH SURESH SHAH |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| *and* COLLEEN LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Abbott Laboratories Inc. ("Abbott") and Colleen Lewis ("Lewis"), by their attorneys and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a)(2), submit the following Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.[1]

**I.      Abbott Hires Rachael Rose as an Endovascular Account Manager.**

1.      On August 26, 2029, Abbott hired Rachael Rose ("Rose") as an Endovascular Account Manager in the Cleveland, Ohio area. (Lewis Dep. 16-19; Rose Dep. 11-14). Lewis, a Regional Sales Director, made the decision to hire Rose. (*Id.*)

2.      Prior to Rose's hiring, in April 2019, Lewis interviewed and considered Rose for another Endovascular Account Manager role in Cleveland, Ohio. (Rose Dep. 49-50; Lewis Dep. 24).

---

[1] These facts are undisputed solely for purposes of this Motion. Except for pleadings on the electronic docket, all evidentiary materials cited in this Statement of Material Facts were filed as exhibits to Abbott's Motion for Summary Judgment.

3. Ultimately, Lewis hired another female candidate instead. (Rose Dep. 51). However, Lewis informed Rose that she anticipated that another Endovascular Account Manager role would open soon, and that Lewis wanted Rose on her team. (Rose Dep. 52).

4. When the position became available, Lewis reached out to Rose and hired her as an Endovascular Account Manager servicing the Cleveland area. (Rose Dep. 53; Lewis Dep. 29-30).

5. As a condition of her employment, Rose electronically signed an Employee Agreement. (Rose Dep. Ex. 2). The Employee Agreement required Rose to conduct herself in accordance with Abbott's policies and to comply with Abbott's Code of Conduct. (Rose Dep. 56 -57; Rose Dep. Exs. 2 and 3).

6. According to the Code of Conduct, Rose was to conduct herself with honesty, fairness, and integrity. (Rose Dep. 59). Further, she had to comply with the laws and regulations that governed how Abbott promoted and sold its products. (Rose Dep. 59).

7. Abbott's Code of Conduct also prohibits retaliation, harassment, and discrimination. (Rose Dep. 58-61, Rose Dep. Ex. 3). Rose admits Abbott also has an Equal Opportunity Employment Policy ("EEO Policy") and a policy prohibiting Workplace Harassment (Rose Dep. 62, Rose Dep. Exs. 4 and 5).

8. With respect to Abbott's Policy Prohibiting Workplace Harassment, Rose understood she was required to report incidences of workplace harassment; she understood the policy provides mechanisms for reporting harassment, including a complaint procedure for reporting harassment. (Rose Dep. 63-64).

9. Rose further admits she received annual training on Abbott's Policy Prohibiting Workplace Harassment as well as annual training on Abbott's EEO Policy and the Code of Conduct. (Rose Dep. 64, 77; Rose Dep. Ex. 9).

**II.      Rose is Trained on Abbott's Business Expense Policies and Requirements.**

10.     The primary function of Abbott's Endovascular Account Manager role is to grow Abbott's business by promoting Abbott products, attending cases with Abbott's customers, managing Abbott's hospital inventory, and building rapport with Abbott's customers through meetings. (Rose Dep 84). Abbott trained Rose on how to promote and sell Abbott products. (Rose Dep. 59).

11.      Rose further understood that Abbott's Office of Ethics and Compliance ("OEC") has specific requirements Rose had to follow regarding reimbursement for meals and other items purchased for Abbott's customers who are healthcare professionals. (Rose Dep. 70-71).

12.     Rose admits she was required to keep accurate records of such meals and items purchased for Abbott's customers. (Rose Dep. 74-75). As she acknowledges, this was to avoid violations of the Sunshine Act "so it doesn't look like you are basically giving things [away] for free so that [healthcare professionals will] buy your products." (Rose Dep. 74-75).

13.     Rose admittedly received multiple trainings from Abbott on the OEC requirements around meals and other expenses, as well as the requirements of the Sunshine Act. (Rose Dep. 71-72, 77-81; Rose Dep. Ex. 9).

14.     Abbott has a "Travel, Entertainment, and Other Employee Business Expenses" policy that provides guidelines for business expenses (such as parking, meals, beverages, and entertainment), which Rose could access remotely in Abbott's online portal. (Rose Dep. 65, Ex. 6 to Rose Dep.).

