# EXHIBIT 20

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RACHAEL ROSE,

Plaintiff,

vs.

ABBOTT LABORATORIES, INC., and COLLEEN LEWIS,

Defendants.

Civil Action No. 1:25-cv-01604

Judge Manish Suresh Shah

\- - -

DEPOSITION OF COLLEEN LEWIS

TUESDAY, SEPTEMBER 23, 2025

\- - -

The deposition of COLLEEN LEWIS, called by the Plaintiff for cross-examination under the Federal Rules of Civil Procedure, taken before me, Heidi Blueskye Geizer, Registered Professional Reporter and Notary Public in and for the State of Ohio, pursuant to notice, via Zoom video conference, commencing at 2:20 p.m., on the day and date above set forth.

\- - -

APPEARANCES:

On behalf of the Plaintiff:

Kevin M. Gross, Esq.
ZIPKIN WHITING CO., L.P.A.
The Zipkin Whiting Building
3637 Green Road, Second Floor
Beachwood, Ohio 44122
216-514-6400
kgross@zipkinwhiting.com

On behalf of the Defendants:

Uma Chandrasekaran, Esq.
SEYFARTH SHAW, LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
312-460-5000
uchandrasekaran@seyfarth.com

Lisa A. Dreishmire, Counsel
Abbott Laboratories

Also Present:

Rachael Rose

\- - -

INDEX


| | |
|---|---|
| CROSS-EXAMINATION OF COLLEEN LEWIS BY MR. GROSS | 4 |
| Abbott 3516 through Abbott 3517 | 80 |
| Abbott 5426 | 92 |
| Abbott 5426 | 95 |
| Abbott 5427 | 96 |
| 5427 | 97 |
| 5426 | 97 |
| Abbott 5428 | 98 |
| Abbott 5429 | 101 |
| Abbott 5430 | 103 |
| Abbott 5431 | 105 |
| Abbott 5432 | 105 |
| Abbott 3224 | 107 |
| Abbott 3605 through Abbott 3608 | 123 |
| Abbott 3606, | 128 |
| Abbott 5608 through 5614 | 129 |
| Abbott 5610 | 130 |
| 5608 | 132 |
| Abbott 5618 to Abbott 5628 | 132 |
| Abbott 5577 through 5592 | 133 |
| 5583 | 133 |
| 5582 | 133 |
| 5583 | 134 |
| 5586 | 137 |
| Abbott 5608 through 5614 | 138 |
| Abbott 5594 through 5607 | 138 |
| 5605 | 138 |
| 5605 | 140 |
| Abbott 3445 through 3447 | 142 |
| 3446 | 142 |
| Abbott 3490 through 3491 | 144 |
| Abbott 3491 | 147 |
| Abbott 3483 to 3484 | 147 |
| Abbott 3501 | 153 |
| Abbott 3512 through 3513 | 154 |
| Abbott 3529 through 3530 | 162 |
| 3530 | 163 |
| Abbott 4092 | 163 |
| Text Message 5:07 | 169 |
| Text Message 5:06 | 171 |
| Text Message 5:05 | 173 |
| Text Message 5:04 | 175 |
| DIRECT EXAMINATION OF COLLEEN LEWIS BY MS. CHANDRASEKARAN | 175 |
| RECROSS-EXAMINATION OF COLLEEN LEWIS BY MR. GROSS | 177 |

COLLEEN LEWIS,

the deponent herein, called for cross-examination under the Rules, having been first duly sworn, as hereinafter certified, was deposed and said as follows:

CROSS-EXAMINATION OF COLLEEN LEWIS

BY MR. GROSS:

Q. Good afternoon, Miss Lewis. My name is Kevin Gross, and I am one of the attorneys representing Rachael Rose in a lawsuit she filed against Abbott and you for sexual harassment and wrongful termination.

I know we had the chance to briefly meet in person when we were in Chicago about 30 days ago for Rachael's deposition, and it's nice to see you again.

If you would state and spell your full name, for the record.

A. Colleen Lewis. C-O-L-L-E-E-N, L-E-W-I-S.

Q. Do you have a middle name?

A. Yes.

Q. What is it?

A. Melany.

Q. M-E-L-A-N-I-E?

A. Y.

Q. M-E-L-A-N-E-Y?

A. M-E-L-A-N-Y.

Q. Thank you. Your current address, please.

A. [redacted]
Q. How long have you resided at that address?
A. Since 2007.
Q. Do you reside there with anybody?
A. My children.
Q. Do you live with anybody else?
A. No.
Q. I know it's a little bit rude, but if you would please give me your birthday?
A. [redacted]
Q. Are you currently married, or single?
A. Engaged.
Q. How long have you been engaged?
A. Ten years.
Q. Has that been to the same person for ten years?
A. Yes.
Q. And what's his name?
A. Rob.
Q. And last name?
A. Rhee.
Q. Can you spell that, please?
A. R-H-E-E.
Q. Where did you grow up?
A. Mars.
Q. Pennsylvania?

A. Yes.
Q. Did you go to high school there?
A. Yes.
Q. What year did you graduate?
A. 1992.
Q. From Mars High School?
A. Yes.
Q. Were you involved in any extracurricular activities, anything like that?
A. Yes.
Q. What did you do?
A. Yes. Cheerleading, student council, clubs.
Q. What did you do after high school or graduation?
A. Went to college.
Q. Where did you go?
A. Is Clarion.
Q. Clarion College?
A. Clarion University of Pennsylvania.
Q. Where is that located?
A. Clarion.
Q. Is that close to Mars?
A. No.
Q. What did you study there?
A. Biology, premed.
Q. Did you start there in the fall of '92?

A. Yes.
Q. Did you graduate from Clarion?
A. Yes.
Q. Was that in 1996?
A. Yes.
Q. What was your degree?
A. Biology.
Q. And what did you do after your college graduation?
A. I went to graduate school.
Q. Where at?
A. University of Pittsburgh.
Q. What did you study there?
A. Exercise physiology, cardiac rehabilitation.
Q. How long was that graduate program?
A. A two-year program, but I graduated within one year.
Q. In 1997 you fully graduated from college; true?
A. Yes.
Q. What did you do next?
A. From graduate school, yes.
Q. Yes. What did you do in 1997 after you finished your college studies?
A. I worked for three months as an assistant director of a health club, and then was hired at Bristol Myers Squibb Company, a pharmaceutical company, in November of 1997.
Q. So the health club, was that in Pittsburgh?

A. Wexford.
Q. Close by?
A. Yes.
Q. What were you doing there?
A. I was assistant director of the health club; operations, training.
Q. Thank you. That was a bad question. I was asking what your job duties were.
MS. DREISHMIRE: She didn't finish answering.
MS. CHANDRASEKARAN: Go ahead. Go ahead and finish.
I think you started talking when she was in the middle of answering the question.
MR. GROSS: I'm sorry, there is a bit of a delay.
A. Membership, training, exercise regimens for members.
Q. Okay. Yeah --
A. Overall operations of the facility.
MR. GROSS: I'm trying to work through being on a virtual deposition, and I think I'm graciously allowing both attorneys to object when that's not proper. And so if I might start before she's finished, I can assure you it's not being done intentionally, and I will stop and give her the opportunity, just like I did Brian.
MS. CHANDRASEKARAN: Listen, we're on Zoom and

there's a delay, and so I'm giving you the benefit of the doubt; but you didn't know that you had interrupted her and you had thought she was done answering your question, so I just wanted to alert you that she was in the middle of continuing to answer your question.

So we're certainly not trying to interrupt your questioning, but you know, I think just as we will try to wait for you to finish asking a question, we ask that you do the same for the witness, and allow her to finish answering.

MR. GROSS: Of course.

MS. CHANDRASEKARAN: I know with the delay that may be an issue, but --

MR. GROSS: I did hear it, and I've been hearing it, you know, throughout the day, and been stopping for Brian. That's not going to change now. I'm going to give the witness the opportunity to give her testimony.

BY MR. GROSS:

Q. What caused you to leave as the assistant director of the health club?
A. Opportunity.
Q. Did you leave on your own?
A. Yes.
Q. To take the job at Bristol Myers Squibb?
A. Yes.
Q. What was your title there when you first started?

A. Account representative.
Q. What were your job duties?
A. To promote and sell medications.
Q. What type?
A. Cardiovascular.
Q. Can you be more specific about what type of medicine for cardio?
A. Diabetes, cholesterol, blood thinners.
Q. How long were you an account rep there?
A. Five years.
Q. What was next after that?
A. I was promoted to a hospital representative.
Q. At Bristol?
A. Yes.
Q. Which hospital?
A. All the hospitals in western Pennsylvania.
Q. Were they Bristol hospitals or you were the rep to go to other hospitals?
A. The second answer.
Q. And what were your job duties as a hospital rep going to other hospitals for Bristol?
A. To educate fellows, residents, and physicians and nurses on our IFU, dos and don'ts of prescribing the products.
Q. So you were no longer selling the products, but you

were overseeing how they were sold?
A. I was selling the product. That included providing IFU instruction to make sure that the product was prescribed properly to patients in servicing them.
Q. Did you have that duty as an account rep?
A. Yes.
Q. How long were you a hospital rep?
A. Five years.
Q. What happened after that?
A. I was hired at Cordis, a Johnson & Johnson company.
Q. P-O-R-T-I-S?
A. C-O-R-D-I-S.
Q. And what was your job title there?
A. Account manager.
Q. What were you selling?
A. Endovascular products.
Q. Would you consider that employment competitive to Brian Lecurgo's job?
A. Yes.
Q. You were doing --
A. But I was in Pittsburgh.
Q. You were in Pittsburgh, but was it the same vascular sales role, just at a different company?
A. Correct, yes.
Q. What year did you start that position?

A. 2008.
Q. Had you done vascular sales before 2008?
A. Yes.
Q. Where?
A. When I worked at Bristol Myers Squibb.
Q. What were you selling there?
A. Plavix, which is for peripheral arterial disease, stroke, and cardiac, MI, and stroke.
Coumadin, for MI, DVT, deep vein thrombosis, for clot in the peripheral.
Q. Is it fair to say that at Bristol Myers Squibb you were selling medications, heart medications; true?
A. Yes.
Q. And then in 2008, when you started as a vascular salesperson at Cordis, a Johnson & Johnson company, you were selling vascular devices; true?
A. Yes.
Q. Like stents?
A. Yes.
Q. Anything else?
A. Yes.
Q. What else did you sell besides stents when you started doing vascular device sales in 2008?
A. Wires, balloons, vena cava filters, sheaths, catheters, re-entry devices, and CTO devices.

Q. What caused you to go from selling cardiovascular drugs to devices?
A. I liked the clinical aspect of being able to be in on a procedure and have an immediate impact on a patient's life.
Q. Any other -- excuse me -- any other reason?
A. It was more rewarding financially.
Q. How did your employment end?
Bristol Myers Squibb, when you were the hospital rep, how did that come to an end?
A. I resigned, gave my two weeks notice.
Q. What caused you to resign?
A. I was offered a position at Cordis.
Q. So you had already lined up the position at Cordis at the time you left?
A. Correct.
Q. Yes?
A. Yes.
Q. Were you interviewed for the job at Cordis?
A. Yes.
Q. Tell me about that interview.
A. I had three interviews. The first was with Tina Fox, the second with Robby Armistead, and the third with some other individual, I can't recall his name, while being 12 weeks pregnant with twins.

Q. Did you feel that played a role at all in the interview process?
A. Being pregnant?
Q. Yes.
A. I told them I was pregnant. It didn't bother them.
Q. Just curious why you included that, if there was a reason. Were you noticeably pregnant at the time you were interviewed?
A. No.
Q. But you shared that with them?
A. I did.
Q. Is there a reason why?
A. Transparency, because I would have to take time off.
Q. So you wanted to let them know up front that you'd be taking FMLA leave?
A. No, maternity leave.
Q. You were going to take maternity leave.
A. Correct.
Q. And did you in fact take it?
A. Yes.
Q. How long into your employment was that?
A. Three months.
Q. And how long were you on maternity leave?
A. Ten weeks.
Q. Who was your supervisor at that time?

A. Tina Fox.
Q. One of the persons who interviewed you.
A. Correct.
Q. Did you tell her in that interview that you were pregnant?
A. Yes.
Q. How did she receive it when you informed her three months into the job that you were taking maternity leave?
A. Good.
Q. Was she supportive?
A. Yes.
Q. Did she ask you about whether you had previous experience selling vascular devices in the interview?
A. She knew. Yes.
Q. And what did you tell her?
A. No, but I sold vascular products.
Q. Were you communicating to her that you felt that was relevant experience?
A. Yes.
Q. And you believe it was?
A. These days, yes.
Q. How long did you work that role at Cordis?
A. Until 2015.
Q. So for seven years.
A. Yes, seven and a half.

Q. Seven and a half you were an account manager in vascular sales at Cordis --
A. Correct.
Q. -- doing what Mr. Lecurgo has been doing at Abbott for the last 10 years?
A. Correct.
Q. Where was your territory?
A. Western Pennsylvania.
Q. Pittsburgh area?
A. Yes.
Q. Did you go to U Pitt?
A. I don't know what that is.
Q. Pittsburgh Medical Center, were they your customers?
A. One of them, yes.
Q. Who else?
A. All of the hospitals in western Pennsylvania. I was the only rep.
Q. In western Pennsylvania or in the whole state?
A. Western Pennsylvania.
Q. Do you know how many square miles you covered?
A. No.
Q. Was it similar size to the Cleveland area?
A. No.
Q. How would you compare it?
A. Larger.

Q. Larger in footage or more hospitals, or both?
A. Time traveled, yes; hospitals, I would have to count to answer that, so I don't know.
Q. Does the University of Pittsburgh Medical Center have a big competitor there?
A. Allegheny General.
Q. Are those the two big ones in Pittsburgh?
A. Yes.
Q. Similar, wouldn't you agree, to the Cleveland Clinic and University Hospital in Cleveland?
A. I don't know.
Q. How long have you been a supervisor covering UH and the Cleveland Clinic?
A. Ten years, just over.
Q. In those ten years have you become familiar with those two hospital systems?
A. Yes.
Q. Do you know if they are bigger or smaller than Pittsburgh Medical Center?
A. In terms of what?
Q. Number of physicians, number of buildings.
A. I think Cleveland Clinic would be the largest.
Q. Okay. Cleveland Clinic is the largest and the other three are similar, or is there a difference between them?
UH --

A. I don't know the bed size off the top of my head.
Q. So in 2015 you leave Cordis. Why did that happen?
A. I was recruited to Abbott to become a sales director.
Q. Is that lower or higher than an account manager?
A. Higher.
Q. How much higher?
A. One above.
Q. At that time; true?
A. Yes.
Q. Because today, one above account manager is senior account manager?
A. No.
Q. No? What's one above account manager at Abbott today?
A. Regional sales director.
Q. Regional sales director.
Were you going to promote Rachael before she was terminated?
A. I did not have the opportunity to do that.
Q. Why not?
A. I did not get the report from finance regarding who was eligible for promotions, it did not come to me.
Q. Was it supposed to?
A. It never does.
Q. Do you know if Rachael was going to be promoted by you or someone else at Abbott before she was terminated?

A. She was on a list of eligible employees to be promoted.
Q. Was she chosen to be promoted?
A. She was terminated before the decision was made.
Q. Before the decision was made to --
A. I wasn't part of the calls. I wasn't involved in that. That is above my level. That is the area vice president and HR that makes those decisions. They get the list from finance and then they make a decision, because there is a limited pool of money, and it is also based off of other behaviors.
Q. I'm not asking you to speculate or testify about something you're not sure of or don't know, so I want to be clear about that.
Do you know if Rachael was going to be promoted before she was terminated?
A. I don't.
Q. You don't know one way or the other, correct?
A. Correct.
Q. Did you have any part in that decision to either -- strike that.
Did you have any part in the decision about whether she was going to be promoted?
A. I did not.
Q. Did you play any role in that process at all?

A. I did not.
Q. So as her direct supervisor at the time -- is that true?
A. Yes.
Q. At the time Rachael was terminated you were her direct supervisor, correct?
A. Correct.
Q. But at the time she was terminated she was also being considered for a promotion? Is that true?
A. I don't know, because I'm not part of those conversations. It's between finance, HR, and the area vice presidents. I would have zero visibility of the timing or when that occurred.
Q. So as far as whether Rachael was going to be promoted and when she was maybe going to be promoted or not, you don't have any knowledge about that?
A. I do.
Q. Please share with me what you know about it; only what you know.
A. I was told by Oliver Asmar that she was on the list of account managers eligible for promotion.
Q. Did she apply?
A. She doesn't have to apply. There's not an application process.
Q. How did she become eligible for promotion?

A. Based on her number.
Q. What was her number?
A. I don't know.
Q. I mean, it was a good number, right?
A. Hitting plan.
Q. What?
A. She hit plan.
Q. She hit the quota?
A. Yes.
Q. Do you consider that a good number?
A. Yes.
MS. CHANDRASEKARAN: By the way, you froze up. We can still hear you, but your video is frozen.
MR. GROSS: Thank you. I'm sure it's a sight to behold. I apologize.
(Pause in proceedings.)
BY MR. GROSS:
Q. Who else was eligible for the promotion that Rachael was?
MS. CHANDRASEKARAN: Objection, foundation.
You can answer.
A. I did not see the list.
Q. How do you know she was eligible?
MS. CHANDRASEKARAN: Objection, asked and answered.

You can answer.

A. As I mentioned, Oliver Asmar told me that she was on the list.

Q. Did you ask him about her?

A. No.

Q. So Oliver came to you and wanted to let you know that Rachael was on the list, but included no other information?

A. Rachael, and he may have said that Rachael and Ron were both on the list.

Q. Okay. So Ron Petitte was also on the list?

A. I didn't see the list, so I don't know that for sure, but he said that to me.

Q. Oliver said that to you.

A. Yes.

Q. He didn't just come up to you and say "Hey, Rachael is on the list," he told you what the list was?

MS. CHANDRASEKARAN: Objection, mischaracterizes testimony.

You can answer.

A. Yes.

Q. Based on the way he told you, you understand that there were other people on the list that he didn't tell you about, or is the way he told you was, "Hey, these are the two people on the list, Rachael, Ron"?

A. He did not list other individuals in the organization

that were on the list.
Q. And what's his/Oliver's role at the company at that time?
A. Area vice president.
Q. Was he your direct supervisor?
A. Yes.
Q. Is he still?
A. No.
Q. Where did he move to?
A. Alignment changes shifted him south.
Q. So he moved away from your territory?
A. Yes.
Q. Who took his place?
A. Trevor Burlison.
Q. When did that happen?
A. January 2025, I believe.
Q. So at the beginning of this year?
A. Yes.
Q. Do you know why that change was made?
A. Yes.
Q. Tell me.
A. Abbott created a new vessel closure team, and the regions were realigned.
Q. So in 2015 you start as a sales manager for Abbott.
A. Correct.

Q. What were your job duties?
A. To lead and support a team strategically. The ultimate goal is to achieve and exceed quota.
Q. Is that a similar job duty as you have today?
A. Yes.
Q. Is there anything different about it?
A. Different portfolio products.
Q. Is one more prestigious than the other?
A. It's the same position.
Q. I meant the products.
A. It's a matter of opinion.
Q. Do you feel they are?
A. Yes.
Q. So you feel like today, as you have been for the last I think decade, you've been over a team selling more sophisticated products than you were when you started there in 2015; true?
A. What do you mean by "sophisticated"?
Q. When did you first meet Rachael?
A. 2019.
Q. And how is it that you came to meet her in 2019?
A. She applied for a position I had open in Cleveland.
Q. Did she have to submit an application for that position?
A. Yes.

Q. And she did?
A. Yes.
Q. Did it go directly to you, like your e-mail?
A. No.
Q. But it was eventually directed to you at some point?
A. It's in a portal.
Q. Was it assigned to you, her application in the portal?
A. It's not assigned.
Q. Were you given any instruction from your employer or supervisor about what you should do with Rachael's application?
A. No.
Q. When you saw it in the portal what did you do next?
A. I contacted her.
Q. How did you contact her?
A. I don't recall.
Q. Is that due to the passage of time?
A. I guess.
Q. Did you call her or contact her for an interview or to set up an interview? What was the purpose of the communication you had?
A. Yes, to set up an interview.
Q. And what was your first impression of her when you talked on the phone or over e-mail, whenever it was?
A. I really liked her. I thought she brought great

energy.
Q. So you felt differently than Brian did?
MS. CHANDRASEKARAN: Just objection, foundation.
You can answer.
A. I guess.
Q. I mean, you were here for his deposition testimony, right?
A. Yes.
Q. And you heard him describe his interview of Rachael?
A. Correct.
Q. And he decided he didn't want to hire her because she didn't have experience in vascular device sales; true?
A. I'm not sure if that's exactly what he said.
Q. I'm not saying it's exact, not the exact words, but would you agree that that's -- that was the gist of his testimony?
A. I thought it was more an impression and a gut feeling rather than the reason behind not having sold in vascular.
Q. He said she was too loose, no product knowledge. Did you find her to be loose?
A. I thought she was bubbly.
Q. Do you say that in a positive or negative way?
A. Positive.
Q. And what do you mean by that, that she was bubbly?

A. Energetic, big smile on her face, excited for the opportunity. Happy.
Q. Was the interview in person or over a video?
A. I don't recall specifically. We did have an in-person interview at some point, but I know we spoke on the phone. I can't recall if it was on Teams as well.
Q. So she interviews with you, and what are you asked to do or what is your responsibility in taking her interview?
A. Assess her skill set and her ability to do the job and gain comprehension of the vast amount of products that we have.
Q. You definitely saw something in her; fair?
A. Yes, definitely.
Q. I mean, you saw potential, because she had no relevant experience; right?
A. Correct, I did.
Q. I mean, you didn't either. You were in heart medicine sales, but she didn't even have that experience; right?
A. I don't think that that's a proper comparison.
Q. How would you compare it?
A. I had product and disease state knowledge, with a degree in the medical field.
Q. Do you believe that made you more qualified than she was in 2019 as -- strike that -- that you were more qualified in 2008, when you interviewed at Cordis, than she

was in 2019, when she interviewed with you at Abbott?
A. I don't know.
Q. Okay.
A. I don't know that you can parallel those two. They are different experiences that give you different depths.
Q. It sounds like you believe you had relevant experience because of Bristol Myers, you know, with heart medicine, but Rachael didn't have any heart-related experience at all, device, medicine; true?
A. No.
Q. No. What type of experience did she have?
A. She worked for AMT, a device company, selling feeding tubes, device.
Q. So you felt that made her -- it added to her qualifications for the job?
A. Yes.
Q. Was it because it was a medical sales position or because selling those feeding tubes is similar to vascular devices?
A. The medical device position.
Q. Just in general, that type of sales position?
A. Navigating a hospital, credentialing, devices. Yes.
Q. After you finish your interview with her, what happens next?
A. I don't recall.

Q. Did you have to send a report up the chain of command, anything like that, on the interview?
A. No.
Q. Did you make a recommendation to anybody that she be hired?
A. No.
Q. Did you hire her yourself?
A. Not at that time.
Q. Who did?
THE WITNESS: I'm confused.
MS. CHANDRASEKARAN: Who did hire her or who did she hire?
BY MR. GROSS:
Q. Do you know who hired Rachael to work at Abbott as an account manager in vascular sales in 2019?
A. I did.
Q. You did?
A. Yes.
Q. You interviewed her and then you made the decision to hire her, and she was then hired?
A. Correct.
Q. Did you see some of yourself in her?
MS. CHANDRASEKARAN: Object, vague.
You can answer.
A. I don't think so.

Q. You understand my question?
A. Yes.
Q. And I didn't say it at the beginning because I know you were here for the last one, but if I ask you a question that you don't understand, just tell me.
A. Okay.
Q. I'll fix it.
MS. CHANDRASEKARAN: I believe she answered your question. I think her answer was "I don't believe so."
MR. GROSS: Yeah. No, she did, but when you said it was vague -- I mean, look, I'd rather have a non-objectionable question. I'll fix it.
Q. Okay. You hired her in 2019. When does she start working after that?
A. Two weeks after I offered her the position, or thereabouts.
Q. Did you interview her in person?
A. Yes.
Q. Here or in Pittsburgh?
A. Cleveland.
Q. Where did that interview take place?
A. The Cleveland Clinic.
Q. Main Campus?
A. Excuse me, I want to amend my answer.
Q. Go ahead.

A. At the Intercontinental.
Q. Attached to the Cleveland Clinic?
A. Yes.
Q. How long did it last?
A. I don't remember.
Q. But you're sitting there face to face talking with her?
A. Yes.
Q. Did you decide on the spot you're going to hire her?
A. I don't recall.
Q. But shortly after you did?
A. Yes.
Q. So she starts working in Cleveland as an account manager in vascular sales at what point in time in 2019?
A. I don't remember her hire date. I think end of year.
Q. And was she assigned to the Cleveland Clinic when she started working there?
A. Yes.
Q. And were her duties when she started at the end of 2019 the same as they were when she was let go by Abbott at the beginning of 2024?
A. Could you clarify what you mean by "duties"?
Q. Yeah, her job duties.
A. The job was different because we had a different portfolio of products, but the function in and of itself was

the same, to sell and promote the devices for Abbott. The portfolio was different.

Q. You've got to meet your quota, you have new products you want to show them, expand your territory; right?

A. Yes.

Q. You're just saying that over that five-year period of time there were different products that came along, and she sold those, too; true?

A. Correct, yes.

Q. But her title and her essential job duties were the same?

A. Correct.

Q. And yours were, too, from 2019 through, let's see, the end of March 2024, except from was it August 2023 until February 2024 that you were not the regional sales manager for the Ohio vascular territory?

A. Correct.

Q. But other than that, those August, September, October, November, December -- other than those seven months, you had the same position, Rachael had the same position, end of 2019 to March of 2024; correct?

A. Yes.

Q. You were her direct supervisor that whole period of time, minus the seven months?

A. Yes.

Q. So she starts at the end of 2019. Did she have a quota at that point to meet at the -- sorry, go ahead.
A. Yes.
Q. So when she started in late 2019 she still had a quota to meet at the end of the year 2019?
A. No.
Q. So her first quota year, as far as measuring it, was 2020?
A. Correct.
Q. How did she do?
A. I don't remember.
Q. Is that due to the passage of time?
A. Likely, yes.
Q. Before you heard Mr. Lecurgo testify that he hasn't met quota since 2019 or 2020, did you know that before he said it today?
A. I can't keep track of when every single rep hits quota.
Q. Is that a no? You didn't know that before we started today?
A. I did not know those specific years.
Q. Is that concerning to you?
MS. CHANDRASEKARAN: Objection, vague.
You may answer.
A. No.

Q. After hearing that, is there anything you feel you need to do or should do as his supervisor after what he just testified to under oath today?
A. No. We're working currently on projects to help achieve that. There were other contractual reasons for revenue loss in his territory that impacted him at multiple hospitals that was already in place in the Cleveland market.
Q. You're saying there were external factors outside of his control that led him to not meet quota for five years?
MS. CHANDRASEKARAN: Object, mischaracterizes his testimony.
You can answer.
A. (Unintelligible.)
COURT REPORTER: Excuse me. This is the court reporter, asking for a repeat on that answer.
MR. GROSS: On the question, please, Heidi, if you can read it back.
COURT REPORTER: Question: "You're saying there were external factors outside of his control that led him to not meet quota for five years?"
A. Yes.
Q. And what exactly were those external factors?
A. Contracting, erosion loss.
At OhioHealth, that hospital system, Genesis eroded massive pricing that was already implemented in Cleveland at

the Cleveland Clinic. They already had the low price point.
Q. So can you tell me just in lay terms what the hospitals did that directly affected Mr. Lecurgo's sales?
A. They signed onto the Cleveland Clinic contract at lower price points.
Q. And how did that affect Brian's sales?
A. It eroded revenue, immediate erosion.
Q. Are you saying that OhioHealth, for example, started buying from the Cleveland Clinic instead of Brian at Abbott?
A. They signed onto the Exelerate contract, which is a Cleveland Clinic GPO.
Q. Okay.
A. So they got better pricing --
Q. They got better pricing on --
A. -- just by signing onto the contract.
Q. Better pricing on vascular devices?
A. Yes.
Q. Stents?
A. Yes.
Q. Wires?
A. Yes.
Q. So by OhioHealth, for example, getting better pricing from the Cleveland Clinic, did that mean OhioHealth was no longer buying from Mr. Lecurgo at Abbott?
A. No.

Q. What did it mean besides lower prices? Because that's what I'm trying to understand.
If Mr. Lecurgo still has the opportunity to sell to OhioHealth, I'm not following where the lower prices are a factor. Can you explain that?
A. For example, Supera stent at the Cleveland Clinic was priced at $900, roughly. OhioHealth System and Genesis, which is 11 hospitals, was priced at 1,400 and $1500, depending on length.
When OhioHealth and Genesis at different period of times decided to go onto the Exelerate contract, their pricing changed from 1400 and 1500 to $900 for a single stent.
Q. Are they still buying that same stent from Abbott?
A. They are. Their contract -- the company is Exelerate, who is -- Abbott contracts with Exelerate, who has over a hundred member hospitals. When a hospital decides that they want to sign on then they get access to the pricing because of the buying power in the masses.
Q. This might be the right example, it might not be, you tell me.
It sounds like OhioHealth joined like a group health plan, where their prices got much cheaper --
A. Yes.
Q. -- and no longer wanted to buy from Brian anymore,

Mr. Lecurgo, because he was still selling more expensive products that they could get cheaper somewhere else?
A. No.
Q. Okay. All right.
Well, is there anything else you think you can include about that that might at least clarify it for me?
A. We at Abbott -- I set up the contract with OhioHealth. Brian still continues to go in there. They just have the same exact pricing as the Cleveland Clinic, who is a different rep.
They still purchase the product from Abbott, but their pricing is the same as the Cleveland Clinic. They get access to that pricing.
Q. So that means Brian is not generating as much revenue anymore because his prices --
A. Yes.
Q. -- have --
A. Correct.
Q. Okay. All right. So is he measured, is his quota measured on his revenue generated or is it measured on the amount of devices sold? Both?
A. For eight years, roughly, at Abbott it was based on every dollar you sold, the account managers would be paid for every dollar they sold. It was paid on revenue. So the territory, you generally -- and if you could maintain that

you made more money, and if you had a smaller territory such as Cleveland, you know, it was less money.
Q. Is Brian's quota based on revenue generated or the amount of devices sold?
A. Revenue.
Q. So your point with why Brian has not met quota in five years is he can't meet his quota because the price of his product has dropped significantly?
A. One factor is the massive revenue loss for that reason, yes.
Q. So no more can he sell the same amount of devices and still get to the place he wants to be, either at quota or near it, let's just say at quota, 2019/2020; right?
A. He has to make up that revenue, plus the growth expectations.
Q. So when did that, what did you call it, contracting erosion, when did that happen in Brian's region to have this effect?
I understand it now, so thank you.
A. I don't remember the exact date.
Q. Can you approximate, without speculating?
A. Three years.
Q. So for three years Brian has known, hey, I have to sell more; fair?
A. Yes.

Q. And you've been his direct supervisor the whole time over three years; true?
A. True.
Q. And based on your supervision of him, are you able to say whether he is aware of that, that, hey, I have to sell more to get to the same quota?
A. He's aware of that.
Q. He's aware, but he hasn't accomplished that in three years; true?
A. That wasn't the only factor.
Q. Okay. We could talk about the other factors, but as far as the pricing of his product going down to affect his quota, he's been aware of that for three years and he hasn't met quota; true?
A. He's meeting quota today.
Q. Today. Okay.
Do you remember anything about Rachael's first full year at Abbott in 2020? I think you said you don't remember if she met quota or what her numbers were like, but is there anything that you can tell me about from her first full year?
A. First full year, you're in training the majority of the year.
Q. Okay.
A. She was in training.

Q. Were you involved in that at all, training her?
A. No. You have to go away to training.
Q. Who were her trainers?
A. It might have been Melissa Vezendy in Westland.
Q. When is the last time you talked to Melissa?
A. A couple of weeks ago.
Q. Did she call you or did you call her?
A. She called me.
Q. What was the reason she called you?
A. She was frustrated and offended.
Q. What did she say?
A. She was offended by her conversation with you.
Q. Those were her words?
A. Yes.
Q. Did she elaborate?
A. Yes.
Q. Please share with me what she said.
A. She was offended by the accusations that you made and the comments that you made.
Q. Let's start with the accusation that I made. What was it that she told you?
A. Around having her breast grabbed.
Q. She told you I made that allegation?
A. That you asked her about it.
Q. That I asked her about it?

A. Yes.
Q. And she was offended by that?
A. Yes.
Q. And what else was it that she was offended by, or however you characterized it?
A. That you made a comment that you have that effect on women, based on how she answered the phone.
Q. And what did you take that to mean?
A. I don't know.
Q. Was she offended by the way that she answered the phone when I called her?
A. No.
Q. Do you understand what she either communicated or attempted to communicate to you about the way she answered my phone call?
A. She said she answered the phone thinking that you were somebody else, so she answered it in a more jovial way.
Q. Okay. Anything else?
A. No.
Q. Was there anything else from your phone call with Melissa two weeks ago about me?
A. That's pretty much it.
Q. Did she tell you that she would be happy to give me a call back if she had any information to offer?
A. I don't recall.

Q. Is that due to the passage of time?
A. I wouldn't -- when she called me I was traveling, so I was in a hurry, I had to go.
Q. So you don't recall if she told you that at the end of the call she asked if she could call me back on the same number I called her on if she had --
A. Yeah, I think she mentioned that.
Q. She told you that, that she offered on her own volition to give me a call back if there's anything more that she had to add beyond what she said?
A. Yes.
Q. Do you recall anything else that she told you about my phone call with her?
A. As I mentioned, she was upset with your comment about saying that you had that effect on women, and that's insinuating that she answered the phone that way because of you, that you had that influence on women.
Q. Even though she told you she thought I was somebody else calling her; true?
A. I'm referring to what she said your comment was.
You asked me what she said. I'm not going to make any assumptions about that.
Q. Well, I'm asking you, and I'll wrap this up, if she told you that when she picked up my phone call she thought I was somebody else from Cleveland --

A. Yes.
Q. -- and that she didn't know me and never talked to me before, and was not expecting my phone call. Did she tell you that?
A. Correct, yes.
Q. So she described her jovial way of answering the phone by making those comments you say about me.
A. She -- I'm not sure I understand the question.
Q. I think I understand it. I mean, I understand your phone call with her. That's all I was getting at.
Before that call you had with her two weeks ago, when did you last talk with Melissa?
A. I don't remember.
Q. Is that due to the passage of time?
A. Yes.
Q. If I call her back and ask if you guys have talked since Rachael filed this lawsuit against you, do you think she'll say yes?
A. Yes.
Q. Have you reached out to her about Rachael's lawsuit?
A. No.
Q. Did she reach out to you before this call two weeks ago?
A. She did not. She and my daughter, she has been helping my daughter through a health condition, and so we

have had a number of phone calls regarding that, and she has spoken with my daughter to help her.

Q. And you're saying in connection with that you've talked with her about Rachael's lawsuit?

MS. CHANDRASEKARAN: Objection.

A. No.

MS. CHANDRASEKARAN: Mischaracterizes the testimony.

Q. What's the connection between her helping your daughter besides that's a nice thing to do?

A. You asked me the question if I talked to her, and so the answer is yes, for personal reasons around my daughter.

Q. Okay. Let me clarify the question. I might ask a bad question from time to time.

Did you talk with her before the call two weeks ago about anything related to Rachael's case or Rachael at Abbott, anything like that?

A. She called me one other time and told me that Rachael contacted her and said that she was thinking about contacting an attorney, and that they just caught up. She said Rachael was pregnant, and that she seemed happy and that she was moving on, and that was the end of it. It sounded like she was doing good.

Q. That who was going to contact an attorney?

A. Rachael was going to contact an attorney.

Q. And Melissa said Rachael told her that at the time Rachael was pregnant?
A. Yes.
Q. So Rachael's second full year, 2021, anything you remember about that?
A. It was COVID. We were stuck at home, primarily doing Teams calls.
Q. Anything else you remember about Rachael or her performance in her second year?
A. No.
Q. Any problems that you saw?
A. No.
Q. In 2020, any problems that you saw in her first full year?
A. No.
Q. Were you checking her expense reports?
A. Yes.
Q. You always checked them, with the exception of the seven months?
A. Yes.
Q. But even during some of those seven months you were checking them as well?
A. No, I was not.
Q. True? You weren't?
A. Absolutely not. You have to submit the expense report

to a manager.
Q. Is it your testimony that when you were not her supervisor for those seven months that you didn't look at any of her expense reports?
A. None of her expense reports were supposed to be submitted to me. I think she may have submitted one or two, which I sent back to her to send to her manager, Tim Powers.
Q. So besides the one or two that she sent to you when she shouldn't have, you didn't look at any of her expense reports during those seven months. Is that correct?
A. Other than screen shots from Tim Powers I don't have access to her, because I was not her manager.
Q. Would you characterize looking at one of her expense reports over a screen shot as looking at one of her expense reports?
A. No, because it's only a portion of the expense report.
Q. Did you make any conclusions based on those portions that you reviewed?
A. I don't recall.
Q. Given that they were portions, would you be able to make any conclusions?
A. I don't know.
Q. You don't remember or you don't know at all?
A. It depends on the content.
Q. Well, let's say that there's an out-of-pocket expense

and you see it on a screen shot. Can you make any conclusions about that?

