**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHAEL ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:25-cv-01604 |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| *and* COLLEEN LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO THE DEFENDANTS' STATEMENT OF MATERIAL FACTS UNDER LR 56.1(b)(2)**

In accordance with LR 56.1(b)(2), Plaintiff Rachael Rose submits her Response to the Defendants' Statement of Material Facts. [42].

1.      On August 26, 2029, Abbott hired Rachael Rose ("Rose") as an Endovascular Account Manager in the Cleveland, Ohio area. (Lewis Dep. 16-19; Rose Dep. 11-14). Lewis, a Regional Sales Director, made the decision to hire Rose. (*Id.*)

**Response:** Rose disputes the first sentence because Rose was first an employee of Abbott's Pediatric Nutrition Division for over five years, from February 27, 2012, to June 29, 2017. ([21], Am. Answer ¶¶ 7, 9.) From June 2010 to February 2012, Rose worked for Abbott's Nutrition Division through a temporary staffing agency. (*Id.* at ¶ 6.) After receiving an offer letter for the position of Endovascular Account Manager on July 29, 2019, Rose was employed by Abbott's Vascular Division from August 26, 2019, to March 26, 2024. ([8-2], Gewalt Decl. ¶¶ 3–4.) Rose disputes the second sentence, as Glenda Bruner offered Rose the position of Endovascular Account Manager on July 29, 2019, and Rose accepted the offer of employment the following day in a signed writing. (*Id.* at ¶ 4.)

1

2.      Prior to Rose's hiring, in April 2019, Lewis interviewed and considered Rose for another Endovascular Account Manager role in Cleveland, Ohio. (Rose Dep. 49-50; Lewis Dep. 24).

**Response:** Rose disputes the first sentence to the extent it suggests that only Lewis interviewed Rose, and that Lewis went out of her way to give Rose numerous opportunities to be hired. Rose had a long interview process that included: a phone interview with Lewis; a virtual interview with an Abbott team based in Columbus, Ohio; an in-person interview with Tim Swiatek in Pittsburgh, Pennsylvania; an in-person interview with Trevor Burlison in Grand Rapids, Michigan; a phone interview with John Florio, who is based in New York; and multiple in-person meetings with health care providers. (Rose Dep. 49:16–51:19; Lewis Dep. 24–31.)[1]

3.      Ultimately, Lewis hired another female candidate instead. (Rose Dep. 51). However, Lewis informed Rose that she anticipated that another Endovascular Account Manager role would open soon, and that Lewis wanted Rose on her team. (Rose Dep. 52).

**Response:** Rose disputes the first sentence because it mischaracterizes Rose's testimony. When Rose was asked if she knew who made the decision to hire Erin Shepard instead of her, Rose testified, "I don't specifically." (Rose Dep. 51:23–52:9.) Rose disputes the second sentence as mischaracterizing the cited testimony because it suggests that when Lewis informed Rose that Shephard got the job, Lewis gave Rose assurances that Rose would be hired "soon." (*Id.* at 52:11–54:11; Lewis Dep. 30–31.)

---

[1]      All references to Rose's deposition transcript will be to the version the Defendants' filed, [46], in response to Rose's Motion to Strike, [45]. All references to Lewis's transcript are to the version found as Exhibit 20 to the Defendants' Statement of Material Facts, [43-21].

4.      When the position became available, Lewis reached out to Rose and hired her as an Endovascular Account Manager servicing the Cleveland area. (Rose Dep. 53; Lewis Dep. 29-30).

**Response:** Rose disputes the first sentence as mischaracterizing the cited testimony; rather, Lewis testified that she conducted an in-person interview of Rose at a hotel in Cleveland, Ohio, before offering Rose the position. (Lewis Dep. 30–31.) Moreover, Glenda Bruner offered Rose the position of Endovascular Account Manager on July 29, 2019, and Rose accepted the written offer of employment the following day in a signed writing. ([21], Gewalt Decl. ¶ 4.)

5.      As a condition of her employment, Rose electronically signed an Employee Agreement. (Rose Dep. Ex. 2). The Employee Agreement required Rose to conduct herself in accordance with Abbott's policies and to comply with Abbott's Code of Conduct. (Rose Dep. 56 -57; Rose Dep. Exs. 2 and 3).

**Response:** Rose does not dispute the first sentence beyond objecting to the legal conclusion. Rose objects to the second sentence because it is vague and ambiguous as it is not clear what policies are being referenced. Rose disputes that her electronic signature on the Employee Agreement includes a certification that she has received and read Abbotts's Code of Business Conduct. ([21], Gewalt Decl. ¶¶ 4–5.)

6.      According to the Code of Conduct, Rose was to conduct herself with honesty, fairness, and integrity. (Rose Dep. 59). Further, she had to comply with the laws and regulations that governed how Abbott promoted and sold its products. (Rose Dep. 59).

**Response:** Rose does not dispute the first sentence. Rose objects the second sentence because it is vague and ambiguous as it is unclear what laws and regulations are being referenced, which Rose indicated in her testimony. (Rose Dep. 58:16–60:8.)

7.      Abbott's Code of Conduct also prohibits retaliation, harassment, and discrimination. (Rose Dep. 58-61, Rose Dep. Ex. 3). Rose admits Abbott also has an Equal Opportunity Employment Policy ("EEO Policy") and a policy prohibiting Workplace Harassment (Rose Dep. 62, Rose Dep. Exs. 4 and 5).

**Response:** As to the first and second sentences, Rose does not dispute the existence of those written policies, but disputes that the policies are applied and enforced in the workplace as written. (Rose Dep. 60:12–64:16.)

