**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| RACHAEL ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:25-cv-01604 |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| *and* COLLEEN LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS**
**UNDER LR 56.1(b)(3)**

In accordance with LR 56.1(b)(3), Plaintiff Rachael Rose submits her Statement of Additional Material Facts.

**A.     Rose was replaced by a person from outside the protected class.**

1.     At the time of her termination, Rose, a female, was an Endovascular Account Manager for Abbott in the Cleveland territory, and Lewis was her direct supervisor. (Rose Dep. 42; Lewis Dep. 20, 31, 126–27.)

2.     Rose was selected for a promotion to a Senior Account Manager position but was terminated before the promotion was awarded to her. (Ex. 3, Defts.' Response to Interrog. No. 23; Lewis Dep. 142–45.)

3.     Lewis replaced Rose by hiring a new male employee, Jeff Rea. (Lewis Dep. 158–59; Ex. 3, Defts.' Response to Interrog. No. 21; Petitte Dep. 17.)

**B.** **Rose's termination for violation of the Code of Conduct was a pretext for gender and sex discrimination.**

4. Lewis testified that Rose "did a fantastic job. I was very proud of her. She was doing wonderful. That is not the reason for her termination. She really was working hard. I was very proud of the things that she was able to accomplish." (Lewis Dep. 126–28.) Rose met quota in 2023, her final year at Abbott, and never had performance-related issues during her tenure. (Petitte Dep. 42.)

5. Lewis became suspicious of Rose because Rose submitted expenses for "Towne Parking," and Lewis testified that she did not know "what's going on"—Lewis did not understand the Towne Parking expenses. (Lewis Dep. 50–51.) Lewis did not believe that Towne Parking existed. (*Id.* 55.) Lewis, however, denied being involved in investigating Rose, testifying, "I did not look at [Rose's] expense sheets." (*Id.* 55.)

6. Upon learning that Towne Parking is a valet service at the Cleveland Clinic where Rose was assigned to work (Lewis Dep. 173), Lewis alleged that Rose had lied during the investigation about her inability to use a credit card to pay for Towne Parking's valet service. (*Id.* 51–54.) Lewis later admitted that Rose was allowed to pay for both the valet service and the tip in cash. (*Id.* 65.)

7. Ron Petitte, a male, was a Cleveland-based Endovascular Account Manager for Abbott and, like Rose, paid for valet service and the tip in cash. (Petitte Dep. 7–8, 30–31.)

8.  Lewis, who also supervised Petitte, never took issue with his practice of paying in cash over a five-year period; Petitte paid in cash because it was "quicker" and could be done with "ease." (*Id.* 15, 30–31.) Petitte also testified:

> Q.  What we talked about earlier and how you use cash to pay for valet, was that a violation of policy?
>
> **A.  No.**
>
> Q.  Why not?
>
> **A.  I said I don't have the policy in front of me to give you specifics. It's based off of, you know, what I've been told by other individuals; like I said, the people who trained me originally that are no longer with the company.**

(Petitte Dep. 65.)

9.  Like Petitte, Rose testified that the manner in which she expensed parking was consistent with the field sales and on-the-job training that she had received when she started at Abbott Vascular in 2019. (Rose Dep. 81–82, 223.) Petitte was promoted to a Senior Account Manager position in March 2024 after meeting quota in 2023. (Petitte Dep. 11, 41–42).

10.  Rose was terminated in March 2024 after meeting quota in 2023 and, but for her termination, would have been promoted to a Senior Account Manager position as well. (*Id.* 42; Lewis Dep. 142, 144; Ex. 3, Defts.' Response to Interrog. No. 23.)

11.  Rose was terminated for allegedly lying to Lewis about her inability to use a credit card to pay for valet service. (Lewis Dep. 52–54.) Without permission from Abbott, Lewis drove three hours round trip from Pittsburgh to the Cleveland Clinic to

investigate Rose's parking expenses "[f]or [her] own personal reasons[.]" (*Id.* 56–60, 120–21.)

12.    Regarding Petitte's use of cash to pay the valet, Lewis saw "[n]othing out of the ordinary[,]" and never called or traveled to Cleveland to investigate Petitte's parking expenses like she did Rose's. (*Id.* 119–20, 52.)

13.    Lewis also alleged that Rose was terminated due to a discrepancy between Roses's out-of-pocket expenses on an expense report and Rose's corresponding Apple Pay statement. (Lewis Dep. 176.) Though Lewis testified (*Id.* 134–35):

> Q.    Now, is it your belief or position that [Rose] did not account for all of the charges on her expense report?
>
> **A.    I don't know.**
>
> \*    \*    \*
>
> Q.    To your knowledge, were there expenses on [Roses's] report that she was not able to account for from your perspective?
>
> **A.    No.**

14.    Further, at her deposition, Rose was shown an email drafted by Tim Powers but never sent, which stated that, going forward, she and the entire team were required to obtain receipts for all miscellaneous expenses, including incidentals and out-of-pockets. (Rose Dep. 188–90; Ex. 17 from Rose Dep.) This draft email further stated that the corporate credit card should be used for all field expenses absent extenuating circumstance. (*Id.* 191; *id.*)

15.    An additional basis cited for Rose's termination was her purportedly high out-of-pocket expenses for January 2024, a period when she was expected to use the

Abbott corporate credit card for parking, based on Powers' unsent December 2023 email. (Lewis Dep. 107–112, 69, 80–82, 96.) Rose's March 2024 termination letter cites Powers' December 2023 unsent email as prior counseling. (Lewis Dep. 111.)

