**UNITED STATES DISTRICT COURT FOR
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RACHAEL ROSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:25-cv-01604 |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| *and* COLLEEN LEWIS, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(b)(3)
STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendants Abbott Laboratories Inc. ("Abbott") and Colleen Lewis ("Lewis") (collectively

"Defendants"), by and through their attorneys, Seyfarth Shaw LLP, and pursuant to Federal Rule

of Civil Procedure 56 and Local Rule 56.1(c)(2), submit Defendants' Response to Plaintiff's Local

Rule 56.1(b)(3) Statement of Additional Material Facts .[1]

**A.      Rose was replaced by a person from outside the protected class.**

1.      At the time of her termination, Rose, a female, was an Endovascular Account Manager for Abbott in the Cleveland territory, and Lewis was her direct supervisor. (Rose Dep. 42; Lewis Dep. 20, 31, 126–27.)

**RESPONSE:**

Admitted.

2.      Rose was selected for a promotion to a Senior Account Manager position but was terminated before the promotion was awarded to her. (Ex. 3, Defts.' Resp. to Interrog. No. 23; Lewis Dep. 142–45.)

---

[1] Defendants admit certain factual assertions of Rose's Statement of Additional Facts ("PSOAF") as true only for summary judgment purposes and without waiving their right to present contrary facts at trial or any other time. *See e.g., Brown v. Navarro*, No. 09-3814, 2012 WL 3987927, *3 (N.D. Ill Sept. 11, 2012) (collecting cases stating that facts admitted for summary judgment purposes are not admissions for trial or other purposes).

**RESPONSE:**

Admitted.

3.     Lewis replaced Rose by hiring a new male employee, Jeff Rea. (Lewis Dep. 158– 59; Ex. 3, Defts.' Response to Interrog. No. 21; Petitte Dep. 17.)

**RESPONSE:**

Defendants object to the assertions in this paragraph as they are misleading, mischaracterize the facts stated in the citations offered, and do not have evidentiary support. As reflected in the cited materials, a female candidate was Lewis' top candidate to replace Rose, however, a non-compete agreement prevented Lewis from hiring this female candidate and, ultimately, a male candidate accepted the role. (Lewis Dep. 158-59; Defts.' Resp. to Interrog. No. 21). Subject to these objections, Defendants admit that Jeff Rea was hired after Rose.

**B.     Rose's termination for violation of the Code of Conduct was a pretext for gender and sex discrimination.**

4.     Lewis testified that Rose "did a fantastic job. I was very proud of her. She was doing wonderful. That is not the reason for her termination. She really was working hard. I was very proud of the things that she was able to accomplish." (Lewis Dep. 126–28.) Rose met quota in 2023, her final year at Abbott, and never had performance-related issues during her tenure. (Petitte Dep. 42.)

**RESPONSE:**

Defendants object to the assertion that Rose "never had performance-related issues during her tenure," as this mischaracterizes the facts in the citation offered and is not supported by admissible evidence. To support this assertion, Rose cites solely to the deposition testimony of Ronald J. Petitte, II (Petitte), Rose's co-worker, who testified that he was not *aware* that Rose had performance-related issues. Specifically, Petitte was asked:

Q.     Were you aware of Rachael ever having any performance-related issues at any time during her employment at Abbott?

A.     No.

2

(Petitte Dep. 42.) Petitte clearly testified that he was not *aware* that Rose had performance-related issues – not that he *knew*, definitively, that Rose never had performance-related issues during her tenure. As a co-worker of Rose who was not her manager, Petitte would not have *known* of Rose's performance-related issues, and Rose failed to establish the appropriate foundation that Petitte has or should have personal knowledge of her performance-related issues.