15.     In addition, Rose was given a Corporate Credit Charge Card ("Abbott Credit Card") to use for all business-related travel and entertainment expenses. (Rose Dep. 66; 69: 9-18). She admits she understood that Abbott's expectation was that she use the Abbott Credit Card whenever possible. (Rose Dep. 66; 69: 9-18).

16.     Lewis instructed Rose on multiple occasions to use Abbott's Credit Card for business expenses. (Rose Dep. 106; Ex. 11 to Rose Dep.).

17.     Rose admittedly understood that failure to use Abbott's Credit Card could result in disciplinary action up to and including review for termination of employment. (Rose Dep. 69-70; see Ex. 7, Section 3.8, to Rose Dep.).

18.     Rose was required to keep records and submit expense reports for reasonable actual expenses which resulted from transacting Abbott's business to be reimbursed for such expenses. (Rose Dep. 100).

19.     If an expense was less than $25, Rose did not have to submit a receipt. (Rose Dep. 101). Rose had to tag or categorize all items on her expense report; she decided how to tag or categorize items for which she sought reimbursement. (Rose Dep. 100-101).

20.     Rose admits she knew to use the code "food with HCP" to categorize meals with healthcare professionals and that there was a different code for transportation expenses. (Rose Dep. 101-104).

21.     Similar to Abbott's Corporate Card policy, Abbott's "Travel, Entertainment, and Other Employee Business Expenses" policy states that "[f]alsification of any documentation may result in employee disciplinary action up to and including termination." (Rose Dep. 72; Rose Dep. Ex. 6, Section XIV).

**III.    Lewis Manages Rose for Several Years and Rose Never Complains to Abbott About Lewis Purportedly Sexually Harassing Her.**

22.     From the time of Rose's hire in August 2019 to approximately the fall of 2023, and then again from February 2024 to Rose's termination of employment, Rose reported to Lewis. (Lewis Dep. 32). While Rose worked and resided in Ohio, Lewis resided in Pennsylvania and managed a team of employees in Ohio. (Lewis Dep. 4-5).

4

23. Rose and Lewis did not often interact in person and, when they did interact, it was mostly via text messages. (Rose Dep. 108-109). Over the course of a year, Rose estimates she only saw Lewis in person four or five times. (Rose Dep. 109).

24. Rose alleges that Lewis told her to go out to dinner with Abbott customers at least once a week as a method to build rapport and have a good relationship with customers. (Rose Dep. 110). Rose also alleges that Lewis told her to have at least two drinks at dinner. (Rose Dep. 118). Rose admits Lewis also told male employees to go out to dinner with Abbott customers at least once a week. (Rose Dep. 229).

25. Rose stated that she did not like having dinners with doctors and thought "having to be out with customers one a week" was "hostile." (Rose Dep. 228).

26. Rose conceded that having one-on-one dinners with Abbott customers only happened "occasionally," a "few times a year." (Rose Dep. 99). Rose also admitted she had discretion about which customers she invited to any particular dinner or meeting, the day of the week and time such meeting took place and could also invite her own manager or other co-workers to attend as well. (Rose Dep. 97-98).

27. Rose also admitted that she had discretion on how she met with customers—whether it was informal, such as having dinner, lunch, or a coffee break, or more formal such as arranging for a customer to attend an Abbott-hosted medical educational event. (Rose Dep. 96). Rose understood the purpose of the meetings was to grow Abbott's business and build rapport with Abbott's customers. (Rose Dep. 84).

28. Rose now alleges that early in her employment, in 2019 or 2020, she saw Lewis kiss a male customer on the cheek, after which Rose thought, "they're so close, like, that's awesome" (Rose Dep. 147). Rose also alleges Lewis told a story about going to a customer's home

5

and drinking wine with him, causing Rose to wonder, "okay, is that what I'm supposed to do?" (Rose Dep. 147). Rose states that Lewis told the story about going to a customer's home two or three times, and at least one time was in the presence of other male customers. (Rose Dep. 147-148).

29.    Rose alleges that, in February 2020, Lewis grabbed the breasts of a co-worker and commented, "these things are great" at a team meeting with Rose and other people around.[2] (Rose Dep. 143-144). Rose recalls that the co-worker "laughed it off or something." (*Id.* at 145.)