MS. CHANDRASEKARAN: Objection, speculation.

You can answer.

A. It depends on what the out-of-pocket expense is.

Q. Parking.

A. It depends on where it's at.

Q. A hospital with a valet.

A. (Pause.)

MS. CHANDRASEKARAN: Wait for the question.

What's the question?

Q. Can you make any conclusions if she lists a valet parking expense on her expense report?

MS. CHANDRASEKARAN: Objection, speculation and vague.

You can answer.

A. That she valet parked.

Q. Anything else that you could conclude beyond that?

A. I don't know. I don't think so.

Q. Could you conclude that it's that line entry for valet parking at a hospital, would you be able to make the conclusion that that line entry is falsifying, at least that part of her expense report?

MS. CHANDRASEKARAN: Objection, speculation.

You can answer.

A. I don't understand the question.
Q. So what I want to know is, you looked at screen shots that Tim Powers sent you in a text message of Rachael Rose's expense reports; correct?
A. Yes.
Q. And you were looking at those expense reports when you were not her supervisor; correct?
A. Correct.
Q. Tim was her supervisor at that time?
A. Correct.
Q. And your testimony is he was sharing with you screen shots of some of Rachael's expense reports; true?
A. Yes.
Q. Were you able to make any conclusions at all, and I want to know what they were, based on any of those screen shots he sent you?
A. I didn't look at them that closely. I understood him to be concerned, and then he wanted to take care of it internally, outside of me.
Q. So you didn't look at them that closely.
Are you saying then you didn't make any conclusions based on her expense reports, the screen shots you were provided?
A. I don't recall.
Q. If you made any conclusions, or you didn't?

A. I don't recall.
Q. I know. When you're saying you don't recall, if you made any conclusions or you don't recall what?
A. Right. I don't know if I made any conclusions. You are asking me -- what am I supposed -- he was asking me what am I supposed to do with this.
Q. Her expense report, or something on it?
A. Something on the expense report.
Q. What was it?
A. I think it was a charger that she purchased.
Q. A phone charger?
A. Correct.
Q. And Tim was really suspicious about that, wasn't he?
A. I don't know what really suspicious means.
Q. He thought that he had her on something. That's what he was texting you, right?
MS. CHANDRASEKARAN: Objection, foundation.
A. I don't know what he thought.
Q. And you texted him back, "No, no, it's a phone charger."
You know, we'll get to the text, but my memory is you texted --
MS. CHANDRASEKARAN: Maybe it would be helpful to show her the documents, if you want to talk about them.
MR. GROSS: Maybe she looked at them recently.

I'll get to them.
Q. Do you recall that part, where you told Tim, "No, no, it's okay"? And I'm paraphrasing, like she bought a phone charger, it's okay, it's a legitimate expense?
Do you recall that?
A. Yes.
Q. And do you recall when he said to you or suggested to you that she was expensing personal parking at her apartment, do you remember that?
A. I think he was confused by the Towne Parking and was trying to make sense of why Towne Parking -- she was the only one in Cleveland putting that down on her expense report. It didn't show under any other rep at that time, through today.
Q. What if anything were you able to conclude based on that?
A. He was trying to figure out a reason why these expenses were there.
Q. My question is, what if anything were you able to conclude based on that?
MS. CHANDRASEKARAN: Objection to that.
Based on what? The text messages or --
Q. That Rachael was expensing Towne Parking and nobody else, as you testified to, in the Cleveland region was; what if anything were you able -- you -- able to conclude based

on that?
A. At that time I didn't realize that she -- I didn't have visibility of the coronary team. The statement that I just made is in retrospect after reviewing reports and being the manager there currently.
The conclusion was I don't know what's going on. I don't understand what this is. Maybe she's parking in downtown Cleveland, maybe it's a meter. I really don't know.
Q. Did you ever find out what it was?
A. Tim Googled it and saw that it was the, in some hospitals, the valet service. It's not the -- it's the company that employs the people, it's not what would come across if you put it on your corporate card.
Q. So you're saying that had she used her corporate card it would have shown up differently on the credit card statement --
A. That's true.
Q. -- for the same exact merchant?
A. The merchant is the hospital. The employees are employed through Towne Parking, the company.
Q. So this is the Cleveland Clinic who hires parking contractors, and it's called Towne Parking. Is that accurate?
A. I don't know what the Cleveland Clinic does.

Q. I thought that's what you said Tim found out --
A. There were some hospitals, I am not sure that it's used for all of their facilities. This valet service, I don't know who they employ.
Q. But you know that they are working at the Cleveland Clinic, where Rachael was assigned; right?
A. I don't know if they're at all of them, no. I don't know the answer to that.
Q. Do you know if they're at some of them?
A. I think.
Q. Did you investigate it at all beside the Google search that Tim did?
A. After the investigation was handed -- after the investigation was ongoing I contacted Towne Parking to ask if they took credit cards --
Q. And --
A. -- and what Towne Parking is, and they did take credit cards at Hillcrest and Fairview. I didn't call every single hospital.
Q. And so what did you conclude, based on the hospital you did call, about Rachael's expense sheet?
A. She lied to me.
Q. About?
A. She stated they don't take credit cards and that's why she had out-of-pocket expenses for Towne Parking, but they

take credit cards.
Q. At which locations?
A. Hillcrest and Fairview.
Q. Are those the only ones --
A. And Main Campus Cleveland.
Q. Are those the only ones she went to?
A. No.
Q. So you didn't completely rule out that she could have used Towne Parking at a Cleveland Clinic facility and needed to pay cash for it, because you didn't call every hospital in town; correct?
A. She didn't have other hospitals down in her expense report. She would put it down as Fairview or Hillcrest, with Towne Parking as the city.
Q. So you're saying that you were able to confirm that she should have been using her corporate card, but instead she put it on her personal card, but it was for parking related to a business expense. Is that true?
A. I'm stating that she lied to me and said they don't take credit card, but they do.
She is allowed to use valet parking. All employees are, especially carrying all of that equipment.
Q. So when did she tell you that they didn't take credit cards, and who was it that didn't take them?
A. She told me and Tim in end of January.

Q. That -- she told you and Tim -- (pause.)
A. That they don't take credit cards.
Q. Who?
A. The Towne Parking locations.
Q. Towne Parking, at any Cleveland Clinic hospital, whichever; she just said in general Towne Parking does not take credit cards? That's what she said?
A. She said it's a valet service, and they don't take credit cards.
Q. Did she specify which locations?
A. No, I don't think so. And they were only on a couple different hospitals on her report.
Q. Anything else about her expensing Towne Parking beyond that?
MS. CHANDRASEKARAN: Objection, vague.
You can answer.
A. I don't know what you mean.
Q. Well, when you were looking into her expense reports with Tim, at that time did you conclude or suspect, yourself or with him, that there was something else wrong with her expensing Towne Parking besides the fact that you say she told you I couldn't use my credit card?
You say you called and you confirmed she could have used it. Anything else besides that?
A. I didn't give it much thought, because Tim was her

manager. He went to Office of Ethics and Compliance to figure out what to do, out of concern from the high amount of parking expenses that were being put through to Tim.

He followed Olga's direction as to how to handle the situation. I was not involved, nor was I on the call. He was the one who had the red flags and went to Olga, our Office of Ethics and Compliance.

Q. You're saying you weren't involved?

A. I did not call Olga.

Q. Okay, fair enough.

But you were involved in looking into Rachael's expense sheets with him?

A. I did not look at her expense sheets. I looked at clips of a few items that were concerning because of the Towne Parking that we didn't believe existed.

Q. And then you found out did, right?

MS. CHANDRASEKARAN: Objection, vague.

Q. You found out Towne Parking --

A. It is not a valid -- if you were to use your credit card, it does not come up as a transaction on your credit card. It is not actually the name of what you would have to put Hillcrest or Fairview down. It doesn't actually -- you can't transact and have a credit card charge from Towne.

But more importantly, the amounts were well above what she was expensing.

Q. What did you conclude by that --
A. Excuse me -- what was posted.
I'm sorry, I'd like to amend.
Q. You can amend.
A. After the fact, after the fact during the investigation, after the analytics came back, the amounts were higher than the posted valet dollar amount, substantially more than what a standard tip would be, on a consistent basis.
Q. Where did you get the posted dollar amount?
A. It's on their valet placard at the hospitals.
Q. So did you go up there and take a picture?
A. I did.
Q. Did you come to Cleveland to do that?
A. I did.
Q. So you drove an hour and a half each way from Pittsburgh to take a picture of a placard at the Cleveland Clinic?
A. I needed to see that, what was posted, because I was having a hard time believing what was happening before my eyes.
Q. So that's a yes, you drove three hours round trip to take a picture of a placard at the Cleveland Clinic; correct?
A. Not the Cleveland Clinic.

Q. Where?
A. Hillcrest.
Q. That is the Cleveland Clinic.
A. It is a branch of the Cleveland Clinic.
Q. Okay. It's the Cleveland Clinic's big hospital on the east side here, it's as much of the Cleveland Clinic as Main Campus.
But you drove to Hillcrest to take a picture of the placard in front of the valet booth; true?
MS. CHANDRASEKARAN: Objection. Asked and answered.
Q. I just want to confirm. I think --
MS. CHANDRASEKARAN: You asked it a few times, but go ahead and answer.
A. Yes.
Q. Did you expense your gas for that trip?
A. Yes, on my fleet card.
Q. So Abbott paid for you to drive to Hillcrest Hospital on Cleveland's east side suburbs, and you expensed it, to take a picture of a placard outside of the valet booth; true?
A. Yes.
Q. Thank you. I just want to make sure I'm clear about that.
Did you stay the night?

A. No.
Q. Did you tell anybody you were doing that?
A. I think Jim Curcio needed confirmation on the dollar amounts at the facilities.
Q. Did he ask you to go drive --
A. He asked what the amounts were at the hospitals, and I had no way to confirm that other than to go there and take a picture of it.
Q. Did you call up there before you drove?
A. I think I did.
Q. And?
A. I spoke with security at a number of the facilities that were showing up. This is after Tim was no longer -- this time frame was at the end of February, when I was formerly her manager.
Prior to that everything was handled by Tim, and then when we were going through the expenses it was hard to decipher what was real and what wasn't, so we had to know for real what the facts were.
Q. And all to say, that's why you drove here; true?
A. Yes.
Q. Do you know if the prices ever changed at Hillcrest over time?
A. I don't know.
Q. You know, for the Towne Parking.

A. I don't know. I don't have anything in front of me. I'm not sure what you're referencing.
Q. Well, I'm just asking you, you know, I'm trying to gauge how reliable your conclusion was.
She expenses it on her report on a date that you haven't included in your testimony, but that expense sheet is what caused you to go up, drive three hours round trip up to Cleveland, to see what they're charging on that day.
My question is, did you look into it at all whether the price had changed over time?
A. There were a couple of Rachael's credit card expenses that were 6 or $8 for Hillcrest during the time frame of the investigation, so it looked as if it was the same. I didn't -- the kiosk has 6 and $8 on it.
Q. So did you see any issue or discrepancy between what she was charging or what she was listing on her Towne hall expense sheet versus what you saw they were charging when you drove to Cleveland and then drove back to Pitt --
A. Yes -- sorry.
Q. There was a discrepancy, or there wasn't?
A. There was.
Q. There was, but you didn't look into, hey, she used the parking on this date, let me find out if the parking was a different price that day; true?
A. I don't recall. Instead of -- it was 6 or $8 when I

went there, 6 or $8.
Q. At that time.
A. Yes.
Q. Did you ask them about any previous times what they charged?
A. No.
Q. Do you know if they always charge the same price, 6 or 8?
A. It's on their placard, that's what it says.
Q. Did you talk to anybody at the hospital or at Towne hall about whether their price has changed and then you see it reflected on the placard?
A. I asked how much is it to valet, and they pointed to the sign, and it said 6 or $8.
Q. Thank you, you've answered the question.
Do you know if they might charge -- or did you ask them if they charge more to valet in the winter because they have higher overhead, salting the road there and plowing it? Did you ask about that?
A. No.
Q. Pittsburgh has got similar weather to Cleveland, right? With the snow, the salt, you need to take care of the winter elements.
A. Probably more snow in Cleveland, from the lake effect.
Q. Did you consider that at all in your analysis about

whether Rachael was falsifying the Towne hall expense items?
A. No.
Q. And in fact, the expense sheets that you and Tim were looking into spanned 13 months, from January of 2023 all the way to January of 2024; correct?
A. Correct.
Q. That's what the investigation entailed, 13 months; right?
A. Yes.
Q. But you never talked with anybody at Towne hall besides looking at their placard.
I don't say that facetiously, but over 13 months the prices could have changed. Do you agree with that?
A. Not during that time. When I went there it was in February, and the dataset was January '23 to January '24, so at that time when I went, end of February, is when they said that the price was 6 or $8.
Q. What were they charging a year before? Because that was part of the investigation, too.
A. I don't know.
Q. You didn't ask, correct?
A. I didn't ask.
Q. And yet Rachael was accused of falsifying expense sheets over 13 months; true?
A. Yes.

Q. And was she found guilty of that?
A. Yes.
Q. Did you find her guilty of that?
A. Employee Relations found her guilty.
Q. Did you make any conclusion?
A. I stated the facts.
Q. Meaning?
A. I did the analysis with Tim, and we provided our analysis to Employee Relations, who ultimately recommended termination.
Q. And your analysis, is there anything that was a part of it that you haven't included yet?
A. The analysis that Employee Relations has has a comprehensive overview with all the data in it.
Q. Okay. Let's talk just in lay terms.
Beyond your analysis of taking a picture of the placard and comparing it to the numbers over a 13-month period that she put on her expense report, did you conduct any other analysis to determine whether she was committing fraud in the way she listed those parking expenses?
A. There were problems across the board with MetroHealth and the dollar amounts that were above the posted parking sign. She also had parking down for Elyria and Mercy Lorain, which don't charge for parking.
And the root of the problem is when asked about it she

first said her wallet -- she leaves her wallet in the car, and then -- and it was easier to Apple Pay.

The second reason when asked about Towne Parking was that she valets, but she had parking down for places that don't charge for parking in a parking lot or a valet, and she was putting Towne Parking down, so it didn't exist. And the root of the problem, she lied and shifted her story, and was untruthful.

And then when asked when there's no parking, she said that -- after a long, long pause, she said that it's for HCP meals or coffee for the ones that didn't have Towne Parking but were marked as Towne, so her story shifted.

Q. With all due respect, yours did, too, because we were just talking about Hillcrest and whether there was anything else you conducted in your analysis and investigation into whether she committed fraud at Hillcrest parking, beyond taking a picture of the placard on the day you did.

We'll get to the other parts, but anything more on that?

A. I'm not sure what you're getting -- I don't understand the question.

Q. Okay. You believe -- well, let me ask you. Do you believe even to this day that Rachael put down parking on her expense sheet when she did not actually incur those exact numbers for parking so she can take the money and put

it in her pocket?
A. Yes.
Q. So you believe that she was running a scheme where she would make money off of Abbott by stating she paid for things on her personal credit card when in fact she didn't, in order to make money from Abbott? That's what you believe?
MS. CHANDRASEKARAN: Objection. Argumentative, vague.
Q. Let me reask it --
A. I don't know what she -- I don't understand the rationale behind why it was done.
Q. So are you saying that you think it's -- there's a chance that it was a mistake or a misunderstanding?
MS. CHANDRASEKARAN: Objection, mischaracterizes testimony.
You can answer it.
A. I'm not sure how to answer that. I'm not sure I understand what you're looking for from me.
Q. That's okay, let me just ask it this way.
Since you believe she was falsifying her expense reports, do you believe she was doing that to make money that she was not entitled to?
MS. CHANDRASEKARAN: Objection, speculation, foundation.

You can answer.
A. I don't know why she was doing it. I don't know.
Q. Did you ask her?
A. When Tim and I had her on the phone we talked to her, and she said that she forgets her wallet in the car, and then she said it's easier to use Apple Pay. And then she said she valets, and then she said she buys HCPs coffee with the parking dollars.
Q. And did you make any conclusions based on any of those things about her committing wrongdoing?
A. None of the dollar amounts matched her Apple Pay. Every parking expense that was submitted was a flat dollar amount, with the exception of one, over a 13-month period. Every Apple Pay charge with the exception of two had change.
Q. And you were at her deposition in Chicago. Do you remember when she testified that she paid cash at times for Towne Parking?
A. She's allowed to if they accepted just cash.
Q. And did you also hear her say that sometimes she gave a tip using cash at the valet?
A. And she's allowed to.
Q. Did you take those facts into consideration when you made a determination that she was falsifying her expense reports?
A. Parking was not the only problem with her expenses.

Q. Okay, but -- we'll get into it, but I just want to focus on one thing at a time.
A. I did take that into consideration, yes, what would a tip amount be.
Q. And --
A. At Metro the posted amount is $11, and they take credit card, but her amounts were 16, 17, $18. Most people aren't going to give a 50 percent tip to a valet person. It's outside the normal range.
Q. Do you know that she didn't actually spend the money that she listed in that example on a business expense?
A. I'm not sure what example you're referring to.
MS. CHANDRASEKARAN: Maybe it would be helpful, Kevin -- there's lots of documents relating to the investigation. Maybe it would be a lot clearer if we actually looked at some of those documents in connection with the testimony, so it's not convoluted.
MR. GROSS: I'm going to get to it. Just let me finish a couple of things.
Q. I'm not trying to give you a hard time. I'm just trying to figure out what your thought process is, that's all.
I think you just said that at MetroHealth it was $11 posted for valet and that you can remember a time when she put on her expense sheet reimbursement at $18; correct?

A. I don't remember the dollar amounts and I don't remember when I approved an expense report.

I remember during the analytics, when it was listed in the spreadsheet, that there were various amounts, 16, 17, $18.

Q. Did you make any conclusion based on that?

A. That it was concerning.

Q. Just concerning or that it was, you know, intentional and to obtain money from Abbott that she's not entitled to by reimbursement?

MS. CHANDRASEKARAN: Objection, speculation and foundation.

You keep asking about what she thought she knew what Rachael was thinking --

MR. GROSS: She's been terminated for falsifying expense reports, so a determination was made that she knew what she was doing and she did it on purpose to enrich herself at the company's expense.

MS. CHANDRASEKARAN: Objection. That assumes facts not in evidence, and there is no question pending.

MR. GROSS: And that is for a determination --

(Overlapping speakers.)

Q. So I'll ask you the question.

A. I don't know what she was thinking. I don't know why she was -- I don't know.

Q. Would you agree that firing somebody for falsifying expense reports is a serious offense?
A. Yes.
Q. It calls into question that person's truthfulness, right?
A. Yes.
Q. But you don't know what she was thinking?
MS. CHANDRASEKARAN: Objection, foundation. How could anybody know what someone else is thinking? You can answer.
Q. Did you ask her?
A. I don't know what she was thinking.
Q. Did you ask her?
A. I did during the interview with Tim Powers, and I already gave you my answer. She had a shifting story of why that was occurring.
Q. And based on that you thought that she was lying, right?
A. That she was, she was lying.
Q. She was, okay. So you do -- you did make a conclusion about what she was doing?
A. In that conversation, the conversation that I had with her, she was lying.
Q. She was lying to cover up what she had done. That's what you concluded, correct?

A. I had not had the analytics, nor did Tim, at that point in time. We could only go by what she said, so I didn't have visibility to her expenses at that point in time.
Q. Well, you had the placard from the valet service?
A. No, that was after the fact.
Q. Okay, so you didn't even have that yet.
A. Correct. She was flagged on an audit for having a high amount, $813, in the month of January out of pocket, and it was something that the company, you know, like was clearly concerned about.
And so our business HR, who Tim spoke with, told Tim and I to call Rachael and ask her why she has so many out-of-pocket expenses; not just parking, but out of pocket.
Q. And that call took place at the end of January of 2024?
A. Correct.
Q. At that point you and Tim had been looking through her things and texting each other for almost six weeks, right?
A. I'd looked at a few pictures.
Q. So you were looking into her, but you didn't make her aware of that; true?
A. I wasn't looking into her, Tim was looking into her.
He asked me an opinion as a colleague. He did not ask me to be the judge and jury of her expense reports. That's

why he went to Olga and Jimmy Brigham in our business HR.
Q. How do you know he went to Olga?
A. He sent me a text and said he talked to Olga, and she gave him good advice.
Q. And he sent you a text of an e-mail that he allegedly sent, too; right?
A. He did. He asked me how I thought it sounded.
Q. And you loved it.
A. I thought it was clear, based on the policy and the guidelines set forth by the organization, but not -- but with kindness.
Q. Well, you really liked how he finished the end, you know, that this was an e-mail to everybody on the team, allegedly, but it was really directed at Rachael; true?
A. I think he was given direction from Olga to send a message to the team to remind everybody to use your credit card.
Q. That's speculation?
A. I'd have to look at the e-mail. I don't know. I'd have to look at the end of the e-mail to see what specifically you're referring to.
When I say the sweetness, it was how he ended his e-mail, so I would have to look at that to see.
Q. My question is, while this on its face appeared to be an e-mail to the whole team, this was really a way to e-mail

Rachael; correct?
MS. CHANDRASEKARAN: Objection, foundation.
You may answer.
A. I can't speak for Tim.
Q. Well, I'm asking you.
A. He wanted to send a message out to the team.
Q. I'm asking you. Do you think that this e-mail was put together to convey a message to Rachael specifically?
A. It was for everybody, including Rachael.
Q. But you agree with me that before he sent you that drafted e-mail, the screen shot -- well, actually it was a picture that he took of his computer screen -- that you and him had already been looking at her expense sheets?
A. I wasn't looking at her expense sheets. I looked at the screen shots that he sent me of a couple expenses that he was concerned about.
Q. That's what I meant, that at the time he drafts the e-mail and he sends you two different drafts and you approve it, and you love it, that you had already been looking at screen shots of Rachael's expense sheets?
A. I looked at a few of those.
Q. Was there anybody else who was included in the to line of that e-mail --
A. No --
Q. -- that was -- hold on -- that you had suspicion about

their expense sheets?
A. No.
Q. Only Rachael?
A. I wasn't managing that team, so I don't know what other people were doing. I did not have visibility to their expense reports. I was not approving them.
Q. I know. I'm just asking, based on your knowledge, all you know is there was concern about Rachael but nobody else in the to line of his e-mail. You are not concerned about their expense sheets, correct?
A. I wasn't worried about it, no.
Q. And you weren't even the supervisor at that point for Akron and the Ohio region?
A. Correct.
Q. But you knew you were coming back, right?
A. I don't recall when I was given the green light, but my start date was February 5th.
Q. You don't recall when you got the green light that you were coming back to your longstanding team?
A. I received an offer letter to move -- to transition from the position I was in over to the Ohio team, and the start date was delayed due to the other team needing me to manage them. So I was managing two teams at that time, trying to -- the team over in upstate New York, Pennsylvania, and then some of the team was contacting me

about contracts stuff because didn't Tim didn't know it.

But I don't really recall. I assume, I guess, that it was -- I don't know. I don't know.

Q. When did you --

A. I don't know the date. I think it was in January I accepted.

Q. When were you offered?

A. In January.

Q. When?

A. I don't know the date.

Q. Can you find out?

A. I could.

Q. Okay.

MS. CHANDRASEKARAN: Kevin, we've been going for about two hours. I think we should take a break when we get to a point where we can.

MR. GROSS: Yeah. Let me just finish this line, and we'll take one.

Q. When did you find out you were going to move away from the Ohio endo supervisor for Rachael when the CSI merger took place?

A. I believe it was August 22nd.

Q. So it was after you initiated the performance improvement plan against Rachael, correct?

MS. CHANDRASEKARAN: Objection, assumes facts

not in evidence.
You can answer.
A. She was never put on a performance plan.
Q. I said initiated one, that you found out --
A. I did not initiate one. I called and created a ticket to have a discussion with them, and then never followed up with that.
Q. Okay.
A. That was in June.
Q. Before you -- strike that. You found out after you called Employee Relations to open up a ticket into a PIP plan for Rachael that you were going to be moved out from her supervisor with the CSI merger; correct?
A. Correct.
Q. And as a result of your transferring job duties, we can see in that document that there was -- that you weren't available to be responsive to Kristin Gewalt regarding the ticket for a performance improvement plan that you opened against Rachael; true?
MS. CHANDRASEKARAN: Objection. That may be confusing.
You may answer.
A. I chose not to proceed with it.
Q. After you initiated it?
A. Correct.

Q. Why did you choose not to proceed with it? What changed?
A. Because I was proud of Rachael for being able to better manage the Cleveland Clinic inventory.
We had been getting on Teams calls. I saw good energy from her. She seemed to be understanding the process of inventory management better. She was executing on her tasks.
She was doing a great job. She just needed a little extra help.
Q. So you opened the ticket for the PIP in June of 2023?
A. Yes.
Q. Is that considered the second quarter?
A. Yes.
Q. How did she do that quarter?
A. I don't recall.
Q. Let me see if I can refresh your recollection on that.
I have it, second quarter 2023, Rachael had the highest grossing quarter in the history of U.S. Vascular.
True?
A. There's no way she had the highest grossing quarter in Abbott Vascular. Her territory is not the size of one that would warrant that kind of recognition.
Q. So if her annual performance review for 2023 said that, that would be a lie?

A. If it was for her territory. I don't think in all of the Abbott Vascular.

Can you repeat that?

Q. Well, I'll pull up her review.

MR. GROSS: We'll take a break. We've been going.

MS. CHANDRASEKARAN: Sounds good, that sounds good. Let's look at some documents instead of just talking around them.

How about we come back in 10 minutes?

MR. GROSS: I'm allowed to take my deposition. I'm going to get to the documents.

Yeah, let's come back in 10.

MS. CHANDRASEKARAN: Okay. That sounds good, so at 3:30 Central, 4:30 Eastern.

MR. GROSS: Correct.

(Recess had.)

MR. GROSS: All right. We're ready.

Q. All right. Well, before I get to the exhibit, I want to ask a couple of questions.

Miss Lewis -- there you are --

MS. CHANDRASEKARAN: Are we supposed to be looking at the document that's on the screen, or not?

MR. GROSS: No, not yet. That's just a placeholder.

Q. You're Ron Petitte's supervisor, true?
A. Yes.
Q. When is the last time you talked with him about Rachael?
A. Maybe like a couple months ago or a month ago. He said he was upset that he had to come in for the deposition.
Q. To go to Chicago?
A. Yes.
Q. Where does Ron live?
A. Ohio.
Q. Do you know where?
A. I'd have to look up his address.
Q. I mean, is it like Cleveland? Columbus?
A. Cleveland area.
Q. Okay. Have you talked with him about the allegations that Rachael has made in this case?
A. No.
Q. Has he talked with you about it?
A. No.
Q. Have you not talked with him about it because you don't feel it would be appropriate?
A. I'm not supposed to.
Q. Why is that?
MS. CHANDRASEKARAN: Object to the extent that gets into any attorney-client privileged conversation.

Instruct the witness not to answer.

Q. Fair enough, and I'll repeat what I have said.

I'm not asking any questions about what you have talked with Uma, Lisa, or Victoria about, not interested. So to the extent you can answer the question without getting into any of those communications, please do.

Are you able to answer that?

A. I don't have anything to share.

Q. Okay. Just for the record, I think you said something like you don't think it would be appropriate to talk with him about Rachael's case, but you can't elaborate further; is that correct?

A. It's just not appropriate to talk to Ron about it.

Q. You made that determination yourself, or did someone tell you who is not --

MS. CHANDRASEKARAN: So again, this is getting into attorney-client privileged communications. I am going to instruct you not to answer.

MR. GROSS: All right. Well, in a way you're kind of telling me, but it's okay.

Q. So I'm taking his deposition tomorrow. Are you aware of that before I told you?

MS. CHANDRASEKARAN: I'm going to object again. It gets into attorney-client privileged communications, but you can answer to the extent you know,

based on the information that was not provided by counsel.
A. Ron did not tell me when his deposition would be.
Q. Are you staying in Chicago tonight?
A. Yes.
Q. Are you going to be back in Seyfarth Shaw's office in Willis Tower tomorrow by 11:00 a.m.?
A. It's not required of me on my schedule.
Q. And it's 10:00 a.m. Central, 11:00 a.m. Eastern.
But you do plan to be here for that, for his deposition?
A. Yes.
Q. And you've made your travel plans around that, to stay the night tonight, to be in the same office tomorrow; correct?
A. I have an earlier flight out tomorrow, so if I can't stay, I can't stay.
Q. What time is your flight?
A. I think it's at like 1:30, or something like that. 1:30 or 2:30.
Q. We should be okay.
All right. I'm going to get to these exhibits.
Miss Lewis, do you see what's on your screen here? And I'm going to go through it, but can you see this okay?
A. Yes.
Q. So I am showing you a series of documents, two

documents marked as Abbott 3516 through Abbott 3517.
Do you recognize the first document here, 3516?
A. It was given to me, yes.
Q. What do you recognize this document to be?
A. Termination worksheet.
Q. For Rachael Rose?
A. Correct.
Q. When did you first see this document?
A. On the date that it was -- I don't remember the date that it was given to me, but it says today's date, 3-25. I assume that's the date that I received it via e-mail from that team.
Q. You're talking about the ER team who sent the letter to you?
A. This was, I believe, sent to me by Jim Curcio.
Q. So we can see here that she was hired on August 26, 2019, so you're pretty close on that.
2023 rating, exceeded. Exceeded expectations, right?
A. Yes.
Q. And that's the highest score you can receive?
A. Yes.
Q. How many times did you get that?
A. Managers are not rated by EE/AE.
Q. So because you started off as a supervisor at Abbott, you're saying that you've never received an annual review

like that?
A. I receive annual reviews. That is not how managers receive their performance rating.
Q. What's the highest performance rating for a manager?
A. It's plus, minus, or equals.
Q. Meaning better, worse, or the same?
A. I don't have definitions for them.
Q. I mean the minus is a bad mark?
A. Under-performing, performing, exceeding, I guess. I'm not sure.
Q. What was your 2023 rating?
A. I think equal to, but I can't remember.
Q. And how about in 2024?
A. Equal to, I believe. I don't remember, but equal to.
Q. Would that be due to the passage of time?
A. Yes.
Q. Are these performance reviews, like, important?
MS. CHANDRASEKARAN: Objection, vague.
You can answer.
A. That's not a performance review.
Q. I know, bad question.
The performance review Rachael had in 2023 exceeded, you just said the last couple of years you believed equaled or stayed the same. When these performance reviews come out annually, are they things that, like, affect your pay, or

can it affect --
A. Yes.
Q. So they're consequential, true?
A. There's a rating seeded with account managers and managers, at all three levels.
Q. So we see here in the middle of the page, it says "Previous counseling history, if applicable," and it says, "On December 9th, 2023, reminder of the requirement to use corporate credit card for all expenses. E-mail reminder. RSD dash Tim Powers."
Did I read that all correctly?
A. Yes.
Q. Is this saying here that Rachael was previously given notice of the requirement to use corporate credit card for all expenses on December 9, 2023?
A. It appears that way.
Q. And you know, given that you are involved in this, was that the discussion as well beyond what we see on the paper?
MS. CHANDRASEKARAN: Objection, vague.
You may answer.
A. I don't know what Tim did. I wasn't the manager.
I think that he indicated that he had Olga get on a Team call and discuss expenses, in addition to that e-mail.
Q. Okay. But the previous counseling is just the e-mail, nothing about Olga, right?

A. That's what it says.
Q. And you knew before he sent out that e-mail on December 9th, 2023 allegedly, you knew that that was coming because he asked you to review his draft, right?
A. Yes.
Q. Did you ever think of, hey, maybe I should just go to Rachael directly and talk with her and say, hey, this is what I'm seeing, this is what I'm thinking, can you tell me what's going on?
A. It was not my responsibility at that time, it was Tim's.
Q. I understand, but was there anything preventing you from saying to Tim what I said, or something like that?
A. The guidance given to Tim was from our Office of Ethics and Compliance, business HR, and Employee Relations, so I had to follow the guidance given.
Q. All right. Was that guidance given to you or given to Tim, which he then told you about?
A. The guidance from Olga was given to Tim. I was not part of that, the guidance to have a conversation with Rachael and reiterate that she needed to use her corporate card.
What occurred between Tim, myself, and Rachael was we were told by Jimmy Brigham to set up a call and ask her about her expenses. That was the opportunity for her to

explain why there were so many out-of-pocket parking -- I'm sorry, amend -- why there was such a high amount of out-of-pocket expenses.
Q. And when you and Tim went to Rachael about it, you're talking about at the end of January of 2024, right?
A. Yes.
Q. I'm just asking, you've been her supervisor now, you know, at the end of 2023, for four years minus five months, even though you're still involved in her employment.
My question is, why didn't you go to her or give her a phone call and say, Hey, Tim showed me some screen shots of your expense report, I want to get some clarity on it.
MS. CHANDRASEKARAN: Objection, asked and answered.
You may answer.
A. It wasn't my responsibility, it was Tim's.
Q. Was there anything preventing you from doing that?
MS. CHANDRASEKARAN: Objection, asked and answered.
A. We had guidance from Human Resources regarding this topic, and followed it.
Q. Did you have direct guidance, or is this based on what Tim told you he was told?
A. Direct guidance from a phone call that we had with Jimmy Brigham.

Q. And what did he say to do?
A. Call her and ask her why there are so many out-of-pocket expenses.
Q. So Jimmy Brigham directed you to interrogate Rachael about what you guys were seeing on her expense report?
MS. CHANDRASEKARAN: Objection.
A. No.
MS. CHANDRASEKARAN: Mischaracterizes testimony.
Q. No? What did he ask you guys to do?
A. He said find out why she has so many expenses, ask her why so many out-of-pocket expenses.
Q. Is that what you thought the issue was, too, or was it not for you to say?
A. What do you mean?
Q. Well, did you think she had too many out-of-pocket expenses?
A. When she worked for me there were very few out-of-pocket expenses. It was primarily corporate card, so I didn't have that experience.
It wasn't for me to say. It was under Tim's leadership that it changed and increased, and across all categories of expense reporting.
Q. Well, I think to be fair, during 2023 you each more or less split time supervising her equally; correct?

A. I would say I probably managed her for about nine months in 2023. And so I mean, analytics showed a remarkable increase after I was realigned, new alignments came out. They went from $30 a month to 200-plus, 300 a month, under Tim's leadership.

Q. Are you sure about that?

A. There was an increase in her expenses out of pocket. It's in the file that was sent to Employee Relations during the time that Tim managed her.

Q. And that was also -- this was also the time when she had her best sales year ever and she was growing her territory, right?

A. It wasn't about the dollar amount, it was about the fact that her behavior changed, from using her corporate card 90-plus percent of the time when she was under my leadership to a higher, a much higher percentage under Tim Powers'.

Q. According to the termination letter, for nine months in 2023 she was engaging in this activity a lot, right?

A. I'm not sure what you mean by a lot.

Q. And wasn't there something like 126 instances that you found of improper line items on expense reports?

Here it is. "Since January 1, 2023, through January 31, 2024, Rachael submitted 126 out-of-pocket expenses totaling $4,856.73, which includes HCP food and parking

expenses that are all far higher than the expenses reported by her peers, more than double than that of the next highest peer."

Do you see that?

A. Yes.

Q. So according to the termination letter, for nine months when she was engaging in this conduct which led directly, as Abbott says, to her termination, you were her direct supervisor approving these expense reports at issue every two weeks; correct?

A. So that doesn't stratify the times and the amounts. You can't assume that based on that, that's just a snapshot in time. But when you actually break it down by month, you see a remarkable increase during the time that Tim was her manager.

Q. And what you've alleged in that regard is that because Tim was working two jobs and you were working two jobs, Rachael took advantage of that to falsify expense sheets?

MS. CHANDRASEKARAN: Objection, argumentative.

Objection. The witness never testified to that, and that's argumentative and assumes facts not in evidence.

You can answer.

A. I'm just stating what was in the report.

Q. Is what I said, do you disagree with it?

A. I don't know how to answer that.

MR. GROSS: Heidi, could you please read me the question back?

COURT REPORTER: Yes.

"Q. And what you've alleged in that regard is that because Tim was working two jobs and you were working two jobs, Rachael took advantage of that to falsify expense sheets?"

A. You said she was doing this during her time when I was approving expenses. I'm stating that that was not the case, that I didn't see it.

And then going back into totality and looking by month, that it was not during my leadership that those expense reports were coming in like they were for Tim.

Q. Okay.

A. That's different.

Q. So if it says here, as we just looked at, that since January 1, 2023 -- and we note that from that date, January 1, 2023, through August of 2023, that for those 8 months, I think you called it 9, that you were her direct supervisor; correct?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. And you were the one responsible for approving her expense reports, correct?

A. Yes.
Q. And did you see anything in those 8 or 9 months that led you to have the concern that you have at the end of 2023/beginning of 2024?
A. Not at that time.
Q. So later on, after you had approved it, you then later saw things that did give you concern for the same expense reports that you had previously approved; true?
A. She submitted a large amount of expense reports. The format is to only see what's on that report at that time. I don't see it in a spreadsheet in total over time.
So I'm not saying that the reports I approved were wrongly approved. There were some questionable parkings on there, but more than that, there were other things that were concerning, like putting down parking for places that don't charge for parking or valet.
Q. Did you drive to those places as well?
A. No. I asked Rachael about it when we were on a call with her.
Q. And what did she say?
A. After a long pause, she said she's buying coffee.
Q. Are you suggesting that she was lying when she said that?
A. No. I'm saying the expense report, I believed her in the moment that it was parking. I didn't think too much of

it, but after the fact and having the spreadsheet, Mercy Lorain does not charge for parking, as well as a couple other hospitals.