8.      With respect to Abbott's Policy Prohibiting Workplace Harassment, Rose understood she was required to report incidences of workplace harassment; she understood the policy provides mechanisms for reporting harassment, including a complaint procedure for reporting harassment. (Rose Dep. 63-64).

**Response:** Rose disputes that she was required to report incidences of workplace harassment, as the complaint procedure states, "The Company encourages individuals who believe they are being subjected to such conduct to promptly advise the offender that his or her behavior is unwelcome and to request that it be discontinued. The Company recognizes, however, that individuals may prefer to pursue the matter through complaint procedures." (Rose Dep. 62:15–64:1; Ex. 5[2] at 5, Section 2.3.) Rose also disputes the feasibility of lodging a complaint against her direct supervisor, Lewis, and asserts that any efforts would have been futile. (*Id.*)

9.      Rose further admits she received annual training on Abbott's Policy Prohibiting Workplace Harassment as well as annual training on Abbott's EEO Policy and the Code of Conduct. (Rose Dep. 64, 77; Rose Dep. Ex. 9).

---

[2]    This is a citation to the Exhibit 5 which the Defendants filed with their Statement of Material Facts, [42].

4

**Response:** Rose disputes that she received annual training on Abbott's EEO Policy and Business Code of Conduct as she could not authenticate the excel sheet that she was handed during her deposition. (Rose Dep. 64:7–16, 77:13–80:1.) *Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.*, 155 F.3d 883, 888 (7th Cir. 1998) (finding testimony "that was necessarily speculative and lacking in foundation" is "insufficient" at summary judgment).

10.     The primary function of Abbott's Endovascular Account Manager role is to grow Abbott's business by promoting Abbott products, attending cases with Abbott's customers, managing Abbott's hospital inventory, and building rapport with Abbott's customers through meetings. (Rose Dep 84). Abbott trained Rose on how to promote and sell Abbott products. (Rose Dep. 59).

**Response:** Rose disputes the first sentence as she was not asked about her "primary function," but instead, "What were your duties as an Endovascular Account Manager?" (Rose Dep. 84:16–21.) Further, Lewis, an Endovascular Regional Sales Director, testified that "[t]he ultimate goal is to achieve and exceed quota." (Lewis Dep. 18, 24, 32.) Brian Lecurgo, an Endovascular Account Manager in Lewis's territory, echoed Lewis's testimony and stated promotional decisions at Abbott are based on "who hits quota." (Ex. 1, Lecurgo Dep. 113.) Lecurgo added that Abbott does not offer promotional applications for opportunities, but instead bases promotional decisions on who meets or exceeds quota. (*Id.* at 114.)

11.     Rose further understood that Abbott's Office of Ethics and Compliance ("OEC") has specific requirements Rose had to follow regarding reimbursement for meals and other items purchased for Abbott's customers who are healthcare professionals. (Rose Dep. 70-71).

**Response:** Rose objects to the sentence because it is argumentative and immaterial. *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture").

12.     Rose admits she was required to keep accurate records of such meals and items purchased for Abbott's customers. (Rose Dep. 74-75). As she acknowledges, this was to avoid violations of the Sunshine Act "so it doesn't look like you are basically giving things [away] for free so that [healthcare professionals will] buy your products." (Rose Dep. 74-75).

**Response:** Rose disputes the first sentence because it is argumentative and mischaracterizes her testimony; Rose testified that she was required to keep accurate records and ensure all healthcare provider expenses were within allowed dollar guidelines. (Rose Dep. 72:23–75:22.) Rose disputes that the citation for the second sentence supports it and objects to the legal conclusion about "avoiding violations of the Sunshine Act."

13.     Rose admittedly received multiple trainings from Abbott on the OEC requirements around meals and other expenses, as well as the requirements of the Sunshine Act. (Rose Dep. 7172, 77-81; Rose Dep. Ex. 9).

**Response:** Rose objects to the sentence because it is vague, ambiguous, immaterial as to "multiple trainings," and contains a legal conclusion regarding "the requirements of the Sunshine Act." *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771 (N.D. Ill. 2012) ("Opinion, suggested inferences, legal arguments, and conclusions are not the proper subject matter of a [Local Rule 56.1] statement.").

6

14.     Abbott has a "Travel, Entertainment, and Other Employee Business Expenses" policy that provides guidelines for business expenses (such as parking, meals, beverages, and entertainment), which Rose could access remotely in Abbott's online portal. (Rose Dep. 65, Ex. 6 to Rose Dep.).

**Response:** Rose objects to the sentence because it is vague, ambiguous, and immaterial. The purpose of an LR 56.1 statement is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. Rose disputes that the citation for the sentence supports it and objects to the relevancy of the policy and Rose's ability to remotely access it.

15.     In addition, Rose was given a Corporate Credit Charge Card ("Abbott Credit Card") to use for all business-related travel and entertainment expenses. (Rose Dep. 66; 69: 9-18). She admits she understood that Abbott's expectation was that she use the Abbott Credit Card whenever possible. (Rose Dep. 66; 69: 9-18).

**Response:** As to the first sentence, Rose does not dispute that she was given an Abbott Credit Card, but she disputes that she was required to use the Card for all business-related travel. For example:

> Q.     And you were at [Rose's] deposition in Chicago. Do you remember when [Rose] testified that she paid cash at times for Towne Parking?
>
> **A.     She's allowed to if they accepted just cash.**
>
> Q.     And did you also hear her say that sometimes she gave a tip using cash at the valet?
>
> **A.     And she's allowed to.**
>
> Q.     Did you take those facts into consideration when you made a determination that she was falsifying her expense reports?
>
> **A.     Parking was not the only problem with her expenses.**

7

(Lewis Dep. 65.) As to the second sentence, Rose does not dispute and Lewis testified that Rose went "from using her corporate credit card 90-plus percent of the time when she was under my leadership to a higher, a much higher percentage under Tim Powers'." (Lewis Dep. 86.)