16.    Regarding Rose's out-of-pocket expenses for January 2024, Lewis testified that "[i]t wasn't about the dollar amount[,]" but Rose's failure to use the corporate credit card. (Lewis Dep. 86, 91.)

17.    However, Lewis testified that Rose went "from using her corporate credit card 90-plus percent of the time when she was under my leadership to a higher, a much higher percentage under Tim Powers'." (*Id.* 86)

18.    Rose testified that, "if there was issues with my expense reports, I would, you know, be notified and not just terminated." (Rose Dep. 69:9–70:18.) Petitte likewise testified that Abbott follows a progressive disciplinary policy. (Petitte Dep. 56–57.)

19.    Lewis denies ever placing Rose on a performance improvement plan, and Rose had no disciplinary history with Abbott prior to her termination. (Lewis Dep. 74.)

**C.    Rose was subjected to a hostile work environment due to her sex and gender.**

20.    Lewis directed Rose to take her male customers out to dinner at least once per week. (Rose Dep. 118–19, 234; *see* 121, 95–96, 110–11, 123–24.)

21.    These weekly dinners resembled dates more than business dinners and were at night after typical work hours, lasted hours, involved alcohol, and were held at dimly lit restaurants. (Rose Dep. 127–28, 164–65, 234; *see* 104, 118–19.)

5

22. Rose testified that Lewis "told [Rose] to go out with doctors [the customers] at least once a week who she knew were toxic and she told me to have at least two drinks when I was going out with them." (Rose Dep. 118, 229.)

23. When Rose responded, "I really don't want to be drinking, I don't like this person, this person's abusive, it was, well, sorry, he's your number one customer, you know, this is part of your job, things like that." (Rose Dep. 118.)

24. Lewis also told Rose, "you have to spend time with him, you need to have at least two drinks when you go out with him because you want him to have a good time." (Rose Dep. 121.)

25. Petitte, a male supervised by Lewis, testified that he chose when to go to dinners and did so "very rarely" while Rose did "quite often." (Ex. 2, Petitte Dep. 24, 46, 62.) As for Lecurgo, another male supervised by Lewis, he testified, "It's a decision that I make." (Ex. 1, Lecurgo Dep. 29; *see also* Rose Dep. 228:14–233:9.)

26. At the Capital Grille in Lyndhurst, Ohio, Rose testified that Lewis smacked her butt and said that she had a "hot ass and made a bunch of other comments and stories over the years." (Rose Dep. 137.)

27. Over a dinner, Lewis told a story about a former male employee having sex with a stripper; Lewis told the story in front of Rose and to two male doctors who were Abbott clients. (Rose Dep. 142.)

28. Lewis also told stories over dinner about how she was "craving sex," about a time when she had sex in a closet, and when she put one of her male customers in the

"doghouse" with his wife when she was at his house drinking wine. (Rose Dep. 147.)

29.    On another occasion, Rose observed Lewis grab an Abbott employee's breasts and make a sexually charged comment. (Rose Dep. 143–44.)

30.    Following a dinner at Ginko Restaurant in Tremont, Ohio, Lewis remarked to Rose that a male customer would have "gone home with her" if she had wanted him to. (Rose Dep. 147.)

31.    Rose testified that she was offended by Lewis' sex-based comments and conduct. (Rose Dep. 150.)

32.    After Rose was sexually assaulted (*Id.* 153, 163) by a customer at Table 45 in Cleveland, Ohio, Lewis told Rose that it would be a "he said-she said" situation, downplaying the severity of the incident and discouraging Rose from seeking to hold the customer accountable. (Rose Dep. 152–56, 160–61; Lewis Dep. 161.)

33.    Although Lewis acknowledges that Rose was sexually assaulted by the customer, she attempted to shift blame to Rose, stating that Rose allowed the customer to caress her hair and "she let it go on for 20 minutes. She never told him to stop at any point." (Lewis Dep. 161.) Lewis, however, was not present, and Rose did not consent to the customer's inappropriate touching in any form or fashion. (Rose Dep. 163.) The incident was never investigated by Abbott. (Lewis Dep. 162.)

Respectfully submitted,

/s/ Kevin M. Gross

Kevin M. Gross (Ohio Bar No. 0097343)
ZIPKIN WHITING CO., L.P.A.
3637 Green Road, Second Floor
Beachwood, Ohio 44122
Phone: (216) 514-6400
Fax: (216) 514-6406
Email: kgross@zipkinwhiting.com

*Counsel for Plaintiff Rachael Rose*

8

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the *Plaintiff's Statement of Additional Material Facts Under LR 56.1(b)(3)* was served via the Court's CM/ECF system on January 27, 2026:

Uma Chandrasekaran, Esq.
SEYFARTH SHAW, LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606
Phone: (312) 460-5000
Fax: (312) 460-7000
Email: uchandrasekaran@seyfarth.com

    *and*

Victoria S. Tolbert, Esq.
SEYFARTH SHAW, LLP
300 South Tryon Street, Suite 400
Charlotte, North Carolina 28202
Phone: (704) 925-6060
Email: vtolbert@seyfarth.com

*Counsel for Defendants Abbott Laboratories, Inc., and Colleen Lewis*

Respectfully submitted,

/s/ Kevin M. Gross
Kevin M. Gross (Ohio Bar No. 0097343)

*Counsel for Plaintiff Rachael Rose*