Moreover, Defendants provided competent evidence, including the deposition testimony of Colleen Lewis (Rose's direct supervisor during most of Rose's tenure at Abbott) that Rose did have performance-related issues—including but not limited to: Rose's mismanagement of customer inventory, submitting late Electronic Clinical Outcome Assessment (eCOA) reports, deficiencies in certain clinical skills, repeated failures to use the company credit card during 2023 and 2024, expense reporting infractions, and not being forthright during the 2024 Employee Relations (ER) investigation into Rose's expense reporting. (Lewis Dep. 73-76, 114-117, 147-151; Ex. 21, Abbott 3516-3517 identified in Lewis Dep.; Rose Dep. 105; Rose Dep. Ex 11). According to Lewis, Rose's expense reporting infractions (knowingly submitting false reports) and not being forthright during the 2024 ER investigation are the reasons that management decided to terminate Rose's employment from Abbott on March 26, 2024. (Lewis Dep. 147; see also Ex. 21, Abbott 3516-3517 identified in Lewis Dep). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

5. Lewis became suspicious of Rose because Rose submitted expenses for "Towne Parking," and Lewis testified that she did not know "what's going on"—Lewis did not understand the Towne Parking expenses. (Lewis Dep. 50–51.) Lewis did not believe that Towne Parking existed. (*Id.* 55.) Lewis, however, denied being involved in investigating Rose, testifying, "I did not look at [Rose's] expense sheets." (*Id.* 55.)

**RESPONSE:**

Defendants object to the assertion that "Lewis became suspicious of Rose," as this assertion does not have evidentiary support and mischaracterizes the facts stated in the citation offered. The testimony Plaintiff cites specifically reflects that Tim Powers ("Powers"), not Lewis, was confused by Rose's Towne Parking expenses, as Powers was Rose's manager at the time and was in charge of reviewing Rose's expense reports:

> Q. And do you recall when *he* [Powers] said to you or suggested to you that she was expensing personal parking at her apartment, do you remember that?
>
> A. I think *he* [Powers] was confused by the Towne Parking and was trying to make sense of the Towne Parking and was trying to make sense of why Towne Parking – she was the only one in Cleveland putting that down on her expense report. It didn't show under any other rep at that time, through today.

(Lewis Dep. 50-51 *emphasis added*). While Powers was Rose's manager, *Powers* became confused by Rose's Towne Parking expenses and *Powers* had responsibility for reviewing Rose's expense reports. (Lewis Dep. 54-55). Lewis had no access to Rose's expense reports at that time. (Lewis Dep. 46). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

6. Upon learning that Towne Parking is a valet service at the Cleveland Clinic where Rose was assigned to work (Lewis Dep. 173), Lewis alleged that Rose had lied during the investigation about her inability to use a credit card to pay for Towne Parking's valet service. (*Id.* 51–54.) Lewis later admitted that Rose was allowed to pay for both the valet service and the tip in cash. (*Id.* 65.)

**<u>RESPONSE:</u>**

Defendants object to the assertion that "[u]pon learning that Towne Parking is a valet service at the Cleveland Clinic where Rose was assigned to work (Lewis Dep. 173), Lewis alleged that Rose had lied during the investigation about her inability to use a credit card to pay for Towne Parking's valet service. (*Id.* 51–54.)." This assertion is not supported by the evidence and mischaracterizes the facts stated in the citation offered. Both Rose and Lewis testified that Rose

4

told Lewis and Powers that her out-of-pocket expenses for parking were high because the valet company [Towne Parking] does not accept credit cards. (Rose Dep. 211; Lewis Dep. 54). Rose also told Abbott's ER investigator that her out-of-pocket parking expenses were higher because she used valet parking more often than her peers and the valet company that she uses–Towne Parking–only accepts cash and she could not use her Abbott credit card. (Rose Dep. 211; Lewis Dep. 52-53). Upon investigation, it was discovered that Towne Parking *does* accept credit cards, and that Rose was not forthright with Lewis, Powers, and ER during the investigation, and this was one of the reasons that management decided to terminate Rose's employment. (Lewis Dep. 147; see also Ex. 21, Abbott 3516-3517 identified in Lewis Dep). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

7. Ron Petitte, a male, was a Cleveland-based Endovascular Account Manager for Abbott and, like Rose, paid for valet service and the tip in cash. (Petitte Dep. 7–8, 30–31.)