30.    At some unspecified time after this alleged incident, Rose also claims Lewis smacked Rose on her butt at a restaurant and said that Rose "had a hot ass." (Rose Dep. 137, 144). Rose states that this type of incident only occurred once, and that she does not recall on what date this event allegedly occurred. (Rose Dep. 137-138). She cannot remember whether anyone else was present at the restaurant (Rose Dep. 138), had "no idea" what she and Lewis were talking about (Rose Dep. 139), and cannot remember the force in which Lewis allegedly smacked her (Rose Dep. 139). Rose never spoke to Lewis about this alleged incident. (Rose Dep. 141). Rose further admits that she was not extremely upset by Lewis's alleged actions (Rose Dep. 142) and doesn't remember if she laughed or not (Rose Dep. 140).

31.    Rose admits she did not report any of foregoing alleged incidents regarding Lewis to Employee Relations ("ER") or anyone else at Abbott, as required by Abbott policy. (Rose Dep. 146; Ex. 5 to Rose Dep.).

32.    Rose alleges that, in the summer of 2023, Lewis told a story to Rose and two male customers at a restaurant about a former employee who had sex with a stripper. (Rose Dep. 142).

---

[2] Although both Lewis and the coworker deny that Lewis ever grabbed her breasts or engaged in any other inappropriate conduct (Lewis Dep. 40-41; 166) and no other witnesses corroborate Rose's allegations, Defendants credit Rose's testimony only for the purposes of summary judgment.

Rose also alleges that on the same night, Lewis told a story about having sex with her fiancé (who is male) in a closet. (Rose Dep. 147; Lewis Dep. 5). Rose says that while she found these alleged stories offensive, Lewis did not "constantly" or "regularly" tell such stories. (Rose Dep. 150). Further, Rose admits she did not report these alleged incidents to ER. (Rose Dep. 146).

33.     Throughout the time Rose and Lewis worked together, they communicated via text message frequently. (Rose Dep. 109). Rose and Lewis communicated not only about work matters, but also about personal matters, such as Rose's wedding, music choices, and clothing, and Lewis's children. (Rose Dep. 114-115, Rose Dep. Ex. 12).

34.     Rose told Lewis via text message that she was "the best manager ever," but claimed in her deposition that she was lying to Lewis when she said this to "make a bond, be connecting, be positive" with Lewis. (Rose Dep. 116-117).

35.     While Lewis managed Rose, Rose received positive performance reviews, consistently met quotas, and performed well at selling Abbott's products. (Rose Dep. 131-136, Rose Dep. Ex. 13). Lewis spotlighted Rose's achievements where appropriate and encouraged Rose to perform well. (Rose Dep. 131-136, Rose Dep. Ex. 13).

36.     However, in 2023, Lewis began having some concerns with Rose's job performance (Lewis Dep. 73-75). In June 2023, Lewis had to remind Rose to always use her Abbott credit card. (Rose Dep. 105, Rose Dep. Ex. 11). Rose also had issues with consignment inventory management and late Electronic Clinical Outcome Assessment (eCOA) reports, which were required by the FDA at the time. (Lewis Dep. 149-150). Further, customers and team members complained to Lewis about Rose's clinical skills. (*Id.*)

37.     Lewis contacted ER to discuss placing Rose on a performance improvement plan ("PIP") or giving a written warning (Lewis Dep. 74, 147-150). However, instead of issuing formal

7

performance documentation, Lewis chose instead to assign Rose a mentor and create a list to help Rose to stay on task. (Lewis Dep. 149-150). Rose's job performance improved, Rose began executing on her tasks, and Lewis never gave Rose a PIP or written warning. (Lewis Dep. 75, 149-150).

**IV.    Rose Complains to Lewis that a Customer Acted Inappropriately and Lewis Immediately Addresses the Concern.**

38.     Rose alleges that in January 2022, a male customer made sexual advances including allegedly biting her on the ear during a one-on-one dinner on a Friday night that Rose had arranged. (Rose Dep. 121-122).