And what I'm saying is when it came through from me approving expense reports, I wasn't going through it with a fine tooth comb because I trusted her that what she was putting forth was true and accurate.

What my job is is to approve that the amount in the expense report is okay. So when one or two expenses are coming through on a singular report it's not alarming, but when you go back and look in totality, then you realize that it was maybe those were -- that was going on during that time, but with a less frequency.

Q. So you determined that it was going on during that time with less frequency, or it might have been?
A. It was going on with less frequency. I just don't have the spreadsheet in front of me to look at. It's a spreadsheet with over a thousand line items on it.
Q. Did you create that?
A. No, finance did.
Q. Are you aware that you're the last editor on it?
A. I am.
Q. So what did you do to it?
A. I had to analyze it and provide feedback, as well as Tim.

Q. So the numbers were entered by a different department, and you determined what those numbers meant?
A. They extracted the data.
Q. That's a program?
A. Concur. It's an expense reporting system. I had no way of pulling that, and neither did Tim.
Q. What prompted that to happen?
A. Olga told Tim to do that.
Q. And that's based on -- sorry. And that's based on what Tim told you?
A. Yes.
Q. So as far as you know, this whole looking into 13 months of expense reports, some of which you previously approved, that's all based on what Olga told Tim and Tim told you?
A. Yes.
Q. Would you agree that if Rachael was working on growing her territory, and in fact doing that, that she would have more parking expenses?
A. Yes.
Q. And the same thing with lunch with HCPs, that she, you know, it would make sense that she could have more of those?
A. Yes.
Q. And do you want to see that?
A. We were launching JETi, so yes, we were trying to get

it into the Cleveland Clinic. When we had -- when Rachael and I were working together in June, you know, to try to help elevate her number and try to put together a plan, that was definitely something that we looked at, was, you know, trying to increase awareness around JETi.

It was proving to be very difficult. It was a very difficult sell. And so yes, I would expect that to be the case.

MS. CHANDRASEKARAN: Kevin, the document, the termination worksheet we were looking at, are you marking that as an exhibit?

MR. GROSS: It's already marked. I read off the Bates stamp.

MS. CHANDRASEKARAN: Okay. So is it -- are you designating it as an Exhibit 1 or 2, or how are you wanting it to be identified in the transcript?

MR. GROSS: So that one was identified as 3516 through 17.

MS. CHANDRASEKARAN: So you're just marking it as Bates numbers, as opposed to like A or B, or 1 or 2?

MR. GROSS: Yes.

MS. CHANDRASEKARAN: Okay.

Q. Okay. I'm showing you what's been marked here as Abbott 5426. Do you recognize this?

A. Yes.

Q. What is it?
A. A text from Tim.
Q. To you?
A. Yes.
Q. So Tim is texting you at the top, and it says "Spoke to Olga. She gave me good guidance."
A. Yes.
Q. Correct? And he wrote that to you on December 7th, 2023, at 1:49 p.m.?
A. Yes.
Q. Is this the first text message in your messages with him?
A. No.
Q. What was said before that?
A. He was a colleague, so there would have been communications about hospitals, contracts, et cetera, prior to that.
Q. Anything about Rachael?
A. Yes.
Q. What was said?
A. In November he sent screen shots, and December and January, of expenses.
Q. To you?
A. He did.
Q. But those were not included in the text messages that

you produced? Is that accurate?

MS. CHANDRASEKARAN: That's not correct. We've produced additional text messages showing those screen shots.

MR. GROSS: So Uma, you're talking about the text that you produced yesterday?

MS. CHANDRASEKARAN: No, I don't think it was yesterday. I'm not sure what was produced yesterday, but we have produced the other text messages.

MR. GROSS: Okay. Look, I haven't seen -- this is the earliest message between Miss Lewis and Timothy -- not Trump, but -- Tim Powers, is December 7th.

MS. CHANDRASEKARAN: I can take a look and see on a break, I can take a look, but I believe that there are earlier text messages that we've produced in the case.

MR. GROSS: Okay. Yeah, we could take a look.

I think that they must have been produced yesterday. I mean, I did look at them, but as far as the initial production, I don't think that they were. I've been through all of that -- but let's keep moving here.

Q. So Tim tells you, "Spoke to Olga, she gave me good guidance."

You respond to him, "I can't wait to hear. I am off today and tomorrow. Talk Monday?"

I read that correctly?

A. Yes.
Q. So when he tells you he spoke to Olga and he got good guidance, you know exactly what he's talking about already; true?
A. No.
Q. No?
A. No.
Q. You didn't say what are you talking about, you said you can't wait to hear.
A. Can't wait to hear what suggestions she provides for him to figure out and how to solve the situation, how to handle it. This was a first time for both he and I.
Q. Which means, I think what's evident, that is what you said, that there are earlier text messages where you guys were talking about this topic before December 7th, and that's why when he says this to you on December 7th you know what he's talking about?
A. Yes.
Q. Okay. And then looking down in the same exhibit, Abbott 5426, Tim Powers sends you a picture that he took of his computer screen; true?
A. Yes.
Q. And what is that a picture of that he sent you?
A. An e-mail to the team, both coronary and endovascular teams.

Q. Was it a sent e-mail?
A. It was a draft for me to look at to say what I thought of it.
Q. So at the time he's sending you this picture of the draft e-mail on December 7th, 2023, at this point you know he has not sent it yet; correct?
A. Correct.
Q. And he says to you, "I'm going to massage the tone of the message but the bones will remain."
You respond, "I like it a lot. I am sure it will" -- and then it continues.
I read that correctly?
A. Yes.
Q. All right. I'm showing you Abbott 5427, more text messages between you and Tim Powers; correct?
A. Yes.
Q. And we can see that these messages are also dated, this is all from the same day, December 7, 2023; right?
A. Yes.
Q. But we can see that there's a message at the top that is cut off, right?
A. Yes.
Q. Who is it that says "Usually where there's smoke there's fire, right?"
A. Tim.

Q. What did you say before that?
A. I don't know.
Q. Because you can't see it on this message, right?
A. Correct.
Q. Did you take these screen shots yourself?
A. Yes.
Q. Why did you leave that part out?
A. You can only fit so much on a screen. You can -- I have what's before this.
Q. Are you sure?
A. I have it.
Q. Let's look at it. It's 5427. We could see "Usually where there's smoke there's fire, right?" We can see you sent the message above it, but we can't see it.
Now let's go back to the one we looked at, 5426, and we see this is going on at 2:10 p.m. It cuts off after you say "I like it a lot, I am sure it will," and then it stops.
We're not able to see the whole message that she sent; true?
A. True.
Q. Is there a reason you did that?
A. I'd have to look and see.
Q. Because --
MS. CHANDRASEKARAN: Look, we can see if we can get that text message in its entirety. You know, I sent

you an e-mail about a bunch of text messages that we never received that your client testified to in her deposition.

That wasn't intentional. On a break we can see if we can remedy it so that you have it and you can ask her about it.

MR. GROSS: I'm not suggesting it was, and I didn't get that idea when we were in Chicago either. I kind of thought after you went through all of that we were going to do a joint motion to do more discovery, but -- we can talk about that.

So the other thing I just want to point out is "Usually where there's smoke there's fire," that's at 2:40, and I'm pretty sure in the text before this, you know, the last one cuts off at 2:10, and I get that there could have been a 30-minute gap, but I'd like to see what's written there.

MS. CHANDRASEKARAN: Sure.

BY MR. GROSS:

Q. Now showing you Abbott 5428, another text between you and Tim Powers, this one is dated December 14th, 2023, at 12:10 p.m.; correct?

A. Yes.

Q. And you sent Tim here an expense report; is that right?

A. I can't tell based on that if I sent it or if he sent

it.
Q. You don't know on your phone --
A. I mean, it looks like that, based on his feedback there.
Q. Okay, that the messages there to the right side of the screen are sent by you; correct?
A. Yes, now I realize that.
Q. Okay. So December 14, '23, at 12:10 p.m., you sent Tim one of Rachael's expense reports, and we can see it's dated 11-24-2023; true?
A. Yes.
Q. Where did you get that report?
A. She submitted the report to me via the Concur system. It should not have come to me, so I'm telling him that she's sending me an expense report, and it wasn't the only time. She was supposed to be sending the reports to Tim, so I'm letting him know that the team is still sending me reports.
I don't -- I'm not supposed to be approving these expense reports, that's his responsibility to be approving them, so I'm notifying him that I sent it back to her.
Q. He responds when you send her expense report that, you know, you just happened to receive, "Did she just send that to you? I sent it back and asked her to put HCP attendees in her meal expense. Unbelievable."
You write back, "Yes, she did send it back."

He replies the next day "WTF"; correct?
A. Yes.
Q. So we can see here that although she happened to send you this report, even though you weren't her supervisor, you and Tim seemed to be having an ongoing conversation here about Rachael. Is that true?
A. That was pretty straightforward. She sent it to me, I sent it back. It's just a notification.
Q. Well, you didn't include a message to him like, "Hey, she sent this to me, you really have to do this," right? The message isn't there like that.
MS. CHANDRASEKARAN: What's your question?
Can you read back the question? I don't know if I understand.
Q. Yeah. My question is, you're not saying to Tim when you're sending him a picture of her expense report, "Hey, I want to provide this to you because she accidentally sent it to me." Instead, you just send him a picture of it, and that's it; correct?
A. I don't know how quickly he responded after I sent that picture. I'm not sure. He might have responded before I had a chance to even type anything. I don't know.
Q. Well, that would be speculation, but what we do know is his response and your subsequent response was all on the same day; correct?

A. Yes.

Q. Why didn't you give him any indication that, "Hey, she sent this to me mistakenly, I'm just getting it to you"?

A. I don't --

COURT REPORTER: Excuse me. I didn't hear the answer.

A. I don't recall.

MR. GROSS: She said she doesn't recall.

Thanks, Heidi.

Q. Okay. Showing you Abbott 5429, more text messages between you and Tim, and we can see here that you did capture everything from the previous message to the next one down. And on December 18, 2023, Tim sends you now a picture of Rachael's expense report; correct?

A. Yes.

Q. Without speculating, do you know why he sent you that?

A. I can't read it, so it's hard for me to determine.

Q. You're saying you don't know why he would send it to you because you can't read it anyway?

A. I can't see the print on the screen shot from my point of view.

Q. Okay.

A. The Towne Parking out of pocket would probably be a trigger. Fuel is something that should not be on an expense report. We have gas cards. That should not be on there.

Q. Okay.
A. And the office supplies, but I don't know what that is.
Oh, Wheeling, they don't charge for parking either there.
Q. So is there anything on here that you determined was not legitimate business expense?
A. At that moment in time I didn't think too much of it. You know, it wasn't at the forefront of my mind.
Q. It wasn't?
A. It wasn't.
Q. Tim writes to you, "My next thought. Does she live in an apartment?"
Wouldn't you agree is Tim is suggesting to you that Rachael is committing fraud by submitting charges on her expense sheet for her own personal parking at her apartment?
MS. CHANDRASEKARAN: Objection, foundation.
You can answer.
A. I don't know what Tim was thinking.
Q. But he asked you "Does she live in an apartment," right?
A. Correct.
Q. But you don't -- you don't know why he asked you that?
A. I think Tim was wondering, like, what is the reason for all of this, and I think he was trying to rationalize

maybe there was some reason that there was this amount of out-of-pocket parking expenses with Towne, but I'm not really sure.
Q. And you told Tim "Rachael lives in a house."
A. Yes.
Q. Why did you want to let him know that she lives in a house and not an apartment?
A. He asked.
Q. Any other reason?
A. My answer has brevity, which shows and demonstrates the amount of time I invested in this. I just answered his question.
Q. Yeah. I mean, I think you were defending Rachael here. You were saying, Look, there's nothing wrong with what she expensed here. She lives in a house. These aren't parking expenses for when she parks at her apartment for her own personal benefit, not Abbott's.
Isn't that what you were saying?
A. I answered his question.
Q. Okay. Showing you Abbott 5430, another text between you and Tim Powers, and he sends you one of Rachael's expense reports, and we can see it looks like a 2024 date. The text message isn't dated.
But in any case, he sends to you, "Now it seems to be coming together."

You respond, "How is that possible? She seems to turn in a bunch. By the way, she sent one to me as well."

What did you mean by that, "How is that possible?"

A. That she had three late charges on her expense report. Those are late fees which are responsible for her to pay directly to Bank of America.

And my point was that she turns in multiple expense reports in a month time frame, so how is it possible that she's getting late charges.

Q. Okay. And you would agree that this text with Tim was also in December of '23?

A. Yeah, I guess. I mean, I don't know, because he's referring to -- I don't know.

End of December -- yeah, I don't know.

Q. He then sends you another expense report, and this one is actually dated January 9, 2024, which gives us some cues on what the date of this text might be.

Did you make anything of this January 9, '24 report that he texted you?

A. I'm not sure I -- I am not sure if this is accurate, but the January, February, December, whatever those three months are, maybe those were the months with the late fees.

I just can't see, it's just not that clear. Maybe he's saying how every month, why is she getting a late fee every single month when all these reports are being turned

in.
I don't know.
Q. And now Abbott 5431, Tim sends you two more of her expense reports, actually it looks like it could be the same dated one, the line items might be different, and he indicates to you, "Upper half with Towne in them."
You respond, "I can talk after my next call. Under water at the moment."
I read that correctly?
A. Yes.
Q. Here is Abbott 5432, January 19, 2024. Tim sends you another expense sheet dated January 16, 2024, and he says, "FYI I sent a message to your entire team about utilizing corp card for expense purposes. Two out of the last five on-services were put on her personal card. In addition, the parking saga continues."
Is Rachael aware at this point, January 19, 2024, that you and Tim and, you know, the people that you're feeding this information to, you know, have serious concern about her expense sheets?
A. Can you repeat that?
Q. I'm just curious. With all the back and forth that we see in these texts between you and Tim about Rachael's expense sheets, my question to you is, did you go to Rachael about it and see what was going on at this point in time?

A. This prompted a conversation with Rachael where we discussed -- he was waiting for analytics, because they were closing the year and they couldn't provide him the report. Doug is in the finance department and would have to provide the report, but that's what Olga told him to do, is compare her reports to other people. Maybe there was a plausible reason for this.

So I asked had he received it from Doug, the Excel file, with the report comparing her to her peers.

Q. So Tim's text here, starting with "FYI, I sent a message," do you know what message he's talking about?

A. Only that message there. I don't know.

Q. So when he said in this text that he sent a message to your entire team, meaning you/Colleen Lewis, your entire team, you don't know what he's talking about with that? Is that true?

A. He just states that "FYI, I sent a message to your entire team about utilizing corporate card for expense purposes." He is doing that in response to "two of the last five" -- which should be "in-services" -- "were put on her personal card," so he is making an effort to communicate to the team to make sure you use your corporate card, not your personal card.

Q. And he communicates that after Rachael did what she just -- what you just testified to?

A. Yes, it appears that way.
Q. And the message he's referring to in the FYI bubble, that's his December 9, 2023 e-mail that he texted you, isn't it?
A. I'm not sure what you're asking.
Q. Okay. Do you see where I have highlighted here? Can you see it? He talks about a message.
My question to you is, to your knowledge, is he referring to the e-mail that he sent you a draft of by text?
A. A message is different than an e-mail, so perhaps it was a text message. I don't know.
Q. Okay. But what we do know from this, it's saying it is a message about utilizing the corporate card for expense purposes, right?
A. Correct.
Q. That part is clear.
THE WITNESS: Can we take a break soon?
MS. CHANDRASEKARAN: Sure.
Can we take a short break soon?
MR. GROSS: Yes. Let me just work through this, and then we'll take it.
BY MR. GROSS:
Q. So I'm showing you here Abbott 3224, and I can represent to you -- I don't need to, but I can -- that this is the screen shot -- strike that.

This is the picture that Tim took, probably using his cell phone, and sent to you by text. Do you see that?

Do you agree with that?

A. Yes.

Q. And the subject of this drafted e-mail is "Expense reporting guidelines"; true?

A. Yes.

Q. And right here, it's the third bullet point, he writes, "Our corporate card should be used for all field expenses unless there is an extenuating circumstance. This will be more heavily scrutinized as we move into 2024. Parking was a topic specifically brought up. Most parking meters today don't accept cash."

I read that correctly?

A. Yes.

Q. He's talking directly about Rachael without saying her name, right?

MS. CHANDRASEKARAN: Objection, foundation, speculation.

You can answer.

A. I didn't send the e-mail. I don't know.

Q. Okay. You don't know exactly what he was thinking, but do you disagree with what I said?

A. I think it prompted him wanting to tell the team, hey, please don't do this.

Q. Have you ever seen a copy of this e-mail but a version that actually denotes that it was sent?
A. I wasn't on that string, so --
Q. Have you ever seen a version where it's actually sent?
A. I wouldn't have access to that.
Q. So the answer is no, you've never seen it?
A. No.
Q. Okay. And you would agree with me that on this draft e-mail we can see here that there's the send button you see in the top left?
A. Yes.
Q. And so you would agree with me he has not sent this at this point, true?
A. True.
Q. This is a picture of an unsent e-mail, correct?
A. Yes.
Q. And you remember earlier when Brian testified, Brian Lecurgo, that he did not receive an e-mail from Tim Powers regarding using corporate credit cards and expense sheets. Do you remember that?
A. He may have said that. He may not have seen this. I don't know.
Q. And we can see that Brian Lecurgo is listed here in the to line, true?
A. Yes.

Q. What we don't see here in the to line is Rachael Rose's name, correct?
A. The plus sign on the right would indicate that there are other members from the team. That is in auto -- excuse me, not auto, it is a group distribution list that would have all members from that team. It just doesn't fit on that screen.
Q. Okay. So what you're saying is that you believe Rachael's name is in the plus 3 others there?
A. I believe that, yes.
Q. You believe it, but you haven't seen it?
A. Correct.
Q. And this is the e-mail that's referenced in Rachael's termination letter that we saw at the beginning, correct?
A. It is.
Q. Do you want me to pull that back up before we take a break?
A. No.
MS. CHANDRASEKARAN: When you say termination letter, are you talking about the termination recommendation worksheet? I don't believe it's a letter -- or are you talking about something else?
MR. GROSS: I called it the termination letter, but it is the recommendation for termination worksheet.

Q. And we can see here "previous counseling history" references what we just looked at, the December 9, 2023 reminder of the requirement to use corporate card for all expenses. True?
A. Are you asking me, or Uma?
Q. Yes --
MS. CHANDRASEKARAN: He's asking you, not me. I don't get to testify.
A. Yes, that's what it says there.
Q. Yeah, I just want to make sure that we're in agreement on that, that it's that unsent e-mail that is the previous counseling history listed on Rachael Rose's recommendation for termination worksheet performance?
MS. CHANDRASEKARAN: Objection, foundation.
You may answer.
Q. Do you agree with that?
A. I didn't generate that document. I did not put any of that information in there. That was not generated by me.
Q. I didn't say that you did. I'm just asking if what I'm saying you agree with, or if you don't, tell me that.
A. It's on there, yes, the 12-9. I don't know because I'm not Tim Powers. It sounds like that's the case, but I wasn't the one -- he also indicated that Olga spoke to his team.
The person that put this together is not Tim Powers,

so perhaps they're paraphrasing. I don't know. I didn't put it together and neither did Tim.

Q. How do you know Tim Powers didn't put this together?

A. It came from Employee Relations.

Q. Is that speculation, or do you know it?

A. I'm not sure.

Q. And you would --

A. I have to reference my e-mail to see where it came from. (Pause.)

Yes, I understand what you're saying.

Q. You'd have to reference your e-mail to see where the recommendation for termination worksheet came from?

A. Yes.

Q. Even if it came from Jimmy Brigham, you would agree that it was you and Tim who were supplying the information for those individuals, weren't you?

A. And Jim Curcio spoke with Rachael as well.

Q. Okay. So Jim Curcio was involved as well?

A. Yes.

Q. But we can see from your and Tim's text messages that the e-mail here listed as the performance issue is the one that he texted you?

MS. CHANDRASEKARAN: Objection, foundation.

You may answer.

A. Yes.

Q. And the way it's written here, wouldn't you agree that it's written such that Rachael was given the reminder of the requirement to use corporate credit card for all expenses by Tim Powers?
Wouldn't you agree that's what it says?
A. He didn't say it was specifically to Rachael, it just says there's a reminder that was sent via e-mail.
Q. Do you think that's misleading at all?
MS. CHANDRASEKARAN: Objection, argumentative.
You may answer.
A. I don't know. I can't speak for other people.
Q. Do you agree or disagree, or something else, that the e-mail that Tim drafted -- and in all fairness, there's no proof at least yet that he sent it -- but that served as a predicate for Rachael's termination?
A. Rachael was reminded, as are other representatives, on a number of occasions to use her corporate card. That was not the only time she was told to use her corporate card.
Q. So what you're saying is it's okay if that e-mail wasn't sent because she was told otherwise?
MS. CHANDRASEKARAN: Objection, mischaracterizes the testimony.
You can answer.
A. I don't know.
Q. Okay, that's fine. You don't know what you don't

know.
Don't you think it's fair that before Rachael be terminated for this reason that she first be made fully aware this is what we're seeing or perhaps this is what you're doing wrong, you need to fix it or else?
A. And Employee Relations did have that conversation with her, and because she lied and shifted her story about -- it wasn't even about Towne Parking so much as it was her saying that she leaves her wallet in the car, and then putting places down that don't actually have valet or parking.
She lied to three individuals, myself, Tim, and Jim Curcio, on another -- after Tim and I spoke with her. It was a shifting story, which was of concern.
Q. After you and Tim spoke with her, and that was at the end of January of '24, and what I'm asking is, if she truly had been notified even in this group e-mail on December 9th, 2023 that she needed to change what she was doing, doesn't it become important that she did not change what she was doing after receiving --
MS. CHANDRASEKARAN: Objection.
Q. -- receiving the e-mail from Tim Powers?
MS. CHANDRASEKARAN: Objection, vague.
A. I don't know.
Q. I mean, are you familiar with the concept that the more talented you are the longer leash you get?

Are you familiar with that idea?
A. No.
Q. Are you familiar with the idea that before anything negative happens to you such as termination we're going to give you full and fair notice of what you're doing wrong and give you the opportunity to correct it before we take this drastic action and terminate you?
A. She had the opportunity on the call to tell us, and she didn't. She had a shifting story, which was the biggest concern. Had in that moment she said she didn't -- in that moment if she didn't lie, it could have been different.
Q. And after that phone call at the end of January did she ever do anything to her expense reports that you found to be inappropriate again?
A. Yes.
Q. What?
A. She sent in an expense report with a Fairview charge that did not charge for parking.
Q. So what was it a charge for?
A. It was a charge for parking and it was one of the facilities that it was above the amount, the posted amount. And Tim also had in a report that he held that she asked to be sent back, he had held that the entire time due to the guidance of Employee Relations.
Q. Right. He was holding it instead of bringing it to

her and saying, "Hey, this is what we're seeing," correct?
A. Yes.
Q. And you said that there was -- after the phone call with you and Tim and Rachael at the end of January '24, you said that she then went to did you say Hillcrest or MetroHealth?
A. I think it might have been Fairview.
Q. Oh, Fairview. She went to Fairview and she expensed parking that was higher than the amount that you believed they charge. Is that correct?
A. I think.
Q. Did you go to Fairview to take a picture of that placard like you did at Hillcrest?
A. No.
Q. How were you aware that Fairview did not charge as much as she listed?
A. I called security.
Q. When?
A. At some point.
Q. Do you know what point?
A. Uh, I think when analyzing the data --
Q. So as far as what -- your position is that she continued to falsify expense reports even after you and Tim spoke with her directly at the end of January, that your basis for --

A. I would have to review. I would have to review and see, but I think that's the case. I think that was the case.
Q. That your basis for believing that she continued to do wrongdoing, even when you went right to her with Tim and said, hey, this is -- we're concerned, is based on a call you made to Fairview Hospital to ask them what they're charging for valet service?
A. Parking or valet service. But the reality is that the violations were not just with parking, they were more than that.
Q. Uh-huh. Okay.
MR. GROSS: Uma, do you want to take a break?
MS. CHANDRASEKARAN: Yes. We're going to take a break. Yes. Let's take a break.
MR. GROSS: What time would you like?
MS. CHANDRASEKARAN: Off the record.
(Discussion off the record.)
(Recess had.)
BY MR. GROSS:
Q. Miss Lewis, are you ready?
A. Yes.
Q. Besides Rachael, do you know if anybody else was the subject of a retroactive review or investigation into their expense reports?

A. Yes.
Q. Who else was?
A. Ron, Grant, Dave Curran, and I can't recall if anybody else was on that list.
Q. So Ron Petitte?
A. Yes.
Q. Did you review --
MR. GROSS: I'm getting an echo. Is anybody else hearing that?
MS. CHANDRASEKARAN: We're not hearing an echo, no.
Q. Did you review Ron' expense reports yourself?
A. When?
Q. Based on the last question that I asked about whether any other employees were subject to a retroactive investigation into their expense reports.
MS. CHANDRASEKARAN: I will object, objection to the question, because the way you asked it just now is different than the question you asked before, which she answered.
MR. GROSS: I'm sorry?
MS. CHANDRASEKARAN: And in particular, I think you asked was anyone else subject to retroactive review, and the second time you asked retroactive investigation.

MR. GROSS: I'm using those terms interchangeably.
Q. Miss Lewis, do you see a difference in the way I worded that that changes my question as far as the way Abbott talks about investigations versus a review?
A. I hear what you're saying. I'm not sure what you're looking for.
Q. Did you review Ron's expense sheets?
A. Yes.
Q. Over what period of time did your review of the records encompass?
A. The same time frame. The data was pulled for the expense reports from January to January.
Q. So January 1, 2023 through January 31, 2024?
A. Yes. I think there was a report in February that was in there as well for Rachael.
Q. For Rachael?
A. Yes, I think there was one report.
Q. So you're saying that Rachael's review was 13 and a half months?
A. Thirteen months and five days maybe. I don't know the exact items on that expense report.
Q. What did you see in Ron's expense report?
A. Nothing out of the ordinary.
Q. Was he putting down parking as a personal expense?

A. No.
Q. Did you notice any of his parking numbers to be suspicious in that they might be inflated based on what the valet or parking garage charges?
A. No.
Q. Did you travel to or contact the parking garages that he listed in his expense reports?
A. No.
Q. Is there a reason why you didn't do that?
A. No.
Q. When you traveled to Hillcrest to take a picture of the placard by the valet stand, was that at the time that you were working double duty?
A. I don't remember the day that I went, so I'm not sure. I think it may have been.
Q. Did you receive any permission from anybody to make that trip to Hillcrest?
A. No.
Q. Did you advise anybody that you were making it before you went?
A. No.
Q. Did you need to?
A. For my own personal reasons, I get -- in my heart I felt I needed to know.
Q. What the sign says at Hillcrest?

A. Yes.
Q. Why is it that you called Fairview instead of driving there?
A. It's on the west side, and I would have to drive more.
Q. Okay. So at the time you went to Hillcrest you had Fairview on your mind, but you didn't drive 30 miles to the west side to see?
A. No.
Q. No, you didn't drive, or no, you didn't have that in your mind at the time?
A. I didn't have it in my mind.
Q. Okay. Did that come in your mind before or after you went to Hillcrest?
A. Fairview was not on my mind.
Q. But at some point you did call Fairview and you asked them what they charged, correct?
A. Yes.
Q. So as far as why you didn't drive to Fairview, it wasn't because it's on the west side of Cleveland, because when you came to Hillcrest on the east side you weren't thinking Fairview, and let me check what those parking rates are. True?
A. True.
Q. You just decided or made the decision that when Fairview -- when you became suspicious about it you decided

you weren't going to make, you know, the trip to Ohio again to see what those signs say; fair?
A. I'm not sure that's what I was thinking. I don't recall.
Q. You don't recall what you were thinking?
A. Yes.
Q. For Grant or Dave, did you go to any of the parking garages that they used and expensed to verify yourself whether their parking expenses were accurate?
A. No, because the majority of theirs were on the corporate card, and I had been at many of the hospitals that they had down on the report and used my corporate card to exit the garage.
Q. Had you been to all of them or many of them?
A. I would say many. I'm not sure, I'd have to go back and look.
Q. And when you say that you've been to them, are you just talking about in the course and scope of your regular job duties?
A. Yes.
Q. And based on that you're just going off of memory, hey, this is what -- I remember what I paid last time?
A. I remember that they take my corporate card and I remember the, you know, the amounts in general.
Q. So the use of the corporate card gave Ron, Grant, and

Dave's parking expense sheets an air of legitimacy to you?
A. Correct.
Q. Simply because --
A. And the fact that they actually charged for parking. The legitimacy issue is that many of those places, like Hillcrest, for example, has a parking garage with free parking. It's free. The hospital is free to park at. Only valet is 6 or $8.
Q. And so you saw an issue with the fact that she shouldn't have been spending that money on valet, she should have parked in the free lot? Is that what you're saying?
A. No.
Q. Can you -- was there something, a point you wanted to make with that, or --
A. No.
Q. Can you still see my screen here?
A. Yes.
Q. I'm showing you what has been marked as Abbott 3605 through Abbott 3608.
Do you recognize Abbott 3605?
A. Vaguely.
Q. This is a 2023 performance assessment for Rachael under her maiden name, Duryea, correct?
A. Yes.
Q. And we see here what we talked about earlier. Her

rating was EE, exceeds expectations. Do you see that?
A. Yes.
Q. And the comment was "Excellent finish for 2023"; true?
A. Yes.
Q. Okay. Now I'm going to direct your attention to what we talked about earlier.
Okay, so I misspoke in what I said. What it says here is "Q1, 129.3 percent to quota, number 2 in the nation. Number 1 in the nation in base endo, 150.8 percent to quota."
The second line with an asterisk says "Highest grossing quarter in the history of U.S. Endovascular."
Do you see that?
A. Yes.
Q. So it was actually Q1 of 2023 that Rachael had the highest grossing quarter in the history of U.S. Vascular. Do you see that?
A. I do.
Q. Do you dispute that?
A. I am not -- I do dispute that, yes. I almost feel like that's around JETi specifically, not her total portfolio.
Q. Meaning -- and I don't want to put words in your mouth, but just so I understand -- what you're saying is because of JETi her numbers were inflated?

A. Um, no. What I'm saying is I think I'm referencing the JETi sales specifically, because we did very well with JETi, and I think that grossing quarter was for JETi.

That's what I'm reading that as, but I can't recall when I wrote that what I was thinking. But her revenue in total, it's not anywhere -- it's one of the smaller territories in the country. It's not -- there's -- it does not generate the revenue that Columbus generates or other geographies throughout the country. So I feel that that is in reference to the JETi, since I talk about JETi in that.

Q. So you actually wrote the comments that we see here?

A. Yes.

Wait -- no. Actually, no, that's not me. It's an employee overall evaluation. That's Rachael's comments, not my comments, so I apologize.

Q. Rachael wrote these comments?

A. I can't tell. I think they are employee overall evaluation comment -- no, maybe it was me.

I don't remember, to be honest. I'd have to look through the whole thing. I'm not sure if she wrote that in or I did.

Q. It says here she was evaluated by Oliver Asmar?

A. Yeah, he delegated it to me.

She didn't do her performance review. I had to e-mail her or text her to tell her to do it. It was past due. And

then it was completed and I was delegated to fill out information, but she had to enter in her review and I had to enter in my review.

Q. So just to touch on this one last time, when it says that she had the highest grossing quarter in the history of U.S. Endovascular, you dispute that because the territory that she's in is not as big as other ones in the country?

A. I think that's in reference -- yes. I think that's in reference to JETi, but I can't be sure. I have to look at the date of this.

But I'm not even sure that I wrote that.

Q. Well, whoever wrote it, I just want to know if you dispute it, and I think you answered that.

Wouldn't you agree it's not within her control how large her market is?

A. Agree.

Q. That she's from Cleveland, she interviewed for the Cleveland job. You hired her. You saw something in her, correct?

A. Yes.

Q. And she performed very highly in the territory that she was hired in, true?

A. A smaller territory, growth, you have less growth requirements in terms of revenue, and you can show a higher percentage increase compared to a larger revenue territory,

so it's more advantageous to have a smaller territory.

And yes, Rachael did a fantastic job. I was very proud of her. She was doing wonderful. That is not the reason for her termination. She really was working hard. I was very proud of the things that she was able to accomplish.

Q. Is that overall, or just limited to her last review before the termination?

A. Can you clarify what you mean?

Q. Yeah. When you said you were really proud of her and what she's done, is that just in reference to this evaluation we see here -- strike that -- this 2023 performance assessment, or is that in reference to the five, almost five years that she spent with the company?

A. I'd say both. She grew and matured in her role, and I was giving her increasing responsibilities to help develop her career, like I'm the one who put her on the 2023 NSM planning committee.

Q. And what's that?

A. You're responsible for working on our national sales meeting, the breakouts, the content.

Q. So you gave her a -- was it an executive role in the national sales area?

A. No.

Q. Was it a prestigious role that you put her in because

of her performance as an employee?
A. I wouldn't consider it prestigious. It's an opportunity to grow and develop and work cross-functionally with your peers across the organization on an important initiative for our company, which is the NSM meeting, national sales meeting.
Q. Looking here at Abbott 3606, at the bottom there's a comment, it says "Manager evaluation. Rating 100." And this is an evaluation done by you, correct?
A. Yes.
Q. Your comment was, "You have been able to establish new relationships with key doctors like Mously and Dappa in your territory. You continue to build your footprint, which will allow early success in 2024."
I read that correctly?
A. Yes.
Q. And you wrote this when?
A. December 31st.
Q. And at that time you and Tim were looking into her expense sheets and the propriety thereof; true?
A. What do you mean by propriety?
Q. The accuracy.
A. We did not have the file at that time, and it doesn't take away from the actions throughout the year of the activities. So that was pending, and we didn't have the

file at that time, so --
Q. You said -- sorry?
A. The file, the file from finance to compare the expense reports to really understand what was going on.
Q. Okay.
A. I was proud of her, and I meant that.
Q. You didn't have the file, F-I-L-E, from finance?
A. Yes.
Q. Is that the Excel sheet?
A. Yes.
Q. Had you had that at this point in time on or about December 31, 2023, would your evaluation as I've just read here have changed?
A. I don't know. I didn't have it when I wrote it. I wrote it with what I had at that time.
Q. I understand, but in hindsight, knowing what the file shows from finance, at least as you interpret it, Abbott interprets it, would you have left a different comment?
MS. CHANDRASEKARAN: Objection, speculation.
You may answer.
A. That comment is based on what she achieved with Mously and Dappa. That didn't change anything.
Q. Understood. Thank you.
Okay. I'm now showing you what's marked as Abbott 5608 through 5614, and I'm going to direct your attention to

Abbott 5610, paragraph F.
Can you see it there on the screen?
A. Yes.
Q. It reads "Direct charges to Abbott. In order to take advantage of certain economies, minimize certain risks, and provide increased controls, employees may charge certain expenses directly to Abbott. All air travel direct charges must be cleared on an expense report. Seminar or conference registrations may be paid either by Abbott via an administrative check request charging the appropriate department expense account number directly, or by the employee for subsequent reimbursement via an expense report. Auto rental, limousine, bus, taxi, meals, lodging, entertainment, and incidental expenses are generally not allowed to be charged directly to Abbott."
Did I read that correctly?
A. Yes.
Q. So if we look here at the last sentence in paragraph F, I want to ask you a question about that. It says that meals and incidental expenses are generally not allowed to be charged directly to Abbott. Does that mean those meals and incidental expenses cannot be charged on the Abbott corporate credit card?
A. It sounds -- I'm not sure exactly what it means, but by being directly charged to Abbott, I'm not sure that that

means -- I'm not sure exactly what that means; but the part that is confusing to me is that "charged directly to Abbott."

So I'm not sure what that means, because we are to put it on our corporate card, which is not necessarily Abbott per se, it's on the credit card. So I'm not sure what -- if that means -- I would say that that means to my cost center, Abbott's cost center, that it would come out of my budget. You can't apply it directly to my cost center, but I don't know for sure.

Direct charges to Abbott, that's meaning directly to the company.

Q. Is it your testimony then that when an employee, let's say like yourself, uses your corporate credit card to pay for parking at Cleveland Clinic Main Campus, that that charge for the corporate card is not a direct charge to Abbott?

A. It's not a direct charge to Abbott. It's a charge on the credit card that needs to be expensed by Abbott. But I'm not sure what that means, I don't really know. That's what I'm assuming, but I don't know.

Q. Do you know who is responsible for paying the Abbott credit card balance?

A. Finance.

Q. I mean, it would be --

A. But it has to go through the approval process and then be submitted.

I mean, I don't know. That doesn't make sense to me, that paragraph in the end there.

Q. Does it not make sense to you because it contradicts what Tim Powers wrote in his draft e-mail about using the Abbott corporate card for everything?