16.     Lewis instructed Rose on multiple occasions to use Abbott's Credit Card for business expenses. (Rose Dep. 106; Ex. 11 to Rose Dep.).

   **Response:** Rose objects to the sentence because it is vague, argumentative, and immaterial. *Phillips*, 855 F. Supp. 2d at 771. Rose disputes that the citation for the sentence supports it and Rose's testimony does not indicate that Lewis instructed her on multiple occasions to use Abbott's Credit Card for business expenses. (Rose Dep. 105:19–108:2.)

17.     Rose admittedly understood that failure to use Abbott's Credit Card could result in disciplinary action up to and including review for termination of employment. (Rose Dep. 69-70; see Ex. 7 to Rose Dep at Section 3.8.)

   **Response:** Rose objects to the sentence because it is argumentative and ambiguous. Rose disputes the sentence based on the following testimony from Ron Petitte, Rose's male colleague in the Cleveland Clinic territory:

> Q.     What we talked about earlier and how you use cash to pay for valet, was that a violation of policy?
>
> **A.     No.**
>
> Q.     Why not?
>
> **A.     I said I don't have the policy in front of me to give you specifics. It's based off of, you know, what I've been told by other individuals; like I said, the people who trained me originally that are no longer with the company.**

8

(Ex. 2, Petitte Dep. 65.)[3] Rose testified that, "if there was issues with my expense reports, I would, you know, be notified and not just terminated." (Rose Dep. 69:9–70:18.) Petitte testified that Abbott follows a progressive disciplinary schedule. (Petitte Dep. 56–57.)

18.     Rose was required to keep records and submit expense reports for reasonable actual expenses which resulted from transacting Abbott's business to be reimbursed for such expenses. (Rose Dep. 100).

   **Response:** Rose does not dispute this paragraph.

19.     If an expense was less than $25, Rose did not have to submit a receipt. (Rose Dep. 101). Rose had to tag or categorize all items on her expense report; she decided how to tag or categorize items for which she sought reimbursement. (Rose Dep. 100-101).

   **Response:** Rose objects to the first and second sentences because they are argumentative, immaterial, and misleading. (Rose Dep. 99:25–102:20; *see* 64:25–77:8). Further, Abbott's policy on expense reporting, which Rose read into the record, required receipts for transactions exceeding $75.00—though Rose "thought it was 25[.]" (*Id.* at 76:20–77:8.)

20.     Rose admits she knew to use the code "food with HCP" to categorize meals with healthcare professionals and that there was a different code for transportation expenses. (Rose Dep. 101-104).

   **Response:** Rose objects to the sentence because it contains suggested inferences and conjecture, but no material facts in support. Rose does not dispute this sentence to

---

   [3]     The Defendants filed with their Statement of Material Facts, [42], only seven pages of Petitte's 90-page deposition transcript. Rose has filed Petitte's complete transcript with her Response as "Exhibit 2."

the extent that it asks Rose to admit that she could use the dropdown menu on Concur. (Rose Dep. 103:2–105:13; *see* 72:23–75:22.)

21.     Similar to Abbott's Corporate Card policy, Abbott's "Travel, Entertainment, and Other Employee Business Expenses" policy states that "[f]alsification of any documentation may result in employee disciplinary action up to and including termination." (Rose Dep. 72; Rose Dep. Ex. 6, Section XIV).

**Response:** Rose objects to the sentence because it contains suggested inferences and conjecture without any factual support. Rose disputes the relevance of Abbott policies in the abstract.

22.     From the time of Rose's hire in August 2019 to approximately the fall of 2023, and then again from February 2024 to Rose's termination of employment, Rose reported to Lewis. (Lewis Dep. 32). While Rose worked and resided in Ohio, Lewis resided in Pennsylvania and managed a team of employees in Ohio. (Lewis Dep. 4-5).

**Response:** Rose disputes the first sentence because Lewis was Rose's de facto supervisor in the fall and winter of 2023. (Lewis Dep. 93–117.) Rose disputes the second sentence because it mischaracterizes the relationship between the parties and their frequent interactions and communications. (*See, e.g.,* Rose Dep. 108:18–113:13, 137:8–142:5.)

23.     Rose and Lewis did not often interact in person and, when they did interact, it was mostly via text messages. (Rose Dep. 108-109). Over the course of a year, Rose estimates she only saw Lewis in person four or five times. (Rose Dep. 109).

**Response:** Rose disputes the first sentence because when she was asked "about the main form of communication" she had with Lewis, she testified, "Probably text, phone, e-amils, team meetings." (Rose Dep. 109:3–18.) Rose does not dispute the second sentence.

24.     Rose alleges that Lewis told her to go out to dinner with Abbott customers at least once a week as a method to build rapport and have a good relationship with customers. (Rose Dep. 110). Rose also alleges that Lewis told her to have at least two drinks at dinner. (Rose Dep. 118). Rose admits Lewis also told male employees to go out to dinner with Abbott customers at least once a week. (Rose Dep. 229).

**Response:** Rose disputes the second half of the first sentence based on the following testimony:

> Because she told me to go out with doctors at least once a week who she knew were toxic and she told me to have at least two drinks when I was going out with them. When I said, you know, I really don't want to be drinking, I don't like this person, this person's abusive, it was, well, sorry, he's your number one customer, you know, this is part of your job, things like that.