**RESPONSE:**

Defendants object to the assertion that Ron Petitte "like Rose, paid for valet service and the tip in cash," as this mischaracterizes the facts stated in the citation offered and is misleading, as it omits the relevant time period. In his testimony immediately before the pages Rose cites, Petitte clarifies that *early on in Petitte's career*, during the 2016 – 2021 time period, he paid for valet services in cash. (Petitte Dep. 26-29). Petitte further testified that, after he became established in his territory in 2021, he *no longer paid for valet services in cash* (Petitte Dep. 27-29), and that he always used his Abbott credit card for parking after 2021. (Petitte Dep. 26-33). Specifically, Petitte testified:

Q. How's that supposed to be done?

A. If we are charging for parking, that is through the corporate card.

> Q. So if you're going to a hospital, you have to use your corporate card to pay for parking?
>
> A. Yes.

(Petitte Dep. 26). Therefore, Petitte used his Abbott credit card for parking, including valet parking, and *did not* pay in cash in 2023 and 2024 like Rose did. (Petitte Dep. 26-33). Subject to these objections, Defendants admit the remaining assertions in this paragraph, but they are immaterial given the difference in timing between Petitte's conduct and the time frame relevant to Abbott's investigation and Rose's termination.

8. Lewis, who also supervised Petitte, never took issue with his practice of paying in cash over a five-year period; Petitte paid in cash because it was "quicker" and could be done with "ease." (*Id.* 15, 30–31.) Petitte also testified:

> Q. What we talked about earlier and how you use cash to pay for valet, was that a violation of policy?
>
> A. No.
>
> Q. Why not?
>
> A. I said I don't have the policy in front of me to give you specifics. It's based off of, you know, what I've been told by other individuals; like I said, the people who trained me originally that are no longer with the company.

(Petitte Dep. 65.)

**RESPONSE:**

Defendants object to the assertions in this paragraph as immaterial because Petitte's practice of paying in cash during the 2016 – 2021 time period predated Rose's alleged practice of paying in cash and therefore is not relevant to any of the claims or defenses. As Petitte testified multiple times, his practice of paying in cash for valet parking evolved over time and, after 2021 and specifically including January 2023 to January 2024 (the period in which Rose claims to have used cash), Petitte used his Abbott credit card for parking, including for valet parking:

Q.      Do you recall on average how much you would tip, whether it was a couple dollars, $5?

A.      As I had said, this *practice has changed and evolved over time*. In the time period in which I did that I don't recall [sic] specific amount.

(Petitte Dep. 31 *emphasis added*).

Q.      And every time that you use valet, that you can at least recall, you paid cash?

(objections made on the record)

A.      No, not every time. *It evolved over time*. And because I'm established in my peer reporting now there's not a need for as many in-services and educational situations.

(Petitte Dep. 66 *emphasis added*). See also Resp. to PSOAF ¶ 7 above, where Petitte testified that after he became established in his territory in 2021, he *no longer paid for valet services in cash* (Petitte Dep. 27-29), and always used his Abbott credit card for parking after 2021. (Petitte Dep. 26-33). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

9.      Like Petitte, Rose testified that the manner in which she expensed parking was consistent with the field sales and on-the-job training that she had received when she started at Abbott Vascular in 2019. (Rose Dep. 81–82, 223.) Petitte was promoted to a Senior Account Manager position in March 2024 after meeting quota in 2023. (Petitte Dep. 11, 41–42).

**RESPONSE:**

Defendants object to the assertions in the first sentence as not supported by the citations offered and immaterial. The manner in which Rose was allegedly trained on the job on how to expense parking in 2019 is not relevant to any of the claims or defenses, as the requirements for expensing parking changed and over time, and Rose admits she received periodic formal training on Abbott's expense reimbursement requirements throughout her employment. (Petite Dep. 66; Rose Dep. 71-72, 77-81). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

10. Rose was terminated in March 2024 after meeting quota in 2023 and, but for her termination, would have been promoted to a Senior Account Manager position as well. (*Id.* 42; Lewis Dep. 142, 144; Ex. 3, Defts.' Resp. to Interrog. No. 23.)

   **RESPONSE:**

   Admitted.

11. Rose was terminated for allegedly lying to Lewis about her inability to use a credit card to pay for valet service. (Lewis Dep. 52–54.) Without permission from Abbott, Lewis drove three hours round trip from Pittsburgh to the Cleveland Clinic to investigate Rose's parking expenses "[f]or [her] own personal reasons[.]" (*Id.* 56– 60, 120–21.)