39.     Rose reported the incident by text message to Lewis on Sunday (two days after the incident occurred). (Rose Dep. 157-159; Rose Dep. Ex. 14; Lewis Dep. 160). That same afternoon, Lewis called Rose on the phone and Lewis agreed that the customer's conduct was not appropriate. (Rose Dep. 159). Lewis told Rose she did not have to work with the customer again including at a clinical event the following day, but Rose told Lewis that she would "just do it." (Rose Dep. 159; Lewis Dep. 161).

40.     Lewis told Rose she would report the incident with the customer to ER and asked Rose if she wanted to take it further. (Rose Dep. 160; Lewis Dep. 161). Rose states that she did not know what Lewis meant by taking it further but did ask Lewis to report the incident to ER. (Rose Dep. 161). Rose alleges Lewis asked her if she wanted ER to follow up with her, and that Rose told her "No" because she did not want to cause problems and wanted to move forward. (Rose Dep. 161).

41.     The next day (Monday), Rose decided to go work with the customer and, afterwards, expressed feeling "proud" of herself in a text message with Lewis. (Rose Dep. 161-162; Rose Dep. Ex. 14). That same day, Lewis reported the incident with the customer to ER as

Rose had asked her to do. (Lewis Dep. 162-163; Ex. 21, Abbott 3529-3530 identified in Lewis Dep.).

42.     Rose admits that after she met with the customer the Monday after the incident, she was not around the customer again (Rose Dep. 165) and had her assistant cover future cases with the customer, which Lewis fully supported. (Rose Dep. 166).[3] Shortly after the January 2022 incident, the customer relocated to another state, and Rose admits she no longer had "to work with him or deal with him too much" after the incident. (Rose Dep. 166-167). Rose does not allege that the customer engaged in any other inappropriate conduct. (Rose Dep. 165).

**V.     Abbott Terminates Rose's Employment After She Submits False Expense Reports and Is Untruthful During Abbott's Investigation.**

43.     In August 2023, it was announced that Lewis' regional territory was changed due to a company re-alignment, and Tim Powers ("Powers") became Rose's interim manager beginning in the fall of 2023. (Lewis Dep. 73, 148).

44.     Powers became concerned about certain out-of-pocket parking expenses that Rose reported as "Towne parking," as no other person on Rose's team in the Cleveland area reported parking expenses from this vendor. (Lewis Dep. 50-51). Powers reached out to Lewis, as the former manager of Rose's team, to ask her what the Towne parking charge was, but Lewis did not know what that charge was either. (Lewis Dep. 50-51).

45.     Powers also told Lewis that he noticed that Rose sought reimbursement for parking at facilities that provided free parking. (Lewis Dep. 62-63, 68, 89).

---

[3] Rose could not remember whether she attended future cases with the customer (Rose Dep. 166: 5-8), but did recall that her assistant covered future cases, and that Rose had the discretion to send her assistant to work with the customer. (Rose Dep. 166: 5-16).

46.     In December 2023, Powers told Lewis he reached out to Abbott's OEC to discuss concerns regarding Rose's out-of-pocket parking expenses. (Lewis Dep. 54-55, Ex. 23, Abbott 5426 identified in Lewis Dep.).

47.     Powers told Lewis that OEC told him to send an email to his entire team reminding everyone that Abbott conducts internal audits of business expenses and the requirement to use the Abbott Credit Card for business expenses. (Lewis Dep. 54-55).

48.     Rose admits that, on or about December 9, 2023, she received an email from Powers reminding everyone that Abbott conducts internal audits of business expenses and the requirement to use the Abbott Credit Card for business expenses. (Rose Dep. 107; Rose Dep. Ex. 17).

49.     The OEC also instructed Powers to reach out to Abbott's finance department to obtain analytics comparing Rose's out-of-pocket expenses with those of her team members. (Lewis Dep. 106).

50.     In late January 2024 or early February 2024, Powers received the analytics from the finance department. (Lewis Dep. 105-106, 129).

51.     During January and February of 2024, Powers received additional expense reports from Rose seeking reimbursement for parking expenses at hospitals that Powers believed did not charge for parking, and Rose continued to use her personal credit card rather than the Abbott Credit Card. (Lewis Dep. 105: 13-16; Ex. 18 and 19 to Rose Dep.).

52.     On February 5, 2024, Lewis officially resumed being Rose's manager. (Lewis Dep. 72).

53.     During late January or early February 2024, Rose's expenses were flagged on an internal audit by the finance department for having a high amount of out-of-pocket expenses for the month of January. (Lewis Dep. 69; 8-14).