A. I'm not sure of the context of this. I don't think that it's speaking of the same -- I think it's speaking a different language than what you're trying to relate it to.

Q. I'm just trying to find out information, and I was asking you because you're more familiar with these policies than I am. But we could see here at the top of this document, 5608, it's titled Abbott Corporate Finance. Title: Expense reporting procedures.

A. Uh-huh.

Q. Do you see that?

A. Yes.

Q. And that's what we've been talking about today, correct?

A. Yes.

Q. The way that Rachael has reported expenses on her sheets, correct?

A. Yes.

Q. I'm showing you what's been marked as Abbott 5618 to

Abbott 5628. This is Abbott Corporate Finance. Title: Reporting and approval of sales force expenses.

Do you see that?

A. Yes.

Q. And if we look here at page 5619, it's the last full sentence on the page, Section 3.2 titled "General travel and travel expenses," and the last line says, "It is expected that the representative use the corporate card in lieu of a personal credit or cash whenever possible."

Do you see that?

A. Yes.

Q. Does that align with your understanding of how the corporate card is supposed to be used?

A. Yes.

Q. That there's not an outright ban of using a personal credit card or cash, it is expected that the corporate card be used whenever possible. True?

A. Yes.

Q. I'm now showing you what's marked -- strike that.

At the top it's another Abbott Corporate Finance titled Travel, entertainment, and other employee business expenses, and this is Abbott 5577 through 5592.

And I'm going to direct your attention here to the following on page 5583, and the section is Section V or 5, and it starts on 5582, and it's titled "Corporate

credit/charge cards. Bank of America MasterCard global corporate card program."

That's the corporate card we've been talking about today, correct?

A. Yes.

Q. We look here on page 5583, it says "Improper use of the corporate card or failure to comply with the corporate card program policies may result in disciplinary action up to and including review for termination of employment. Upon termination of employment for any reason, an employee may no longer use and must return the corporate card, and the employee and manager must ensure all expense reports are submitted and the corporate card balance is paid in full, including all personal charges."

I read that right?

A. Yes.

Q. Now, is it your belief or position that Rachael did not account for all of the charges on her expense report?

A. I don't know.

Q. I'm sorry?

A. I don't know.

Q. You don't know. Upon her termination, Rachael, did you as her manager insure all expense reports are submitted and the corporate card balance is paid in full, including all personal charges?

A. I approved her expense report that comes through Human Resources and anything that would have come to me I approved, and then it would have been paid by -- it would then be paid in the usual format.

Q. Do you remember during Rachael's deposition Miss -- your attorney Uma, I apologize for the first name -- but your attorney Uma pointed out to Rachael how there was about a 677-dollar discrepancy?

MS. CHANDRASEKARAN: Objection, vague.

You may answer.

A. Regarding what?

Q. Let me ask that again. To your knowledge, were there expenses on Rachael's report that she was not able to account for from your perspective?

A. No.

MS. DREISHMIRE: I'm sorry, can you please repeat that question? I'm not sure I heard it accurately or that the witness heard it accurately.

Could you please repeat the question?

MR. GROSS: Heidi?

MS. CHANDRASEKARAN: Sure. Have Heidi --

MS. DREISHMIRE: Have the court reporter repeat it, please.

MR. GROSS: Yes. Heidi -- sorry to interrupt -- would you read both the question and the answer, please.

COURT REPORTER: (Read back as follows:)

"Q. Do you remember during Rachael's deposition Miss -- your attorney Uma, I apologize for the first name -- but your attorney Uma pointed out to Rachael how there was about a 677-dollar discrepancy?

"MS. CHANDRASEKARAN: Objection, vague.

You may answer.

"A. Regarding what?

"Q. Let me ask that again. To your knowledge, were there expenses on Rachael's report that she was not able to account for from your perspective?

"A. No."

A. She did not reference -- Rachael submitted all her expense reports and they were approved. Uma was referencing something else, and that is accountability for the expenses on the Apple Pay.

Q. And what did you understand those expenses on the Apple Pay to mean?

A. The difference between what Rachael submitted versus what was on her expense report. There was a differential of unaccounted-for expenses.

Q. Meaning she was seeking reimbursement for money that you were not able to account were being spent on business purpose?

A. I'm not sure which one we're talking about. I'm not

sure if you're referencing an expense report, the one that Tim had, or if you're referencing the Curcio response to being able to demonstrate that there was 600-some dollars in charges that were unaccounted for. I'm not sure what we're referencing here.
Q. The latter, the latter. It sounds like -- I don't want to put words in your mouth, but it sound like you're aware or at least remember from Rachael's deposition that there was an allegation of 600-some dollars that was not accounted for that she put on her expense sheet. Do you know what I'm talking about, or no?
A. Yes, I believe so.
Q. Okay. Let me go back to where I was.
Okay. Given that you believe that there was a 600-some dollar discrepancy, why didn't you go to Rachael and have her pay that money back at the end of her employment when she was terminated?
A. We're talking about two different things here. We're not talking about the same thing.
Q. Okay. Is there anything else you want to add beyond that?
A. No.
Q. Okay. Here on 5586, Section VII, titled expense reports, it says, "It is also the general policy of Abbott that all expenditures $25 or greater must each be supported

by an original paid receipt from the establishment that provided the service."

Do you see that?

A. Yes.

Q. Is that a requirement?

A. Yes.

Q. Did Rachael violate that rule?

A. No.

Q. All right. I'm showing you another Abbott Corporate Finance. Title: Expense reporting procedures. Abbott 5608 through 5614.

Let me try that again. I'm now showing you global expense type descriptions, this is Abbott 5594 through 5607. I'm going to go to 5605 and ask you about 9 at the bottom here. Do you see that?

A. Yes.

Q. It says "Personal: Any expense non-business related that is not reimbursable must be classified as a personal expense. Note: Any corporate card charge marked as personal, employee is responsible for sending payment directly to Bank of America.

Do you see that?

A. Yes.

Q. Did Rachael have to do that at any point, to your knowledge?

A. On late payment, late charges, it is the responsibility of the rep to pay for the late charge. So in those circumstances she would have.

Q. The parking expenses that we've talked about, whether it be, you know, what you've characterized as an inflated number or no parking lot that requires payment, weren't those expensed as personal expenses?

A. No, out of pocket.

Q. They're expenses out of pocket. And what's the difference between personal and out of pocket?

A. Personal means I, Colleen, am going to pay Bank of America because I have responsibility for this charge because it's personal.

Q. Are you allowed to do that?

A. It happens. If you accidentally put something, maybe you accidentally gave Wendy's your credit card and it was actually your own meal, that you have to have a way to be able to remove it and pay Bank of America and address that line item. Out of the pocket means you just pay cash or on your own card.

Q. Do you believe that Rachael expensed personal expenses to Abbott for reimbursement?

A. She said she did.

Q. What did she say?

A. Her vehicle being towed, a sweatshirt.

Q. So the vehicle tow was when she was on a trip to West Virginia for work, correct?
A. I have no idea when it was, because it wasn't expensed as a tow.
Q. Do you recall her testimony to that effect, or not?
A. Yes.
Q. Would you agree or disagree that if she was on an overnight work trip and her car got towed that that would be a business expense?
A. No.
Q. Why not?
A. Don't park in a no parking zone. And I don't know of other details around it, why she would have gotten towed. She must have chosen to park in an area that was not permitted to be parked in.
Q. Do you know that or are you assuming that based on the tow?
A. Why else would be you towed?
Q. So that's what you believe based on the situation, but you don't know specifically where she parked and why the tow truck picked her up; true?
A. I have no idea.
Q. At the bottom of page 5605 it references "Tips, tips/gratuity for service provided. Examples include concierge, valet, housekeeping, restaurant, and taxi/hired

car tips." Do you see that?
A. Yes.
Q. Does this mean that tips are reimbursable by Abbott on the expense sheet?
A. One hundred percent they are, yes.
Q. They are. Did you take that into consideration when you saw what you characterize as inflated parking numbers?
A. As I said earlier, yes.
Q. That the numbers might be different? I think you indicated Hillcrest charged either 6 or $8 -- is that right?
A. Yes.
Q. -- on their valet parking placard; true?
A. Yes.
Q. So wouldn't you agree with me that it's at least possible that the difference in the numbers that you saw when you traveled to Hillcrest to compare that with Rachael's expense sheet could have been attributable to a valet tip that she left?
MS. CHANDRASEKARAN: Objection, speculation.
You can answer.
A. If you want to pull up the grid we can review that. I would be just guessing. I don't know how much Rachael tips. I would say that it's unlikely that she was tipping a hundred percent at $12-plus and beyond.
If it was down for $12-plus, that's a substantial tip

that most people are not giving to a valet, but I don't know that, so I'd have to look at the Excel to see what those dollar amounts were. It varied.

Q. No, I understand that. I'm just asking whether that was a consideration of yours, that the discrepancy in the parking amount that you saw and that she expensed, you know, could have been for tipping?

A. Yes, I took that into consideration.

Q. All right. Okay. I'm showing you Abbott 3445 through 3447. I'm going to direct your attention here to 3446.

You wrote an e-mail to Rachael and Ron Petitte on March 19, 2024, at 9:34 a.m., and you wrote "Subject: Promotion. Hi, Rachael and Ron. Please start thinking about what you would enter in the document below. I have not heard anything yet but want to make sure you both have a chance to think about what your case looks like. There are three areas to enter comments. This is an opportunity to dig in and think about what you have done. As soon as I am notified, we can begin to put this together. Colleen."

I read that correct?

A. Yes.

Q. Why did you send this e-mail to Rachael?

A. I -- I sent it to Rachael and Ron together because they both hit their number, and I thought that we could get a head start and send this in on their behalf.

Q. So you were reaching out to Rachael and Ron to talk about promotional opportunities for each of them. Is that true?
A. Yes.
Q. At this point in time were you aware that Rachael would be terminated?
A. I did not have a final from Employee Relations at that point in time.
Q. But you had the file from financial; true?
A. Yes.
Q. And if I'm understanding your testimony correctly, that's a big part of the evidence that you rely on to support Rachael's termination.
A. It was the evidence that was submitted for review by Employee Relations.
Q. And do you believe what was submitted and what was generated in that Excel sheet, which I think you're referring to as the file from financial, that that supported Rachael's termination from the company?
A. Say that again?
Q. Did the Excel sheet support Rachael's termination from the company, in your view?
A. I think it did.
Q. Did you have a belief at this point in time when you sent Rachael this e-mail about being promoted on March 19,

2024, that she was going to be terminated soon?
A. I did not know. It was not up to me at that point, it was in Employee Relations' hands. We were moving forward with business as usual.
Q. I understand that, but based on your involvement and the communications that you received from ER, did you have a belief that she was probably going to be terminated?
A. I thought that it could be -- it was concerning and that that could be the end result, but that it was not up to me.
Q. And she was ultimately terminated on March 26th, 2024?
A. I don't remember the exact date.
Q. Would you agree it's on or around that time, the end of March?
A. Yes. It might have been the 27th.
Q. So that would be eight days after this e-mail here.
A. Yes.
Q. I'm showing you Abbott 3490 through 3491. Do you recognize this?
A. I don't know that I was provided that. I'm not sure.
Q. So I'm going to direct your attention here to what I have highlighted, and it reads, "Did she ever get reminded at the out of pocket?
"Not initially, but there were originally so few."
Do you see that?

A. I see it.
Q. Do you know what that's referring to?
A. I don't know.
Q. Do you know if it's referring to Rachael when it says "she"?
A. It appears that way.
Q. And does it also appear that she was not reminded about out-of-pocket expenses?
A. It says that, but that's not the fact. She was reminded.
Q. So you dispute what it says here.
A. I don't know the time frame on that, and I don't know who they were referring to. Maybe it is Jim Curcio saying he didn't remind her. Jimmy Brigham, maybe he's saying that. I don't know who this is between. I don't know who's typing this.
Q. So if we go up here a little bit, these asterisks here denote a break. And we can see here that there was a conference call on March 4, 2024, and you, Jimmy, and Tim were on the call with Jim Curcio. Do you see that?
A. Yes.
Q. And if we go down a couple lines here, it says "Tim managed Rachael from Q4 2023 through February 2024 and saw questionable expenses." Do you see that?
A. Yes.

Q. And you're aware of that because you were communicating with him at that time?
A. Yes.
Q. The next paragraph, "The main issue is multiple out-of-pocket expenses, majority were parking that were out of pocket. Very unusual to continually pay 3 to $400 parking expenses, seeing remote areas where there is no parking fees. Not out of line with expected spend, but too many cash, especially parking expenses where there is no paid parking."
It then leads into what we looked at, "Did she ever get reminded at the out of pocket?"
"Not initially, but there were originally so few. Tim also had a conversation with everyone on the team in October, reminder to the whole team. Olga in finance assembled data that."
Do you see that?
A. Yes.
Q. Are you aware of this October reminder that's referenced?
A. I referred to that earlier, that Tim had Olga on a call and told everybody about using a corporate credit card.
Q. Including for incidentals?
A. For all Abbott business-related expenses it is advised that you use your corporate credit card.

Q. At the bottom here, the last sentence on Abbott 3491 reads, "Rachael was terminated for violating Abbott's Code of Conduct by knowingly submitting false expense reports and not being forthright during the investigation."
Do you see that?
A. Yes.
Q. Do you agree with that?
A. Yes.
Q. I'm now showing you Abbott 3483 to 3484. Do you recognize this?
A. It was not submitted to me.
Q. So no, you don't recognize it?
A. I think it may be in the file that I -- in the documents that were shared with Rachael as evidence, but it was originally that was not submitted to me via e-mail or anything.
Q. You saw it in connection with this case, but not before that? Is that what you're saying?
A. Not before that.
Q. Okay. So this is an Employee Relations performance PIP, correct?
A. Yes.
Q. And if we go here to the first comment, it says, "First name/last name of the requester: Colleen Lewis. Reason for calling: Colleen is requesting to speak with ER

regarding a PIP for her employee, Rachael Rose. Please assist, and thank you in advance."

Did you write that?

A. I didn't write that.

Q. And here there's an entry on July 11, 2023. The requester again is you. "Reason for calling: Colleen is requesting to speak with ER regarding a PIP for her employee Rachael Rose. Please assist, and thank you in advance."

Is it true that you made this request as stated here?

A. Yes.

Q. And we can see the last entry on September 28, 2023, "Effective 8-22-2023 Rachael started to report to a new manager, Kristin Niles. If Kristin needs assistance regarding Rachael's performance she needs to contact the HR service center and open a new ticket."

Do you see that?

A. Yes.

Q. So we can gauge from this that beginning on August 22, 2023, that's when you stopped being Rachael's supervisor?

A. No.

Q. No? What does that mean then?

A. That was the date that I was told that I was going to be realigned. That was when they made the announcements. October 1 would have been the first day that I was not her manager.

Q. So when it says "Effective August 22nd, Rachael started to report to a new manager," that's not accurate?
A. Where does it say that?
That's not accurate. That was when she was notified. That's the date that it was said that I would no longer be her manager, but it was not in effect at that date. On that date is when she was told she was going to report to Kristin Niles.
Q. I'm looking here, September 25th, there's a notation that Maria Hernandez Martin sent you a copy of the written warning template for you to create a draft.
Do you see that?
A. Yes.
Q. Did you do that?
A. I did not.
Q. Why didn't you fill out that written warning template?
A. As I mentioned earlier, Rachael was doing well with the initiatives, the task lists we put together; basically having a to-do list and executing on assignments such as consignment, reconciliation, addressing the customers' needs both at Metro and at the Cleveland Clinic, and just handling her business. She was doing a good job.
I did not have to wait for the template to be sent, I could have done that at any point in time; but because she was doing a good job and I felt she needed added help, that

she needed to have me show her how to manage the inventory.
Q. And did you?
A. Yes. We got on Teams calls, and it was a result of a customer complaint and our divisional vice president making the request that we fix that, or we weren't able to get any more consignments.
Q. And that's what led you to open a ticket for a PIP?
A. One of the factors.
Q. Were there any others besides that?
A. She had late eCOA reports, which are required by the FDA that you're on time. There was customer complaints, team complaints on her need to become better at her clinical skill set, so I assigned her a mentor to help her with JETi, John Bandera.
Q. Do you think that helped her numbers in 2023?
A. I think it helped, and it also helped that Ron Petitte got JETi in at University Hospitals and trained those physicians, like Mously on there, who went to Metro, because Ron trained them on JETi.
And then Rachael has a few UH accounts and then was able to benefit from that, so it definitely helped her number because they were already trained physicians by Ron to use the device. They just wanted it in the hospitals that Rachael had responsibility for.
Q. So to be clear, you dropped the PIP. You didn't

follow up with it on your own volition?
A. What does volition mean?
Q. Was that a decision you made to not proceed with the PIP on the ticket you opened?
A. Correct, yes.
Q. So you made that decision yourself and it didn't have anything to do with the fact that you were being transferred away from being her supervisor?
A. That's correct.
Q. And then when we look at mid December of 2023, or about four months -- well, five months after you opened the ticket for the PIP, that your collaboration with Tim, her supervisor, into her expense reports, that that didn't have anything to do with the fact that you were coming back to be her supervisor after the PIP did not go through?
A. The PIP was not related to the expense reporting infractions. That occurred while Tim was her manager, which created a whole new set of issues. They were independent of each other.
Q. So at the time you opened the PIP, you were not aware of any expense reporting issues that Rachael made in your mind?
A. If I had an issue with an expense from Rachael I would send it back to her, such as an individual meal that may have been coded, on several occasions; but anything that I

noticed I would address it with Rachael. And there were several, they were corrected. But after, you know, when Tim was her manager I just didn't have responsibility for that, and I mean -- you know (pause.)
Q. You cut out there. Are you finished?
A. Yes.
Q. Okay. So you weren't working with Tim in December of 2023 because you knew you were coming back to be Rachael's supervisor. Is that your testimony?
A. Tim was my colleague. We shared the same -- 90 percent of the same geography. We worked together on a regular basis for contracts with our -- we have the same customer base, he was my partner.
Q. Were you texting with him about anybody else's expense reports?
A. No -- I think maybe to some of the other people that were being considered to be reviewed.
Q. So your working with Tim beginning in December of '23 was done as a matter of course in your job and not related to you coming back to being Rachael's supervisor at the beginning of 2024?
A. I don't know.
Q. And your working with Tim on the expense report issue was not relating to the fact that the performance improvement plan ticket you opened never resulted in there

being a formal PIP?
A. Because I chose not to proceed with it.
Q. I understand. I'm asking, did your decision not to proceed with it cause you to work with Tim in investigating Rachael on her expense reports?
A. No.
MS. CHANDRASEKARAN: Kevin, I think we're at that hour mark, you know, so if you can wrap it up. How much more do you have?
MR. GROSS: If I were to go another half hour, I'll be done at that point.
MS. CHANDRASEKARAN: Okay, let's proceed.
MR. GROSS: Okay.
Q. So I'm showing you here Abbott 3501. It's an e-mail from David Paoli to you, and he writes, "Hi, Colleen. Can you be a little more specific on your request? I think maybe you are referring to our new monthly process of receiving audit reports and sending messages to the field.
"Rachael was on the out-of-pocket report for January, but I did not send her an e-mail. I only sent it to the highest offenders of the month. Here is her data below, but again, I don't think I sent her an e-mail. Let me know. Thanks, Dave."
And he sent you this on March 4, 2024. Do you see that?

A. Yes.
Q. Who were the highest offenders?
A. I don't know.
Q. You never found out?
A. That wasn't the purpose of that e-mail.
Q. Okay. So here I'm looking at Abbott 3512 through 3513, and you wrote an e-mail to Jim Curcio and Jimmy Brigham, and you're sending both of them a copy of an expense report that Rachael submitted; true?
A. Yes.
Q. Is there --
(Overlapping speakers.)
A. -- six dollars --
COURT REPORTER: Excuse me. Would you please repeat your answer?
A. The first item, you now see Hillcrest at $6 on her corporate card not showing up as Towne, but as Hillcrest Hospital.
Q. Yes. So Towne is the valet parking service, correct?
A. Yes.
Q. And Hillcrest Hospital has its own parking garage situated next to the hospital, true?
A. Yes.
Q. Isn't that the distinction that you're pointing out?
A. I'm pointing out that when it's on a corporate card

it's only $6, when it's out of pocket it's well above that.
Q. What is the out of pocket for Towne Parking?
A. Towne and hilt sheet Towne, and then the description was the Mayfield, Ohio, which went with Hillcrest, because she had to retype that in to create the expense. When you put it on your credit card it populates.
Q. My question to you is, is there a different vendor listed? Because on one occasion she's using the Hillcrest parking garage, the concrete structure, and on the other occasion she's using Towne Parking, a third-party vendor, that does valet --
A. The garage was free.
Q. Go ahead.
A. The garage is free.
Q. Are you sure about that?
A. A hundred percent.
Q. Okay. So you can't understand how there's a Towne Parking charge for Hillcrest Hospital. Is that fair?
A. No.
Q. Or is it that you can't understand why there's a Hillcrest Hospital vendor name for a parking charge?
A. No.
Q. Can you explain?
A. When using your corporate card at the valet service at Hillcrest it's 6 or $8 and comes up on your expense report

as Hillcrest Hospital. The amount on the valet kiosk says 6 or $8. There's no additional out-of-pocket $2 parking and an additional $6 out of pocket for tips on there. There's no tip amount put on this for $1, $2, $3. There's no tip.

The only charges that you will incur at Hillcrest is if you valet. If you park in the parking garage it's free.

Q. Did the valet accept credit cards at Hillcrest?

A. It has to be, yes, as proven by that charge --

Q. When you went there --

A. -- on the corporate MasterCard.

Q. When you went there did you confirm that --

A. Yes.

Q. -- that valet at Hillcrest accepts credit card?

A. Yes.

Q. And that what's its going to show as the vendor name?

A. Hillcrest Hospital.

Q. When Towne Parking is the one who valets?

A. Corrected.

Q. And based on the Google search that Tim did, is it your understanding that Towne Parking is a company that's separate from Hillcrest?

MS. CHANDRASEKARAN: Objection, foundation.

You may answer.

A. You can't give your credit card and have it show up as Towne, it shows up as Hillcrest. That's the company they're

employed through, but any charges go back to the hospital. It doesn't get paid to the valet service, it gets paid -- it's a charge at the Cleveland Clinic Hillcrest, so they're the ones that are being paid.

Q. How do you know all of that?

A. Because every time you use a corporate card at Hillcrest it comes up as Hillcrest Hospital. On her reports they were -- she titled them Towne and put Mayfield.

Q. So is that information that she puts in?

A. She has to input that information.

Q. Why does she have to input that information from Towne?

A. It's required.

Q. Is it because she was paying cash and there wouldn't be a credit card statement that indicates who the vendor is?

A. Correct.

Q. I saw in the discovery that after Rachael filed the lawsuit you went on her husband's Facebook page and downloaded some information. Do you recall that?

A. Screen shots.

Q. What led you to do that?

A. Rachael decided to take her Facebook down, and I thought that it would be important to demonstrate that she chose to send her husband pictures that had me in it to recognize her performance.

Q. So on her Facebook page she had pictures of you recognizing her performance?
A. No, her husband had them on his Facebook page.
Q. And that's what you wanted to document?
A. Yes.
Q. And you agree with that, that you did celebrate her success at the company?
A. Yes.
Q. So there wasn't anything untruthful that her husband posted, was there?
A. No.
Q. Who was the female candidate that you say you wanted to hire but could not due to a noncompete agreement?
A. Angela Pavlik.
Q. What did you want to hire her to do?
A. To be an account manager in Cleveland for the Cleveland Clinic territory.
Q. Who was she replacing had you hired her?
A. Rachael.
Q. But ultimately you hired Jeff Rea instead?
A. I had no -- I hired Jeff Rea to backfill Rachael, that's correct.
Q. Did you say to backfill?
A. Yeah.
Q. Did he take over the same position that she had held

when she was terminated?
A. Yes.
Q. So in the last about 20 minutes here, 18 minutes, I'm going to change gears a little bit.
Dr. Smolock, do you know who that is?
A. Yes.
Q. And on January 23, 2022, Rachael informed you that Dr. Smolock was touching her inappropriately on January 21, 2022; true?
A. I don't remember the 21st date, but around there, yes.
Q. I mean, do you dispute those dates?
A. No.
Q. Okay. I'll represent to you that those are the dates I have, based on the documents, that the incident where Dr. Smolock was touching Rachael inappropriately happened, and then she informed you of it two days later. Does that sound accurate?
A. Yes.
Q. And on January 24th, or the day after Rachael informed you of what Dr. Smolock had done to her, you write a note on your iPhone; true?
A. Yes.
Q. And in that note you wrote, quote, "Dr. Smolock began playing with her hair for an extended period of time."
True?

A. Yes.
Q. And you also wrote that, quote, "Advised no more alone dinners on Friday/Saturday unless in group setting, or even during the week," end quote.
Do you remember that?
A. Yes.
Q. Do you want me to show it to you?
A. No.
Q. So in your own personal note dated January 24, 2022, you're stating that you advised Rachael that she's not to go on any more dinners alone on Friday or Saturday; correct?
A. Yes.
Q. Unless she's in a group setting, right?
A. Yes.
Q. Why did you believe that?
A. Because that incident happened, and I was concerned. I felt it was important for her not to be put -- to be in a one-on-one situation.
Q. Anymore with him or anybody else, right?
A. Correct.
Q. And that's because of the conduct that Dr. Smolock engaged in with Rachael in a one-on-one setting?
A. Correct.
Q. Did she ever work with him again?
A. Yes.

Q. Did you permit that?
MS. CHANDRASEKARAN: Objection, vague.
You can answer.
A. That was her choice. I told her she did not have to work with him. It was the next day she went and worked with him.
Q. Okay. How about after the next day? Did she work with him any more?
A. Not to my knowledge. I know that she sent the clinical Brian Billiter to go work with him.
Q. Did you contact HR about what happened with Rachael and Dr. Smolock that she reported to you?
A. Yes.
Q. Why?
A. Because of the assault that occurred.
Q. Would you characterize it as a sexual assault?
A. I'm not sure of the specifications around the difference between assault and sexual assault, but I would say that, yes, it falls under sexual assault.
Q. On January 26, 2022, you told Kristin Gewalt of Employee Resources that "Dr. Smolock" quote "caressed her hair, she let it go on for 20 minutes. She never told him to stop at any point."
True?
A. That was her words to me.

Q. She said that to you?
A. Yes. Rachael told me that, yes.
Q. That she --
A. I was repeating.
Q. Go ahead.
A. Yes.
Q. So your testimony is Rachael told you that she let Dr. Smolock caress her hair and let it go on for 20 minutes?
A. Yes.
Q. Do you believe that Rachael acted inappropriately if in fact that's true?
A. No.
Q. To your knowledge, was there ever an investigation done into the incident between Dr. Smolock and Rachael?
A. Not to my knowledge.
Q. Do you know if there should have been under the rules?
A. I don't know.
Q. I'm showing you Abbott 3529 through 3530. This is an Employee Relations form submitted on January 24, 2022 by you; correct?
A. I didn't fill out the form.
Q. The first comment here says, "First name/last name of requester: Colleen M. Lewis. Reason for calling: Harassment to an employee."
So you called ER --

A. Correct.
Q. -- about what happened with Rachael and Dr. Smolock, correct?
A. Correct.
Q. And here on 3530 is where the report says "Doctor caressed her hair. She let it go on for 20 minutes."
Do you see that?
A. Yes.
Q. "She never told him to stop at any point. Then escalated to him touching his mouth over her ear. The second time he leaned in and bit her ear. She said ouch. He touched her hands. He did apologize to her at the end of the dinner. They left. After they left he called her immediately and apologized."
Is that a true and accurate rendition of the facts that you relayed to Kristin Gewalt at Employee Relations?
A. Yes.
Q. Do you believe Rachael was at fault over what happened to her that night?
A. No.
Q. I'm showing you Abbott 4092, and this is a text between you and Rachael. Rachael is in the dark bubble, and she writes here on March 2, 2022, "At the ED in the waiting room. Sound like Smolock's leg case is on for tomorrow, 7:00 a.m. start."

You respond, "Interesting RE/regarding Smolock. Happy you went. Better to be safe than sorry."

Do you see that?

A. Yes.

Q. So this is after the January 21st, '22 incident with Dr. Smolock and Rachael; correct?

A. That is (pause) but she's not going to work with Smolock. That is an emergency department visit for herself because she had a urinary tract infection. That's me -- I sent her to the emergency department. She's referencing Smolock's case, which Brian Billiter covers, not Rachael.

Q. So you're saying that -- I am not -- I misunderstood what this text is actually saying.

A. She's in the emergency department. Yes, that's what ED means. She is physically in the emergency department, Rachael was.

Q. I understand. But you're saying she's in the emergency department for her own health and wellness, not for work?

A. Correct.

Q. Which one was she at?

A. That's why I asked. I think she went to -- I can't remember. I think I asked. I don't know if it's in there or not.

Q. But she is referencing that Smolock has a leg case

that is on for tomorrow at a 7:00 a.m. start.
A. Yes.
Q. You don't ever tell her you don't have to go to that, do you?
A. She sent Brian Billiter to that case, and I already told her that she doesn't have to go to his cases. She was well aware. I didn't need to repeat it.
She was at the UH Parma ED.
Q. For her own personal care.
A. Correct.
Q. Do you know what that was for?
A. A UTI.
Q. I'm showing you a March 16, 2022 text message between you and Rachael. You write to her at the top, "Good morning, Mrs. Rose. Are you at CC today?"
She says, "Yes, ma'am."
"With Smolock?" Question mark.
She gives the thumbs up, indicating yes.
True?
A. She's with him. I'm not sure if she's doing a case with him or he's present in the OR, where there are other vascular surgeons like Ambani and other doctors she would be working with.
Q. Why did you ask if she was with Smolock?
A. I don't recall.

Q. Was it done out of concern?
A. No.
Q. Did you ever smack Rachael on the behind?
A. No, never.
Q. Did you ever grab Melissa's breasts?
A. No, never.
Q. Did you ever talk about having sex with your fiance?
A. No.
Q. Did you require Rachael to attend one dinner a week?
A. No, never.
Q. Did you require her to have a two-drink minimum at dinner?
A. Never, nor anyone else.
Q. Do you drink alcohol?
A. Occasionally.
Q. Did Brian in his testimony describe the way you drink alcohol accurately?
A. Yes.
Q. At least, you know, when you're working?
A. Yes.
Q. All my questions about that, your drinking of alcohol, only pertains to your employment at Abbott, so I just want to be clear about that.
Did Rachael ever indicate to you that she was not comfortable at dinner with Dr. Rao?

A. Yes.
Q. What did she say?
A. It wasn't going to dinner, it was the comments he made about Angela and another female rep, praising them for losing weight. It made her feel uncomfortable.
Q. That's what she referred to in her deposition as body shaming?
A. Correct.
Q. And she made you aware that Dr. Rao -- this misconduct you just testified to, that came from her to you; true?
A. Yes.
Q. Did you ever tell a story about Colin, last name unknown, having sex with a stripper in the summer of 2023?
A. No.
Q. At dinner did you ever discuss craving sex from your fiance, describe having sex with him in a closet and how his underwear was stuck?
A. No.
Q. Did you ever brag that a doctor, a customer, would have gone home with you following a dinner?
A. No.
Q. Did you ever remark about having wine at a doctor's house and bragging how it put the doctor in the dog house with his wife?
A. I did not say those things, no.

Q. Okay. Was anything like that regarding the doctor --
A. Yes.
Q. -- in the dog house?
A. Yes.
Q. What was it?
A. No. I had -- I did go to dinner and went back to a physician's house, who is friends with my fiance, they went to school together, and he wanted to introduce me to his wife and his daughter. She was a cheerleader. And he gave a bottle of wine for me and my fiance.
Q. Anything else?
A. Months later my fiance and he were golfing with a bunch of guys, and he mentioned that I had gone back there, which my fiance knew and, you know, was totally fine with, and one of the guys made the comment, like "I'll bet you were in the doghouse for taking her back," and they were all patting him on the back, just joking around.
So he did not make that comment to me, he made it to my fiance -- not him, but the group he was with golfing.
Q. And you related that story to Rachael at some point, because she wasn't there for that?
A. Correct.
Q. Last question: Did you ever relate to Rachael that this isn't a job for mommies?
A. Definitely not. I have three beautiful children.

MR. GROSS: I have nothing further.

Thank you very much for your time today, and also thank you for flying to Chicago for this. I do appreciate it.

MS. CHANDRASEKARAN: Ken, before we finish, I just want to make sure you saw the additional text messages we sent. I don't want the deposition to be held open.

Are you planning on going through those? I just want to make sure. If you're going to, we're doing it now.

MR. GROSS: I'm not a hold-it-open lawyer. I don't like those. (Pause.)

We're on the record.

BY MR. GROSS:

Q. All right, I see it here.

Can you still see my screen, Miss Lewis?

A. Yes.

Q. Okay. So let me just run through these quick.

MR. GROSS: Just for the record, these are -- just for identifying in the record -- these are text messages that counsel sent me today, September 23, at 5:16 p.m. Central, and they are supplementary text messages to the one we went through earlier between Colleen and Tim Powers. They are not Bates stamped. I will identify them by the time in the corner.

Q. The first one, the time is 5:07, and this is a screen

shot of a text you had with Tim Powers; correct?
A. Yes.
Q. And Tim, his message bubbles are in the black; true?
A. Correct.
Q. You're in the blue.
A. Correct.
Q. And this is a true and accurate text message between you and Tim, yes?
A. Yes.
Q. And your concern here is "It seems like more frequent expense reports closer in date with those on each report."
Do you see that?
A. Yes.
Q. What does that mean?
A. There was concern.
Q. I get that part, but when you say it seems like more frequent expense reports closer in date, what does that mean?
A. Tim had more -- I don't really know. I'm thinking maybe he had more expense reports.
MS. CHANDRASEKARAN: I don't want you to guess.
THE WITNESS: Sorry.
A. I don't know.
MS. CHANDRASEKARAN: Testify as to what you

know. I don't want you to guess.

Q. I don't either. I know you wrote this message, but if you don't know what it means I'll move on. Is that your final answer?

A. Yes.

Q. Okay. Text message dated 5:06. You write here, "The hard part for me now is that I didn't realize Towne was only in two places. That was a clear revelation of deception. Before I suspected and was concerned, now I know."

What does that mean?

A. He did some Google search and found Towne in two places, I guess, and so now I'm thinking to myself, I guess when I typed that on her report she had more than two places, so I was thinking that that, based on that information, was deceptive.

Q. Do you stand by that today or do you think differently?

A. I -- what part?

Q. The deception; that what you described, that was a clear revelation of deception that Rachael was engaging in.

A. Not -- what I said there was about the Towne part, the Towne Parking. I do believe that it was deceptive, not because -- it wasn't just expense reporting around parking, it was on many items.

Like for example, she had an HCP meal at the Cleveland

Clinic, Joseph Beth's, HCP meal. They don't provide food, they don't have coffee. You can't get a snack, a protein bar, anything. She put a physician down as a health care provider that had an HCP meal at a bookstore.

This was not an isolated incident of the parking, it was across many modalities.

Q. I think you've made that clear, but I appreciate you saying it. I just want to know if I can get a better understanding of what you believed was a clear revelation of deception, number one; and number two, are you referring to Rachael as being deceptive or as Towne Parking as being deceptive?

MS. CHANDRASEKARAN: You're talking about at the time of these text messages? Is that your question?

MR. GROSS: Yeah, at the time of the text messages. Yes.

A. At the time of that text message I thought that she was being deceptive, based on the information that I received from Tim.

Q. And today, as you sit here today, you don't believe there was deception as you did back then?

A. I do believe there is deception.

Q. But not in the way --

A. There is a difference. There is a difference, yes.

Q. So you still believe that she acted deceptively, but

not in the way you say in this text with the 5:06 time in the left-hand corner; true?
A. That's correct, because I state I didn't realize Towne was only in two places. I subsequently found out that it was a valet service, so it was in likely more than two places; but at that time, that's why I said what I said.
Q. At the time you thought it was a way for her to engage in fraud in reporting her parking expenses; true?
A. At that time, yes.
Q. Okay, that's all I want to know.
Okay. The one with 5:05 in the upper left, another text between you and Tim Powers, correct?
A. Yes.
Q. And Tim is saying to you, "The second layer to this message is to have Doug run a query to see how her parking expenses match up to Dave, Ron, and Grant's."
Do you see that?
A. Yes.
Q. And you thought that was a really good idea? At the bottom --
A. Yes.
Q. Did that occur where --
A. Yes.
Q. And what did you see when you compared Rachael's parking expenses to Dave, Ron, and Grant's?