(Rose Dep. 118:1–11.) Lewis had a "culture of pushing personal relationships, not referring to working towards professional relationships, like, knowing your business, working hard." (*Id.* at 261:2–262:5.) Rose does not dispute the second sentence. Rose disputes the third sentence because Petitte, a male supervised by Lewis, testified that he chose when to go to dinners and did so "very rarely" while Rose went to dinners "quite often." (Petitte Dep. 24, 46, 62.) As for Lecurgo, another male supervised by Lewis, he testified, "It's a decision that I make." (Lecurgo Dep. 29; *see also* Rose Dep. 228:14–233:9.)

25.     Rose stated that she did not like having dinners with doctors and thought "having to be out with customers one a week" was "hostile." (Rose Dep. 228).

**Response:** Rose disputes the first sentence because it mischaracterizes her testimony; she testified that for Lewis "to perpetuate it and say, you know, you have to have at least two drinks, you know, years into my employment there, that was hostile." (Rose Dep. 228:17–229:10.)

11

26.     Rose conceded that having one-on-one dinners with Abbott customers only happened "occasionally," a "few times a year." (Rose Dep. 99). Rose also admitted she had discretion about which customers she invited to any particular dinner or meeting, the day of the week and time such meeting took place and could also invite her own manager or other co-workers to attend as well. (Rose Dep. 97-98).

**Response:** Rose disputes the first and second sentences. (Rose Dep. 95:19–99:24, 126:1–128:24.)

27.     Rose also admitted that she had discretion on how she met with customers— whether it was informal, such as having dinner, lunch, or a coffee break, or more formal such as arranging for a customer to attend an Abbott-hosted medical educational event. (Rose Dep. 96). Rose understood the purpose of the meetings was to grow Abbott's business and build rapport with Abbott's customers. (Rose Dep. 84).

**Response:** Rose disputes the first and second sentences. (Rose Dep. 95:19–99:24, 126:1–128:24.)

28.     Rose now alleges that early in her employment, in 2019 or 2020, she saw Lewis kiss a male customer on the cheek, after which Rose thought, "they're so close, like, that's awesome" (Rose Dep. 147). Rose also alleges Lewis told a story about going to a customer's home and drinking wine with him, causing Rose to wonder, "okay, is that what I'm supposed to do?" (Rose Dep. 147). Rose states that Lewis told the story about going to a customer's home two or three times, and at least one time was in the presence of other male customers. (Rose Dep. 147-148).

**Response:** Rose objects to use of the word "now" in first sentence as argumentative. (Rose Dep. 146:18–151:12.)

29.     Rose alleges that, in February 2020, Lewis grabbed the breasts of a co-worker and commented, "these things are great" at a team meeting with Rose and other people around.[3] (Rose Dep. 143-144). Rose recalls that the co-worker "laughed it off or something." (Id. at 145.)

**Response:** Rose admits that Lewis did so grab a female subordinate's breasts in the presence other employees during a team meeting.

29. n.3.     Although both Lewis and the coworker deny that Lewis ever grabbed her breasts or engaged in any other inappropriate conduct (Lewis Dep. 40-41; 166) and no other witnesses corroborate Rose's allegations, Defendants credit Rose's testimony only for the purposes of summary judgment.

**Response:** Rose objects to the coworker's denial as inadmissible hearsay evidence.

30.     At some unspecified time after this alleged incident, Rose also claims Lewis smacked Rose on her butt at a restaurant and said that Rose "had a hot ass." (Rose Dep. 137, 144). Rose states that this type of incident only occurred once, and that she does not recall on what date this event allegedly occurred. (Rose Dep. 137-138). She cannot remember whether anyone else was present at the restaurant (Rose Dep. 138), had "no idea" what she and Lewis were talking about (Rose Dep. 139), and cannot remember the force in which Lewis allegedly smacked her (Rose Dep. 139). Rose never spoke to Lewis about this alleged incident. (Rose Dep. 141). Rose further admits that she was not extremely upset by Lewis's alleged actions (Rose Dep. 142) and doesn't remember if she laughed or not (Rose Dep. 140).

**Response:** Rose disputes the third sentence. (Rose Dep. 137:8–142:5.)

31.     Rose admits she did not report any of foregoing alleged incidents regarding Lewis to Employee Relations ("ER") or anyone else at Abbott, as required by Abbott policy. (Rose Dep. 146; Ex. 5 to Rose Dep.).

**Response:** Rose disputes that Abbott policy required her to report incidences of

workplace harassment, as the relevant policy merely "encourages" reporting:

> The Company encourages individuals who believe they are being subjected to such conduct to promptly advise the offender that his or her behavior is unwelcome and to request that it be discontinued. The Company recognizes, however, that individuals may prefer to pursue the matter through complaint procedures.
>
> Individuals who believe that they have been subject to such conduct or believe they have witnessed such conduct, should discuss their concerns with their immediate supervisor, manager, Employee Relations or the Office of Ethics and Compliance (OEC). Supervisors are obligated to report any such complaints received or concerns, in accordance with this Complaint Procedure.

(Rose Dep. 62:15–64:6; Ex. 5[4] at 5, Section 2.3.)