   **RESPONSE:**

   Defendants object to the assertion that "Rose was terminated for allegedly lying to Lewis about her inability to use a credit card to pay for valet service" as misleading, mischaracterizing the facts stated in the citation offered, and lacking evidentiary support. According to Lewis, Rose's expense reporting infractions (knowingly submitting false reports) and not being forthright during the 2024 ER investigation are the reasons for Rose's termination from Abbott on March 26, 2024. (Lewis Dep. 147; see also Ex. 21, Abbott 3516-3517 identified in Lewis Dep).

   Defendants object to the assertion that Lewis drove "[w]ithout permission from Abbott," as this assertion is not supported by the citation offered and does not have any evidentiary support. Lewis testified that the ER investigator needed confirmation of the posted valet parking charges, so, as a part of Abbott's ER investigation, Lewis drove to Hillcrest Hospital to get this confirmation and was reimbursed by Abbott for this business trip. (Lewis Dep. 56 – 58). Subject to these objections, Defendants dispute the remaining assertions in this paragraph as unsupported, as detailed above.

12. Regarding Petitte's use of cash to pay the valet, Lewis saw "[n]othing out of the ordinary[,]" and never called or traveled to Cleveland to investigate Petitte's parking expenses like she did Rose's. (*Id.* 119–20, 52.)

**RESPONSE:**

Defendants object to the assertion that "[r]egarding Petitte's use of cash to pay the valet, Lewis saw '[n]othing out of the ordinary[,]'" as this assertion is misleading, mischaracterizes the facts stated in the citation offered, and does not have evidentiary support because the assertion does not qualify the relevant time period. During the 2024 ER investigation, Lewis testified that Petitte's expense report data from January 1, 2023 through January 31, 2024 was reviewed, and she did not see anything out of the ordinary for Petitte in 2023 and 2024. (Lewis Dep. 119). Petitte testified that from 2016–2021, he paid for valet parking in cash, but after 2021, he used his Abbott credit card for parking, including valet parking, and *did not* continue to pay in cash like Rose did in 2023 and 2024. (Petitte Dep. 26-33). Therefore, during the 2024 ER investigation, Lewis did not review Petitte's expense report data from 2016–2021 (which is the time period in which Petitte states that he paid for valet services in cash). Subject to these objections, Defendants admit the remaining assertions in this paragraph.

13. Lewis also alleged that Rose was terminated due to a discrepancy between Roses's [sic] out-of-pocket expenses on an expense report and Rose's corresponding Apple Pay statement. (Lewis Dep. 176.) Though Lewis testified (*Id.* 134–35):

> Q. Now, is it your belief or position that [Rose] did not account for all of the charges on her expense report?
>
> A. I don't know.
>
> *   *   *
>
> Q. To your knowledge, were there expenses on [Roses's] [sic] report that she was not able to account for from your perspective?
>
> A. No.

9

**RESPONSE:**

Defendants object to the assertion that "Lewis also alleged that Rose was terminated due to a discrepancy between [Roses's] [sic] out-of-pocket expenses on an expense report and Rose's corresponding Apple Pay statement" as misleading, mischaracterizes the facts stated in the citation offered and does not have evidentiary support. According to Lewis, Rose's expense reporting infractions (knowingly submitting false reports) and not being forthright during the 2024 ER investigation are the reasons for Rose's termination from Abbott on March 26, 2024. (Lewis Dep. 147; see also Ex. 21, Abbott 3516-3517 identified in Lewis Dep.). Defendants further object to the quoted testimony in this paragraph as misleading and incomplete because it omits a back-and-forth immediately following this testimony where it is clear Lewis did not correctly hear the original question and then clarified that "there was a differential of unaccounted-for expenses." (Lewis Dep. 136.) Subject to these objections, Defendants admit the remaining assertions in this paragraph.