54. Lewis reached out to Business Human Resources, who told Lewis and Powers to have a conversation with Rose about her out-of-pocket expenses. (Lewis Dep. 69; 8-14; Lewis Dep. 83: 19-25, 84:1-3). On or about February 28, 2024, Rose spoke with Lewis and Powers about Rose's out-of-pocket expenses. (Rose Dep. 199-200, Ex. 20 to Rose Dep.)

55. Rose told Lewis and Powers that her overall out-of-pocket expenses were high because she uses valet parking and forgets her wallet in her car, and then uses her personal Apple Pay account to pay for expenses, rather than her Abbott credit card. (Rose Dep. 201; Lewis Dep. 62-65) Rose also told Lewis and Powers that her out-of-pocket expenses for parking were high because the valet company does not accept credit cards. (Rose Dep. 211; Lewis Dep. 54).

56. Ultimately, ER began investigating Rose's expense reporting practices. (Rose Dep. 210). During the investigation, ER reviewed analytics produced by the finance department that showed Rose sought reimbursement for out-of-pocket expenses in amounts that far exceeded those submitted by her peers. (Lewis Dep. 90, 129; Ex. 20, Abbott 3516-3517 identified in Lewis Dep.). The analytics reflected expense report information for Rose and her peer account managers. (Lewis Dep. 106, 129). Rose's out-of-pocket expenses were *more than double* those of the next highest-spending account manager. (Rose Dep. 216: 18-21; Ex. 20, Abbott 3516-3517 identified in Lewis Dep).

57. On or about March 20, 2024, ER interviewed Rose to discuss her out-of-pocket expenses. (Rose Dep. 210). Initially, Rose told ER that her out-of-pocket expenses for healthcare provider meals and parking were higher than her peers because she forgets her wallet in her car and then uses her personal Apple Pay account, rather than her Abbott credit card, to pay for expenses. (Rose Dep. 200). Upon investigation, however, Rose's Apple Pay records did not match the amount for which she sought reimbursement. (Lewis Dep. 65; Lewis Dep. 80, Ex. 20, Abbott

3516-3517 identified in Lewis Dep). Of the $1,117.83 that Rose submitted for out-of-pocket reimbursement, only $440.23 could be verified by Rose's Apple Pay records for the same time period. (Lewis Dep. 176, Ex. 20, Abbott 3516-3517 identified in Lewis Dep; Rose Dep. 213). Thus, Rose's explanation concerning her use of Apple Pay was proven false. (Lewis Dep. 176).

58.     Rose also told ER that her out-of-pocket parking expenses were higher because she used valet parking more often than her peers and the valet company that she uses (Towne Parking) only accepts cash; therefore, Rose said, she could not use her Abbott credit card. (Rose Dep. 211; Lewis Dep. 52-53). Upon investigation, it was found that Towne Parking *does* accept credit cards. (*Id.*). Again, this demonstrated that Rose was not truthful with ER. (*Id.*).

59.     When ER advised Rose that it was confirmed that many of hospital locations where she claimed to have paid for parking actually have no parking fees or valets, Rose changed her explanation, telling ER that such parking reimbursements were actually for coffee purchases for healthcare professionals and not parking. (Ex. 20, Abbott 3516-3517 identified in Lewis Dep). Rose's conflicting explanations for her "parking" expenses were yet another example of her lack of integrity during the investigation. (*Id.*).

60.     Rose contended to ER that co-workers also charged coffee and other miscellaneous items such as parking, but she refused to identify any such co-workers during Abbott's investigation. (Rose Dep 212: 3-11; Ex. 20, Abbott 3516-3517 identified in Lewis Dep).

61.     During her deposition, Rose admitted she regularly sought reimbursement for miscellaneous business expenses that she categorized as "parking" at hospitals where parking is free. (Rose Dep. 194 "It was just a way reimbursing myself for other business expenses. I didn't pay for parking there physically but paid for other things while I was traveling ...;" see also Rose Dep. 212: 20-24).