A. Nobody else had Towne listed. It didn't come up on a corporate credit card and it wasn't written in as a write-in on an out-of-pocket expense.
Q. And that was part of the deception that at the time you believed Rachael was engaging in, but today you don't?
A. I believed that she did, even more so now, based on the vast majority of items --
Q. You are talking about other --
A. -- on the spreadsheet.
MS. CHANDRASEKARAN: Let her finish her answer, please.
MR. GROSS: I'm sorry, I thought she was done.
A. At that time the impression was that Towne was only in two locations, so I thought at that moment I know that there were a lot of them, and I was like, that's deceptive.
Subsequently I realized and found out that Towne is the name of the valet service. However, I believe the deception was there, because there are places where she has it listed as Towne that have no fee for parking and no valet.
So there was no valet service at the hospital, period, none, zero. It was zero dollars to park there, and they didn't have valet, and yet she put Towne down. That is what I'm referencing as deceptive.
Q. And when she put Towne down, do you know if that

expense that she noted as Towne, do you know if that was a legitimate business expense?
A. How could I?
Q. At the time -- okay. At the time you couldn't know, but did you ever subsequently find out more information?
A. None of the expenses on the Apple Pay except for two of those 52 charges, I believe, were flat dollar amounts. I tried to compare them.
The dollar amounts that she expensed were flat dollar amounts. Her Apple charges had change, they did not match.
Q. Okay. Last one, 5:04 in the upper left. This is a text between you and Tim Powers; correct?
A. Yes.
Q. It looks like this is a repeat, right? We already went through this?
A. Yes.
MR. GROSS: Okay. Now I'm finished, and thank you again for your time.
THE WITNESS: Thank you.
MS. CHANDRASEKARAN: I have just a couple of questions, because I want to make sure the record is clear, and I want to go to the Apple Pay statement.
DIRECT EXAMINATION OF COLLEEN LEWIS
BY MS. CHANDRASEKARAN:
Q. So there was a time where you reviewed Rachael Rose's

Apple Pay statements?
A. Yes.
Q. When was that?
A. Sometime in March, Jim Curcio sent them to me.
Q. Do you know how Jim Curcio received the Apple Pay statement?
A. From Rachael.
Q. So this was evidence that Rachael had submitted to Jim Curcio, as far as you understood?
A. Yes.
Q. And was there a discrepancy between what Rachael submitted as out-of-pocket expenses on her expense report and what was reflected on her Apple Pay statement?
A. Correct.
Q. And then there were some questions about a $600 discrepancy. Can you explain what that was?
A. Jim Curcio asked her to support the charges, the out-of-pocket expenses, prove -- if you're saying if you put it on your Apple card, prove that you have the receipts, because she said she put it on her Apple Pay.
When doing so, that time frame, November to January, between the Apple receipts that she provided and what was -- the Apple receipts did not add up, the thousand-plus dollars of out of expense -- expenses that she submitted, she was missing -- there was a gap that she did not submit to prove

that she made those purchases on her Apple card.

MS. CHANDRASEKARAN: Give me one second here.

I don't have any further questions.

MR. GROSS: I just have one follow-up.

RECROSS-EXAMINATION OF COLLEEN LEWIS

BY MR. GROSS:

Q. So Rachael incurred expenses on her own line of credit through her Apple card that she submitted in an expense report, correct?

A. That's her claim.

Q. And was she ever reimbursed the money by Abbott for the expenses that she submitted from her Apple card?

A. She was. She was reimbursed for whatever out-of-pocket expenses, but the difference in what we're saying is that she could not prove that she had incurred those expenses on her Apple card. She had no proof that they even happened.

Q. But she was -- I want to make sure I understand this.

Despite what you just said, Abbott did give her the money that she incurred on her Apple card as reported on the expense sheet; correct?

A. Yes. There were no pending expense reports for Rachael. She put them on her expense report and was reimbursed the out-of-pocket $813 in the month of January.

Q. At the end of her employment did you have Rachael pay

that money back?
A. No.
Q. Do you know if anybody had Rachael pay that money back?
A. I don't know how we would receive it, who would have her pay us back. I don't know how that would work.
Q. Well, could you go to her and say we gave you money for expenses that you submitted on your sheet, but you didn't actually incur those expenses or they were not for a business purpose; therefore, you owe us the $600 back?
A. No.
Q. I mean, that makes sense to you, right, what I just said?
A. It does, but that's not what happened.
Q. Okay, that's all I want to know; that you were aware or believed that Rachael was paid money by Abbott through an expense report that she should not have been paid, but when her employment ended you didn't make sure that she paid that money back to Abbott; correct?
MS. CHANDRASEKARAN: Objection, argumentative. You can answer.
A. Correct.
MR. GROSS: Nothing further. I hope you all have a nice evening, and I'll see you tomorrow at 10:00, your time.

MS. CHANDRASEKARAN: Okay. Thank you. We'll reserve signature.

\- - -

Deposition concluded at 8:07 p.m.

\- - -

CERTIFICATE.

The State of Ohio, )
) SS:
County of Geauga. )

I, Heidi Blueskye Geizer, Registered Professional Reporter and Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, COLLEEN LEWIS, was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth, in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to writing in the presence of said witness, afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel, or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office in Chardon, Ohio, on this 30th day of October, 2025.

Heidi Blueskye Geizer, Notary Public
Within and for the State of Ohio
My commission expires July 24, 2027

## $

**$1 (1)**
156:4
**$11 (2)**
66:6,23
**$12-plus (2)**
141:24,25
**$1500 (1)**
36:8
**$18 (3)**
66:7,25;67:5
**$2 (2)**
156:2,4
**$25 (1)**
137:25
**$3 (1)**
156:4
**$30 (1)**
86:4
**$4,856.73 (1)**
86:25
**$400 (1)**
146:6
**$6 (3)**
154:16;155:1;156:3
**$600 (2)**
176:15;178:10
**$8 (10)**
59:12,14,25;60:1,14;61:17;123:8;141:10;155:25;156:2
**$813 (2)**
69:9;177:24
**$900 (2)**
36:7,12

## A

**Abbott (88)**
4:9;16:4;18:3,13,25;23:22,24;28:1;29:14;31:20;32:1;35:9,24;36:14,16;37:7,11,22;39:18;44:17;57:18;64:4,6;67:9;75:22;76:2;80:1,1,24;87:8;92:24;95:20;96:14;98:19;101:10;103:20;105:3,11;107:23;119:5;123:18,19,20;128:7;129:17,24;130:1,4,7,9,15,21,22,25;131:3,5,11,17,18,19,22;132:7,14,25;133:1,1,20,22;137:24;138:9,10,13;139:22;141:3;142:9;144:18;146:24;147:1,9;153:14;154:6;162:18;163:21;166:22;177:11,19;178:16,19
**Abbott's (3)**
103:17;131:8;147:2
**ability (1)**
27:9
**able (22)**
13:3;39:4;46:20;47:21;48:14;50:15,19,25,25;53:15;75:3;78:7;97:18;127:5;128:11;135:13;136:10,23;137:3;139:18;150:5,21
**above (9)**
18:7,10,13;19:7;55:24;62:22;97:14;115:21;155:1
**Absolutely (1)**
45:25
**accept (2)**
108:13;156:7
**accepted (2)**
65:18;73:6
**accepts (1)**
156:13
**access (4)**
36:18;37:13;46:12;109:5
**accidentally (3)**
100:17;139:15,16
**accomplish (1)**
127:6
**accomplished (1)**
39:8
**According (2)**
86:18;87:6
**Account (20)**
10:1,9;11:5,14;16:1;18:4,10,11,13;20:21;29:15;31:13;37:23;82:4;130:11;134:18;135:14;136:11,23;158:16
**accountability (1)**
136:15
**accounted (1)**
137:10
**accounts (1)**
150:20
**accuracy (1)**
128:22
**accurate (10)**
51:24;90:7;94:1;104:20;122:9;149:2,4;159:17;163:15;170:7
**accurately (3)**
135:17,18;166:17
**accusation (1)**
40:20
**accusations (1)**
40:18
**accused (1)**
61:23
**achieve (2)**
24:3;34:5
**achieved (1)**
129:21
**across (5)**
51:14;62:21;85:22;128:4;172:6
**acted (2)**
162:10;172:25
**action (2)**
115:7;134:8
**actions (1)**
128:24
**activities (2)**
6:8;128:25
**activity (1)**
86:19
**actually (19)**
55:21,22;63:24;66:10,16;71:11;87:13;104:16;105:4;109:2,4;114:10;123:4;124:15;125:11,13;139:17;164:13;178:9
**add (3)**
42:10;137:20;176:23
**added (2)**
28:14;149:25
**addition (2)**
82:23;105:15
**additional (4)**
94:3;156:2,3;169:6
**address (5)**
4:25;5:2;77:12;139:18;152:1
**addressing (1)**
149:20
**administrative (1)**
130:10
**advance (2)**
148:2,8
**advantage (3)**
87:18;88:6;130:5
**advantageous (1)**
127:1
**advice (1)**
70:4
**advise (1)**
120:19
**advised (3)**
146:24;160:2,10
**affect (4)**
35:6;39:12;81:25;82:1
**affected (1)**
35:3
**afternoon (1)**
4:7
**again (13)**
4:13;78:16,24;115:14;122:1;135:12;136:9;138:12;143:20;148:6;153:22;160:24;175:18
**against (4)**
4:9;43:17;73:24;74:19
**ago (8)**
4:12;40:6;41:21;43:11,23;44:15;77:5,5
**agree (24)**
17:9;26:16;61:13;68:1;71:10;91:17;102:14;104:10;108:3;109:8,12;111:16,20;112:14;113:1,5,12;126:14,16;140:7;141:14;144:13;147:7;158:6
**agreement (2)**
111:10;158:13
**ahead (7)**
8:10,10;30:25;33:2;57:14;155:13;162:5
**air (2)**
123:1;130:7
**Akron (1)**
72:13
**alarming (1)**
90:10
**alcohol (3)**
166:14,17,21
**alert (1)**
9:4
**align (1)**
133:12
**Alignment (1)**
23:10
**alignments (1)**
86:3
**allegation (2)**
40:23;137:9
**allegations (1)**
77:15
**alleged (2)**
87:16;88:4
**allegedly (3)**
70:5,14;83:3
**Allegheny (1)**
17:6
**allow (2)**
9:9;128:14
**allowed (7)**
53:21;65:18,21;76:11;130:15,20;139:14
**allowing (1)**
8:20
**almost (3)**
69:19;124:20;127:14
**alone (2)**
160:2,11
**along (1)**
32:7
**although (1)**
100:3
**always (2)**
45:18;60:7
**Ambani (1)**
165:22
**amend (4)**
30:24;56:3,4;84:2
**America (5)**
104:6;134:1;138:21;139:12,18
**amount (23)**
27:10;37:21;38:4,11;55:2;56:7,10;65:13;66:4,6;69:9;84:2;86:13;89:9;90:8;103:1,11;115:21,21;116:9;142:6;156:1,4
**amounts (15)**
55:24;56:6;58:4,6;62:22;65:11;66:7;67:1,4;87:11;122:24;142:3;175:7,9,10
**AMT (1)**
28:12
**analysis (8)**
60:25;62:8,9,11,13,16,19;63:15
**analytics (5)**
56:6;67:3;69:1;86:2;106:2
**analyze (1)**
90:24
**analyzing (1)**
116:21
**Angela (2)**
158:14;167:4
**announcements (1)**
148:23
**annual (3)**
75:24;80:25;81:2
**annually (1)**
81:25
**answered (16)**
21:25;30:8;41:7,10,14,16,17;42:16;57:11;60:15;84:14,19;103:11,19;118:20;126:13
**anymore (3)**
36:25;37:15;160:19
**apartment (6)**
50:9;102:13,16,20;103:7,16
**apologize (5)**
21:15;125:15;135:6;136:3;163:12
**apologized (1)**
163:14
**appear (1)**

145:7
**appeared (1)**
70:24
**appears (3)**
82:16;107:1;145:6
**Apple (21)**
63:2;65:6,11,14;136:16,18;175:6,10,22;176:1,5,13,19,20,22,23;177:1,8,12,16,20
**applicable (1)**
82:7
**application (4)**
20:23;24:23;25:7,11
**applied (1)**
24:22
**apply (3)**
20:22,23;131:9
**appreciate (2)**
169:3;172:7
**appropriate (4)**
77:21;78:10,13;130:10
**approval (2)**
132:1;133:2
**approve (2)**
71:18;90:8
**approved (9)**
67:2;89:6,8,12,13;91:14;135:1,3;136:14
**approving (7)**
72:6;87:9;88:9,24;90:5;99:18,19
**approximate (1)**
38:21
**area (8)**
16:9,22;19:7;20:11;23:4;77:14;127:23;140:14
**areas (2)**
142:17;146:7
**Argumentative (5)**
64:9;87:19,21;113:9;178:20
**Armistead (1)**
13:23
**Around (12)**
40:22;44:12;76:9;79:12;92:5;124:21;140:13;144:13;159:10;161:17;168:17;171:23
**arterial (1)**
12:7
**Asmar (3)**
20:20;22:2;125:22
**aspect (1)**
13:3
**assault (5)**
161:15,16,18,18,19
**assembled (1)**
146:16
**Assess (1)**
27:9
**assessment (2)**
123:22;127:13
**assigned (5)**
25:7,8;31:16;52:6;150:13
**assignments (1)**
149:19
**assist (2)**
148:2,8
**assistance (1)**
148:13
**assistant (3)**
7:22;8:5;9:18
**assume (3)**
73:2;80:11;87:12
**assumes (3)**
67:19;73:25;87:21
**assuming (2)**
131:21;140:16
**assumptions (1)**
42:22
**assure (1)**
8:22
**asterisk (1)**
124:11
**asterisks (1)**
145:17
**Attached (1)**
31:2
**attempted (1)**
41:14
**attend (1)**
166:9
**attendees (1)**
99:23
**attention (5)**
124:5;129:25;133:23;142:10;144:21
**attorney (7)**
44:20,24,25;135:6,7;136:3,4
**attorney-client (3)**
77:25;78:17,24
**attorneys (2)**
4:8;8:21
**attributable (1)**
141:17
**audit (2)**
69:8;153:18
**August (7)**
32:14,18;73:22;80:16;88:18;148:18;149:1
**auto (3)**
110:4,5;130:13
**available (1)**
74:17
**aware (18)**
39:5,7,8,13;69:22;78:21;90:21;105:17;114:4;116:15;137:8;143:5;146:1,19;151:20;165:7;167:9;178:15
**awareness (1)**
92:5
**away (5)**
23:11;40:2;73:19;128:24;151:8

**B**

**back (46)**
34:17;41:24;42:5,9;43:16;46:7;49:19;56:6;59:18;72:15,19;76:10,13;79:5;88:2,11;90:11;97:15;99:20,23,25,25;100:8,13;105:22;110:16;115:23;122:15;136:1;137:13,16;151:14,24;152:8,20;157:1;168:6,13,16,17;172:21;178:1,4,6,10,19
**backfill (2)**
158:21,23
**bad (4)**
8:7;44:13;81:8,21
**balance (3)**
131:23;134:13,24
**balloons (1)**
12:24
**ban (1)**
133:15
**Bandera (1)**
150:14
**Bank (5)**
104:6;134:1;138:21;139:11,18
**bar (1)**
172:3
**base (2)**
124:9;152:13
**based (41)**
19:10;21:1;22:21;37:22;38:3;39:4;41:7;46:17;48:15,22;50:15,20,22,25;52:20;65:9;67:6;68:17;70:9;72:7;79:1;84:22;87:12;91:9,9,14;98:25;99:3;117:6;118:14;120:3;122:21;129:21;140:16,19;144:5;156:19;159:14;171:14;172:18;174:6
**basically (1)**
149:18
**basis (4)**
56:9;116:25;117:4;152:12
**Bates (3)**
92:13,20;169:23
**beautiful (1)**
168:25
**became (1)**
121:25
**become (5)**
17:15;18:3;20:25;114:18;150:12
**bed (1)**
18:1
**began (1)**
159:23
**begin (1)**
142:19
**beginning (7)**
23:17;30:3;31:21;110:14;148:18;152:18,21
**behalf (1)**
142:25
**behavior (1)**
86:14
**behaviors (1)**
19:11
**behind (3)**
26:19;64:12;166:3
**behold (1)**
21:15
**belief (3)**
134:17;143:24;144:7
**believing (2)**
56:20;117:4
**below (2)**
142:14;153:21
**benefit (3)**
9:1;103:17;150:21
**beside (1)**
52:11
**besides (9)**
12:22;36:1;44:10;46:8;54:21,24;61:11;117:23;150:9
**best (1)**
86:11
**bet (1)**
168:15
**Beth's (1)**
172:1
**better (10)**
35:13,14,16,22;75:4,7;81:6;150:12;164:2;172:8
**beyond (8)**
42:10;47:18;54:13;62:16;63:16;82:18;137:20;141:24
**big (6)**
17:5,7;27:1;57:5;126:7;143:12
**bigger (1)**
17:18
**biggest (1)**
115:9
**Billiter (3)**
161:10;164:11;165:5
**Biology (2)**
6:24;7:7
**birthday (1)**
5:9
**bit (5)**
5:8;8:14;145:17;159:4;163:11
**black (1)**
170:3
**blood (1)**
10:8
**blue (1)**
170:5
**board (1)**
62:21
**body (1)**
167:6
**bones (1)**
96:9
**bookstore (1)**
172:4
**booth (2)**
57:9,20
**both (12)**
8:21;17:1;22:9;37:21;95:12,24;127:15;135:25;142:15,24;149:21;154:8
**bother (1)**
14:5
**bottle (1)**
168:10
**bottom (5)**
128:7;138:14;140:23;147:1;173:20
**bought (1)**
50:3
**brag (1)**
167:19
**bragging (1)**
167:23
**branch (1)**
57:4
**break (12)**
73:15;76:5;87:13;94:14;98:3;107:17,19;110:17;117:13,15,15;145:18
**breakouts (1)**
127:21
**breast (1)**
40:22
**breasts (1)**
166:5
**brevity (1)**
103:10

**Brian (17)**
8:24;9:15;11:18;26:2;35:9;36:25;37:8,14;38:6,23;109:17,17,23;161:10;164:11;165:5;166:16
**Brian's (3)**
35:6;38:3,17
**briefly (1)**
4:11
**Brigham (7)**
70:1;83:24;84:25;85:4;112:14;145:14;154:8
**bringing (1)**
115:25
**Bristol (9)**
7:23;9:23;10:13,17,21;12:5,11;13:9;28:7
**brought (2)**
25:25;108:12
**bubble (2)**
107:2;163:22
**bubbles (1)**
170:3
**bubbly (2)**
26:22,25
**budget (1)**
131:8
**build (1)**
128:13
**buildings (1)**
17:21
**bullet (1)**
108:8
**bunch (3)**
98:1;104:2;168:13
**Burlison (1)**
23:14
**bus (1)**
130:13
**business (13)**
53:18;66:11;69:12;70:1;83:15;102:7;133:21;136:23;140:9;144:4;149:22;175:2;178:10
**business-related (1)**
146:24
**button (1)**
109:9
**buy (1)**
36:25
**buying (5)**
35:9,24;36:14,19;89:21
**buys (1)**
65:7

## C

**call (41)**
25:19;38:16;40:7,7;41:15,20,24;42:5,5,9,13,24;43:3,10,11,16,22;44:15;52:18,21;53:10;55:5,9;58:9;69:13,15;82:23;83:24;84:11,24;85:2;89:18;105:7;115:8,12;116:3;117:6;121:15;145:19,20;146:22
**called (17)**
4:2;40:8,9;41:11;42:2,6;44:18;51:23;54:23;74:5,11;88:19;110:23;116:17;121:2;162:25;163:13
**calling (4)**
42:19;147:25;148:6;162:23
**calls (6)**
19:6;44:1;45:7;68:4;75:5;150:3
**came (12)**
22:6;24:21;32:7;56:6;86:4;90:4;112:4,8,12,14;121:20;167:10
**Campus (4)**
30:23;53:5;57:7;131:15
**Can (97)**
5:21;8:22;10:6;21:13,21;22:1,19;26:5;28:4;29:24;34:12,17;35:2;36:5;37:5;38:11,21;39:20;47:1,4,12,16,25;54:16;56:4;63:25;64:17;65:1;66:24;68:10;73:11,16;74:2,16;75:17;76:3;78:5,25;79:23;80:16,20;81:19;82:1;83:8;87:22;94:13,14;96:17,20;97:8,8,13,24,25;98:3,4,4,9;99:9;100:3,13;101:11;102:18;103:22;105:7,21;107:6,17,19,23,24;108:20;109:9,23;111:1;112:20;113:23;123:13,16;126:24;127:9;130:2;135:16;141:20,21;142:19;145:18;148:11,18;153:8,15;155:23;161:3;169:15;172:8;176:16;178:21
**candidate (1)**
158:12
**capture (1)**
101:12
**car (5)**
63:1;65:5;114:9;140:8;141:1
**card (75)**
51:14,15,16;53:16,17,20;54:22;55:20,21,23;57:17;59:11;64:5;66:7;70:17;82:9,14;83:22;85:19;86:15;105:14,15;106:18,21,22,23;107:13;108:9;111:3;113:3,17,18;122:11,12,23,25;130:23;131:5,6,14,16,19,23;132:7;133:8,13,16,16;134:2,3,7,8,11,13,24;138:19;139:16,20;146:22,25;154:17,25;155:6,24;156:13,24;157:6,15;174:2;176:19;177:1,8,12,16,20
**cardiac (2)**
7:13;12:8
**cardio (1)**
10:7
**Cardiovascular (2)**
10:5;13:1
**cards (12)**
52:15,18,24;53:1,24;54:2,7,9;101:25;109:19;134:1;156:7
**care (4)**
48:18;60:22;165:9;172:3
**career (1)**
127:17
**caress (1)**
162:8
**caressed (2)**
161:21;163:6
**carrying (1)**
53:22
**case (17)**
44:16;77:16;78:11;88:9;92:8;94:15;103:24;111:22;117:2,3;142:16;147:17;163:24;164:11,25;165:5,20
**cases (1)**
165:6
**cash (10)**
53:10;65:16,18,20;108:13;133:9,16;139:19;146:9;157:14
**categories (1)**
85:23
**catheters (1)**
12:25
**caught (1)**
44:20
**cause (1)**
153:4
**caused (4)**
9:18;13:1,12;59:7
**cava (1)**
12:24
**CC (1)**
165:15
**celebrate (1)**
158:6
**cell (1)**
108:2
**Center (7)**
16:13;17:4,19;131:7,8,9;148:15
**Central (3)**
76:15;79:8;169:21
**certain (3)**
130:5,5,6
**certainly (1)**
9:6
**certified (1)**
4:4
**cetera (1)**
93:16
**chain (1)**
29:1
**chance (4)**
4:11;64:14;100:22;142:16
**CHANDRASEKARAN (95)**
8:10,25;9:11;21:12,20,24;22:17;26:3;29:11,23;30:8;33:23;34:10;44:5,7;47:3,10,14,24;49:17,23;50:21;54:15;55:17;57:10,13;64:8,15,24;66:13;67:11,19;68:8;71:2;73:14,25;74:20;76:7,14,22;77:24;78:16,23;81:18;82:19;84:13,18;85:6,8;87:19;92:9,14,19,22;94:2,7,13;97:24;98:17;100:12;102:17;107:18;108:18;110:19;111:7,14;112:23;113:9,21;114:20,22;117:14,17;118:10,17,22;129:19;135:9,21;136:6;141:19;153:7,12;156:22;161:2;169:5;170:21,25;172:13;174:10;175:20,24;177:2;178:20;179:1
**change (8)**
9:15;23:19;65:14;114:17,18;129:22;159:4;175:10
**changed (9)**
36:12;58:22;59:10;60:11;61:13;75:2;85:22;86:14;129:13
**changes (2)**
23:10;119:4
**characterize (3)**
46:13;141:7;161:16
**characterized (2)**
41:5;139:5
**charge (28)**
55:23;60:7,16,17;62:24;63:5;65:14;89:16;90:2;102:4;115:17,18,19,20;116:10,15;130:6;131:16,16,18,18;138:19;139:2,12;155:18,21;156:8;157:3
**charged (9)**
60:5;121:16;123:4;130:15,21,22,25;131:2;141:10
**charger (4)**
49:10,11,20;50:4
**charges (17)**
102:15;104:4,9;120:4;130:4,7;131:11;134:14,18,25;137:4;139:1;156:5;157:1;175:7,10;176:17
**charging (6)**
59:8,16,17;61:18;117:8;130:10
**cheaper (2)**
36:23;37:2
**check (2)**
121:21;130:10
**checked (1)**
45:18
**checking (2)**
45:16,22
**cheerleader (1)**
168:9
**Cheerleading (1)**
6:12
**Chicago (6)**
4:12;65:15;77:7;79:3;98:7;169:3
**children (2)**
5:5;168:25
**choice (1)**
161:4
**cholesterol (1)**
10:8
**choose (1)**
75:1
**chose (3)**
74:23;153:2;157:24
**chosen (2)**
19:3;140:14
**circumstance (1)**
108:10
**circumstances (1)**
139:3

**city (1)** 53:14
**claim (1)** 177:10
**clarify (4)** 31:22;37:6;44:13;127:9
**Clarion (5)** 6:16,17,18,20;7:2
**clarity (1)** 84:12
**classified (1)** 138:18
**clear (12)** 19:14;57:23;70:9;104:23;107:16;150:25;166:23;171:8,20;172:7,9;175:21
**cleared (1)** 130:8
**clearer (1)** 66:15
**clearly (1)** 69:11
**Cleveland (58)** 16:22;17:9,10,13,22,23;24:22;30:20,22;31:2,13,16;34:7,25;35:1,4,9,11,23;36:6;37:9,12;38:2;42:25;50:12,24;51:8,22,25;52:5;53:5,9;54:5;56:14,17,23,25;57:3,4,5,6;59:8,18;60:21,24;75:4;77:13,14;92:1;121:19;126:17,18;131:15;149:21;157:3;158:16,17;171:25
**Cleveland's (1)** 57:19
**client (1)** 98:2
**Clinic (33)** 17:9,13,22,23;30:22;31:2,16;35:1,4,9,11,23;36:6;37:9,12;51:22,25;52:6;53:9;54:5;56:18,23,25;57:3,4,6;75:4;92:1;131:15;149:21;157:3;158:17;172:1
**clinical (3)** 13:3;150:12;161:10
**Clinic's (1)** 57:5
**clips (1)** 55:14
**close (3)** 6:21;8:2;80:17
**closely (2)** 48:17,20
**closer (2)** 170:11,17
**closet (1)** 167:16
**closing (1)** 106:3
**closure (1)** 23:22
**clot (1)** 12:9
**club (4)** 7:23,25;8:5;9:19
**clubs (1)** 6:12
**Code (1)** 147:2
**coded (1)** 151:25
**coffee (4)** 63:11;65:7;89:21;172:2
**Colin (1)** 167:12
**collaboration (1)** 151:12
**colleague (3)** 69:24;93:15;152:10
**COLLEEN (13)** 4:1,5,16;139:11;142:19;147:24,25;148:6;153:15;162:23;169:22;175:23;177:5
**C-O-L-L-E-E-N (1)** 4:16
**college (5)** 6:14,17;7:8,16,21
**Columbus (2)** 77:13;125:8
**comb (1)** 90:6
**comfortable (1)** 166:25
**coming (9)** 72:15,19;83:3;88:13;90:10;103:25;151:14;152:8,20
**command (1)** 29:1
**comment (13)** 41:6;42:14,20;124:3;125:18;128:8,11;129:18,21;147:23;162:22;168:15,18
**comments (8)** 40:19;43:7;125:11,14,15,16;142:17;167:3
**committed (1)** 63:16
**committee (1)** 127:18
**committing (3)** 62:19;65:10;102:15
**communicate (2)** 41:14;106:21
**communicated (1)** 41:13
**communicates (1)** 106:24
**communicating (2)** 15:17;146:2
**communication (1)** 25:21
**communications (5)** 78:6,17,25;93:16;144:6
**Company (19)** 7:24,24;11:10,23;12:15;23:2;28:12;36:15;51:13,21;69:10;127:14;128:5;131:12;143:19,22;156:20,25;158:7
**company's (1)** 67:18
**compare (6)** 16:24;27:20;106:5;129:3;141:16;175:8
**compared (2)** 126:25;173:24
**comparing (2)** 62:17;106:9
**comparison (1)** 27:19
**competitive (1)** 11:17
**competitor (1)** 17:5
**complaint (1)** 150:4
**complaints (2)** 150:11,12
**completed (1)** 126:1
**completely (1)** 53:8
**Compliance (3)** 55:1,7;83:15
**comply (1)** 134:7
**comprehension (1)** 27:10
**comprehensive (1)** 62:14
**computer (2)** 71:12;95:21
**concept (1)** 114:24
**concern (10)** 55:2;72:8;89:3,7;105:19;114:13;115:10;166:1;170:10,15
**concerned (7)** 48:18;69:11;71:16;72:9;117:6;160:16;171:9
**concerning (6)** 33:22;55:14;67:7,8;89:15;144:8
**concierge (1)** 140:25
**conclude (8)** 47:18,20;50:15,20,25;52:20;54:19;56:1
**concluded (2)** 68:25;179:4
**conclusion (6)** 47:22;51:6;59:4;62:5;67:6;68:20
**conclusions (10)** 46:17,21;47:2,12;48:14,21,25;49:3,4;65:9
**concrete (1)** 155:9
**Concur (2)** 91:5;99:13
**condition (1)** 43:25
**conduct (4)** 62:18;87:7;147:3;160:21
**conducted (1)** 63:15
**conference (2)** 130:8;145:19
**confirm (4)** 53:15;57:12;58:7;156:11
**confirmation (1)** 58:3
**confirmed (1)** 54:23
**confused (2)** 29:10;50:10
**confusing (2)** 74:21;131:2
**connection (4)** 44:3,9;66:16;147:17
**consequential (1)** 82:3
**consider (4)** 11:17;21:10;60:25;128:2
**consideration (5)** 65:22;66:3;141:6;142:5,8
**considered (3)** 20:9;75:13;152:17
**consignment (1)** 149:20
**consignments (1)** 150:6
**consistent (1)** 56:9
**contact (7)** 25:15,19;44:24,25;120:6;148:14;161:11
**contacted (3)** 25:14;44:19;52:14
**contacting (2)** 44:20;72:25
**content (2)** 46:24;127:21
**context (1)** 132:8
**continually (1)** 146:6
**continue (1)** 128:13
**continued (2)** 116:23;117:4
**continues (3)** 37:8;96:11;105:16
**continuing (1)** 9:5
**contract (6)** 35:4,10,15;36:11,15;37:7
**Contracting (2)** 34:23;38:16
**contractors (1)** 51:23
**contracts (4)** 36:16;73:1;93:16;152:12
**contractual (1)** 34:5
**contradicts (1)** 132:5
**control (3)** 34:9,19;126:14
**controls (1)** 130:6
**conversation (9)** 40:12;68:22,22;77:25;83:20;100:5;106:1;114:6;146:14
**conversations (1)** 20:11
**convey (1)** 71:8
**convoluted (1)** 66:17
**copy (3)** 109:1;149:10;154:8
**Cordis (9)** 11:10;12:15;13:13,14,19;15:22;16:2;18:2;27:25
**C-O-R-D-I-S (1)** 11:12
**corner (2)** 169:24;173:2
**coronary (2)** 51:3;95:24
**corp (1)** 105:14
**corporate (50)** 51:14,15;53:16;82:9,14;83:21;85:19;

86:14;106:18,22;107:13;108:9;109:19;111:3;113:3,17,18;122:11,12,23,25;130:23;131:5,14,16;132:7,14;133:1,8,13,16,20,25;134:2,3,7,7,11,13,24;138:9,19;146:22,25;154:17,25;155:24;156:10;157:6;174:2
**corrected (2)** 152:2;156:18
**correctly (8)** 82:11;94:25;96:12;105:9;108:14;128:15;130:16;143:11
**cost (3)** 131:7,8,9
**Coumadin (1)** 12:9
**council (1)** 6:12
**counsel (2)** 79:1;169:20
**counseling (4)** 82:7,24;111:1,12
**count (1)** 17:2
**country (3)** 125:7,9;126:7
**couple (11)** 40:6;54:11;59:11;66:19;71:15;76:20;77:5;81:23;90:2;145:22;175:20
**course (3)** 9:10;122:18;152:19
**court (8)** 34:14,14,18;88:3;101:5;135:22;136:1;154:14
**cover (1)** 68:24
**covered (1)** 16:20
**covering (1)** 17:12
**covers (1)** 164:11
**COVID (1)** 45:6
**craving (1)** 167:15
**create (3)** 90:19;149:11;155:5
**created (3)** 23:22;74:5;151:18
**credentialing (1)** 28:22
**credit (39)** 51:16;52:15,17,24;53:1,20,23;54:2,7,9,22;55:19,20,23;59:11;64:5;66:7;70:16;82:9,14;109:19;113:3;130:23;131:6,14,19,23;133:9,16;139:16;146:22,25;155:6;156:7,13,24;157:15;174:2;177:7
**credit/charge (1)** 134:1
**cross-examination (2)** 4:2,5
**cross-functionally (1)** 128:3
**CSI (2)** 73:20;74:13
**CTO (1)** 12:25
**cues (1)** 104:16
**Curcio (13)** 58:3;80:15;112:17,18;114:12;137:2;145:13,20;154:7;176:4,5,9,17
**curious (2)** 14:6;105:22
**Curran (1)** 118:3
**current (1)** 4:25
**currently (3)** 5:11;34:4;51:5
**customer (4)** 150:4,11;152:13;167:19
**customers (1)** 16:13
**customers' (1)** 149:20
**cut (2)** 96:21;152:5
**cuts (2)** 97:16;98:14

## D

**Dappa (2)** 128:12;129:22
**dark (1)** 163:22
**dash (1)** 82:10
**data (6)** 62:14;91:3;116:21;119:12;146:16;153:21
**dataset (1)** 61:15
**date (24)** 31:15;38:20;59:5,23;72:17,22;73:5,10;80:9,9,10,11;88:17;103:22;104:17;126:10;144:12;148:22;149:5,6,7;159:10;170:11,17
**dated (9)** 96:17;98:20;99:10;103:23;104:16;105:5,12;160:9;171:6
**dates (2)** 159:11,13
**daughter (6)** 43:24,25;44:2,10,12;168:9
**Dave (5)** 118:3;122:7;153:23;173:16,25
**Dave's (1)** 123:1
**David (1)** 153:15
**day (13)** 9:14;59:8,24;63:17,23;96:18;100:1,25;120:14;148:24;159:19;161:5,7
**days (5)** 4:12;15:21;119:21;144:16;159:16
**decade (1)** 24:15
**December (25)** 32:19;82:8,15;83:3;93:8,21;94:12;95:15,16;96:5,18;98:20;99:8;101:13;104:11,14,21;107:3;111:2;114:16;128:18;129:12;151:10;152:7,18
**deception (8)** 171:8,19,20;172:10,21,22;174:4,18
**deceptive (7)** 171:15,22;172:11,12,18;174:15,24
**deceptively (1)** 172:25
**decide (1)** 31:9
**decided (5)** 26:12;36:11;121:24,25;157:22
**decides (1)** 36:17
**decipher (1)** 58:18
**decision (10)** 19:4,5,9,20,22;29:19;121:24;151:3,6;153:3
**decisions (1)** 19:8
**deep (1)** 12:9
**defending (1)** 103:13
**definitely (5)** 27:12,13;92:4;150:21;168:25
**definitions (1)** 81:7
**degree (2)** 7:6;27:22
**delay (3)** 8:15;9:1,11
**delayed (1)** 72:22
**delegated (2)** 125:23;126:1
**demonstrate (2)** 137:3;157:23
**demonstrates (1)** 103:10
**denote (1)** 145:18
**denotes (1)** 109:2
**department (8)** 91:1;106:4;130:11;164:8,10,14,15,18
**depending (1)** 36:9
**depends (3)** 46:24;47:5,7
**deponent (1)** 4:2
**deposed (1)** 4:4
**deposition (16)** 4:13;8:20;26:7;65:15;76:11;77:6;78:21;79:2,10;98:2;135:5;136:2;137:8;167:6;169:7;179:4
**depths (1)** 28:5
**describe (3)** 26:10;166:16;167:16
**described (2)** 43:6;171:19
**description (1)** 155:3
**descriptions (1)** 138:13
**designating (1)** 92:15
**Despite (1)** 177:19
**details (1)** 140:13
**determination (4)** 65:23;67:16,21;78:14
**determine (2)** 62:19;101:17
**determined (3)** 90:14;91:2;102:6
**develop (2)** 127:16;128:3
**device (7)** 12:23;26:13;28:9,12,13,20;150:23
**devices (12)** 12:16,25,25;13:2;15:13;28:19,22;32:1;35:16;37:21;38:4,11
**Diabetes (1)** 10:8
**difference (9)** 17:24;119:3;136:19;139:10;141:15;161:18;172:24,24;177:14
**different (25)** 11:23;24:6,7;28:5,5;31:24,24;32:2,7;36:10;37:10;54:12;59:24;71:18;88:15;91:1;105:5;107:10;115:11;118:19;129:18;132:10;137:18;141:9;155:7
**differential (1)** 136:20
**differently (3)** 26:2;51:16;171:17
**difficult (2)** 92:6,7
**dig (1)** 142:18
**dinner (8)** 163:13;166:9,12,25;167:3,15,20;168:6
**dinners (2)** 160:3,11
**direct (20)** 20:2,5;23:5;32:23;39:1;84:22,24;87:9;88:19;124:5;129:25;130:4,7;131:11,16,18;133:23;142:10;144:21;175:23
**directed (3)** 25:5;70:14;85:4
**direction (2)** 55:4;70:15
**directly (16)** 25:3;35:3;83:7;87:8;104:6;108:16;116:24;130:7,11,15,21,25;131:2,9,11;138:21
**director (6)** 7:22;8:5;9:18;18:3,14,15
**disagree (4)** 87:24;108:23;