32.    Rose alleges that, in the summer of 2023, Lewis told a story to Rose and two male customers at a restaurant about a former employee who had sex with a stripper. (Rose Dep. 142). Rose also alleges that on the same night, Lewis told a story about having sex with her fiancé (who is male) in a closet. (Rose Dep. 147; Lewis Dep. 5). Rose says that while she found these alleged stories offensive, Lewis did not "constantly" or "regularly" tell such stories. (Rose Dep. 150). Further, Rose admits she did not report these alleged incidents to ER. (Rose Dep. 146).

**Response:** Rose admits that Lewis did relate these sexual escapades to her

subordinates in the manner described.

33.    Throughout the time Rose and Lewis worked together, they communicated via text message frequently. (Rose Dep. 109). Rose and Lewis communicated not only about work matters, but also about personal matters, such as Rose's wedding, music choices, and clothing, and Lewis's children. (Rose Dep. 114-115, Rose Dep. Ex. 12).

**Response:** Rose admits that during her employment, she communicated with her

supervisor, Lewis, and discussed both work-related and personal matters.

34.    Rose told Lewis via text message that she was "the best manager ever," but claimed in her deposition that she was lying to Lewis when she said this to "make a bond, be connecting, be positive" with Lewis. (Rose Dep. 116-117).

**Response:** Rose objects because the sentence is argumentative.

35.    While Lewis managed Rose, Rose received positive performance reviews, consistently met quotas, and performed well at selling Abbott's products. (Rose Dep. 131-136, Rose Dep. Ex. 13). Lewis spotlighted Rose's achievements where appropriate and encouraged Rose to perform well. (Rose Dep. 131-136, Rose Dep. Ex. 13).

---

[4]    This is a citation to the Exhibit 5 which the Defendants filed with their Statement of Material Facts, [42].

**Response:** Rose admits that she was repeatedly recognized by Lewis and others for being a high-performing and productive employee.

36.     However, in 2023, Lewis began having some concerns with Rose's job performance (Lewis Dep. 73-75). In June 2023, Lewis had to remind Rose to always use her Abbott credit card. (Rose Dep. 105, Rose Dep. Ex. 11). Rose also had issues with consignment inventory management and late Electronic Clinical Outcome Assessment (eCOA) reports, which were required by the FDA at the time. (Lewis Dep. 149-150). Further, customers and team members complained to Lewis about Rose's clinical skills. (*Id.*)

**Response:** Rose objects because the citation to Lewis' testimony in the first sentence fails to provide evidentiary support and the alleged "concerns" are undocumented. On July 11, 2023, Lewis initiated a performance improvement plan against Rose for unspecified and undocumented reasons. (Lewis Dep. 148–49, 151.) Rose objects because the citations to her testimony and Ex. 11 fail to provide evidentiary support. Rose disputes the second sentence. (Rose Dep. 106:9–15.) Rose objects to the third and fourth sentences because they are vague, ambiguous, immaterial as to "clinical skills," "issues," and unnamed "customers" and "team members." Rose disputes the third and fourth sentences. (*Id.* at 81:5–92:7.)

37.     Lewis contacted ER to discuss placing Rose on a performance improvement plan ("PIP") or giving a written warning (Lewis Dep. 74, 147-150). However, instead of issuing formal performance documentation, Lewis chose instead to assign Rose a mentor and create a list to help Rose to stay on task. (Lewis Dep. 149-150). Rose's job performance improved, Rose began executing on her tasks, and Lewis never gave Rose a PIP or written warning. (Lewis Dep. 75, 149-150).

**Response:** Rose objects to the first sentence because it is vague as to a basis for disciplinary action. As to the second sentence, Rose disputes that Lewis assigned her a mentor and created a list to help Rose stay on task and objects for immateriality. As to

15

the third sentence, Rose agrees that neither Abbott nor Lewis ever gave her a written warning or other documented discipline at any time before she was terminated in March 2024. (Lewis Dep. 147–48, 151.)

38. Rose alleges that in January 2022, a male customer made sexual advances including allegedly biting her on the ear during a one-on-one dinner on a Friday night that Rose had arranged. (Rose Dep. 121-122).

**Response:** Rose objects because the citation to her testimony fails to provide evidentiary support. (Rose Dep. 151:25–158:22; *see* 121:17–23.)

39. Rose reported the incident by text message to Lewis on Sunday (two days after the incident occurred). (Rose Dep. 157-159; Rose Dep. Ex. 14; Lewis Dep. 160). That same afternoon, Lewis called Rose on the phone and Lewis agreed that the customer's conduct was not appropriate. (Rose Dep. 159). Lewis told Rose she did not have to work with the customer again including at a clinical event the following day, but Rose told Lewis that she would "just do it." (Rose Dep. 159; Lewis Dep. 161).

**Response:** Rose objects because the citations to her testimony fail to provide evidentiary support. (Rose Dep. 151:25–158:22.) Rose admits the first and second sentences but disputes the third sentence. (*Id.* at 159:7–165:22.)

40. Lewis told Rose she would report the incident with the customer to ER and asked Rose if she wanted to take it further. (Rose Dep. 160; Lewis Dep. 161). Rose states that she did not know what Lewis meant by taking it further but did ask Lewis to report the incident to ER. (Rose Dep. 161). Rose alleges Lewis asked her if she wanted ER to follow up with her, and that Rose told her "No" because she did not want to cause problems and wanted to move forward. (Rose Dep. 161).

**Response:** Rose does not dispute this paragraph.

41. The next day (Monday), Rose decided to go work with the customer and, afterwards, expressed feeling "proud" of herself in a text message with Lewis. (Rose Dep. 161-162; Rose Dep. Ex. 14). That same day, Lewis reported the incident with the customer

16

to ER as Rose had asked her to do. (Lewis Dep. 162-163; Ex. 21, Abbott 3529-3530 identified in Lewis Dep.).