14. Further, at her deposition, Rose was shown an email drafted by Tim Powers but never sent, which stated that, going forward, she and the entire team were required to obtain receipts for all miscellaneous expenses, including incidentals and out-of-pockets. (Rose Dep. 188–90; Ex. 17 from Rose Dep.) This draft email further stated that the corporate credit card should be used for all field expenses absent extenuating circumstance. (*Id.* 191; *id.*)

**RESPONSE:**

Defendants object to the assertion that the email shown to Rose was "never sent," as this assertion is not supported by the citations offered and does not have evidentiary support. Rose stated several times during deposition that Rose *knew* that Powers sent an email to the whole team in December 2023 about the corporate credit card use expectation, and Rose remembered that she "glanced over it" or "browsed it" and "browsed this e-mail briefly." (Rose Dep. 107, 188-190). Rose stated:

10

Q.   Do you recall Tim Powers telling you that the expectation was to use the corporate credit card?

A.   No. I *know* he wrote an e-mail that was supposedly referring to that typical team.

Q.   Do you recall receiving an e-mail from Tim Powers?

A.   I think I just *glanced over it*. So yes, I do vaguely recall it.

(Rose Dep. 107 *emphasis added*)

Q.   Do you recall Mr. Powers telling the Ohio region team that corporate credit cards were supposed to be used for all expenses?

A.   No. I *know* there was an e-mail sent that I -- I think I said earlier, but it was to the whole team.

(Rose Dep. 188 *emphasis added*)

Q.   It is a Tim Powers e-mail.

A.   Okay, go ahead.

Q.   Have you seen this before?

A.   Um... maybe. (Reviewing document.) Yes, *browsed it*.

(Rose Dep. 188-189 *emphasis added*)

Q.   Did you understand -- in this e-mail, Tim Powers doesn't put any kind of dollar limit on -- for what needs to be accompanied by receipts. Did you understand that by sending this e-mail that he was telling you and the rest of the team that you need to have a receipt for any miscellaneous expense, incidental or out of pocket?

A.   That's what it says. But do I understand it? Having said that, I think I just *browsed this e-mail briefly*.

(Rose Dep. 190 *emphasis added*)

Therefore, Rose's assertion that Powers never sent an email about the corporate credit card use expectation is mischaracterizes the facts and contradicts Rose's own testimony of facts she remembered at deposition. Subject to these objections, Defendants admit the remaining assertions in this paragraph.

15.     An additional basis cited for Rose's termination was her purportedly high out-of-pocket expenses for January 2024, a period when she was expected to use the Abbott corporate credit card for parking, based on Powers' unsent December 2023 email. (Lewis Dep. 107–112, 69, 80–82, 96.) Rose's March 2024 termination letter cites Powers' December 2023 unsent email as prior counseling. (Lewis Dep. 111.)

**RESPONSE:**

Defendants object to the assertions in this paragraph as they are misleading, mischaracterize the facts stated in the citations offered, and do not have evidentiary support. According to Lewis, Rose's expense reporting infractions (knowingly submitting false reports) and not being forthright during the 2024 ER investigation are the reasons for Rose's termination from Abbott on March 26, 2024. (Lewis Dep. 147; see also Ex. 21, Abbott 3516-3517 identified in Lewis Dep). Therefore, Rose was not terminated for high out-of-pocket expenses for January 2024. Moreover, during deposition, Rose stated multiple times that she *knew* that Powers sent an email to the whole team and Rose remembered three times that she "glanced over it" or "browsed it" and "browsed this e-mail briefly." (Rose Dep. 107, 188-190). Therefore, Rose's assertion regarding an "unsent December 2023" email is mischaracterizes the facts and contradicts Rose's own deposition testimony that she knew Powers sent an email, as detailed above. Lastly, a "March 2024 termination letter" does not exist; ER created a Recommendation for Termination Worksheet,[2] which Rose's counsel admitted and corrected himself on during Lewis' deposition:

> MR. GROSS:  I called it the termination letter, but it is the recommendation for termination worksheet.

(Lewis Dep. 110). Subject to these objections, Defendants dispute the assertions in this paragraph as unsupported, as detailed above.

---

[2] Abbott's ER Recommendation for Termination Worksheet ("Termination Worksheet") is attached as Exhibit 21 to Defendants' Appendix of Documentary Evidence and Other Materials in Support of their Motion for Summary Judgment (ECF 43).

16. Regarding Rose's out-of-pocket expenses for January 2024, Lewis testified that "[i]t wasn't about the dollar amount[,]" but Rose's failure to use the corporate credit card. (Lewis Dep. 86, 91.)