62.     Not only did Rose falsely code coffee purchases for healthcare providers as "parking" (Rose Dep. 202), she admittedly falsely coded as "parking" the following personal expenses: personal food items (such as Gatorade she brought for herself) (Rose Dep. 194), clothing items (such as a sweatshirt and a cell phone charger purchased from a hospital gift shop) (Rose Dep. 204-205), and towing charges (Rose Dep. 195-196; Lewis Dep. 139-140). These practices are violations of Abbott's "Code of Conduct" and Abbott's "Travel, Entertainment and Other Employee Business Expenses" policy. (Exs. 3 and 6 to Rose Dep; see also Rose Dep. 100-103).

63.     Rose also requested reimbursement for parking in amounts higher than the posted valet placard dollar amount and for substantially more than a standard tip amount. (Rose Dep 211; Lewis Dep. 56).

64.     After receiving this information, Lewis personally called the valet company to verify the dollar amounts for valet parking and traveled from Pennsylvania to Cleveland to take pictures of the posted valet placards. (Lewis Dep. 56).

65.     On March 25, 2024, ER completed its investigation, finding that Rose violated Abbott's Code of Conduct by knowingly submitting false expense reports and not being forthright during the investigation. (Lewis Dep. 62, Ex. 20, Abbott 3516-3517 identified in Lewis Dep). ER recommended terminating Rose's employment based on this conduct. (*Id.*) On or about March 26, 2024, Abbott terminated (Rose's employment. (Rose Dep. 217).

66.     On March 31, 2024, six days after her termination, Rose sent a text message to Lewis apologizing for "the damage caused by [her] lapse in judgment" and stating that she "was carrying around some baggage from things that occurred over the years," which she now contends included Rose's alleged toxic relationship with a customer, the ear biting incident with a customer, and Rose not feeling supported for a product launch. (Rose Dep. 222, Rose Dep. Ex. 23). Rose

13

further stated to Lewis that she understood "this was my doing and my mistake and I'm sorry that you were put in the middle." (Rose Dep. 224-225; Rose Dep. Ex. 23). Rose ended the text to Lewis by saying "[t]hese last 4.5 years have been a crazy ride and I've learned [so] much…I love you. Thank you." (Rose Dep. Ex. 23).

67. On April 2, 2024, Rose called ER to ask if Lewis had reported the January 2022 incident with the customer to ER. (Rose Dep. 219-220, Rose Dep. Ex. 21). ER confirmed that Lewis reported this incident. (Rose Dep. 219-220, Rose Dep. Ex. 21). Then, on April 10, 2024, Rose reached out to ER to appeal her termination. (Rose Dep. 220, Rose Dep. Ex. 22).

68. Rose does not dispute that she coded items as parking expenses that were not parking expenses, nor does she dispute that she sought reimbursement for parking expenses that she did not incur. (Rose Dep. 221).

69. During Rose's deposition, Rose alleged that Account Manager Ron Petitte ("Petitte") told her to tag miscellaneous expenses as parking (Rose Dep. 222), that he did that himself (Rose Dep. 225), that Petitte tagged his expenses the same way Rose did. (Rose Dep. 234). However, Rose admits she never saw Petitte's expense reports and has no idea whether Petitte actually engaged in this behavior. (Rose Dep 226). Petitte denied tagging miscellaneous expenses as parking. (Petite Dep. 83).

70. Also during her deposition, Rose identified Kim Wissman ("Wissman"), a female, as a comparator (Rose Dep. 225-226), but like Petitte, Rose admits she never saw Wissman's expense reports and has no idea whether Wissman actually engaged in this behavior. (Rose Dep 226).

14

DATED:  December 19, 2025

Respectfully submitted by,


ABBOTT LABORATORIES INC. AND
COLLEEN LEWIS


By: /s/ *Uma Chandrasekaran*
One of Defendant's Attorneys

Uma Chandrasekaran
Illinois Bar No. 6281690
uchandrasekaran@seyfarth.com

Victoria S. Tolbert
Admitted *Pro Hac Vice*
vtolbert@seyfarth.com

SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on December 19, 2025, she caused the foregoing Defendants' Statement of Undisputed Material Facts in Support of their Motion For Summary Judgment to be filed with the Clerk of the United States District Court for the Northern District of Illinois through the Court's CM/ECF system, which will provide notice to and serve a copy upon all other counsel of record.

/s/ *Uma Chandrasekaran*
Uma Chandrasekaran

16