113:12;140:7
**disciplinary (1)**
134:8
**discovery (2)**
98:9;157:17
**discrepancy (8)**
59:15,20;135:8;136:5;137:15;142:5;176:11,16
**discuss (2)**
82:23;167:15
**discussed (1)**
106:2
**discussion (3)**
74:6;82:18;117:18
**disease (2)**
12:7;27:21
**dispute (6)**
124:19,20;126:6,13;145:11;159:11
**distinction (1)**
154:24
**distribution (1)**
110:5
**divisional (1)**
150:4
**Doctor (4)**
163:5;167:19,23;168:1
**doctors (2)**
128:12;165:22
**doctor's (1)**
167:22
**document (10)**
74:16;76:23;80:2,4,8;92:9;111:17;132:14;142:14;158:4
**documents (9)**
49:24;66:14,16;76:8,12;79:25;80:1;147:14;159:14
**dog (2)**
167:23;168:3
**doghouse (1)**
168:16
**dollar (15)**
37:23,24;56:7,10;58:3;62:22;65:11,12;67:1;86:13;137:15;142:3;175:7,9,9
**dollars (6)**
65:8;137:3,9;154:13;174:22;176:23
**done (15)**
8:23;9:3;12:2;64:12;68:24;127:11;128:9;142:18;149:24;152:19;153:11;159:20;162:14;166:1;174:12
**don'ts (1)**
10:23
**dos (1)**
10:23
**double (2)**
87:2;120:13
**doubt (1)**
9:2
**Doug (3)**
106:4,8;173:15
**down (22)**
39:12;50:12;53:12,13;55:22;62:23;63:4,6,23;87:13;89:15;95:19;101:13;114:10;119:25;122:12;141:25;145:22;157:22;172:3;174:23,25
**downloaded (1)**
157:19
**downtown (1)**
51:8
**Dr (14)**
159:5,7,14,20,23;160:21;161:12,21;162:7,14;163:2;164:6;166:25;167:9
**draft (7)**
83:4;96:2,5;107:9;109:8;132:6;149:11
**drafted (3)**
71:11;108:5;113:13
**drafts (2)**
71:17,18
**drastic (1)**
115:7
**DREISHMIRE (3)**
8:9;135:16,22
**drink (2)**
166:14,16
**drinking (1)**
166:21
**Drive (9)**
5:1;57:18;58:5;59:7;89:17;121:4,6,9,18
**driving (1)**
121:2
**dropped (2)**
38:8;150:25
**drove (7)**
56:16,22;57:8;58:9,20;59:18,18
**drugs (1)**
13:2
**due (10)**
25:17;33:12;42:1;43:14;63:13;72:22;81:15;115:23;125:25;158:13
**duly (1)**
4:3
**during (18)**
45:21;46:10;56:5;59:12;61:14;67:3;68:14;85:24;86:8;87:14;88:8,12;90:12,14;135:5;136:2;147:4;160:4
**Duryea (1)**
123:23
**duties (10)**
8:8;10:2,20;24:1;31:19,22,23;32:10;74:15;122:19
**duty (3)**
11:5;24:4;120:13
**DVT (1)**
12:9

**E**

**ear (2)**
163:10,11
**earlier (10)**
79:15;94:15;95:14;109:17;123:25;124:6;141:8;146:21;149:17;169:22
**earliest (1)**
94:11
**early (1)**
128:14
**easier (2)**
63:2;65:6
**east (3)**
57:6,19;121:20
**Eastern (2)**
76:15;79:8
**echo (2)**
118:8,11
**eCOA (1)**
150:10
**economies (1)**
130:5
**ED (3)**
163:23;164:15;165:8
**editor (1)**
90:21
**educate (1)**
10:22
**EE (1)**
124:1
**EE/AE (1)**
80:23
**effect (6)**
38:18;41:6;42:15;60:24;140:5;149:6
**Effective (2)**
148:12;149:1
**effort (1)**
106:21
**eight (2)**
37:22;144:16
**either (9)**
19:21;27:17;38:12;41:13;98:7;102:4;130:9;141:10;171:2
**elaborate (2)**
40:15;78:11
**elements (1)**
60:23
**elevate (1)**
92:3
**eligible (6)**
18:21;19:1;20:21,25;21:18,23
**else (40)**
5:6;12:20,22;16:15;18:25;21:18;37:2,5;41:4,17,18,20;42:12,19,25;45:8;47:18;50:24;54:13,20,24;63:15;68:9;71:22;72:8;110:22;113:12;114:5;117:23;118:2,4,9,23;136:15;137:20;140:18;160:19;166:13;168:11;174:1
**else's (1)**
152:14
**Elyria (1)**
62:23
**e-mail (54)**
25:3,24;70:5,13,19,20,23,25,25;71:7,11,18,23;72:9;80:11;82:9,23,24;83:2;95:24;96:1,5;98:1;107:3,9,10;108:5,21;109:1,9,15,18;110:13;111:11;112:8,11,21;113:7,13,19;114:16,21;125:24;132:6;142:11,22;143:25;144:16;147:15;153:14,20,22;154:5,7
**emergency (5)**
164:8,10,14,15,18
**employ (1)**
52:4
**employed (2)**
51:21;157:1
**Employee (28)**
62:4,9,13;74:11;83:15;86:8;112:4;114:6;115:24;125:14,17;128:1;130:12;131:13;133:21;134:10,12;138:20;143:7,15;144:3;147:20;148:1,7;161:21;162:19,24;163:16
**employees (5)**
19:1;51:20;53:21;118:15;130:6
**employer (1)**
25:9
**employment (10)**
11:17;13:8;14:21;84:9;134:9,10;137:17;166:22;177:25;178:18
**employs (1)**
51:13
**encompass (1)**
119:11
**end (31)**
13:8,10;31:15,19;32:14,20;33:1,5;42:4;44:22;53:25;58:14;61:16;69:15;70:12,20;84:5,8;89:3;104:14;114:15;115:12;116:4,24;132:4;137:16;144:9,13;160:4;163:12;177:25
**ended (2)**
70:22;178:18
**endo (2)**
73:20;124:9
**Endovascular (4)**
11:16;95:24;124:12;126:6
**Energetic (1)**
27:1
**energy (2)**
26:1;75:5
**engage (1)**
173:7
**Engaged (3)**
5:12,13;160:22
**engaging (4)**
86:19;87:7;171:20;174:5
**enough (2)**
55:10;78:2
**enrich (1)**
67:18
**ensure (1)**
134:12
**entailed (1)**
61:7
**enter (4)**
126:2,3;142:14,17
**entered (1)**
91:1
**entertainment (2)**
130:14;133:21
**entire (5)**
105:13;106:14,14,18;115:23
**entirety (1)**
97:25
**entitled (2)**
64:23;67:9
**entry (4)**
47:20,22;148:5,11
**equal (3)**

81:12,14,14
**equaled (1)**
81:23
**equally (1)**
85:25
**equals (1)**
81:5
**equipment (1)**
53:22
**ER (5)**
80:13;144:6;
147:25;148:7;162:25
**eroded (2)**
34:24;35:7
**erosion (3)**
34:23;35:7;38:17
**escalated (1)**
163:10
**especially (2)**
53:22;146:9
**essential (1)**
32:10
**establish (1)**
128:11
**establishment (1)**
138:1
**et (1)**
93:16
**Ethics (3)**
55:1,7;83:15
**evaluated (1)**
125:22
**evaluation (6)**
125:14,18;127:12;
128:8,9;129:12
**even (18)**
27:18;42:18;45:21;
63:23;69:7;72:12;
84:9;100:4,22;
112:14;114:8,16;
116:23;117:5;126:11;
160:3;174:6;177:17
**evening (1)**
178:24
**eventually (1)**
25:5
**everybody (4)**
70:13,16;71:9;
146:22
**everyone (1)**
146:14
**evidence (7)**
67:20;74:1;87:21;
143:12,14;147:14;
176:8
**evident (1)**
95:13
**exact (8)**
26:15,15;37:9;
38:20;51:19;63:25;
119:22;144:12
**exactly (6)**
26:14;34:22;95:3;
108:22;130:24;131:1
**EXAMINATION (1)**
175:23
**example (8)**
35:8,22;36:6,20;
66:11,12;123:6;
171:25
**Examples (1)**
140:24
**exceed (1)**
24:3
**Exceeded (3)**
80:18,18;81:22
**exceeding (1)**
81:9
**exceeds (1)**
124:1
**Excel (5)**
106:8;129:9;142:2;
143:17,21
**Excellent (1)**
124:3
**except (2)**
32:14;175:6
**exception (3)**
45:18;65:13,14
**excited (1)**
27:1
**excuse (7)**
13:6;30:24;34:14;
56:2;101:5;110:4;
154:14
**executing (2)**
75:7;149:19
**executive (1)**
127:22
**Exelerate (4)**
35:10;36:11,15,16
**Exercise (2)**
7:13;8:16
**exhibit (4)**
76:19;92:11,15;
95:19
**exhibits (1)**
79:21
**exist (1)**
63:6
**existed (1)**
55:15
**exit (1)**
122:13
**expand (1)**
32:4
**expect (1)**
92:7
**expectations (3)**
38:15;80:18;124:1
**expected (3)**
133:7,16;146:8
**expecting (1)**
43:3
**expenditures (1)**
137:25
**expense (151)**
45:16,25;46:4,5,9,
13,14,16,25;47:5,13,
13,23;48:4,6,12,22;
49:7,8;50:4,12;52:21;
53:12,18;54:18;
55:12,13;57:16;59:6,
17;61:1,3,23;62:18;
63:24;64:21;65:12,
23;66:11,25;67:2,16,
18;68:2;69:25;71:13,
14,20;72:1,6,10;
84:12;85:5,23;86:22;
87:9,18;88:6,13,25;
89:7,9,24;90:5,9;91:5,
13;98:23;99:9,15,19,
21,24;100:16;101:14,
24;102:7,16;103:22;
104:4,7,15;105:4,12,
14,20,24;106:18;
107:13;108:5;109:19;
115:13,17;116:23;
117:25;118:12,16;
119:8,13,22,23,25;
120:7;123:1;128:20;
129:3;130:8,11,12;
132:15;134:12,18,23;
135:1;136:14,20;
137:1,10,23;138:10,
13,17,19;140:9;141:4,
17;147:3;151:13,16,
21,23;152:14,23;
153:5;154:9;155:5,
25;170:11,17,20;
171:23;174:3;175:1,
2;176:12,24;177:8,21,
22,23;178:17
**expensed (10)**
57:19;103:15;
116:8;122:8;131:19;
139:7,21;140:3;
142:6;175:9
**expenses (71)**
50:18;52:25;55:3;
58:17;59:5,11;62:20;
65:25;69:3,14;71:15;
82:9,15,23;83:25;
84:3;85:3,11,12,17,
19;86:7,24;87:1,1;
88:9;90:9;91:19;
93:22;103:2,16;
108:10;111:4;113:3;
122:9;130:7,14,20,22;
132:22;133:2,7,22;
135:13;136:10,15,17,
21;139:4,7,9,21;
145:8,24;146:5,7,9,
24;173:8,16,25;
175:6;176:12,18,24;
177:7,12,14,16;178:8,
9
**expensing (5)**
50:8,23;54:13,21;
55:25
**expensive (1)**
37:1
**experience (9)**
15:13,18;26:13;
27:15,18;28:6,8,11;
85:20
**experiences (1)**
28:5
**explain (4)**
36:5;84:1;155:23;
176:16
**extended (1)**
159:24
**extent (3)**
77:24;78:5,25
**extenuating (1)**
108:10
**external (3)**
34:8,19,22
**extra (1)**
75:10
**extracted (1)**
91:3
**extracurricular (1)**
6:8
**eyes (1)**
56:21

**F**

**face (4)**
27:1;31:6,6;70:24
**Facebook (4)**
157:18,22;158:1,3
**facetiously (1)**
61:12
**facilities (4)**
52:3;58:4,12;
115:21
**facility (2)**
8:18;53:9
**fact (17)**
14:19;54:21;56:5,5;
61:3;64:5;69:6;86:14;
90:1;91:18;123:4,9;
145:9;151:7,14;
152:24;162:11
**factor (3)**
36:5;38:9;39:10
**factors (5)**
34:8,19,22;39:11;
150:8
**facts (7)**
58:19;62:6;65:22;
67:20;73:25;87:21;
163:15
**failure (1)**
134:7
**fair (10)**
12:11;27:12;38:24;
55:10;78:2;85:24;
114:2;115:5;122:2;
155:18
**fairness (1)**
113:13
**Fairview (18)**
52:18;53:3,13;
55:22;115:17;116:7,
8,8,12,15;117:7;
121:2,6,14,15,18,21,
25
**fall (1)**
6:25
**falls (1)**
161:19
**false (1)**
147:3
**falsify (3)**
87:18;88:6;116:23
**falsifying (7)**
47:22;61:1,23;
64:21;65:23;67:16;
68:1
**familiar (5)**
17:15;114:24;
115:1,3;132:12
**fantastic (1)**
127:2
**far (10)**
20:14;33:7;39:12;
87:1;91:12;94:18;
116:22;119:4;121:18;
176:9
**fault (1)**
163:18
**FDA (1)**
150:11
**February (8)**
32:15;58:14;61:15,
16;72:17;104:21;
119:15;145:23
**fee (2)**
104:24;174:19
**feedback (2)**
90:24;99:3
**feeding (3)**
28:12,18;105:18
**feel (8)**
14:1;24:12,14;34:1;
77:21;124:20;125:9;
167:5
**feeling (1)**
26:18
**fees (3)**
104:5,22;146:8
**fellows (1)**
10:22
**felt (6)**
15:17;26:2;28:14;
120:24;149:25;
160:17
**female (2)**
158:12;167:4
**few (8)**
55:14;57:13;69:20;

71:21;85:18;144:24;146:13;150:20
**fiance (7)** 166:7;167:16;168:7,10,12,14,19
**field (3)** 27:22;108:9;153:18
**figure (4)** 50:17;55:2;66:21;95:11
**file (11)** 86:8;106:9;128:23;129:1,3,3,7,16;143:9,18;147:13
**F-I-L-E (1)** 129:7
**filed (3)** 4:9;43:17;157:17
**fill (3)** 126:1;149:16;162:21
**filters (1)** 12:24
**final (2)** 143:7;171:4
**finance (14)** 18:20;19:9;20:11;90:20;106:4;129:3,7,17;131:24;132:14;133:1,20;138:10;146:15
**financial (2)** 143:9,18
**financially (1)** 13:7
**find (9)** 26:21;51:10;59:23;62:3;73:11,19;85:11;132:11;175:5
**fine (3)** 90:6;113:25;168:14
**finish (10)** 8:9,11;9:8,9;28:23;66:19;73:17;124:3;169:5;174:10
**finished (5)** 7:20;8:22;70:12;152:5;175:17
**fire (3)** 96:24;97:13;98:12
**firing (1)** 68:1
**first (25)** 4:3;9:25;13:22;24:19;25:23;33:7;39:17,20,22;45:13;63:1;80:2,8;93:11;95:12;114:3;135:6;136:3;147:23,24;148:24;154:16;162:22,22;169:25
**fit (2)** 97:8;110:6
**Five (12)** 10:10;11:8;34:9,20;38:6;84:8;105:14;106:20;119:21;127:13,14;151:11
**five-year (1)** 32:6
**fix (4)** 30:7,12;114:5;150:5
**flagged (1)** 69:8
**flags (1)** 55:6
**flat (3)** 65:12;175:7,9
**fleet (1)** 57:17
**flight (2)** 79:15,17
**flying (1)** 169:3
**FMLA (1)** 14:15
**focus (1)** 66:2
**follow (2)** 83:16;151:1
**followed (3)** 55:4;74:6;84:21
**following (3)** 36:4;133:24;167:20
**follows (2)** 4:4;136:1
**follow-up (1)** 177:4
**food (2)** 86:25;172:1
**footage (1)** 17:1
**footprint (1)** 128:13
**force (1)** 133:2
**forefront (1)** 102:9
**forgets (1)** 65:5
**form (2)** 162:19,21
**formal (1)** 153:1
**format (2)** 89:10;135:4
**formerly (1)** 58:15
**forth (3)** 70:10;90:7;105:22
**forthright (1)** 147:4
**forward (1)** 144:3
**found (13)** 52:1;55:16,18;62:1,4;74:4,10;86:22;115:13;154:4;171:11;173:4;174:16
**foundation (12)** 21:20;26:4;49:17;64:25;67:12;68:8;71:2;102:17;108:18;111:14;112:23;156:22
**four (2)** 84:8;151:11
**Fox (2)** 13:22;15:1
**frame (6)** 58:14;59:12;104:8;119:12;145:12;176:21
**fraud (4)** 62:20;63:16;102:15;173:8
**free (7)** 123:6,7,7,11;155:12,14;156:6
**frequency (3)** 90:13,15,16
**frequent (2)** 170:10,17
**Friday (1)** 160:11
**Friday/Saturday (1)** 160:3
**friends (1)** 168:7
**front (4)** 14:14;57:9;59:1;90:17
**froze (1)** 21:12
**frozen (1)** 21:13
**frustrated (1)** 40:10
**Fuel (1)** 101:24
**full (10)** 4:14;39:17,20,22;45:4,13;115:5;133:5;134:13,24
**fully (2)** 7:16;114:3
**function (1)** 31:25
**further (4)** 78:11;169:1;177:3;178:23
**FYI (4)** 105:13;106:10,17;107:2

## G

**gain (1)** 27:10
**gap (2)** 98:15;176:25
**garage (8)** 120:4;122:13;123:6;154:21;155:9,12,14;156:6
**garages (2)** 120:6;122:8
**gas (2)** 57:16;101:25
**gauge (2)** 59:4;148:18
**gave (11)** 13:11;65:19;68:15;70:4;93:6;94:21;122:25;127:22;139:16;168:9;178:7
**gears (1)** 159:4
**General (6)** 17:6;28:21;54:6;122:24;133:6;137:24
**generally (3)** 37:25;130:14,20
**generate (2)** 111:17;125:8
**generated (4)** 37:20;38:3;111:18;143:17
**generates (1)** 125:8
**generating (1)** 37:14
**Genesis (3)** 34:24;36:7,10
**geographies (1)** 125:9
**geography (1)** 152:11
**gets (3)** 77:25;78:24;157:2
**Gewalt (3)** 74:17;161:20;163:16
**gist (1)** 26:16
**given (15)** 25:9;46:20;70:15;72:16;80:3,10;82:13,17;83:14,16,17,17,19;113:2;137:14
**gives (2)** 104:16;165:18
**giving (3)** 9:1;127:16;142:1
**global (2)** 134:1;138:12
**goal (1)** 24:3
**golfing (2)** 168:12,19
**Good (17)** 4:7;15:9;21:4,10;44:23;70:4;75:5;76:7,8,14;93:6;94:21;95:2;149:22,25;165:14;173:19
**Google (3)** 52:11;156:19;171:11
**Googled (1)** 51:11
**GPO (1)** 35:11
**grab (1)** 166:5
**grabbed (1)** 40:22
**graciously (1)** 8:20
**graduate (5)** 6:4;7:2,9,14,19
**graduated (2)** 7:15,16
**graduation (2)** 6:13;7:8
**Grant (3)** 118:3;122:7,25
**Grant's (2)** 173:16,25
**great (2)** 25:25;75:9
**greater (1)** 137:25
**green (2)** 72:16,18
**grew (1)** 127:15
**grid (1)** 141:21
**GROSS (56)** 4:6,7;8:14,19;9:10,13,17;21:14,17;29:13;30:10;34:16;49:25;66:18;67:15,21;73:17;76:5,11,16,18,24;78:19;88:1;92:12,17,21;94:5,10,16;98:6,18;101:8;107:20,22;110:23;117:13,16,20;118:8,21;119:1;135:20,24;153:10,13;169:1,10,13,18;172:15;174:12;175:17;177:4,6;178:23
**grossing (6)** 75:19,21;124:12,16;125:3;126:5
**group (6)** 36:22;110:5;114:16;160:3,13;168:19
**grow (2)** 5:23;128:3

**growing (2)** 86:11;91:17
**growth (3)** 38:14;126:23,23
**guess (9)** 25:18;26:6;73:2;81:9;104:12;170:22;171:1,12,12
**guessing (1)** 141:22
**guidance (12)** 83:14,16,17,19,20;84:20,22,24;93:6;94:22;95:3;115:24
**guidelines (2)** 70:10;108:6
**guilty (3)** 62:1,3,4
**gut (1)** 26:18
**guys (6)** 43:16;85:5,10;95:14;168:13,15

**H**

**hair (4)** 159:24;161:22;162:8;163:6
**half (6)** 15:25;16:1;56:16;105:6;119:20;153:10
**hall (4)** 59:16;60:11;61:1,10
**handed (1)** 52:13
**handle (2)** 55:4;95:12
**handled (1)** 58:16
**handling (1)** 149:21
**hands (2)** 144:3;163:12
**happen (4)** 18:2;23:15;38:17;91:7
**happened (10)** 11:9;99:22;100:3;159:15;160:16;161:11;163:2,18;177:17;178:14
**happening (1)** 56:20
**happens (3)** 28:23;115:4;139:15
**Happy (4)** 27:2;41:23;44:21;164:1
**harassment (2)** 4:10;162:24
**hard (6)** 56:20;58:17;66:20;101:17;127:4;171:7
**Harmony (1)** 5:1
**HCP (6)** 63:10;86:25;99:23;171:25;172:1,4
**HCPs (2)** 65:7;91:21
**head (2)** 18:1;142:25
**health (8)** 7:23,25;8:5;9:19;36:22;43:25;164:18;172:3
**hear (8)** 9:13;21:13;65:19;94:23;95:9,10;101:5;119:6
**heard (5)** 26:10;33:14;135:17,18;142:15
**hearing (4)** 9:14;34:1;118:9,10
**heart (4)** 12:12;27:17;28:7;120:23
**heart-related (1)** 28:8
**heavily (1)** 108:11
**Heidi (6)** 34:16;88:1;101:9;135:20,21,24
**held (4)** 115:22,23;158:25;169:7
**help (7)** 34:4;44:2;75:10;92:3;127:16;149:25;150:13
**helped (4)** 150:15,16,16,21
**helpful (2)** 49:23;66:14
**helping (2)** 43:25;44:9
**herein (1)** 4:2
**hereinafter (1)** 4:3
**Hernandez (1)** 149:10
**herself (2)** 67:18;164:8
**Hey (15)** 22:15,23;38:23;39:5;59:22;83:6,7;84:11;100:9,16;101:2;108:24;116:1;117:6;122:22
**Hi (2)** 142:13;153:15
**high (6)** 6:2,6,13;55:2;69:9;84:2
**higher (10)** 18:4,5,6;56:7;60:18;86:16,16;87:1;116:9;126:24
**highest (10)** 75:19,21;80:20;81:4;87:2;124:11,16;126:5;153:21;154:2
**highlighted (2)** 107:6;144:22
**highly (1)** 126:21
**Hillcrest (40)** 52:18;53:3,13;55:22;57:2,8,18;58:22;59:12;63:14,16;116:5,13;120:11,17,25;121:5,13,20;123:6;141:10,16;154:16,17,21;155:4,8,18,21,25;156:1,5,7,13,16,21,25;157:3,7,7
**hilt (1)** 155:3
**hindsight (1)** 129:16
**hire (9)** 26:12;29:7,11,12,20;31:9,15;158:13,15
**hired (12)** 7:23;11:10;29:5,14,20;30:13;80:16;126:18,22;158:18,20,21
**hires (1)** 51:22
**his/Oliver's (1)** 23:2
**history (7)** 75:19;82:7;111:1,12;124:12,16;126:5
**hit (3)** 21:7,8;142:24
**hits (1)** 33:17
**Hitting (1)** 21:5
**hold (1)** 71:25
**holding (1)** 115:25
**hold-it-open (1)** 169:10
**home (2)** 45:6;167:20
**honest (1)** 125:19
**hope (1)** 178:23
**hospital (32)** 10:12,15,20;11:7;13:9;17:10,16;28:22;34:24;36:17;47:8,21;51:20;52:19,20;53:10;54:5;57:5,18;60:10;117:7;123:7;154:18,21,22;155:18,21;156:1,16;157:1,7;174:21
**hospitals (22)** 10:16,17,18,21;16:16;17:1,2;34:7;35:3;36:8,17;51:12;52:2;53:12;54:12;56:11;58:6;90:3;93:16;122:11;150:17,23
**hour (3)** 56:16;153:8,10
**hours (3)** 56:22;59:7;73:15
**house (7)** 103:4,7,15;167:23,23;168:3,7
**housekeeping (1)** 140:25
**HR (7)** 19:8;20:11;69:12;70:1;83:15;148:14;161:11
**Human (2)** 84:20;135:1
**hundred (4)** 36:17;141:5,24;155:16
**hurry (1)** 42:3
**husband (3)** 157:24;158:3,9
**husband's (1)** 157:18

**I**

**idea (6)** 98:7;115:1,3;140:3,22;173:19
**identified (2)** 92:16,17
**identify (1)** 169:23
**identifying (1)** 169:19
**IFU (2)** 10:23;11:3
**immediate (2)** 13:4;35:7
**immediately (1)** 163:14
**impact (1)** 13:4
**impacted (1)** 34:6
**implemented (1)** 34:25
**important (5)** 81:17;114:18;128:4;157:23;160:17
**importantly (1)** 55:24
**impression (3)** 25:23;26:18;174:13
**improper (2)** 86:22;134:6
**improvement (3)** 73:24;74:18;152:25
**inappropriate (1)** 115:14
**inappropriately (3)** 159:8,15;162:10
**incident (5)** 159:14;160:16;162:14;164:5;172:5
**incidental (3)** 130:14,20,22
**incidentals (1)** 146:23
**include (3)** 37:5;100:9;140:24
**included (7)** 11:2;14:6;22:7;59:6;62:12;71:22;93:25
**includes (1)** 86:25
**including (5)** 71:9;134:9,14,24;146:23
**increase (5)** 86:3,7;87:14;92:5;126:25
**increased (2)** 85:22;130:6
**increasing (1)** 127:16
**incur (3)** 63:24;156:5;178:9
**incurred (3)** 177:7,15,20
**independent (1)** 151:18
**indicate (2)** 110:3;166:24
**indicated (3)** 82:22;111:23;141:10
**indicates (2)** 105:6;157:15
**indicating (1)** 165:18
**indication (1)** 101:2
**individual (2)** 13:24;151:24
**individuals (3)** 22:25;112:16;

114:11
**infection (1)**
164:9
**inflated (4)**
120:3;124:25;
139:5;141:7
**influence (1)**
42:17
**information (15)**
22:7;41:24;79:1;
105:19;111:18;
112:15;126:2;132:11;
157:9,10,11,19;
171:15;172:18;175:5
**informed (4)**
15:7;159:7,16,19
**infractions (1)**
151:17
**initial (1)**
94:18
**initially (2)**
144:24;146:13
**initiate (1)**
74:5
**initiated (3)**
73:23;74:4,24
**initiative (1)**
128:5
**initiatives (1)**
149:18
**in-person (1)**
27:4
**input (2)**
157:10,11
**in-services (1)**
106:20
**insinuating (1)**
42:16
**instances (1)**
86:21
**instead (8)**
35:9;53:16;59:25;
76:8;100:18;115:25;
121:2;158:20
**Instruct (2)**
78:1,18
**instruction (2)**
11:3;25:9
**insure (1)**
134:23
**intentional (2)**
67:8;98:3
**intentionally (1)**
8:23
**interchangeably (1)**
119:2
**Intercontinental (1)**
31:1
**interested (1)**
78:4
**Interesting (1)**
164:1
**internally (1)**
48:19
**interpret (1)**
129:17
**interprets (1)**
129:18
**interrogate (1)**
85:4
**interrupt (2)**
9:6;135:24
**interrupted (1)**
9:2
**interview (16)**
13:21;14:2;15:4,13;
25:19,20,22;26:10;
27:3,5,8;28:23;29:2;
30:17,21;68:14
**interviewed (7)**
13:19;14:8;15:2;
27:25;28:1;29:19;
126:17
**interviews (2)**
13:22;27:7
**into (32)**
14:21;15:8;54:18;
55:11;59:9,22;61:4;
63:15;65:22;66:1,3;
68:4;69:21,23,23;
74:11;77:25;78:6,17,
24;88:11;91:12;92:1;
108:11;117:24;
118:16;128:19;141:6;
142:8;146:11;151:13;
162:14
**introduce (1)**
168:8
**inventory (3)**
75:4,7;150:1
**invested (1)**
103:11
**investigate (1)**
52:11
**investigating (1)**
153:4
**investigation (13)**
52:13,14;56:6;
59:13;61:7,19;63:15;
66:15;117:24;118:16,
25;147:4;162:13
**investigations (1)**
119:5
**involved (9)**
6:8;19:6;40:1;55:5,
8,11;82:17;84:9;
112:18
**involvement (1)**
144:5
**iPhone (1)**
159:21
**isolated (1)**
172:5
**issue (10)**
9:12;59:15;85:13;
87:9;112:21;123:5,9;
146:4;151:23;152:23
**issues (2)**
151:18,21
**item (2)**
139:19;154:16
**items (8)**
55:14;61:1;86:22;
90:18;105:5;119:22;
171:24;174:7

**J**

**January (40)**
23:16;53:25;61:4,5,
15,15;69:9,15;73:5,8;
84:5;86:23,23;88:17,
17;93:22;104:16,18,
21;105:11,12,17;
114:15;115:12;116:4,
24;119:13,13,14,14;
153:19;159:7,8,19;
160:9;161:20;162:19;
164:5;176:21;177:24
**Jeff (2)**
158:20,21
**JETi (13)**
91:25;92:5;124:21,
25;125:2,3,3,10,10;
126:9;150:13,17,19
**Jim (12)**
58:3;80:15;112:17,
18;114:11;145:13,20;
154:7;176:4,5,8,17
**Jimmy (8)**
70:1;83:24;84:25;
85:4;112:14;145:14,
19;154:7
**job (25)**
8:8;9:23;10:2,20;
11:13,18;13:19;15:8;
24:1,4;27:9;28:15;
31:23,24;32:10;
74:15;75:9;90:8;
122:19;126:18;127:2;
149:22,25;152:19;
168:24
**jobs (4)**
87:17,17;88:5,6
**John (1)**
150:14
**Johnson (4)**
11:10,10;12:15,15
**joined (1)**
36:22
**joint (1)**
98:9
**joking (1)**
168:17
**Joseph (1)**
172:1
**jovial (2)**
41:17;43:6
**judge (1)**
69:25
**July (1)**
148:5
**June (3)**
74:9;75:11;92:2
**jury (1)**
69:25

**K**

**keep (3)**
33:17;67:13;94:20
**Ken (1)**
169:5
**Kevin (5)**
4:7;66:14;73:14;
92:9;153:7
**key (1)**
128:12
**kind (3)**
75:23;78:20;98:7
**kindness (1)**
70:11
**kiosk (2)**
59:14;156:1
**knew (8)**
15:14;67:13,17;
72:15;83:2,3;152:8;
168:14
**knowing (1)**
129:16
**knowingly (1)**
147:3
**knowledge (11)**
20:16;26:20;27:21;
72:7;107:8;135:12;
136:9;138:25;161:9;
162:13,15
**known (1)**
38:23
**Kristin (6)**
74:17;148:13,13;
149:7;161:20;163:16

**L**

**lake (1)**
60:24
**language (1)**
132:10
**large (2)**
89:9;126:15
**Larger (3)**
16:25;17:1;126:25
**largest (2)**
17:22,23
**last (26)**
5:19;16:5;24:14;
30:4;31:4;40:5;43:12;
77:3;81:23;90:21;
98:14;105:14;106:19;
118:14;122:22;126:4;
127:7;130:18;133:5,
7;147:1;148:11;
159:3;167:12;168:23;
175:11
**late (10)**
33:4;104:4,5,9,22,
24;139:1,1,2;150:10
**later (4)**
89:6,6;159:16;
168:12
**latter (2)**
137:6,6
**launching (1)**
91:25
**lawsuit (5)**
4:9;43:17,20;44:4;
157:18
**lawyer (1)**
169:10
**lay (2)**
35:2;62:15
**layer (1)**
173:14
**lead (1)**
24:2
**leadership (4)**
85:22;86:5,16;
88:12
**leads (1)**
146:11
**leaned (1)**
163:11
**leash (1)**
114:25
**least (7)**
37:6;47:22;113:14;
129:17;137:8;141:14;
166:19
**leave (9)**
9:18,21;14:15,16,
17,23;15:8;18:2;97:7
**leaves (2)**
63:1;114:9
**Lecurgo (7)**
16:4;33:14;35:24;
36:3;37:1;109:18,23
**Lecurgo's (2)**
11:18;35:3
**led (6)**
34:9,19;87:7;89:3;
150:7;157:21
**left (8)**
13:15;109:10;
129:18;141:18;
163:13,13;173:11;
175:11
**left-hand (1)**
173:2
**leg (2)**
163:24;164:25
**legitimacy (2)**
123:1,5
**legitimate (3)**
50:4;102:7;175:2

**length (1)** 36:9
**less (6)** 38:2;85:25;90:13,15,16;126:23
**letter (8)** 72:20;80:13;86:18;87:6;110:14,20,21,24
**letting (1)** 99:17
**level (1)** 19:7
**levels (1)** 82:5
**LEWIS (15)** 4:1,5,7,16;76:21;79:22;94:11;106:14;117:21;119:3;147:24;162:23;169:15;175:23;177:5
**L-E-W-I-S (1)** 4:16
**lie (2)** 75:25;115:11
**lied (5)** 52:22;53:19;63:7;114:7,11
**lieu (1)** 133:8
**life (1)** 13:5
**light (2)** 72:16,18
**liked (3)** 13:3;25:25;70:12
**Likely (2)** 33:13;173:5
**limited (2)** 19:10;127:7
**limousine (1)** 130:13
**line (15)** 47:20,22;71:22;72:9;73:18;86:22;90:18;105:5;109:24;110:1;124:11;133:7;139:19;146:8;177:7
**lined (1)** 13:14
**lines (1)** 145:22
**Lisa (1)** 78:4
**list (18)** 19:1,9;20:20;21:22;22:3,7,9,10,11,16,16,22,24,25;23:1;110:5;118:4;149:19
**listed (11)** 62:20;66:11;67:3;109:23;111:12;112:21;116:16;120:7;155:8;174:1,19
**Listen (1)** 8:25
**listing (1)** 59:16
**lists (2)** 47:12;149:18
**little (5)** 5:8;75:9;145:17;153:16;159:4
**live (4)** 5:6;77:9;102:12,20
**lives (3)** 103:4,6,15
**located (1)** 6:19
**locations (4)** 53:2;54:4,10;174:14
**lodging (1)** 130:13
**long (13)** 5:2,13;7:14;10:9;11:7;14:21,23;15:22;17:12;31:4;63:10,10;89:21
**longer (7)** 10:25;35:24;36:25;58:14;114:25;134:11;149:5
**longstanding (1)** 72:19
**look (33)** 30:11;46:3,9;48:17,20;55:13;59:9,22;70:19,20,23;76:8;77:12;90:11,17;94:10,13,14,16,18;96:2;97:12,22,24;103:14;122:16;125:19;126:9;130:18;133:5;134:6;142:2;151:10
**looked (13)** 48:2;49:25;55:13;59:13;66:16;69:20;71:14,21;88:16;92:4;97:15;111:2;146:11
**looking (25)** 46:13,14;48:6;54:18;55:11;61:4,11;64:19;69:18,21,23,23;71:13,14,19;76:23;88:11;91:12;92:10;95:19;119:7;128:7,19;149:9;154:6
**looks (5)** 99:3;103:22;105:4;142:16;175:14
**loose (2)** 26:20,21
**Lorain (2)** 62:24;90:2
**losing (1)** 167:5
**loss (3)** 34:6,23;38:9
**lot (9)** 63:5;66:15;86:19,20;96:10;97:17;123:11;139:6;174:15
**lots (1)** 66:14
**love (1)** 71:19
**loved (1)** 70:8
**low (1)** 35:1
**lower (4)** 18:4;35:5;36:1,4
**lunch (1)** 91:21
**lying (5)** 68:17,19,23,24;89:22