**Response:** Rose does not dispute this paragraph.

42. Rose admits that after she met with the customer the Monday after the incident, she was not around the customer again (Rose Dep. 165) and had her assistant cover future cases with the customer, which Lewis fully supported. (Rose Dep. 166). Shortly after the January 2022 incident, the customer relocated to another state, and Rose admits she no longer had "to work with him or deal with him too much" after the incident. (Rose Dep. 166-167). Rose does not allege that the customer engaged in any other inappropriate conduct. (Rose Dep. 165).

**Response:** Rose does not dispute this paragraph.

43. In August 2023, it was announced that Lewis' regional territory was changed due to a company re-alignment, and Tim Powers ("Powers") became Rose's interim manager beginning in the fall of 2023. (Lewis Dep. 73, 148).

**Response:** Rose objects to the sentence as vague and ambiguous. Further, Rose

disputes that "it was announced" that Powers would become her supervisor because it

was Kristin Niles who became Rose's supervisor. (Lewis Dep. 148, 151.)

44. Powers became concerned about certain out-of-pocket parking expenses that Rose reported as "Towne parking," as no other person on Rose's team in the Cleveland area reported parking expenses from this vendor. (Lewis Dep. 50-51). Powers reached out to Lewis, as the former manager of Rose's team, to ask her what the Towne parking charge was, but Lewis did not know what that charge was either. (Lewis Dep. 50-51).

**Response:** Rose objects to the first and second sentences as inadmissible hearsay

evidence. Further, Rose disputes that neither Lewis nor Powers knew what the charge

was for, as they were working with Jim Curcio. (Lewis Dep. 49–58, 91, 111–12.)

45. Powers also told Lewis that he noticed that Rose sought reimbursement for parking at facilities that provided free parking. (Lewis Dep. 62-63, 68, 89).

17

**Response:** Rose objects to the first sentence as inadmissible hearsay evidence.

Further, Rose disputes the sentence to the extent that it suggests Lewis' noninvolvement.

(Lewis Dep. 62, 91, 105–06.)

46.     In December 2023, Powers told Lewis he reached out to Abbott's OEC to discuss concerns regarding Rose's out-of-pocket parking expenses. (Lewis Dep. 54-55, Ex. 23, Abbott 5426 identified in Lewis Dep.).

**Response:** Rose objects to the first sentence as inadmissible hearsay evidence.

47.     Powers told Lewis that OEC told him to send an email to his entire team reminding everyone that Abbott conducts internal audits of business expenses and the requirement to use the Abbott Credit Card for business expenses. (Lewis Dep. 54-55).

**Response:** Rose objects to the first sentence as inadmissible hearsay within hearsay

and disputes that there is a requirement to use the Abbott Credit Card for business

expenses. (Petitte Dep. 86–87, 91.)

48.     Rose admits that, on or about December 9, 2023, she received an email from Powers reminding everyone that Abbott conducts internal audits of business expenses and the requirement to use the Abbott Credit Card for business expenses. (Rose Dep. 107; Rose Dep. Ex. 17).

**Response:** Rose disputes Ex. 17 because it is a picture that Powers took of an

unsent email and shared with Lewis. (Lewis Dep. 109–10; Petitte Dep. 86–87.)

49.     The OEC also instructed Powers to reach out to Abbott's finance department to obtain analytics comparing Rose's out-of-pocket expenses with those of her team members. (Lewis Dep. 106).

**Response:** Rose objects to the first sentence as inadmissible hearsay within

hearsay.

50.     In late January 2024 or early February 2024, Powers received the analytics from the finance department. (Lewis Dep. 105-106, 129).

**Response:** Rose objects to the first sentence as inadmissible hearsay evidence.

51.     During January and February of 2024, Powers received additional expense reports from Rose seeking reimbursement for parking expenses at hospitals that Powers believed did not charge for parking, and Rose continued to use her personal credit card rather than the Abbott Credit Card. (Lewis Dep. 105:13-16; Ex. 18 and 19 to Rose Dep.).

**Response:** Rose objects to the first sentence as inadmissible hearsay evidence, conjecture, and speculation. Rose disputes the sentence. (Lewis Dep. 109–10, 171; Petitte Dep. 86–87; Rose Dep. 193:14–216:25.)

52.     On February 5, 2024, Lewis officially resumed being Rose's manager. (Lewis Dep. 72).

**Response:** Rose disputes the first sentence. (Lewis Dep. 93–117; *see* 69.)

53.     During late January or early February 2024, Rose's expenses were flagged on an internal audit by the finance department for having a high amount of out-of-pocket expenses for the month of January. (Lewis Dep. 69; 8-14).

**Response:** Rose objects to the first sentence as inadmissible hearsay within hearsay, vague, conjecture, and speculation. Rose disputes the sentence. (Lewis Dep. 109–10, 171; Petitte Dep. 86–87.)

54.     Lewis reached out to Business Human Resources, who told Lewis and Powers to have a conversation with Rose about her out-of-pocket expenses. (Lewis Dep. 69; 8-14; Lewis Dep. 83: 19-25, 84:1-3). On or about February 28, 2024, Rose spoke with Lewis and Powers about Rose's out-of-pocket expenses. (Rose Dep. 199-200, Ex. 20 to Rose Dep.)

**Response:** Rose objects to the first sentence as inadmissible hearsay evidence. Rose disputes the second sentence. (Rose Dep. 199:2–203:23.)