**RESPONSE:**

Defendants object to the assertions in this paragraph as they are misleading, mischaracterize the facts stated in the citations offered, and do not have evidentiary support. Regarding Rose's out-of-pocket expenses from January 1, 2023 through January 21, 2024, Lewis testified as follows:

A. I would say I probably managed her for about nine months in 2023. And so I mean, analytics showed a remarkable increase after I was realigned, new alignments came out. They went from $30 a month to 200-plus, 300 a month, under Tim's leadership.

Q. Are you sure about that?

A. There was an increase in her expenses out of pocket. It's in the file that was sent to Employee Relations during the time that Tim managed her.

Q. And that was also – this was also the time when she had her best sales year ever and she was growing her territory, right?

A. It wasn't about the dollar amount, it was about the fact that her behavior changed, from using her corporate card…

(Lewis Dep. 86). Subject to these objections, the remaining factual assertions are admitted.

17. However, Lewis testified that Rose went "from using her corporate credit card 90-plus percent of the time when she was under my leadership to a higher, a much higher percentage under Tim Powers'." (*Id.* 86)

**RESPONSE:**

Admitted.

18. Rose testified that, "if there was [sic] issues with my expense reports, I would, you know, be notified and not just terminated." (Rose Dep. 69:9–70:18.) Petitte likewise testified that Abbott follows a progressive disciplinary policy. (Petitte Dep. 56–57.)

**RESPONSE:**

13

Defendants object to the assertion that "Petitte likewise testified that Abbott follows a progressive disciplinary policy," as this assertion is not supported by the citation offered and directly contradicts Petitte's testimony and, therefore, does not have evidentiary support. The pertinent questioning went as follows:

> Q. Do you know if Abbott follows a progressive discipline scale?
>
> A. Not specifically, no.
>
> Q. Do you know what I mean by that?
>
> A. Could you define it for me?
>
> Q. For example, the first infraction might be a verbal warning. The second might be a written warning. Third might be a suspension without pay. Do you know if Abbott has a program or policy that follows that progression in discipline?
>
> A. I'm sure there's a policy, but I don't know specifics.
>
> Q. You've never been disciplined?
>
> A. Not in -- no.

(Petitte Dep. 55-56). Therefore, Petitte actually testified that he *does not know* if Abbott follows a progressive discipline scale and, if such scale exists, Petitte is not aware of any specifics, as he has never received discipline as an employee of Abbott. Subject to these objections, Defendants admit that Rose testified as quoted at page 70, lines 16-18.

19. Lewis denies ever placing Rose on a performance improvement plan, and Rose had no disciplinary history with Abbott prior to her termination. (Lewis Dep. 74.)

**RESPONSE:**

Admitted. This assertion is not an additional fact and is redundant of facts cited in Defendants' Statement of Undisputed Facts. (See SOF ¶ 37.)

14

**C.     Rose was subjected to a hostile work environment due to her sex and gender.**

20.    Lewis directed Rose to take her male customers out to dinner at least once per week. (Rose Dep. 118–19, 234; *see* 121, 95–96, 110–11, 123–24.)

**RESPONSE:**

Defendants object to this paragraph as to the phrase "male customers" as not supported by the citations offered, as Rose testified that Lewis told to go out to dinner with "customers" at least once a week, not specifically just "male customers." Subject to these objections, Defendants admit the remaining assertions in this paragraph.

21.    These weekly dinners resembled dates more than business dinners and were at night after typical work hours, lasted hours, involved alcohol, and were held at dimly lit restaurants. (Rose Dep. 127–28, 164–65, 234; *see* 104, 118–19.)

**RESPONSE:**

Defendants object to the assertions in this paragraph as they are misleading, argumentative, mischaracterize the facts stated in the citations offered, and do not have evidentiary support. Specifically, the assertion that "[t]hese weekly dinners resembled dates more than business dinners" is not supported by the citations offered and does not have evidentiary support. Rose testified that she only had one-on-one dinners "occasionally," or a "few times a year" (Rose Dep. 99), so these one-on-one dinners could hardly be categorized as "weekly dinners." Rose also testified that she had discretion about which customers she invited, and that she could invite other people to attend in addition to customers, including her own manager or other co-workers. (Rose Dep. 97-99). Rose also testified that she had the ability to control the day of the week and time such dinner or meeting took place, but, according to Rose, she chose to defer to the customer's schedule and scheduled dinners to occur at night at dimly lit restaurants. (Rose Dep. 127-28). Further, Rose admitted that Lewis told both male and female employees to go out to dinner with Abbott customers once a

15

week. (Rose Dep. 229). Subject to these objections, Defendants dispute the assertions in this paragraph as unsupported, as detailed above.