**M**

**ma'am (1)** 165:16
**maiden (1)** 123:23
**Main (5)** 30:23;53:5;57:6;131:15;146:4
**maintain (1)** 37:25
**majority (4)** 39:22;122:10;146:5;174:7
**makes (2)** 19:8;178:12
**making (4)** 43:7;106:21;120:19;150:4
**manage (3)** 72:23;75:4;150:1
**managed (3)** 86:1,9;145:23
**management (1)** 75:7
**manager (29)** 11:14;16:1;18:4,10,11,13;23:24;29:15;31:14;32:15;46:1,7,12;51:5;55:1;58:15;81:4;82:21;87:15;128:8;134:12,23;148:13,25;149:2,6;151:17;152:3;158:16
**managers (6)** 20:21;37:23;80:23;81:2;82:4,5
**managing (2)** 72:4,23
**many (15)** 16:20;69:13;80:22;84:1;85:2,11,12,16;122:11,14,15;123:5;146:9;171:24;172:6
**March (11)** 32:14,21;142:12;143:25;144:11,14;145:19;153:24;163:23;165:13;176:4
**Maria (1)** 149:10
**mark (3)** 81:8;153:8;165:17
**marked (9)** 63:12;80:1;92:12,23;123:18;129:24;132:25;133:19;138:19
**market (2)** 34:7;126:15
**marking (2)** 92:10,19
**married (1)** 5:11
**Mars (3)** 5:24;6:6,21
**Martin (1)** 149:10
**massage (1)** 96:8
**masses (1)** 36:19
**massive (2)** 34:25;38:9
**MasterCard (2)** 134:1;156:10
**match (2)** 173:16;175:10
**matched (1)** 65:11
**maternity (4)** 14:16,17,23;15:8
**matter (2)** 24:11;152:19
**matured (1)** 127:15
**may (25)** 9:12;22:8;33:24;46:6;71:3;74:20,22;82:20;84:15;109:21,21;111:15;112:24;113:10;120:15;129:20;130:6,9;134:8,10;135:10;136:7;147:13;151:24;156:23
**maybe (22)** 20:15;49:23,25;51:7,8;66:13,15;77:5;83:6;90:12;103:1;104:22,23;106:6;119:21;125:18;139:15;145:13,14;152:16;153:17;170:20
**Mayfield (2)** 155:4;157:8
**meal (6)** 99:24;139:17;151:24;171:25;172:1,4
**meals (4)** 63:11;130:13,20,21
**mean (39)** 21:4;24:18;26:7,25;27:14,17;30:11;31:22;35:23;36:1;41:8;43:9;54:17;77:13;81:8;85:15;86:2,20;94:18;99:3;103:13;104:3,12;114:24;127:9;128:21;130:21;131:25;132:3;136:18;141:3;148:21;151:2;152:4;159:11;170:14,18;171:10;178:12
**Meaning (6)** 62:7;81:6;106:14;124:23;131:11;136:22
**means (14)** 37:14;49:14;95:13;130:24;131:1,1,4,7,7,20;139:11,19;164:15;171:3
**meant (4)** 24:10;71:17;91:2;129:6
**measured (3)** 37:19,20,20
**measuring (1)** 33:7
**Medical (6)** 16:13;17:4,19;27:22;28:17,20
**medications (3)** 10:3;12:12,12
**medicine (4)** 10:6;27:17;28:7,9
**meet (9)** 4:11;24:19,21;32:3;33:2,5;34:9,20;38:7
**meeting (4)** 39:15;127:21;128:5,6
**M-E-L-A-N-E-Y (1)** 4:23
**M-E-L-A-N-I-E (1)** 4:21
**Melany (1)** 4:20
**M-E-L-A-N-Y (1)** 4:24
**Melissa (5)** 40:4,5;41:21;43:12;

45:1
**Melissa's (1)** 166:5
**member (1)** 36:17
**members (3)** 8:16;110:4,6
**Membership (1)** 8:16
**memory (2)** 49:21;122:21
**mentioned (5)** 22:2;42:7,14;149:17;168:13
**mentor (1)** 150:13
**merchant (2)** 51:19,20
**Mercy (2)** 62:23;90:1
**merger (2)** 73:20;74:13
**message (34)** 48:3;70:16;71:6,8;93:11;94:11;96:9,20;97:3,14,18,25;100:9,11;101:12;103:23;105:13;106:11,11,12,13,17;107:2,7,10,11,13;165:13;170:3,7;171:2,6;172:17;173:15
**messages (19)** 50:22;93:11,25;94:3,9,15;95:14;96:15,17;98:1;99:5;101:10;112:20;153:18;169:6,20,21;172:14,16
**met (4)** 33:15;38:6;39:14,19
**meter (1)** 51:8
**meters (1)** 108:13
**Metro (3)** 66:6;149:21;150:18
**MetroHealth (3)** 62:21;66:23;116:6
**MI (2)** 12:8,9
**mid (1)** 151:10
**middle (4)** 4:17;8:12;9:4;82:6
**might (15)** 8:22;36:20,20;37:6;40:4;44:13;60:16;90:15;100:21;104:17;105:5;116:7;120:3;141:9;144:15
**miles (2)** 16:20;121:6
**mind (7)** 102:9;121:6,10,11,12,14;151:22
**minimize (1)** 130:5
**minimum (1)** 166:11
**minus (4)** 32:24;81:5,8;84:8
**minutes (6)** 76:10;159:3,3;161:22;162:8;163:6
**mischaracterizes (6)** 22:18;34:10;44:7;64:16;85:8;113:22
**misconduct (1)** 167:9
**misleading (1)** 113:8
**Miss (9)** 4:7;76:21;79:22;94:11;117:21;119:3;135:6;136:3;169:15
**missing (1)** 176:25
**misspoke (1)** 124:7
**mistake (1)** 64:14
**mistakenly (1)** 101:3
**misunderstanding (1)** 64:14
**misunderstood (1)** 164:12
**modalities (1)** 172:6
**moment (6)** 89:25;102:8;105:8;115:10,11;174:14
**mommies (1)** 168:24
**Monday (1)** 94:24
**money (19)** 19:10;38:1,2;63:25;64:4,6,22;66:10;67:9;123:10;136:22;137:16;177:11,20;178:1,3,7,16,19
**month (11)** 69:9;77:5;86:4,5;87:13;88:12;104:8,24,25;153:21;177:24
**monthly (1)** 153:17
**months (28)** 7:22;14:22;15:8;32:19,24;45:19,21;46:3,10;61:4,7,12,24;77:5;84:8;86:2,18;87:7;88:18;89:2;91:13;104:22,22;119:20,21;151:11,11;168:12
**more (49)** 10:6;13:7;17:1;24:8,15;26:18;27:23,24;37:1;38:1,11,24;39:6;41:17;42:9;55:24;56:8;60:17,24;63:18;85:24;87:2;89:14;91:19,22;96:14;98:9;101:10;105:3;108:11;114:25;117:10;121:4;127:1;132:12;150:6;153:9,16;160:2,11;161:8;170:10,16,19,20;171:13;173:5;174:6;175:5
**morning (1)** 165:15
**Most (3)** 66:7;108:12;142:1
**motion (1)** 98:9
**Mously (3)** 128:12;129:21;150:18
**mouth (3)** 124:24;137:7;163:10
**move (5)** 23:9;72:20;73:19;108:11;171:3
**moved (2)** 23:11;74:12
**moving (3)** 44:22;94:20;144:3
**Mrs (1)** 165:15
**much (16)** 18:6;36:23;37:14;41:22;54:25;57:6;60:13;86:16;89:25;97:8;102:8;114:8;116:16;141:22;153:9;169:2
**multiple (3)** 34:6;104:7;146:4
**must (7)** 94:17;130:8;134:11,12;137:25;138:18;140:14
**Myers (6)** 7:23;9:23;12:5,11;13:9;28:7
**myself (3)** 83:23;114:11;171:12

## N

**name (19)** 4:7,14,17;5:17,19;13:24;55:21;108:17;110:2,9;123:23;135:7;136:4;147:24;155:21;156:15;162:22;167:12;174:17
**name/last (2)** 147:24;162:22
**nation (2)** 124:8,9
**national (3)** 127:20,23;128:6
**Navigating (1)** 28:22
**near (1)** 38:13
**necessarily (1)** 131:5
**need (7)** 34:2;60:22;107:24;114:5;120:22;150:12;165:7
**needed (9)** 53:9;56:19;58:3;75:9;83:21;114:17;120:24;149:25;150:1
**needing (1)** 72:22
**needs (4)** 131:19;148:13,14;149:20
**negative (2)** 26:23;115:4
**neither (2)** 91:6;112:2
**new (10)** 23:22;32:3;72:24;86:3;128:11;148:12,15;149:2;151:18;153:17
**next (13)** 7:18;10:11;25:13;28:24;87:2;100:1;101:12;102:12;105:7;146:4;154:22;161:5,7
**nice (3)** 4:13;44:10;178:24
**night (3)** 57:25;79:13;163:19
**Niles (2)** 148:13;149:8
**nine (3)** 86:1,18;87:6
**nobody (3)** 50:23;72:8;174:1
**non-business (1)** 138:17
**noncompete (1)** 158:13
**None (4)** 46:5;65:11;174:22;175:6
**non-objectionable (1)** 30:12
**nor (3)** 55:5;69:1;166:13
**normal (1)** 66:9
**notation (1)** 149:9
**note (5)** 88:17;138:19;159:20,23;160:9
**noted (1)** 175:1
**notice (4)** 13:11;82:14;115:5;120:2
**noticeably (1)** 14:7
**noticed (1)** 152:1
**notification (1)** 100:8
**notified (3)** 114:16;142:19;149:4
**notifying (1)** 99:20
**November (4)** 7:24;32:19;93:21;176:21
**NSM (2)** 127:17;128:5
**Number (19)** 17:21,21;21:1,2,4,10;42:6;44:1;58:12;92:3;113:17;124:8,9;130:11;139:6;142:24;150:22;172:10,10
**numbers (12)** 39:19;62:17;63:25;91:1,2;92:20;120:2;124:25;141:7,9,15;150:15
**nurses (1)** 10:23

## O

**oath (1)** 34:3
**object (6)** 8:21;29:23;34:10;77:24;78:23;118:17
**Objection (46)** 21:20,24;22:17;26:3;33:23;44:5;47:3,14,24;49:17;50:21;54:15;55:17;57:10;64:8,15,24;67:11,19;68:8;71:2;73:25;74:20;81:18;82:19;84:13,18;85:6;87:19,20;102:17;108:18;

111:14;112:23;113:9, 21;114:20,22;118:17; 129:19;135:9;136:6; 141:19;156:22;161:2; 178:20
**obtain (1)**
67:9
**occasion (2)**
155:8,10
**Occasionally (1)**
166:15
**occasions (2)**
113:17;151:25
**occur (1)**
173:22
**occurred (4)**
20:13;83:23; 151:17;161:15
**occurring (1)**
68:16
**October (4)**
32:18;146:15,19; 148:24
**off (13)**
14:13;18:1;19:10; 64:4;80:24;92:12; 94:23;96:21;97:16; 98:14;117:17,18; 122:21
**offended (6)**
40:10,12,18;41:2,4, 10
**offenders (2)**
153:21;154:2
**offense (1)**
68:2
**offer (2)**
41:24;72:20
**offered (4)**
13:13;30:15;42:8; 73:7
**Office (6)**
55:1,7;79:5,13; 83:14;102:2
**Ohio (7)**
32:16;72:13,21; 73:20;77:10;122:1; 155:4
**OhioHealth (9)**
34:24;35:8,22,23; 36:4,7,10,22;37:7
**Olga (18)**
55:6,9;70:1,2,3,15; 82:22,25;83:19;91:8, 14;93:6;94:21;95:2; 106:5;111:23;146:15, 21
**Olga's (1)**
55:4
**Oliver (5)**
20:20;22:2,6,13; 125:22
**one (59)**
4:8;7:15;15:2; 16:14;18:7,10,13; 19:18;24:8;30:4;38:9; 44:18;46:6,8,13,14; 50:12;55:6;65:13; 66:2;73:18;74:4,5; 75:22;88:24;90:9; 92:17;97:15;98:14, 20;99:9;101:12; 103:21;104:2,15; 105:5;111:23;112:21; 115:20;119:18;125:6; 126:4;127:17;136:25; 137:1;141:5;150:8; 155:8;156:17;164:21; 166:9;168:15;169:22, 25;172:10;173:11; 175:11;177:2,4
**one-on-one (2)**
160:18,22
**ones (6)**
17:7;53:4,6;63:11; 126:7;157:4
**ongoing (2)**
52:14;100:5
**only (24)**
16:17;20:18;39:10; 46:16;50:12;53:4,6; 54:11;65:25;69:2; 72:3;89:10;97:8; 99:15;106:12;113:18; 123:7;153:20;155:1; 156:5;166:22;171:7; 173:4;174:13
**on-services (1)**
105:15
**onto (4)**
35:4,10,15;36:11
**open (5)**
24:22;74:11; 148:15;150:7;169:7
**opened (6)**
74:18;75:11;151:4, 11,20;152:25
**operations (2)**
8:6,18
**opinion (2)**
24:11;69:24
**opportunities (1)**
143:2
**opportunity (11)**
8:24;9:16,20;18:18; 27:2;36:3;83:25; 115:6,8;128:3;142:17
**opposed (1)**
92:20
**order (2)**
64:6;130:4
**ordinary (1)**
119:24
**organization (3)**
22:25;70:10;128:4
**original (1)**
138:1
**originally (3)**
144:24;146:13; 147:15
**others (2)**
110:9;150:9
**otherwise (1)**
113:20
**ouch (1)**
163:11
**out (60)**
43:20,22;50:17; 51:10;52:1;53:8;55:2, 2,16,18;59:23;66:21; 69:9,14;71:6;73:11, 19;74:4,10,12;79:15; 81:24;83:2;85:11; 86:4,7;95:11;97:7; 98:11;101:23;105:14; 119:24;126:1;131:8; 132:11;135:7;136:4; 139:8,9,10,19;143:1; 144:23;146:5,8,12; 149:16;152:5;154:4, 24,25;155:1,2;156:3; 162:21;166:1;173:4; 174:16;175:5;176:24
**out-of-pocket (21)**
46:25;47:5;52:25; 69:14;84:1,3;85:3,12, 16,19;86:24;103:2; 145:8;146:5;153:19; 156:2;174:3;176:12, 18;177:14,24
**outright (1)**
133:15
**outside (5)**
34:8,19;48:19; 57:20;66:9
**over (22)**
17:14;24:15;25:24; 27:3;32:6;36:16;39:2; 46:14;58:23;59:10; 61:12,24;62:17; 65:13;72:21,24; 89:11;90:18;119:10; 158:25;163:10,18
**Overall (4)**
8:18;125:14,17; 127:7
**overhead (1)**
60:18
**Overlapping (2)**
67:22;154:12
**overnight (1)**
140:8
**overseeing (1)**
11:1
**overview (1)**
62:14
**owe (1)**
178:10
**own (13)**
9:21;42:8;102:16; 103:17;120:23; 139:17,20;151:1; 154:21;160:9;164:18; 165:9;177:7

**P**

**page (9)**
82:6;133:5,6,24; 134:6;140:23;157:18; 158:1,3
**paid (19)**
37:23,24;57:18; 64:4;65:16;122:22; 130:9;134:13,24; 135:3,4;138:1; 146:10;157:2,2,4; 178:16,17,18
**Paoli (1)**
153:15
**paper (1)**
82:18
**paragraph (4)**
130:1,18;132:4; 146:4
**parallel (1)**
28:4
**paraphrasing (2)**
50:3;112:1
**park (5)**
123:7;140:12,14; 156:6;174:22
**parked (4)**
47:17;123:11; 140:15,20
**Parking (112)**
47:6,13,21;50:8,10, 11,23;51:7,21,22,23; 52:14,17,25;53:9,14, 17,21;54:4,5,6,13,21; 55:3,15,18;58:25; 59:23,23;62:20,22,23, 24;63:3,4,5,5,6,9,11, 16,23,25;65:8,12,17, 25;69:14;84:1;86:25; 89:15,16,25;90:2; 91:19;101:23;102:4, 16;103:2,16;105:16; 108:12,12;114:8,10; 115:18,20;116:9; 117:9,10;119:25; 120:2,4,6;121:21; 122:7,9;123:1,4,6,7; 131:15;139:4,6; 140:12;141:7,12; 142:6;146:5,7,8,9,10; 154:19,21;155:2,9,10, 18,21;156:2,6,17,20; 171:22,24;172:5,11; 173:8,15,25;174:19
**parkings (1)**
89:13
**parks (1)**
103:16
**Parma (1)**
165:8
**part (18)**
19:6,20,22;20:10; 47:23;50:2;61:19; 62:11;83:20;97:7; 107:16;131:1;143:12; 170:16;171:7,18,21; 174:4
**particular (1)**
118:22
**partner (1)**
152:13
**parts (1)**
63:18
**passage (5)**
25:17;33:12;42:1; 43:14;81:15
**past (1)**
125:25
**patients (1)**
11:4
**patient's (1)**
13:4
**patting (1)**
168:17
**Pause (9)**
21:16;47:9;54:1; 63:10;89:21;112:9; 152:4;164:7;169:11
**Pavlik (1)**
158:14
**pay (25)**
53:10;63:2;65:6,11, 14;81:25;104:5; 131:14;136:16,18; 137:16;139:2,11,18, 19;146:6;175:6,22; 176:1,5,13,20;177:25; 178:3,6
**paying (2)**
131:22;157:14
**payment (3)**
138:20;139:1,6
**peer (1)**
87:3
**peers (3)**
87:2;106:9;128:4
**pending (3)**
67:20;128:25; 177:22
**Pennsylvania (9)**
5:1,25;6:18;10:16; 16:8,16,18,19;72:25
**people (10)**
22:22,24;51:13; 66:7;72:5;105:18; 106:6;113:11;142:1; 152:16
**per (1)**
131:6

**percent (8)**
66:8;86:15;124:8,9;141:5,24;152:11;155:16
**percentage (2)**
86:16;126:25
**performance (22)**
45:9;73:23;74:3,18;75:24;81:3,4,17,20,22,24;111:13;112:21;123:22;125:24;127:13;128:1;147:20;148:14;152:24;157:25;158:2
**performed (1)**
126:21
**performing (1)**
81:9
**perhaps (3)**
107:10;112:1;114:4
**period (8)**
32:6,23;36:10;62:18;65:13;119:10;159:24;174:21
**peripheral (2)**
12:7,10
**permission (1)**
120:16
**permit (1)**
161:1
**permitted (1)**
140:15
**person (6)**
4:11;5:15;27:3;30:17;66:8;111:25
**personal (25)**
44:12;50:8;53:17;64:5;102:16;103:17;105:15;106:21,23;119:25;120:23;133:9,15;134:14,25;138:17,18,20;139:7,10,11,13,21;160:9;165:9
**persons (1)**
15:2
**person's (1)**
68:4
**perspective (2)**
135:14;136:11
**pertains (1)**
166:22
**Petitte (4)**
22:10;118:5;142:11;150:16
**Petitte's (1)**
77:1
**pharmaceutical (1)**
7:24
**phone (24)**
25:24;27:5;41:7,11,15,16,20;42:13,16,24;43:3,6,10;44:1;49:11,19;50:3;65:4;84:11,24;99:2;108:2;115:12;116:3
**physically (1)**
164:15
**physician (1)**
172:3
**physicians (4)**
10:22;17:21;150:18,22
**physician's (1)**
168:7
**physiology (1)**
7:13
**picked (2)**
42:24;140:21
**picture (20)**
56:12,17,23;57:8,20;58:8;62:16;63:17;71:12;95:20,23;96:4;100:16,18,21;101:13;108:1;109:15;116:12;120:11
**pictures (3)**
69:20;157:24;158:1
**PIP (13)**
74:11;75:11;147:21;148:1,7;150:7,25;151:4,12,15,16,20;153:1
**Pitt (2)**
16:11;59:18
**Pittsburgh (12)**
7:11,25;11:21,22;16:9,13;17:4,7,19;30:19;56:17;60:21
**placard (14)**
56:11,17,23;57:9,20;60:9,12;61:11;62:17;63:17;69:5;116:13;120:12;141:12
**place (6)**
23:13;30:21;34:7;38:12;69:15;73:21
**placeholder (1)**
76:25
**places (11)**
63:4;89:15,17;114:10;123:5;171:8,12,14;173:4,6;174:18
**plan (10)**
21:5,7;36:23;73:24;74:3,12,18;79:9;92:3;152:25
**planning (2)**
127:18;169:8
**plans (1)**
79:12
**plausible (1)**
106:6
**Plavix (1)**
12:7
**play (1)**
19:25
**played (1)**
14:1
**playing (1)**
159:24
**please (18)**
4:25;5:8,21;20:18;34:16;40:17;78:6;88:1;108:25;135:16,19,23,25;142:13;148:1,8;154:14;174:11
**plowing (1)**
60:18
**plus (4)**
38:14;81:5;110:3,9
**pm (6)**
93:9;97:16;98:21;99:8;169:21;179:4
**pocket (15)**
64:1;69:9,14;86:7;101:23;139:8,9,10,19;144:23;146:6,12;155:1,2;156:3
**point (34)**
25:5;27:5;31:14;33:2;35:1;38:6;69:2,3,18;72:12;73:16;96:5;98:11;101:20;104:7;105:17,25;108:8;109:13;116:19,20;121:15;123:13;129:11;138:24;143:5,8,24;144:2;149:24;153:11;161:23;163:9;168:20
**pointed (3)**
60:13;135:7;136:4
**pointing (2)**
154:24,25
**points (1)**
35:5
**policies (2)**
132:12;134:8
**policy (2)**
70:9;137:24
**pool (1)**
19:10
**populates (1)**
155:6
**portal (3)**
25:6,7,13
**portfolio (4)**
24:7;31:25;32:2;124:22
**portion (1)**
46:16
**portions (2)**
46:17,20
**P-O-R-T-I-S (1)**
11:11
**position (16)**
11:25;13:13,14;24:9,22,24;28:17,20,21;30:15;32:20,20;72:21;116:22;134:17;158:25
**positive (2)**
26:23,24
**possible (6)**
104:1,3,8;133:9,17;141:15
**posted (9)**
56:2,7,10,19;62:22;66:6,24;115:21;158:10
**potential (1)**
27:14
**power (1)**
36:19
**Powers (21)**
46:7,11;48:3;68:14;82:10;94:12;95:20;96:15;98:20;103:21;109:18;111:22,25;112:3;113:4;114:21;132:6;169:23;170:1;173:12;175:12
**Powers' (1)**
86:17
**praising (1)**
167:4
**predicate (1)**
113:15
**pregnant (7)**
13:25;14:3,5,7;15:5;44:21;45:2
**premed (1)**
6:24
**prescribed (1)**
11:3
**prescribing (1)**
10:23
**present (1)**
165:21
**president (3)**
19:8;23:4;150:4
**presidents (1)**
20:12
**prestigious (3)**
24:8;127:25;128:2
**pretty (4)**
41:22;80:17;98:13;100:7
**preventing (2)**
83:12;84:17
**previous (7)**
15:12;60:4;82:7,24;101:12;111:1,11
**previously (3)**
82:13;89:8;91:13
**price (8)**
35:1,5;38:7;59:10,24;60:7,11;61:17
**priced (2)**
36:7,8
**prices (6)**
36:1,4,23;37:15;58:22;61:13
**pricing (11)**
34:25;35:13,14,16,22;36:12,18;37:9,12,13;39:12
**primarily (2)**
45:6;85:19
**print (1)**
101:20
**Prior (2)**
58:16;93:16
**privileged (3)**
77:25;78:17,24
**Probably (5)**
60:24;86:1;101:23;108:1;144:7
**problem (3)**
62:25;63:7;65:25
**problems (3)**
45:11,13;62:21
**procedure (1)**
13:4
**procedures (2)**
132:15;138:10
**proceed (6)**
74:23;75:1;151:3;153:2,4,12
**proceedings (1)**
21:16
**process (7)**
14:2;19:25;20:24;66:21;75:6;132:1;153:17
**produced (7)**
94:1,3,6,8,9,15,17
**product (7)**
11:2,3;26:20;27:21;37:11;38:8;39:12
**production (1)**
94:19
**products (12)**
10:24,25;11:16;15:16;24:7,10,16;27:10;31:25;32:3,7;37:2
**program (5)**
7:14,15;91:4;134:2,8
**projects (1)**
34:4
**promote (3)**
10:3;18:16;32:1
**promoted (9)**
10:12;18:24;19:2,3,15,23;20:14,15;143:25
**promotion (5)**
20:9,21,25;21:18;142:13
**promotional (1)**
143:2

**promotions (1)**
18:21
**prompted (3)**
91:7;106:1;108:24
**proof (2)**
113:14;177:16
**proper (2)**
8:21;27:19
**properly (1)**
11:4
**propriety (2)**
128:20,21
**protein (1)**
172:2
**proud (5)**
75:3;127:3,5,10;
129:6
**prove (4)**
176:18,19,25;
177:15
**proven (1)**
156:8
**provide (6)**
90:24;100:17;
106:3,4;130:6;172:1
**provided (7)**
48:23;62:8;79:1;
138:2;140:24;144:20;
176:22
**provider (1)**
172:4
**provides (1)**
95:10
**providing (1)**
11:2
**proving (1)**
92:6
**pull (3)**
76:4;110:16;141:21
**pulled (1)**
119:12
**pulling (1)**
91:6
**purchase (1)**
37:11
**purchased (1)**
49:10
**purchases (1)**
177:1
**purpose (5)**
25:20;67:17;
136:24;154:5;178:10
**purposes (3)**
105:14;106:19;
107:14
**put (39)**
51:14;53:13,17;
55:3,22;62:18;63:23,
25;66:25;71:7;74:3;
92:3;99:23;105:15;
106:20;111:17,25;
112:2,3;124:23;
127:17,25;131:4;
137:7,10;139:15;
142:19;149:18;155:6;
156:4;157:8;160:17;
167:23;172:3;174:23,
25;176:18,20;177:23
**puts (1)**
157:9
**putting (6)**
50:12;63:6;89:15;
90:7;114:9;119:25

**Q**

**Q1 (2)**
124:8,15
**Q4 (1)**
145:23
**qualifications (1)**
28:15
**qualified (2)**
27:23,25
**quarter (9)**
75:13,15,18,19,21;
124:12,16;125:3;
126:5
**query (1)**
173:15
**questionable (2)**
89:13;145:24
**quick (1)**
169:17
**quickly (1)**
100:20
**quota (23)**
21:8;24:3;32:3;
33:2,4,7,15,18;34:9,
20;37:19;38:3,6,7,12,
13;39:6,13,14,15,19;
124:8,10
**quote (4)**
159:23;160:2,4;
161:21

**R**

**Rachael (161)**
4:8;18:16,24;19:15;
20:5,14;21:18;22:7,8,
8,15,24;24:19;26:10;
28:8;29:14;32:20;
43:17;44:16,18,21,25;
45:1,2,8;48:3;50:23;
52:6;61:1,23;63:23;
67:14;69:13;70:14;
71:1,8,9;72:3,8;73:20,
24;74:12,19;75:3,18;
77:4,16;80:6;81:22;
82:13;83:7,21,23;
84:4;85:4;86:24;
87:18;88:6;89:18;
91:17;92:1;93:18;
100:6;102:15;103:4,
13;105:17,24;106:1,
24;108:16;110:1;
111:12;112:17;113:2,
6,16;114:2;116:4;
117:23;119:16,17;
123:22;124:15;
125:16;127:2;132:22;
134:17,22;135:7;
136:4,13,19;137:15;
138:7,24;139:21;
141:22;142:11,13,22,
23;143:1,5,25;145:4,
23;147:2,14;148:1,8,
12;149:1,17;150:20,
24;151:21,23;152:1;
153:5,19;154:9;
157:17,22;158:19,21;
159:7,15,19;160:10,
22;161:11;162:2,7,10,
14;163:2,18,22,22;
164:6,11,16;165:14;
166:3,9,24;168:20,23;
171:20;172:11;174:5;
175:25;176:7,8,11;
177:7,23,25;178:3,16
**Rachael's (36)**
4:12;25:10;39:17;
43:20;44:4,16;45:4;
48:12;52:21;55:11;
59:11;71:20;78:11;
99:9;101:14;103:21;
105:23;110:9,13;
113:15;119:19;
125:14;135:5,13;
136:2,10;137:8;
141:17;143:13,19,21;
148:14,19;152:8,20;
173:24
**range (1)**
66:9
**Rao (2)**
166:25;167:9
**rated (1)**
80:23
**rates (1)**
121:21
**rather (2)**
26:19;30:11
**rating (7)**
80:18;81:3,4,11;
82:4;124:1;128:8
**rationale (1)**
64:12
**rationalize (1)**
102:25
**RE/regarding (1)**
164:1
**Rea (2)**
158:20,21
**reach (1)**
43:22
**reached (1)**
43:20
**reaching (1)**
143:1
**read (18)**
34:17;82:11;88:1;
92:12;94:25;96:12;
100:13;101:17,19;
105:9;108:14;128:15;
129:12;130:16;
134:15;135:25;136:1;
142:20
**reading (1)**
125:4
**reads (3)**
130:4;144:22;147:2
**ready (2)**
76:18;117:21
**real (2)**
58:18,19
**realigned (3)**
23:23;86:3;148:23
**reality (1)**
117:9
**realize (5)**
51:2;90:11;99:7;
171:7;173:3
**realized (1)**
174:16
**really (16)**
25:25;49:13,14;
51:8;70:12,14,25;
73:2;100:10;103:3;
127:4,10;129:4;
131:20;170:19;
173:19
**reask (1)**
64:10
**reason (20)**
13:6;14:7,12;26:19;
38:10;40:9;50:17;
63:3;97:21;102:24;
103:1,9;106:7;114:3;
120:9;127:4;134:10;
147:25;148:6;162:23
**reasons (3)**
34:5;44:12;120:23
**recall (31)**
13:24;25:16;27:4,6;
28:25;31:10;41:25;
42:4,12;46:19;48:24;
49:1,2,3;50:2,5,7;
59:25;72:16,18;73:2;
75:16;101:7,8;118:3;
122:4,5;125:4;140:5;
157:19;165:25
**receipt (1)**
138:1
**receipts (3)**
176:19,22,23
**receive (8)**
15:7;80:20;81:2,3;
99:22;109:18;120:16;
178:5
**received (8)**
72:20;80:11,25;
98:2;106:8;144:6;
172:19;176:5
**receiving (3)**
114:19,21;153:18
**recently (1)**
49:25
**Recess (2)**
76:17;117:19
**recognition (1)**
75:23
**recognize (8)**
80:2,4;92:24;
123:20;144:19;
147:10,12;157:25
**recognizing (1)**
158:2
**recollection (1)**
75:17
**recommendation (5)**
29:4;110:20,24;
111:12;112:12
**recommended (1)**
62:9
**reconciliation (1)**
149:20
**record (8)**
4:15;78:9;117:17,
18;169:12,18,19;
175:21
**records (1)**
119:11
**RECROSS-EXAMINATION (1)**
177:5
**recruited (1)**
18:3
**red (1)**
55:6
**re-entry (1)**
12:25
**reference (8)**
112:8,11;125:10;
126:8,9;127:11,13;
136:13
**referenced (2)**
110:13;146:20
**references (2)**
111:2;140:23
**referencing (9)**
59:2;125:1;136:14;
137:1,2,5;164:10,25;
174:24
**referred (2)**
146:21;167:6
**referring (12)**
42:20;66:12;70:21;
104:13;107:2,9;
143:18;145:2,4,13;
153:17;172:10
**reflected (2)**
60:12;176:13
**refresh (1)**
75:17
**regard (2)**

87:16;88:4
**regarding (11)**
18:20;44:1;74:17;84:20;109:19;135:11;136:8;148:1,7,14;168:1
**regimens (1)**
8:16
**region (3)**
38:17;50:24;72:13
**Regional (3)**
18:14,15;32:15
**regions (1)**
23:23
**registrations (1)**
130:9
**regular (2)**
122:18;152:12
**rehabilitation (1)**
7:13
**reimbursable (2)**
138:18;141:3
**reimbursed (3)**
177:11,13,24
**reimbursement (5)**
66:25;67:10;130:12;136:22;139:22
**reiterate (1)**
83:21
**relate (2)**
132:10;168:23
**related (6)**
44:16;53:18;138:17;151:16;152:19;168:20
**relating (2)**
66:14;152:24
**Relations (14)**
62:4,9,13;74:11;83:15;86:8;112:4;114:6;115:24;143:7,15;147:20;162:19;163:16
**Relations' (1)**
144:3
**relationships (1)**
128:12
**relayed (1)**
163:16
**relevant (3)**
15:18;27:14;28:6
**reliable (1)**
59:4
**rely (1)**
143:12
**remain (1)**
96:9
**remark (1)**
167:22
**remarkable (2)**
86:3;87:14
**remedy (1)**
98:4
**remember (33)**
31:5,15;33:11;38:20;39:17,18;43:13;45:5,8;46:23;50:9;65:16;66:24;67:1,2,3;80:9;81:12,14;109:17,20;120:14;122:22,23,24;125:19;135:5;136:2;137:8;144:12;159:10;160:5;164:23
**remind (2)**
70:16;145:14
**reminded (5)**
113:16;144:22;145:7,10;146:12
**reminder (7)**
82:8,9;111:3;113:2,7;146:15,19
**remote (1)**
146:7
**remove (1)**
139:18
**rendition (1)**
163:15
**rental (1)**
130:13
**rep (12)**
10:9,17,20;11:5,7;13:9;16:17;33:17;37:10;50:13;139:2;167:4
**repeat (10)**
34:15;76:3;78:2;105:21;135:17,19,23;154:15;165:7;175:14
**repeating (1)**
162:4
**replacing (1)**
158:18
**replies (1)**
100:1
**report (65)**
18:20;29:1;45:25;46:16;47:13,23;49:7,8;50:13;53:13;54:12;59:5;62:18;67:2;84:12;85:5;87:23;89:10,24;90:9,10;98:23;99:12,13,15,21;100:4,16;101:14,25;104:4,15,18;106:3,5,9;115:17,22;119:15,18,22,23;122:12;130:8,12;134:18;135:1,13;136:10,20;137:1;148:12;149:2,7;152:23;153:19;154:9;155:25;163:5;170:11;171:13;176:12;177:9,23;178:17
**reported (4)**
87:1;132:22;161:12;177:20
**REPORTER (8)**
34:14,15,18;88:3;101:5;135:22;136:1;154:14
**reporting (10)**
85:23;91:5;108:6;132:15;133:2;138:10;151:16,21;171:23;173:8
**reports (59)**
45:16;46:4,5,10,14,15;48:4,6,12,22;51:4;54:18;64:22;65:24;67:16;68:2;69:25;72:6;86:22;87:9;88:13,25;89:8,9,12;90:5;91:13;99:9,16,17,19;103:22;104:8,25;105:4;106:6;115:13;116:23;117:25;118:12,16;119:13;120:7;129:4;134:12,23;136:14;137:24;147:3;150:10;151:13;152:15;153:5,18;157:7;170:11,17,20;177:22
**represent (2)**
107:24;159:13
**representative (3)**
10:1,12;133:8
**representatives (1)**
113:16
**representing (1)**
4:8
**request (4)**
130:10;148:9;150:5;153:16
**requester (3)**
147:24;148:6;162:23
**requesting (2)**
147:25;148:7
**require (2)**
166:9,11
**required (3)**
79:7;150:10;157:13
**requirement (5)**
82:8,14;111:3;113:3;138:5
**requirements (1)**
126:24
**requires (1)**
139:6
**reserve (1)**
179:2
**reside (1)**
5:4
**resided (1)**
5:2
**residents (1)**
10:22
**resign (1)**
13:12
**resigned (1)**
13:11
**Resources (3)**
84:20;135:2;161:21
**respect (1)**
63:13
**respond (5)**
94:23;96:10;104:1;105:7;164:1
**responded (2)**
100:20,21
**responds (1)**
99:21
**response (4)**
100:24,24;106:19;137:2
**responsibilities (1)**
127:16
**responsibility (8)**
27:8;83:10;84:16;99:19;139:2,12;150:24;152:3
**responsible (5)**
88:24;104:5;127:20;131:22;138:20
**responsive (1)**
74:17
**restaurant (1)**
140:25
**result (4)**
74:15;134:8;144:9;150:3
**resulted (1)**
152:25
**retroactive (4)**
117:24;118:15,23,24
**retrospect (1)**
51:4
**return (1)**
134:11
**retype (1)**
155:5
**revelation (3)**
171:8,20;172:9
**revenue (13)**
34:6;35:7;37:14,20,24;38:3,5,9,14;125:5,8;126:24,25
**review (23)**
75:24;76:4;80:25;81:20,22;83:4;117:1,1,24;118:7,12,24;119:5,8,10,19;125:24;126:2,3;127:7;134:9;141:21;143:14
**reviewed (3)**
46:18;152:17;175:25
**reviewing (1)**
51:4
**reviews (3)**
81:2,17,24
**rewarding (1)**
13:7
**Rhee (1)**
5:20
**R-H-E-E (1)**
5:22
**Ridge (1)**
5:1
**right (56)**
21:4;26:8;27:15,18;32:4;36:20;37:4,19;38:13;49:4,16;52:6;55:16;60:22;61:8;68:5,18;69:19;70:6;72:15;76:18,19;78:19;79:21;80:18;82:25;83:4,17;84:5;86:12,19;96:14,18,21,24;97:3,13;98:24;99:5;100:10;102:21;107:14;108:8,17;110:3;115:25;117:5;134:15;138:9;141:10;142:9;160:13,19;169:14;175:14;178:12
**risks (1)**
130:5
**road (1)**
60:18
**Rob (1)**
5:18
**Robby (1)**
13:23
**role (8)**
11:23;14:1;15:22;19:25;23:2;127:15,22,25
**Ron (19)**
22:8,10,24;77:1,9;78:13;79:2;118:3,5;122:25;142:11,13,23;143:1;150:16,19,22;173:16,25
**Ron' (1)**
118:12
**Ron's (2)**
119:8,23
**room (1)**
163:24
**root (2)**
62:25;63:7
**Rose (5)**
4:8;80:6;148:1,8;165:15
**Rose's (4)**
48:3;110:2;111:12;175:25