55.     Rose told Lewis and Powers that her overall out-of-pocket expenses were high because she uses valet parking and forgets her wallet in her car, and then uses her personal Apple Pay account to pay for expenses, rather than her Abbott credit card. (Rose Dep. 201; Lewis Dep. 62-65) Rose also told Lewis and Powers that her out-of-pocket expenses for parking were high because the valet company does not accept credit cards. (Rose Dep. 211; Lewis Dep. 54).

**Response:** Rose objects both sentences are argumentative, vague, and conclusory.

Rose disputes both sentences. (Petitte Dep. 30–31, 66–67, 86–87; Lewis Dep. 118–23, 134,

153, 171, 173.)

56.     Ultimately, ER began investigating Rose's expense reporting practices. (Rose Dep. 210). During the investigation, ER reviewed analytics produced by the finance department that showed Rose sought reimbursement for out-of-pocket expenses in amounts that far exceeded those submitted by her peers. (Lewis Dep. 90, 129; Ex. 20, Abbott 3516-3517 identified in Lewis Dep.). The analytics reflected expense report information for Rose and her peer account managers. (Lewis Dep. 106, 129). Rose's out-of-pocket expenses were more than double those of the next highest-spending account manager. (Rose Dep. 216: 18-21; Ex. 20, Abbott 3516-3517 identified in Lewis Dep).

**Response:** Rose objects because these sentences are argumentative, vague, and

conclusory. Rose disputes the last three sentences. (Lewis Dep. 67, 89, 90–91, 134, 153–54.)

57.     On or about March 20, 2024, ER interviewed Rose to discuss her out-of-pocket expenses. (Rose Dep. 210). Initially, Rose told ER that her out-of-pocket expenses for healthcare provider meals and parking were higher than her peers because she forgets her wallet in her car and then uses her personal Apple Pay account, rather than her Abbott credit card, to pay for expenses. (Rose Dep. 200). Upon investigation, however, Rose's Apple Pay records did not match the amount for which she sought reimbursement. (Lewis Dep. 65; Lewis Dep. 80, Ex. 20, Abbott 3516-3517 identified in Lewis Dep). Of the $1,117.83 that Rose submitted for out-of-pocket reimbursement, only $440.23 could be verified by Rose's Apple Pay records for the same time period. (Lewis Dep. 176, Ex. 20, Abbott 3516-3517 identified in Lewis Dep; Rose Dep. 213). Thus, Rose's explanation concerning her use of Apple Pay was proven false. (Lewis Dep. 176).

**Response:** Rose objects as argumentative. Rose disputes the second sentence.

(Lewis Dep. 133, 153; Petitte Dep. 86–87.) Rose disputes the third and fourth sentences.

(Lewis Dep. 134.) Rose objects to the fifth sentence as argumentative and conclusory.

58.     Rose also told ER that her out-of-pocket parking expenses were higher because she used valet parking more often than her peers and the valet company that she uses (Towne Parking) only accepts cash; therefore, Rose said, she could not use her Abbott credit card. (Rose Dep. 211; Lewis Dep. 52-53). Upon investigation, it was found that Towne Parking does accept credit cards. (Id.). Again, this demonstrated that Rose was not truthful with ER. (Id.).

**Response:** Rose disputes the three sentences. (Lewis Dep. 50–55, 65, 119–20, 173;

Petitte Dep. 7–8, 15, 30–31, 65.)

59.     When ER advised Rose that it was confirmed that many of hospital locations where she claimed to have paid for parking actually have no parking fees or valets, Rose changed her explanation, telling ER that such parking reimbursements were actually for coffee purchases for healthcare professionals and not parking. (Ex. 20, Abbott 3516-3517 identified in Lewis Dep). Rose's conflicting explanations for her "parking" expenses were yet another example of her lack of integrity during the investigation. (Id.).

**Response:** Rose objects to the two sentences as inadmissible hearsay evidence.

Rose disputes the two sentences. (Lewis Dep. 134–35, 74; Rose Dep. 69:9–70:18, 226;

Petitte Dep. 56–57.)

60.     Rose contended to ER that co-workers also charged coffee and other miscellaneous items such as parking, but she refused to identify any such co-workers during Abbott's investigation. (Rose Dep 212: 3-11; Ex. 20, Abbott 3516-3517 identified in Lewis Dep).

**Response:** Rose objects to the sentence as inadmissible hearsay evidence. Rose

disputes the sentence. (Rose Dep. 81–82, 223, 226; Petitte Dep. 65.)

61.     During her deposition, Rose admitted she regularly sought reimbursement for miscellaneous business expenses that she categorized as "parking" at hospitals where

parking is free. (Rose Dep. 194 "It was just a way reimbursing myself for other business expenses. I didn't pay for parking there physically but paid for other things while I was traveling ...;" see also Rose Dep. 212: 20-24).

**Response:** Rose disputes the sentence. (Lewis Dep. 134–35, 74; Rose Dep. 69:9–70:18, 226; Petitte Dep. 56–57.)

62.     Not only did Rose falsely code coffee purchases for healthcare providers as "parking" (Rose Dep. 202), she admittedly falsely coded as "parking" the following personal expenses: personal food items (such as Gatorade she brought for herself) (Rose Dep. 194), clothing items (such as a sweatshirt and a cell phone charger purchased from a hospital gift shop) (Rose Dep. 204-205), and towing charges (Rose Dep. 195-196; Lewis Dep. 139-140).These practices are violations of Abbott's "Code of Conduct" and Abbott's "Travel, Entertainment and Other Employee Business Expenses" policy. (Exs. 3 and 6 to Rose Dep; see also Rose Dep. 100-103).