22.    Rose testified that Lewis "told [Rose] to go out with doctors [the customers] at least once a week who she knew were toxic and she told me to have at least two drinks when I was going out with them." (Rose Dep. 118, 229.)

**RESPONSE:**

Admitted that Rose so testified, but this allegation is immaterial because Rose also testified that she had discretion about which customers she invited and could invite other people, including Lewis or other co-workers, to attend outings with her customers as well. (Rose Dep. 97-99). Further, Rose testified that Lewis told her male and female employees to go out to dinner with Abbott customers once a week. (Rose Dep. 229).

23.    When Rose responded, "I really don't want to be drinking, I don't like this person, this person's abusive, it was, well, sorry, he's your number one customer, you know, this is part of your job, things like that." (Rose Dep. 118.)

**RESPONSE:**

Admitted that Rose so testified, but this allegation is immaterial because Rose also testified that she had discretion about which customers she invited and could invite other people, including Lewis or other co-workers, to attend outings with her customers as well. (Rose Dep. 97-99). Further, Rose testified that Lewis told both male and female employees to go out to dinner with Abbott customers once a week. (Rose Dep. 229).

24.    Lewis also told Rose, "you have to spend time with him, you need to have at least two drinks when you go out with him because you want him to have a good time." (Rose Dep. 121.)

**RESPONSE:**

Admitted that Rose so testified, but this allegation is immaterial because Rose also testified that she had discretion about which customers she invited and could invite other people, including

16

Lewis or other co-workers, to attend outings with her customers as well. (Rose Dep. 97-99). Further, Rose testified that Lewis told both male and female employees to go out to dinner with Abbott customers once a week. (Rose Dep. 229).

25. Petitte, a male supervised by Lewis, testified that he chose when to go to dinners and did so "very rarely" while Rose did "quite often." (Ex. 2, Petitte Dep. 24, 46, 62.) As for Lecurgo, another male supervised by Lewis, he testified, "It's a decision that I make." (Ex. 1, Lecurgo Dep. 29; *see also* Rose Dep. 228:14–233:9.)

   **RESPONSE:**

   Defendants object to the allegation that Rose had dinners "quite often," as this assertion is not supported by admissible evidence because Petitte does not have personal knowledge of how often Rose attended dinners with customers and Rose failed to establish the appropriate foundation that Petitte does or should have such knowledge. Rose testified that she only had one-on-one dinners "occasionally," or a "few times a year." (Rose Dep. 99). Subject to these objections, Defendants admit that Petitte and Lecurgo testified as quoted.

26. At the Capital Grille in Lyndhurst, Ohio, Rose testified that Lewis smacked her butt and said that she had a "hot ass and made a bunch of other comments and stories over the years." (Rose Dep. 137.)

   **RESPONSE:**

   Admitted, but this assertion is not an additional fact and is redundant of facts cited in Defendants' Statement of Undisputed Facts. (See SOF ¶ 30).

27. Over a dinner, Lewis told a story about a former male employee having sex with a stripper; Lewis told the story in front of Rose and to two male doctors who were Abbott clients. (Rose Dep. 142.)

   **RESPONSE:**

   Admitted, but this assertion is not an additional fact and is redundant of facts cited in Defendants' Statement of Undisputed Facts. (See SOF ¶ 32).

17

28. Lewis also told stories over dinner about how she was "craving sex," about a time when she had sex in a closet, and when she put one of her male customers in the "doghouse" with his wife when she was at his house drinking wine. (Rose Dep. 147.)

**RESPONSE:**

Admitted, but this assertion is not an additional fact and is redundant of facts cited in the SOF. (See SOF ¶¶ 32, 28).