**roughly (2)**
36:7;37:22
**round (2)**
56:22;59:7
**RSD (1)**
82:10
**rude (1)**
5:8
**rule (2)**
53:8;138:7
**Rules (2)**
4:3;162:16
**run (2)**
169:17;173:15
**running (1)**
64:3

## S

**safe (1)**
164:2
**saga (1)**
105:16
**sales (23)**
11:23;12:2,23;16:2;18:3,14,15;23:24;26:13;27:18;28:17,21;29:15;31:14;32:15;35:3,6;86:11;125:2;127:20,23;128:6;133:2
**salesperson (1)**
12:15
**salt (1)**
60:22
**salting (1)**
60:18
**same (34)**
5:15;9:9;11:22;24:9;31:20;32:1,11,20,20;36:14;37:9,12;38:11;39:6;42:5;51:19;59:13;60:7;79:13;81:6,24;89:7;91:21;95:19;96:18;100:25;105:4;119:12;132:9;137:19;152:10,11,12;158:25
**Saturday (1)**
160:11
**saw (19)**
25:13;27:12,14;45:11,13;51:11;59:17;75:5;89:7;110:14;123:9;126:18;141:7,15;142:6;145:23;147:17;157:17;169:6
**saying (47)**
26:15;32:6;34:8,18;35:8;42:15;44:3;48:21;49:2;51:15;53:15;55:8;64:13;80:25;82:13;83:13;89:12,24;90:4;100:15;101:18;103:14,18;104:24;107:12;108:16;110:8;111:20;112:10;113:19;114:8;116:1;119:6,19;123:11;124:24;125:1;145:13,14;147:18;164:12,13,17;172:8;173:14;176:18;177:15
**schedule (1)**
79:7
**scheme (1)**
64:3
**school (6)**
6:2,6,13;7:9,19;168:8
**scope (1)**
122:18
**score (1)**
80:20
**screen (28)**
46:11,14;47:1;48:2,11,15,22;71:11,12,15,20;76:23;79:22;84:11;93:21;94:3;95:21;97:5,8;99:6;101:20;107:25;110:7;123:16;130:2;157:20;169:15,25
**scrutinized (1)**
108:11
**se (1)**
131:6
**search (3)**
52:11;156:19;171:11
**second (12)**
10:19;13:23;45:4,9;63:3;75:13,18;118:24;124:11;163:11;173:14;177:2
**Section (4)**
133:6,24,24;137:23
**security (2)**
58:12;116:17
**seeded (1)**
82:4
**seeing (5)**
83:8;85:5;114:4;116:1;146:7
**seeking (1)**
136:22
**seemed (3)**
44:21;75:6;100:5
**seems (4)**
103:24;104:1;170:10,16
**sell (8)**
10:3;12:22;32:1;36:3;38:11,24;39:5;92:7
**selling (12)**
10:25;11:2,15;12:6,12,16;13:1;15:13;24:15;28:12,18;37:1
**Seminar (1)**
130:8
**send (17)**
29:1;46:7;70:15;71:6;99:21,22,25;100:3,18;101:18;108:21;109:9;142:22,25;151:24;153:20;157:24
**sending (8)**
96:4;99:15,16,17;100:16;138:20;153:18;154:8
**sends (8)**
71:18;95:20;101:13;103:21,24;104:15;105:3,11
**senior (1)**
18:10
**sense (5)**
50:11;91:22;132:3,5;178:12
**sent (62)**
46:7,8;48:3,16;70:3,5,6;71:10,15;80:13,15;83:2;86:8;93:21;95:23;96:1,6;97:14,18,25;98:23,25,25;99:6,8,20,23;100:7,8,10,17,20;101:3,16;104:2;105:13;106:10,13,17;107:9;108:2;109:2,4,12;113:7,14,20;115:17,23;142:23;143:25;149:10,23;153:20,22,24;161:9;164:10;165:5;169:7,20;176:4
**sentence (3)**
130:18;133:6;147:1
**separate (1)**
156:21
**September (4)**
32:18;148:11;149:9;169:20
**series (1)**
79:25
**serious (2)**
68:2;105:19
**served (1)**
113:14
**service (15)**
51:12;52:3;54:8;69:5;117:8,9;138:2;140:24;148:15;154:19;155:24;157:2;173:5;174:17,21
**servicing (1)**
11:4
**set (8)**
25:20,22;27:9;37:7;70:10;83:24;150:13;151:18
**setting (3)**
160:3,13,22
**seven (9)**
15:24,25;16:1;32:19,24;45:19,21;46:3,10
**several (2)**
151:25;152:2
**sex (4)**
166:7;167:13,15,16
**sexual (4)**
4:9;161:16,18,19
**Seyfarth (1)**
79:5
**shaming (1)**
167:7
**share (3)**
20:18;40:17;78:8
**shared (3)**
14:10;147:14;152:10
**sharing (1)**
48:11
**Shaw's (1)**
79:5
**sheaths (1)**
12:24
**sheet (16)**
52:21;59:6,17;63:24;66:25;102:16;105:12;129:9;137:10;141:4,17;143:17,21;155:3;177:21;178:8
**sheets (18)**
55:12,13;61:3,24;71:13,14,20;72:1,10;87:18;88:7;105:20,24;109:19;119:8;123:1;128:20;132:23
**shifted (4)**
23:10;63:7,12;114:7
**shifting (3)**
68:15;114:13;115:9
**short (1)**
107:19
**shortly (1)**
31:11
**shot (6)**
46:14;47:1;71:11;101:20;107:25;170:1
**shots (12)**
46:11;48:2,12,16,22;71:15,20;84:11;93:21;94:4;97:5;157:20
**show (8)**
32:4;49:24;50:13;126:24;150:1;156:15,24;160:7
**showed (2)**
84:11;86:2
**showing (23)**
58:13;79:25;92:23;94:3;96:14;98:19;101:10;103:20;107:23;123:18;129:24;132:25;133:19;138:9,12;142:9;144:18;147:9;153:14;154:17;162:18;163:21;165:13
**shown (1)**
51:16
**shows (3)**
103:10;129:17;156:25
**side (7)**
57:6,19;99:5;121:4,7,19,20
**sight (1)**
21:14
**sign (5)**
36:18;60:14;62:23;110:3;120:25
**signature (1)**
179:2
**signed (2)**
35:4,10
**significantly (1)**
38:8
**signing (1)**
35:15
**signs (1)**
122:2
**similar (6)**
16:22;17:9,24;24:4;28:18;60:21
**Simply (1)**
123:3
**single (5)**
5:11;33:17;36:12;52:18;104:25
**singular (1)**
90:10
**sit (1)**
172:20
**sitting (1)**
31:6
**situated (1)**
154:22
**situation (4)**
55:5;95:11;140:19;160:18
**six (2)**
69:19;154:13
**size (3)**
16:22;18:1;75:22
**skill (2)**

27:9;150:13
**smack (1)** 166:3
**smaller (5)** 17:18;38:1;125:6; 126:23;127:1
**smile (1)** 27:1
**smoke (3)** 96:23;97:13;98:12
**Smolock (17)** 159:5,8,15,20,23; 160:21;161:12,21; 162:8,14;163:2; 164:1,6,8,25;165:17, 24
**Smolock's (2)** 163:24;164:11
**snack (1)** 172:2
**snapshot (1)** 87:12
**snow (2)** 60:22,24
**sold (8)** 11:1;15:16;26:19; 32:8;37:21,23,24; 38:4
**solve (1)** 95:11
**somebody (4)** 41:17;42:18,25; 68:1
**someone (3)** 18:25;68:9;78:14
**Sometime (1)** 176:4
**sometimes (1)** 65:19
**somewhere (1)** 37:2
**soon (4)** 107:17,19;142:18; 144:1
**sophisticated (2)** 24:16,18
**sorry (14)** 8:14;33:2;56:3; 59:19;84:2;91:9; 118:21;129:2;134:20; 135:16,24;164:2; 170:23;174:12
**sound (3)** 137:7;159:16; 163:24
**sounded (2)** 44:23;70:7
**sounds (8)** 28:6;36:22;76:7,7, 14;111:22;130:24; 137:6
**south (1)** 23:10
**spanned (1)** 61:4
**speak (4)** 71:4;113:11; 147:25;148:7
**speakers (2)** 67:22;154:12
**speaking (2)** 132:9,9
**specific (3)** 10:6;33:21;153:16
**specifically (8)** 27:4;70:21;71:8; 108:12;113:6;124:21; 125:2;140:20
**specifications (1)** 161:17
**specify (1)** 54:10
**speculate (1)** 19:12
**speculating (2)** 38:21;101:16
**speculation (11)** 47:3,14,24;64:24; 67:11;70:18;100:23; 108:19;112:5;129:19; 141:19
**spell (2)** 4:14;5:21
**spend (2)** 66:10;146:8
**spending (1)** 123:10
**spent (2)** 127:14;136:23
**split (1)** 85:25
**spoke (11)** 27:5;58:12;69:12; 93:5;94:21;95:2; 111:23;112:17; 114:12,14;116:24
**spoken (1)** 44:2
**spot (1)** 31:9
**spreadsheet (6)** 67:4;89:11;90:1,17, 18;174:9
**square (1)** 16:20
**Squibb (5)** 7:23;9:23;12:5,11; 13:9
**stamp (1)** 92:13
**stamped (1)** 169:23
**stand (2)** 120:12;171:16
**standard (1)** 56:8
**start (12)** 6:25;8:22;11:25; 23:24;30:13;40:20; 72:17,22;142:13,25; 163:25;165:1
**started (13)** 8:12;9:25;12:14,22; 24:16;31:17,19;33:4, 19;35:8;80:24; 148:12;149:2
**starting (1)** 106:10
**starts (3)** 31:13;33:1;133:25
**state (4)** 4:14;16:18;27:21; 173:3
**stated (3)** 52:24;62:6;148:9
**statement (6)** 51:3,17;157:15; 175:22;176:6,13
**statements (1)** 176:1
**states (1)** 106:17
**stating (5)** 53:19;64:4;87:23; 88:9;160:10
**stay (4)** 57:25;79:12,16,16
**stayed (1)** 81:24
**staying (1)** 79:3
**stent (3)** 36:6,13,14
**stents (3)** 12:18,22;35:18
**still (14)** 21:13;23:7;33:4; 36:3,14;37:1,8,11; 38:12;84:9;99:17; 123:16;169:15; 172:25
**stop (3)** 8:23;161:23;163:9
**stopped (1)** 148:19
**stopping (1)** 9:14
**stops (1)** 97:17
**story (8)** 63:7,12;68:15; 114:7,13;115:9; 167:12;168:20
**straightforward (1)** 100:7
**strategically (1)** 24:2
**stratify (1)** 87:11
**strike (6)** 19:21;27:24;74:10; 107:25;127:12; 133:19
**string (1)** 109:3
**stripper (1)** 167:13
**stroke (2)** 12:8,8
**structure (1)** 155:9
**stuck (2)** 45:6;167:17
**student (1)** 6:12
**studies (1)** 7:21
**study (2)** 6:23;7:12
**stuff (1)** 73:1
**subject (5)** 108:5;117:24; 118:15,23;142:12
**submit (3)** 24:23;45:25;176:25
**submitted (23)** 46:6,6;65:12;86:24; 89:9;99:13;132:2; 134:13,23;136:13,19; 143:14,16;147:11,15; 154:9;162:19;176:8, 12,24;177:8,12;178:8
**submitting (2)** 102:15;147:3
**subsequent (2)** 100:24;130:12
**subsequently (3)** 173:4;174:16;175:5
**substantial (1)** 141:25
**substantially (1)** 56:8
**suburbs (1)** 57:19
**success (2)** 128:14;158:7
**suggested (1)** 50:7
**suggesting (3)** 89:22;98:6;102:14
**suggestions (1)** 95:10
**summer (1)** 167:13
**Supera (1)** 36:6
**supervising (1)** 85:25
**supervision (1)** 39:4
**supervisor (27)** 14:25;17:12;20:2,6; 23:5;25:10;32:23; 34:2;39:1;46:3;48:7, 9;72:12;73:20;74:13; 77:1;80:24;84:7;87:9; 88:19;100:4;148:19; 151:8,13,15;152:9,20
**supplementary (1)** 169:21
**supplies (1)** 102:2
**supplying (1)** 112:15
**support (4)** 24:2;143:13,21; 176:17
**supported (2)** 137:25;143:18
**supportive (1)** 15:10
**supposed (9)** 18:22;46:5;49:5,6; 76:22;77:22;99:16, 18;133:13
**sure (61)** 11:3;19:13;21:14; 22:11;26:14;43:8; 52:2;57:23;59:2; 63:20;64:18,18; 66:12;81:10;86:6,20; 94:8;96:10;97:10,17; 98:13,17;100:21; 103:3;104:20,20; 106:22;107:5,18; 111:10;112:6;119:6; 120:14;122:3,15; 125:20;126:9,11; 130:24,25;131:1,4,6, 10,20;132:8;135:17, 21;136:25;137:1,4; 142:15;144:20; 155:15;161:17; 165:20;169:6,9; 175:21;177:18; 178:18
**surgeons (1)** 165:22
**suspect (1)** 54:19
**suspected (1)** 171:9
**suspicion (1)** 71:25
**suspicious (4)** 49:13,14;120:3; 121:25
**sweatshirt (1)** 139:25
**sweetness (1)** 70:22
**sworn (1)** 4:3
**system (4)**

34:24;36:7;91:5;
99:13
**systems (1)**
17:16

**T**

**talented (1)**
114:25
**talk (15)**
39:11;43:12;44:15;
49:24;60:10;62:15;
78:10,13;83:7;94:24;
98:10;105:7;125:10;
143:1;166:7
**talked (17)**
25:24;40:5;43:2,16;
44:4,11;61:10;65:4;
70:3;77:3,15,18,20;
78:4;123:25;124:6;
139:4
**talking (25)**
8:12;31:6;63:14;
76:8;80:13;84:5;94:5;
95:3,8,15,17;106:11,
15;108:16;110:20,22;
122:18;132:19;134:3;
136:25;137:11,18,19;
172:13;174:8
**talks (2)**
107:7;119:5
**task (1)**
149:18
**tasks (1)**
75:8
**taxi (1)**
130:13
**taxi/hired (1)**
140:25
**team (31)**
23:22;24:2,15;51:3;
70:13,16,25;71:6;
72:4,19,21,22,24,25;
80:12,13;82:23;
95:24;99:17;105:13;
106:14,15,18,22;
108:24;110:4,6;
111:24;146:14,15;
150:12
**Teams (6)**
27:6;45:7;72:23;
75:5;95:25;150:3
**telling (2)**
78:20;99:14
**tells (2)**
94:21;95:2
**template (3)**
149:11,16,23
**Ten (5)**
5:14,15;14:24;
17:14,15
**terminate (1)**
115:7
**terminated (15)**
18:17,25;19:4,16;
20:5,8;67:15;114:3;
137:17;143:6;144:1,
7,11;147:2;159:1
**termination (24)**
4:10;62:10;80:5;
86:18;87:6,8;92:10;
110:14,19,20,23,24;
111:13;112:12;
113:15;115:4;127:4,
8;134:9,10,22;143:13,
19,21
**terms (5)**
17:20;35:2;62:15;
119:1;126:24
**territories (1)**
125:7
**territory (18)**
16:7;23:11;32:4,16;
34:6;37:25;38:1;
75:22;76:1;86:12;
91:18;126:6,21,23,25;
127:1;128:13;158:17
**testified (8)**
34:3;50:24;65:16;
87:20;98:2;106:25;
109:17;167:10
**testify (4)**
19:12;33:14;111:8;
170:25
**testimony (19)**
9:16;22:18;26:7,17;
34:11;44:8;46:2;
48:11;59:6;64:16;
66:17;85:9;113:22;
131:13;140:5;143:11;
152:9;162:7;166:16
**texted (5)**
49:19,22;104:19;
107:3;112:22
**texting (4)**
49:16;69:19;93:5;
152:14
**texts (1)**
105:23
**Thanks (2)**
101:9;153:23
**theirs (1)**
122:10
**thereabouts (1)**
30:16
**therefore (1)**
178:10
**thereof (1)**
128:20
**thinking (18)**
41:16;44:19;67:14,
24;68:7,9,12;83:8;
102:19;108:22;
121:21;122:3,5;
125:5;142:13;170:19;
171:12,14
**thinners (1)**
10:8
**third (2)**
13:23;108:8
**third-party (1)**
155:10
**Thirteen (1)**
119:21
**though (3)**
42:18;84:9;100:4
**thought (27)**
9:3;25:25;26:18,22;
42:18,24;49:15,18;
52:1;54:25;66:21;
67:13;68:17;70:7,9;
85:13;96:2;98:8;
102:12;142:24;144:8;
157:23;172:17;173:7,
19;174:12,14
**thousand (1)**
90:18
**thousand-plus (1)**
176:23
**three (18)**
7:22;13:22;14:22;
15:7;17:24;38:22,23;
39:2,8,13;56:22;59:7;
82:5;104:4,21;
114:11;142:17;
168:25
**thrombosis (1)**
12:9
**throughout (3)**
9:14;125:9;128:24
**thumbs (1)**
165:18
**ticket (9)**
74:5,11,18;75:11;
148:15;150:7;151:4,
12;152:25
**Tim (117)**
46:7,11;48:3,9;
49:13;50:2;51:11;
52:1,12;53:25;54:1,
19,25;55:3;58:13,16;
61:3;62:8;65:4;68:14;
69:1,12,12,18,23;
71:4;73:1;82:10,21;
83:13,14,18,19,23;
84:4,11,23;86:9,16;
87:14,17;88:5,13;
90:25;91:6,8,10,14,
14;93:2,5;94:12,21;
95:20;96:15,25;
98:20,23;99:9,16;
100:5,15;101:11,13;
102:12,14,19,24;
103:4,21;104:10;
105:3,11,18,23;108:1;
109:18;111:22,25;
112:2,3,15;113:4,13;
114:11,12,14,21;
115:22;116:4,23;
117:5;128:19;132:6;
137:2;145:19,22;
146:13,21;151:12,17;
152:2,7,10,18,23;
153:4;156:19;169:22;
170:1,3,8,19;172:19;
173:12,14;175:12
**Timber (1)**
5:1
**times (6)**
36:11;57:13;60:4;
65:16;80:22;87:11
**timing (1)**
20:12
**Timothy (1)**
94:12
**Tim's (6)**
83:11;84:16;85:21;
86:5;106:10;112:20
**Tina (2)**
13:22;15:1
**tip (8)**
56:8;65:20;66:4,8;
141:18,25;156:4,4
**tipping (2)**
141:23;142:7
**Tips (5)**
140:23;141:1,3,22;
156:3
**tips/gratuity (1)**
140:24
**title (6)**
9:25;11:13;32:10;
132:15;133:1;138:10
**titled (6)**
132:14;133:6,21,
25;137:23;157:8
**today (21)**
18:10,13;24:4,14;
33:16,20;34:3;39:15,
16;50:14;94:24;
108:13;132:19;134:4;
165:15;169:2,20;
171:16;172:20,20;
174:5
**today's (1)**
80:10
**to-do (1)**
149:19
**together (12)**
71:8;92:2,3;103:25;
111:25;112:2,3;
142:19,23;149:18;
152:11;168:8
**told (43)**
14:5;20:20;22:2,16,
21,23;40:21,23;42:4,
8,12,18,24;44:18;
45:1;50:2;53:25;54:1,
22;69:12;78:22;
83:18,24;84:23,23;
91:8,10,14,15;103:4;
106:5;113:18,20;
146:22;148:22;149:7;
161:4,20,22;162:2,7;
163:9;165:6
**tomorrow (8)**
78:21;79:6,13,15;
94:24;163:24;165:1;
178:24
**tone (1)**
96:8
**tonight (2)**
79:3,13
**took (10)**
23:13;52:15;69:15;
71:12;73:21;87:18;
88:6;95:20;108:1;
142:8
**tooth (1)**
90:6
**top (7)**
18:1;93:5;96:20;
109:10;132:13;
133:20;165:14
**topic (3)**
84:21;95:15;108:12
**total (3)**
89:11;124:21;125:6
**totaling (1)**
86:25
**totality (2)**
88:11;90:11
**totally (1)**
168:14
**touch (1)**
126:4
**touched (1)**
163:12
**touching (3)**
159:8,15;163:10
**tow (4)**
140:1,4,17,20
**towed (4)**
139:25;140:8,13,18
**Tower (1)**
79:6
**town (1)**
53:11
**Towne (57)**
50:10,11,23;51:21,
23;52:14,17,25;53:9,
14;54:4,5,6,13,21;
55:15,18,23;58:25;
59:16;60:10;61:1,10;
63:3,6,11,12;65:17;
101:23;103:2;105:6;
114:8;154:17,19;
155:2,3,3,10,17;
156:17,20,25;157:8,
12;171:7,11,21,22;
172:11;173:3;174:1,
13,16,19,23,25;175:1
**track (1)**
33:17
**tract (1)**

164:9
**trained (3)** 150:17,19,22
**trainers (1)** 40:3
**training (6)** 8:6,16;39:22,25; 40:1,2
**transact (1)** 55:23
**transaction (1)** 55:20
**transcript (1)** 92:16
**transferred (1)** 151:7
**transferring (1)** 74:15
**transition (1)** 72:20
**Transparency (1)** 14:13
**travel (6)** 79:12;120:6;130:7; 133:6,7,21
**traveled (3)** 17:2;120:11;141:16
**traveling (1)** 42:2
**Trevor (1)** 23:14
**tried (1)** 175:8
**trigger (1)** 101:24
**trip (7)** 56:22;57:16;59:7; 120:17;122:1;140:1,8
**truck (1)** 140:21
**true (69)** 7:16;12:12,16;18:8; 20:3,9;24:17;26:13; 28:9;32:8;39:2,3,9, 14;42:19;45:24; 48:12;51:18;53:18; 57:9,21;58:20;59:24; 61:24;69:22;70:14; 74:19;75:20;77:1; 82:3;89:8;90:7;95:4, 21;97:19,20;99:10; 100:6;106:16;108:6; 109:13,14,24;111:4; 121:22,23;124:3; 126:22;128:20; 133:17;140:21; 141:12;143:3,9; 148:9;154:9,22; 159:9,21,25;161:24; 162:11;163:15; 165:19;167:10;170:3, 7;173:2,8
**truly (1)** 114:15
**Trump (1)** 94:12
**trusted (1)** 90:6
**truthfulness (1)** 68:4
**try (4)** 9:7;92:2,3;138:12
**trying (14)** 8:19;9:6;36:2; 50:11,17;59:3;66:20, 21;72:24;91:25;92:5; 102:25;132:10,11
**tubes (2)** 28:13,18
**turn (1)** 104:1
**turned (1)** 104:25
**turns (1)** 104:7
**twins (1)** 13:25
**two (36)** 13:11;17:7,16; 22:24;28:4;30:15; 41:21;43:11,22; 44:15;46:6,8;65:14; 71:18;72:23;73:15; 79:25;87:10,17,17; 88:5,5;90:9;105:3,14; 106:19;137:18; 159:16;171:8,11,13; 172:10;173:4,5; 174:14;175:6
**two-drink (1)** 166:11
**two-year (1)** 7:15
**type (6)** 10:4,6;28:11,21; 100:22;138:13
**typed (1)** 171:13
**typing (1)** 145:16

**U**

**UH (5)** 17:12,25;116:21; 150:20;165:8
**ultimate (1)** 24:3
**ultimately (3)** 62:9;144:11;158:20
**Um (1)** 125:1
**Uma (9)** 78:4;94:5;111:5; 117:13;135:6,7; 136:3,4,14
**unaccounted (1)** 137:4
**unaccounted-for (1)** 136:21
**Unbelievable (1)** 99:24
**uncomfortable (1)** 167:5
**under (11)** 4:2;34:3;50:13; 85:21;86:5,15,16; 105:7;123:23;161:19; 162:16
**Under-performing (1)** 81:9
**understood (3)** 48:17;129:23;176:9
**underwear (1)** 167:17
**Unintelligible (1)** 34:13
**University (5)** 6:18;7:11;17:4,10; 150:17
**unknown (1)** 167:13
**unless (3)** 108:10;160:3,13
**unlikely (1)** 141:23
**unsent (2)** 109:15;111:11
**untruthful (2)** 63:8;158:9
**unusual (1)** 146:6
**up (45)** 5:23;13:14;14:14; 21:12;22:15;25:20, 22;29:1;37:7;38:14; 42:23,24;44:20; 51:16;55:20;56:12; 58:9,13;59:7,7;68:24; 74:6,11;76:4;77:12; 83:24;108:12;110:16; 134:8;140:21;141:21; 144:2,9;145:17; 151:1;153:8;154:17; 155:25;156:24,25; 157:7;165:18;173:16; 174:1;176:23
**Upon (2)** 134:9,22
**Upper (3)** 105:6;173:11; 175:11
**upset (2)** 42:14;77:6
**upstate (1)** 72:24
**urinary (1)** 164:9
**use (20)** 53:21;54:22;55:19; 65:6;70:16;82:8,14; 83:21;106:22;111:3; 113:3,17,18;122:25; 133:8;134:6,11; 146:25;150:23;157:6
**used (10)** 51:15;52:3;53:9; 54:24;59:22;108:9; 122:8,12;133:13,17
**uses (1)** 131:14
**using (12)** 53:16;65:20;86:14; 108:1;109:19;119:1; 132:6;133:15;146:22; 155:8,10,24
**usual (2)** 135:4;144:4
**Usually (3)** 96:23;97:12;98:12
**UTI (1)** 165:12
**utilizing (3)** 105:13;106:18; 107:13

**V**

**vague (13)** 29:23;30:11;33:23; 47:15;54:15;55:17; 64:9;81:18;82:19; 114:22;135:9;136:6; 161:2
**Vaguely (1)** 123:21
**valet (44)** 47:8,12,17,20; 51:12;52:3;53:21; 54:8;56:7,11;57:9,20; 60:13,17;63:5;65:20; 66:8,24;69:5;89:16; 114:10;117:8,9; 120:4,12;123:8,10; 140:25;141:12,18; 142:1;154:19;155:11, 24;156:1,6,7,13; 157:2;173:5;174:17, 20,21,23
**valets (3)** 63:4;65:7;156:17
**valid (1)** 55:19
**varied (1)** 142:3
**various (1)** 67:4
**vascular (20)** 11:22;12:2,14,16, 23;15:13,16;16:2; 26:13,19;28:18; 29:15;31:14;32:16; 35:16;75:19,22;76:2; 124:16;165:22
**vast (2)** 27:10;174:7
**vehicle (2)** 139:25;140:1
**vein (1)** 12:9
**vena (1)** 12:24
**vendor (5)** 155:7,10,21; 156:15;157:15
**verify (1)** 122:8
**version (2)** 109:1,4
**versus (3)** 59:17;119:5;136:19
**vessel (1)** 23:22
**Vezendy (1)** 40:4
**via (6)** 80:11;99:13;113:7; 130:9,12;147:15
**vice (4)** 19:7;20:11;23:4; 150:4
**Victoria (1)** 78:4
**video (2)** 21:13;27:3
**view (2)** 101:21;143:22
**VII (1)** 137:23
**violate (1)** 138:7
**violating (1)** 147:2
**violations (1)** 117:10
**Virginia (1)** 140:2
**virtual (1)** 8:20
**visibility (4)** 20:12;51:3;69:3; 72:5
**visit (1)** 164:8
**volition (3)** 42:9;151:1,2

**W**

**wait (7)** 9:8;47:10;94:23; 95:9,10;125:13; 149:23
**waiting (2)** 106:2;163:23

**wallet (4)** 63:1,1;65:5;114:9
**wants (1)** 38:12
**warning (2)** 149:11,16
**warrant (1)** 75:23
**water (1)** 105:8
**way (33)** 19:18;21:12;22:21,23;26:23;41:10,14,17;42:16;43:6;56:16;58:7;61:5;62:20;64:20;70:25;75:21;78:19;82:16;91:6;104:2;107:1;113:1;118:18;119:3,4;132:22;139:17;145:6;166:16;172:23;173:1,7
**weather (1)** 60:21
**week (2)** 160:4;166:9
**weeks (11)** 13:11,25;14:24;30:15;40:6;41:21;43:11,22;44:15;69:19;87:10
**weight (1)** 167:5
**wellness (1)** 164:18
**Wendy's (1)** 139:16
**weren't (11)** 45:24;55:8;72:12;74:16;100:4;112:16;121:20;122:1;139:6;150:5;152:7
**west (4)** 121:4,7,19;140:1
**western (5)** 10:16;16:8,16,18,19
**Westland (1)** 40:4
**Wexford (1)** 8:1
**what's (21)** 5:17;18:13;23:2;44:9;47:11;51:6;79:22;81:4;83:9;89:10;92:23;95:13;97:9;98:15;100:12;127:19;129:24;132:25;133:19;139:9;156:15
**Wheeling (1)** 102:4
**whenever (3)** 25:24;133:9,17
**whichever (1)** 54:6
**whole (9)** 16:18;32:23;39:1;70:25;91:12;97:18;125:20;146:15;151:18
**who's (1)** 145:15
**wife (2)** 167:24;168:9
**Willis (1)** 79:6
**wine (2)** 167:22;168:10
**winter (2)** 60:17,23
**Wires (2)** 12:24;35:20
**within (2)** 7:15;126:14
**without (4)** 38:21;78:5;101:16;108:16
**witness (9)** 9:9,16;29:10;78:1;87:20;107:17;135:18;170:23;175:19
**women (3)** 41:7;42:15,17
**wonderful (1)** 127:3
**wondering (1)** 102:24
**worded (1)** 119:4
**words (5)** 26:15;40:13;124:23;137:7;161:25
**work (15)** 8:19;15:22;29:14;107:20;128:3;140:2,8;153:4;160:24;161:5,7,10;164:7,19;178:6
**worked (6)** 7:22;12:5;28:12;85:18;152:11;161:5
**working (19)** 30:14;31:13,17;34:4;52:5;87:17,17;88:5,5;91:17;92:2;120:13;127:4,20;152:7,18,23;165:23;166:19
**worksheet (6)** 80:5;92:10;110:21,25;111:13;112:12
**worried (1)** 72:11
**worse (1)** 81:6
**wrap (2)** 42:23;153:8
**write (6)** 99:25;148:3,4;159:20;165:14;171:6
**write-in (1)** 174:2
**writes (4)** 102:12;108:9;153:15;163:23
**written (6)** 98:15;113:1,2;149:10,16;174:2
**wrong (4)** 54:20;103:14;114:5;115:5
**wrongdoing (2)** 65:10;117:5
**wrongful (1)** 4:10
**wrongly (1)** 89:13
**wrote (17)** 93:8;125:5,11,16,20;126:11,12;128:17;129:14,15;132:6;142:11,12;154:7;159:23;160:2;171:2
**WTF (1)** 100:1

**Y**

**year (18)** 6:4;7:15;11:25;23:17;31:15;33:5,7;39:18,21,22,23;45:4,9,14;61:18;86:11;106:3;128:24
**years (21)** 5:14,15;10:10;11:8;15:24;16:5;17:14,15;33:21;34:9,20;37:22;38:7,22,23;39:2,9,13;81:23;84:8;127:14
**yesterday (4)** 94:6,8,8,17
**York (1)** 72:24
**you/Colleen (1)** 106:14

**Z**

**zero (3)** 20:12;174:22,22
**zone (1)** 140:12
**Zoom (1)** 8:25

**1**

**1 (8)** 86:23;88:17,18;92:15,20;119:14;124:9;148:24
**1,400 (1)** 36:8
**1:30 (2)** 79:18,19
**1:49 (1)** 93:9
**10 (3)** 16:5;76:10,13
**10:00 (2)** 79:8;178:24
**100 (1)** 128:8
**11 (2)** 36:8;148:5
**11:00 (2)** 79:6,8
**11-24-2023 (1)** 99:10
**119 (1)** 5:1
**12 (1)** 13:24
**12:10 (2)** 98:21;99:8
**126 (2)** 86:21,24
**12-9 (1)** 111:21
**129.3 (1)** 124:8
**13 (6)** 61:4,7,12,24;91:12;119:19
**13-month (2)** 62:17;65:13
**14 (1)** 99:8
**1400 (1)** 36:12
**14th (1)** 98:20
**150.8 (1)** 124:9
**1500 (1)** 36:12
**16 (4)** 66:7;67:4;105:12;165:13
**16037 (1)** 5:1
**17 (3)** 66:7;67:4;92:18
**18 (2)** 101:13;159:3
**19 (4)** 105:11,17;142:12;143:25
**1992 (1)** 6:5
**1996 (1)** 7:4
**1997 (3)** 7:16,20,24

**2**

**2 (4)** 92:15,20;124:8;163:23
**2:10 (2)** 97:16;98:14
**2:30 (1)** 79:19
**2:40 (1)** 98:12
**20 (4)** 159:3;161:22;162:8;163:6
**2007 (1)** 5:3
**2008 (5)** 12:1,2,14,23;27:25
**200-plus (1)** 86:4
**2015 (4)** 15:23;18:2;23:24;24:17
**2019 (15)** 24:20,21;27:24;28:1;29:15;30:13;31:14,20;32:13,21;33:1,4,5,15;80:17
**2019/2020 (1)** 38:13
**2020 (4)** 33:8,15;39:18;45:13
**2021 (1)** 45:4
**2022 (7)** 159:7,9;160:9;161:20;162:19;163:23;165:13
**2023 (42)** 32:14;61:4;75:11,18,24;80:18;81:11,22;82:8,15;83:3;84:8;85:24;86:2,19,23;88:17,18,18;93:9;96:5,18;98:20;101:13;107:3;111:2;114:17;119:14;123:22;124:3,15;127:12,17;129:12;145:23;148:5,11,19;150:15;151:10;152:8;167:13
**2023/beginning (1)** 89:4
**2024 (25)** 31:21;32:14,15,21;61:5;69:16;81:13;

84:5;86:24;89:4;103:22;104:16;105:11,12,17;108:11;119:14;128:14;142:12;144:1,11;145:19,23;152:21;153:24
**2025 (1)** 23:16
**21 (1)** 159:8
**21st (2)** 159:10;164:5
**22 (2)** 148:18;164:5
**22nd (2)** 73:22;149:1
**23 (6)** 61:15;99:8;104:11;152:18;159:7;169:20
**24 (6)** 61:15;104:18;114:15;116:4;160:9;162:19
**24th (1)** 159:19
**25th (1)** 149:9
**26 (2)** 80:16;161:20
**26th (1)** 144:11
**27th (1)** 144:15
**28 (1)** 148:11

**3**

**3 (2)** 110:9;146:6
**3.2 (1)** 133:6
**3:30 (1)** 76:15
**30 (2)** 4:12;121:6
**300 (1)** 86:4
**30-minute (1)** 98:15
**31 (3)** 86:24;119:14;129:12
**31st (1)** 128:18
**3224 (1)** 107:23
**3-25 (1)** 80:10
**3445 (1)** 142:9
**3446 (1)** 142:10
**3447 (1)** 142:10
**3483 (1)** 147:9
**3484 (1)** 147:9
**3490 (1)** 144:18
**3491 (2)** 144:18;147:1
**3501 (1)** 153:14
**3512 (1)** 154:6
**3513 (1)** 154:7
**3516 (3)** 80:1,2;92:17
**3517 (1)** 80:1
**3529 (1)** 162:18
**3530 (2)** 162:18;163:5
**3605 (2)** 123:18,20
**3606 (1)** 128:7
**3608 (1)** 123:19

**4**

**4 (2)** 145:19;153:24
**4:30 (1)** 76:15
**4092 (1)** 163:21

**5**

**5 (1)** 133:24
**5:04 (1)** 175:11
**5:05 (1)** 173:11
**5:06 (2)** 171:6;173:1
**5:07 (1)** 169:25
**5:16 (1)** 169:20
**50 (1)** 66:8
**52 (1)** 175:7
**5426 (3)** 92:24;95:20;97:15
**5427 (2)** 96:14;97:12
**5428 (1)** 98:19
**5429 (1)** 101:10
**5430 (1)** 103:20
**5431 (1)** 105:3
**5432 (1)** 105:11
**5-4-74 (1)** 5:10
**5577 (1)** 133:22
**5582 (1)** 133:25
**5583 (2)** 133:24;134:6
**5586 (1)** 137:23
**5592 (1)** 133:22
**5594 (1)** 138:13
**5605 (2)** 138:14;140:23
**5607 (1)** 138:13
**5608 (3)** 129:25;132:14;138:10
**5610 (1)** 130:1
**5614 (2)** 129:25;138:11
**5618 (1)** 132:25
**5619 (1)** 133:5
**5628 (1)** 133:1
**5th (1)** 72:17

**6**

**6 (11)** 59:12,14,25;60:1,7,14;61:17;123:8;141:10;155:25;156:1
**600-some (3)** 137:3,9,15
**677-dollar (2)** 135:8;136:5

**7**

**7 (1)** 96:18
**7:00 (2)** 163:25;165:1
**7th (5)** 93:8;94:12;95:15,16;96:5

**8**

**8 (3)** 60:8;88:18;89:2
**8:07 (1)** 179:4
**8-22-2023 (1)** 148:12

**9**

**9 (8)** 82:15;88:19;89:2;104:16,18;107:3;111:2;138:14
**9:34 (1)** 142:12
**90 (1)** 152:10
**90-plus (1)** 86:15
**92 (1)** 6:25
**9th (3)** 82:8;83:3;114:16