**Response:** Rose disputes the two sentences. (Lewis Dep. 134–35, 74; Rose Dep. 69:9–70:18, 226; Petitte Dep. 56–57.)

63.     Rose also requested reimbursement for parking in amounts higher than the posted valet placard dollar amount and for substantially more than a standard tip amount. (Rose Dep 211; Lewis Dep. 56).

**Response:** Rose disputes the sentence. (Lewis Dep. 134–35, 74; Rose Dep. 69:9–70:18; Petitte Dep. 56–57.)

64.     After receiving this information, Lewis personally called the valet company to verify the dollar amounts for valet parking and traveled from Pennsylvania to Cleveland to take pictures of the posted valet placards. (Lewis Dep. 56).

**Response:** Rose admits that Lewis traveled to Cleveland but disputes the balance of the sentence. (Lewis Dep. 134–35, 74.)

65.     On March 25, 2024, ER completed its investigation, finding that Rose violated Abbott's Code of Conduct by knowingly submitting false expense reports and not being forthright during the investigation. (Lewis Dep. 62, Ex. 20, Abbott 3516-3517 identified in

22

Lewis Dep). ER recommended terminating Rose's employment based on this conduct. (Id.) On or about March 26, 2024, Abbott terminated (Rose's employment. (Rose Dep. 217).

**Response:** Rose objects to the two sentences as inadmissible hearsay evidence.

Rose disputes the two sentences. (Lewis Dep. 134–35, 74, 50–55, 65, 119–20; Rose Dep.

69:9–70:18, 226; Petitte Dep. 56–57.)

66.     On March 31, 2024, six days after her termination, Rose sent a text message to Lewis apologizing for "the damage caused by [her] lapse in judgment" and stating that she "was carrying around some baggage from things that occurred over the years," which she now contends included Rose's alleged toxic relationship with a customer, the ear biting incident with a customer, and Rose not feeling supported for a product launch. (Rose Dep. 222, Rose Dep. Ex. 23). Rose further stated to Lewis that she understood "this was my doing and my mistake and I'm sorry that you were put in the middle." (Rose Dep. 224-225; Rose Dep. Ex. 23). Rose ended the text to Lewis by saying "[t]hese last 4.5 years have been a crazy ride and I've learned [so] much...I love you. Thank you." (Rose Dep. Ex. 23).

**Response:** Rose disputes the three sentences because the citations do not support

them. Rose admits to sending the text messages to Lewis but disputes how the

Defendants have characterized them. (Rose Dep. 223.)

67.     On April 2, 2024, Rose called ER to ask if Lewis had reported the January 2022 incident with the customer to ER. (Rose Dep. 219-220, Rose Dep. Ex. 21). ER confirmed that Lewis reported this incident. (Rose Dep. 219-220, Rose Dep. Ex. 21). Then, on April 10, 2024, Rose reached out to ER to appeal her termination. (Rose Dep. 220, Rose Dep. Ex. 22).

**Response:** Rose admits.

68.     Rose does not dispute that she coded items as parking expenses that were not parking expenses, nor does she dispute that she sought reimbursement for parking expenses that she did not incur. (Rose Dep. 221).

**Response:** Rose disputes the sentence because the citation does not support it, and to the extent this sentence suggests Rose sought reimbursement for anything other than legitimate business expenses.

69.     During Rose's deposition, Rose alleged that Account Manager Ron Petitte ("Petitte") told her to tag miscellaneous expenses as parking (Rose Dep. 222), that he did that himself (Rose Dep. 225), that Petitte tagged his expenses the same way Rose did. (Rose Dep. 234). However, Rose admits she never saw Petitte's expense reports and has no idea whether Petitte actually engaged in this behavior. (Rose Dep 226). Petitte denied tagging miscellaneous expenses as parking. (Petite Dep. 83).

**Response:** Rose admits the first and third sentences but disputes she had no idea whether Petitte was engaging in this behavior. (Rose Dep. 202–03.)

70.     Also during her deposition, Rose identified Kim Wissman ("Wissman"), a female, as a comparator (Rose Dep. 225-226), but like Petitte, Rose admits she never saw Wissman's expense reports and has no idea whether Wissman actually engaged in this behavior. (Rose Dep 226).

**Response:** Rose objects because the sentence calls for a legal conclusion. Rose disputes the sentence. (Rose Dep. 68, 81–83.)

Respectfully submitted,

/s/ Kevin M. Gross

Kevin M. Gross (Ohio Bar No. 0097343)
ZIPKIN WHITING CO., L.P.A.
3637 Green Road, Second Floor
Beachwood, Ohio 44122
Phone: (216) 514-6400
Fax: (216) 514-6406
Email: kgross@zipkinwhiting.com

*Counsel for Plaintiff Rachael Rose*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *Plaintiff's Response to the Defendants' Statement of Material Facts Under LR 56.1(b)(2)* was served via the Court's CM/ECF system on January 27, 2026:

Uma Chandrasekaran, Esq.
SEYFARTH SHAW, LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Phone: (312) 460-5000
Fax: (312) 460-7000
Email: uchandrasekaran@seyfarth.com

    *and*

Victoria S. Tolbert, Esq.
SEYFARTH SHAW, LLP
300 South Tryon Street, Suite 400
Charlotte, North Carolina 28202
Phone: (704) 925-6060
Email: vtolbert@seyfarth.com

*Counsel for Defendants Abbott Laboratories, Inc.,*
*and Colleen Lewis*

Respectfully submitted,

/s/ Kevin M. Gross
Kevin M. Gross (Ohio Bar No. 0097343)

*Counsel for Plaintiff Rachael Rose*

25