29. On another occasion, Rose observed Lewis grab an Abbott employee's breasts and make a sexually charged comment. (Rose Dep. 143–44.)

**RESPONSE:**

Defendants object to the allegation that Rose testified that Lewis made "a sexually charged comment," as this assertion is not supported by the citation offered and does not have evidentiary support. Subject to these objections, Defendants admit the remaining assertions in this paragraph but they are not additional facts and are redundant of facts cited in Defendant's Statement of Undisputed Facts. (See SOF ¶ 29).

30. Following a dinner at Ginko Restaurant in Tremont, Ohio, Lewis remarked to Rose that a male customer would have "gone home with her" if she had wanted him to. (Rose Dep. 147.)

**RESPONSE:**

Admitted.

31. Rose testified that she was offended by Lewis' sex-based comments and conduct. (Rose Dep. 150.)

**RESPONSE:**

Defendants object to the allegation that Rose testified that Lewis made "sex-based comments" or engaged in "sex-based" "conduct" as inappropriate argument, not supported by the citation offered, and lacking evidentiary support. Subject to these objections, Defendants admit that

18

Rose testified that she was offended by Lewis's alleged stories, but this assertion is not an additional fact and is redundant of facts cited in Defendants' Statement of Undisputed Facts. (See SOF ¶ 32).

32.     After Rose was sexually assaulted (*Id.* 153, 163) by a customer at Table 45 in Cleveland, Ohio, Lewis told Rose that it would be a "he said-she said" situation, downplaying the severity of the incident and discouraging Rose from seeking to hold the customer accountable. (Rose Dep. 152–56, 160–61; Lewis Dep. 161.)

**RESPONSE:**

Defendants object to the assertion that "Lewis told Rose that it would be a 'he said-she said' situation, downplaying the severity of the incident and discouraging Rose from seeking to hold the customer accountable," as it is improper argument, not supported by the citations offered, and does not have evidentiary support. Subject to these objections, Defendants admit the remaining assertions in this paragraph, but they are redundant of facts cited in Defendants' Statement of Undisputed Facts  (See SOF ¶¶ 38-39).

33.     Although Lewis acknowledges that Rose was sexually assaulted by the customer, she attempted to shift blame to Rose, stating that Rose allowed the customer to caress her hair and "she let it go on for 20 minutes. She never told him to stop at any point." (Lewis Dep. 161.) Lewis, however, was not present, and Rose did not consent to the customer's inappropriate touching in any form or fashion. (Rose Dep. 163.) The incident was never investigated by Abbott. (Lewis Dep. 162.)

**RESPONSE:**

Defendants object to the assertion that Lewis "attempted to shift blame to Rose," as this assertion is improper argument, is not supported by the citation offered, and does not have evidentiary support. Defendants further dispute the assertion that "[t]he incident was never investigated by Abbott," as this assertion mischaracterizes the facts, is not supported by the citation offered, and does not have evidentiary support. In fact, both Rose and Lewis testified to the contrary, that Lewis reported the incident between Rose and the customer to ER, that Lewis asked Rose if she wanted ER to follow up with her, and that Rose told Lewis "No" because she did not want to cause

19

problems and wanted to move forward. (Rose Dep. 160-61; Lewis Dep. 161-63; see also Ex. 22, Abbott 3529-3530). Subject to these objections, Defendants dispute the assertions in this paragraph as unsupported, as detailed above.

DATED:  February 24, 2026

Respectfully submitted by,

ABBOTT LABORATORIES INC. AND
COLLEEN LEWIS

By: /s/ *Uma Chandrasekaran*
One of Defendants' Attorneys

Uma Chandrasekaran
Illinois Bar No. 6281690
uchandrasekaran@seyfarth.com

Victoria S. Tolbert
Admitted *Pro Hac Vice*
vtolbert@seyfarth.com

SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL 60606-6448
Telephone: (312) 460-5000
Facsimile: (312) 460-7000

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on February 24, 2026, she caused the foregoing document to be filed with the Clerk of the United States District Court for the Northern District of Illinois through the Court's CM/ECF system, which will provide notice to and serve a copy upon all other counsel of record.

/s/ *Uma Chandrasekaran*
Uma Chandrasekaran